BENBROOK LAW GROUP, PC
BRADLEY A. BENBROOK (SBN 177786)
STEPHEN M. DUVERNAY (SBN 250957)
701 University Avenue, Suite 106
Sacramento, CA 95825
Telephone: (916) 447-4900
Facsimile: (916) 447-4904
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCO ANTONIO CARRALERO; GARRISON HAM; MICHAEL SCHWARTZ; ORANGE COUNTY GUN OWNERS PAC; SAN DIEGO COUNTY GUN OWNERS PAC; CALIFORNIA GUN RIGHTS FOUNDATION; and FIREARMS POLICY COALITION, INC., | Case No.: 8:23-cv-01798 **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |
| Plaintiffs, | |
| v. | |
| ROB BONTA, in his official capacity as Attorney General of California, | |
| Defendant. | |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................... 1

STATEMENT OF THE CASE ............................................................................ 2

I.    Constitutional and Statutory Provisions ................................................... 2

II.    SB2's Effect on Plaintiffs ........................................................................ 4

ARGUMENT ...................................................................................................... 5

I.    Preliminary Injunction Standard ............................................................. 5

II.    The Challenged Provisions Likely Violate Plaintiffs' Second Amendment
Rights ....................................................................................................... 5

    A.  The Second Amendment's Plain Text Covers Plaintiffs' Conduct ........... 6

    B.  The State Cannot Meet Its Burden to Offer Historical Analogues ........... 7

        1.  The Challenged Provisions in SB2 Are Inconsistent with the Historical
Tradition of Firearm Regulation ........................................................ 10

            a.  The no-carry default in private businesses .................................... 10

            b.  Places selling liquor for consumption on the premises ................. 12

            c.  Gambling establishments ............................................................... 13

            d.  Stadiums, arenas, and amusement parks ........................................ 14

            e.  Museums and libraries ................................................................... 14

            f.  Hospitals and health care facilities ............................................... 15

            g.  Parks, areas controlled by California wildlife agencies, and zoos 16

            h.  Public gatherings or special events ............................................... 18

1

i.   Public Transportation .........................................................19

2.  SB2's Location Specific Bans Are Not Analogous to Permissible
"Sensitive Place" Restrictions ............................................20

III.   The Other Factors Favor a Preliminary Injunction ...................................23

IV.   The Court Should Waive Bond or Require Only Nominal Security .......24

CONCLUSION ...........................................................................................25

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**                                                                                                   **Page**

*Antonyuk v. Hochul*,
    635 F. Supp. 3d 111 (N.D.N.Y. 2022) (*Antonyuk I*) ...................................13

*Antonyuk v. Hochul*,
    639 F. Supp. 3d 232 (N.D.N.Y. 2022) (*Antonyuk II*).............9, 12, 17, 18, 23

*Baird v. Bonta*,
    No. 23-15016, 2023 WL 5763345 (9th Cir. Sept. 7, 2023) .....................5, 24

*Barahona-Gomez v. Reno*,
    167 F.3d 1228 (9th Cir. 1999).........................................................................24

*Bridgeville Rifle & Pistol Club, Ltd. v. Small*,
    176 A.3d 632 (Del. 2017) ..........................................................................17

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018)..........................................................................5

*Christian v. Nigrelli*,
    642 F. Supp. 3d 393 (W.D.N.Y 2022) ....................................................10, 23

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)..............................................................................6, 7, 12

*Espinoza v. Mont. Dep't of Revenue*,
    140 S. Ct. 2246 (2020) ..................................................................................8

*Hardaway v. Nigrelli*,
    No. 22-CV-771 (JLS), 2022 WL 16646220 (W.D.N.Y. Nov. 3, 2022)........22

*Junior Sports Mags., Inc. v. Bonta*,
    No. 22-56090, 2023 WL 5945879 (9th Cir. Sept. 13, 2023) .............5, 23, 24

*Koons v. Platkin*,
    No. 22-7464, 2023 WL 3478604
    (D.N.J. May 16, 2023) ............................9, 10, 13, 14, 15, 16, 18, 19, 22, 23

*Lynch v. Donnelly*,
    465 U.S. 668 (1983) .......................................................................................8

*Morris v. Army Corps of Eng'rs*,
    2017 WL 11676289 (9th Cir. Dec. 15, 2017) .........................................17, 18

*Morris v. Army Corps of Eng'rs*,
    60 F. Supp. 3d 1120 (D. Idaho 2014)......................................................17, 18

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
    142 S. Ct. 2111 (2022) ...... 1, 2, 5, 6, 7, 8, 9, 10, 11, 12, 14, 16, 17, 21, 22, 23

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................... 23

*People v. Chairez*,
    2018 IL 121417, 104 N.E.3d 1158 (2018) .................................... 17

*Ramos v. Louisiana*,
    140 S. Ct. 1390 (2020) .............................................................. 7, 8

*Range v. U.S. Att'y Gen.*,
    69 F.4th 96 (3d Cir. 2023) .......................................................... 23

*Sammartano v. First Jud. Dist. Ct.*,
    303 F.3d 959 (9th Cir. 2002) ...................................................... 24

*Save Our Sonoran, Inc. v. Flowers*,
    408 F.3d 1113 (9th Cir. 2005) .................................................... 24

*Siegel v. Platkin*,
    No. 1:22-cv-7463, 2023 WL 1103676 (D.N.J. Jan. 30, 2023) ............... 14, 23

*Solomon v. Cook Cnty. Bd. of Comm'rs*,
    559 F. Supp. 3d 675 (N.D. Ill. 2021) .......................................... 18

*Timbs v. Indiana*,
    139 S. Ct. 682 (2019) ................................................................. 8

*Virginia v. Moore*,
    553 U.S. 164 (2008) .................................................................. 8

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................ 5, 23

## Statutes

U.S. CONST. amend. II. ................................................................ 2

S.2 (Cal. Stat. 2023) ................................................................... 1

S.2 § 1(b) ................................................................................. 2

Cal. Pen. Code
    § 26150 ................................................................................. 3
    § 26165 ................................................................................. 3
    § 26230(7) ......................................................................... 3, 15
    § 26230(8) ..................................................................... 3, 19, 20
    § 26230(9) ..................................................................... 2, 12, 13
    § 26230(10) ................................................................... 3, 18, 19

§ 26230(12) ...........................................................................3, 16
§ 26230(13) ...........................................................................3, 16
§ 26230(15) ................................................................................3
§ 26230(16) ...........................................................................3, 14
§ 26230(17) ...........................................................................3, 14
§ 26230(19) ...........................................................................3, 14
§ 26230(20) ....................................................................3, 14, 16
§ 26230(26) ...........................................................................2, 10

## Other Authorities

2021 Annual Report, PARKS CALIFORNIA, https://tinyurl.com/4b7w7sdc .............17

9 STATUTES AT LARGE OF SOUTH CAROLINA 61 (1841) ..........................................20

"American Independence," Samuel Adams Speech (Aug. 1, 1776),
    https://tinyurl.com/3zued27k ...........................................................19

"AT THE INSTANCE OF BENJAMIN FRANKLIN": A BRIEF HISTORY OF THE LIBRARY
    COMPANY OF PHILADELPHIA 5 (2015), https://bit.ly/3vdBGQk ....................15

A DIGEST OF THE LAWS OF THE STATE OF GEORGIA, 1800 Ga. Laws 611
    (Watkins ed., 1800) ........................................................................22

A Museum of Art and Culture, PEABODY ESSEX MUSEUM, https://bit.ly/439jDtl
    (last visited Sept. 25, 2023) ............................................................15

About Us, CHARLESTON MUSEUM, https://bit.ly/3MPYhMB
    (last visited Sept. 25, 2023) ............................................................15

About Us, N.Y. HIST. SOC'Y MUSEUM & LIBRARY, https://bit.ly/3WkCcZF
    (last visited Sept. 25, 2023) ............................................................15

ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA 42
    (Davis ed., 1796) ...........................................................................22

Amici Br. of Citizens Comm. for the Right to Keep & Bear Arms, et al.,
    Koons v. Platkin, No. 23-1900, ECF No. 91 (3d Cir. Aug. 16, 2023) ..........22

Amicus Br. of The Ctr. for Human Liberty,
    Antonyuk v. Nigrelli, No. 22-2908, ECF No. 313
    (2d Cir. Feb. 9, 2023) ................................................................21, 22

Anne Beamish, Before Parks: Public Landscapes in Seventeenth- and Eighteenth-
    Century Boston, New York, and Philadelphia,
    40 LANDSCAPE J. 1 (2021) ........................................................16, 17

BARBARA PEPE, FREEHOLD:
    A HOMETOWN HISTORY 81 (2003) ..............................................14

*Bellevue History*, NYC HEALTH + HOSPITALS, https://bit.ly/4240MiB
(last visited Sept. 25, 2023)................................................................16

*California Concealed Carry Overview*, CONCEALED COAL.,
https://tinyurl.com/3kjvwcnp (last visited Sept. 26, 2023) ...........................23

Christine Sismondo, AMERICA WALKS INTO A BAR: A SPIRITED HISTORY OF
TAVERNS, SALOONS, SPEAKEASIES AND GROG SHOPS 15
(Oxford 2011)....................................................................................12

Ed Crews, *Gambling: Apple-Pie American and Older than the Mayflower*,
COLONIAL WILLIAMSBURG (Autumn 2008),
https://tinyurl.com/23db8pzk ..............................................................13

Gov. Gavin Newsom (@CAgovernor), *Press Conference on SB2*, TWITTER [X],
https://bit.ly/46qMATf (last accessed Sept. 18, 2023)..................................2

Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No
Carry" Defaults on Private Land*, 48 J. L. MED. & ETHICS 183 (2020) .......11

JANE CARSON, COLONIAL VIRGINIANS 108 (1965) ...................................14

Jay Precht, *Legalized Gambling*, 64 PARISHES (Nov. 16, 2011),
https://tinyurl.com/bdepz9rn ...............................................................13

Jonathan Lloyd, *Security Guard Injured in Shootout with Armed Robbers at
Hustler Casino,* NBC L.A. (Aug. 4, 2022), https://bit.ly/3PoVBp8 .......13, 14

Karla Rendon et al., *1 Killed, 1 Injured in Shooting at San Diego Central Library:
SDPD,* NBC7 SAN DIEGO (May 23, 2023), https://bit.ly/3ZmYk73 .............15

Kopel & Greenlee, *The "Sensitive Places" Doctrine*,
13 CHARLESTON L. REV. 205 (2018) .....................................................10, 21

Lauren Hepler et al., *Gilroy Shooting: Two Children Among the Dead at
California Festival,* N.Y. TIMES (July 29, 2019),
https://nyti.ms/3PtDbTY ....................................................................19

1 LAWS OF THE STATE OF NEW JERSEY 36 (Bloomfield ed., 1811).........................22

1 LAWS OF THE STATE OF NEW YORK 176
(2d ed., Albany: Websters & Skinner 1807).................................................22

2 LAWS OF THE STATE OF DELAWARE 984
(Samuel & John Adams eds., 1797)............................................................22

Mark W. Smith, *'Not all History is Created Equal': In the Post-*Bruen *World, the
Critical Period for Historical Analogues Is When the Second Amendment
Was Ratified in 1791, and not 1868*, SSRN, Oct. 1, 2022,
https://bit.ly//3CMSKjw ........................................................................7

*Monuments of Colonial New York: George III and Liberty Poles*, GOTHAM CTR. (Oct. 15, 2020), https://tinyurl.com/bdzkafap .................................................19

Nicholas J. Johnson et al., SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 2195 (3d ed. 2021) ...................................................................20

Oliver W. Holmes, *The Stage-Coach Business in the Hudson Valley*, THE Q. J. OF THE N.Y. STATE HIST. ASS'N (1931) ..........................................20

Omri Ben-Shahar & John A.E. Pottow, *On the Stickiness of Default Rules*, 33 FLA. ST. U. L. REV. 651 (2006) .................................................11

Orlando Mayorquin, *Store Owner is Fatally Shot by Man Who Confronted Her About Pride Flag,* N.Y. TIMES (Aug. 20, 2023), https://nyti.ms/3rbCMOg ..........................................................11

*Our History*, THE PEALE, https://bit.ly/41KAZvC (last visited May 23, 2023) ......15

PENNSYLVANIA STATUTES AT LARGE, VOLUME X: 1779-81 (Stanley Ray ed., 1904)........................................................22

Shawn Hubler et al., *Gunman Kills 3 at Biker Bar in California, Then Dies in Shootout*, N.Y. TIMES (Aug. 24, 2023), https://tinyurl.com/yc3hjhdp ....12, 13

Standard Initial and Renewal Application for License to Carry a Concealed Firearm, CAL. DEP'T OF JUST., https://tinyurl.com/5dzdff49 (last visited Sept. 25, 2023)...................................................5

T.H. Breen, *Horses and Gentlemen: The Cultural Significance of Gambling Among the Gentry of Virginia*, 34 WM. & MARY Q. 239 (1977)..............................14

*The Earliest New York City Parks*, N.Y. CITY DEP'T. OF PARKS & REC., https://tinyurl.com/4fckn7r4 (last visited Sept. 19, 2023)............................17

THE PUBLIC LAWS OF THE STATE OF SOUTH CAROLINA 271 (Grimke ed., 1790) ..........................................................22

Turpin Bannister, *Oglethorpe's Sources for the Savannah Plan*, 20 J. OF SOC'Y OF ARCH. HIST. 47 (1961)........................................17

VOTES AND PROCEEDINGS OF THE HOUSE OF DELEGATES OF THE STATE OF MARYLAND: NOVEMBER SESSION 1791 (Green ed., 1795) ...........................22

**INTRODUCTION**

Last summer, the Supreme Court unequivocally held that Americans have a Second Amendment right to keep and bear arms outside their homes. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2122 (2022). This week, California enacted Senate Bill 2 ("SB2") in retaliation. *See* S.2 (Cal. Stat. 2023). SB2 unconstitutionally limits where law-abiding, licensed-to-carry Californians may keep and bear arms. Its laundry list of so-called "sensitive" locations includes all manner of ordinary venues that Californians frequent. As a result, licensed individuals cannot exercise their constitutional right to bear arms during most daily activities—going to work, taking public transportation, running errands, going out to dinner, entering a hospital, attending sporting events, and more. By labeling myriad public places de facto "gun free zones," SB2 effectively "eviscerate[s] the general right to publicly carry arms for self-defense." *Bruen*, 142 S. Ct. at 2134.

Plaintiffs are ordinary, law-abiding citizens licensed to carry in California, and organizations that have members possessing such permits. Plaintiffs target provisions of SB2 that impose particularly egregious restrictions on their Second Amendment right to bear arms outside the home. Plaintiffs seek a preliminary injunction to enjoin enforcement of SB2's restrictions on carry inside public transportation, places selling liquor, hospitals, parks, gambling establishments, stadiums, public libraries, amusement parks, zoos, museums, and public gatherings. Plaintiffs also seek to enjoin SB2's no-carry-default provision making it unlawful for licensed citizens to carry firearms in businesses open to the public without express consent.

All these provisions infringe on Plaintiffs' Second Amendment rights. In *Bruen*, the Supreme Court reaffirmed that any Second Amendment regulation is constitutional only if the government "demonstrate[s] that [it] is consistent with this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126. But there is no historical tradition supporting California's ban on lawful firearm carrying in the public places just mentioned. And, under this Court's preliminary injunction analysis,

because these provisions of SB2 infringe a constitutional right, they are either causing or will soon cause Plaintiffs irreparable harm which no public interest can justify. Plaintiffs thus respectfully ask this Court to preliminarily enjoin the challenged provisions' enforcement.

## STATEMENT OF THE CASE

### I.   Constitutional and Statutory Provisions

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. And the Supreme Court recently reiterated that the right to "bear arms" includes the ability to "carry a handgun for self-defense outside the home." *Bruen*, 142 S. Ct. at 2122.

California passed SB2 to circumvent that holding. At a press conference announcing the bill, Governor Newsom called *Bruen* a "bad ruling," an "absurdity," and mocked the right to carry firearms outside the home.[1] The State now attempts to gut that right by decreeing nearly every public place "sensitive," overextending a narrow exception mentioned in *Bruen*. S.2 § 1(b) (legislative findings).

As relevant here, SB2 adds Section 26230 to the California Penal Code. Among other restrictions, it restricts licensed carry in: (a) "any . . . privately owned commercial establishment that is open to the public, unless the operator of the establishment clearly and conspicuously posts a sign" that carry is permitted (the "no-carry default"), Cal. Pen. Code § 26230(26); (b) buildings and parking lots of "establishment[s] where intoxicating liquor is sold for consumption on the premises[,]" *id.* § 26230(9); (c) buildings and their parking lots "used for gambling or gaming of any kind whatsoever, including, but not limited to, casinos, gambling establishments, gaming clubs, bingo operations, facilities licensed by the California

---

[1]  *See* Gov. Gavin Newsom (@CAgovernor), Press Conference on SB2, TWITTER [X], https://bit.ly/46qMATf (last accessed Sept. 18, 2023) (timestamps: called *Bruen* an absurdity at 41:08; used air quotes while discussing "right" to carry outside home at 41:20; called *Bruen* a bad ruling at 1:01:44).

Horse Racing Board, or a facility wherein banked or percentage games, any form of gambling device, or lotteries, other than the California State Lottery, are or will be played[,]" *id.* § 26230(15); (d) "[a] stadium, arena, or the real property or parking area under the control of a stadium, arena, or a collegiate or professional sporting or eSporting event[,]" *id.* § 26230(16); (e) buildings or parking lots of a public library, *id.* § 26230(17); (f) buildings or parking lots of an amusement park, *id.* § 26230(19); (g) buildings or parking lots of a zoo or a museum, *id.* § 26230(20); (h) buildings or parking lots of a hospital, medical office, or other place where "medical services are customarily provided[,]" *id.* § 26230(7); (i) "[a] park, athletic area, or athletic facility that is open to the public and a street or sidewalk immediately adjacent to those areas[,]" *id.* § 26230(12); (j) property under the control of the Department of Parks and Recreation or Department of Fish and Wildlife, except those areas designated for hunting, *id.* § 26230(13); (k) a "bus, train, or other form of transportation paid for in whole or in part with public funds, and a building, real property, or parking area under the control of a transportation authority supported in whole or in part with public funds[,]" *id.* § 26230(8); and (l) "[a] public gathering or special event conducted on property open to the public that requires the issuance of a permit from a federal, state, or local government, and sidewalk or street immediately adjacent to the public gathering or special event but is not more than 1,000 feet from the event or gathering[,]" *id.* § 26230(10).

SB2's restrictions fall on Californians who have already gone through the onerous state licensing process to obtain a Concealed Carry Weapon (CCW) license. To obtain a CCW license, California requires individuals to complete a lengthy application, police interview, background check, training course, and shooting proficiency exam. *See id.* §§ 26150, 26165. Individual Plaintiffs are licensed to carry in California, as are many members of the Orange County Gun Owners PAC (OCGO), the San Diego County Gun Owners PAC (SDCGO), California Gun Rights Foundation (CGF), and Firearms Policy Coalition, Inc. (FPC), including Individual

Plaintiffs. *See* Decl. of Marco Antonio Carralero ¶ 6 (Sept. 26, 2023), Ex. A ("Carralero Decl."); Decl. of Garrison Ham ¶ 2 (Sept. 26, 2023), Ex. B ("Ham Decl."); Decl. of Michael Schwartz ¶¶ 5, 7 (Sept. 26, 2023), Ex. C ("Schwartz Decl."); Decl. of Gene Hoffman ¶ 5 (Sept. 26, 2023), Ex. D ("Hoffman Decl."); Decl. of Brandon Combs ¶ 9 (Sept. 26, 2023), Ex. E ("Combs Decl."). Individual Plaintiffs and Organizational Plaintiffs' members with CCW licenses are law-abiding firearm owners. Yet, SB2 strips them of their Second Amendment right to self-defense in public spaces while criminals may roam free.

## II.    SB2's Effect on Plaintiffs

All Individual Plaintiffs are ordinary, law-abiding citizens. Plaintiff Carralero works in the warehouse of a small family business and has participated in the Orange County Sheriff's Department Citizen's Academy. *See* Carralero Decl. ¶ 6. Plaintiff Ham served his country in combat for several years in Iraq and Afghanistan, and currently works in sales. *See* Ham Decl. ¶ 5. Plaintiff Schwartz is the Founder and Director of several gun advocacy organizations. *See* Schwartz Decl. ¶ 3. Each has a California CCW license issued by their County Sheriff, *see* Carralero Decl. ¶ 7; Ham Decl. ¶ 4; Schwartz Decl. ¶ 9, as do many members of OCGO, SDCGO, CGF, and FPC, *see* Schwartz Decl. ¶¶ 5, 7; Hoffman Decl. ¶ 5; Combs Decl. ¶ 9.

SB2's effect on Plaintiffs is obvious. Plaintiffs have carried in many of the places where SB2 now bars carry and would carry in those places after January 1, 2024, the effective date of SB2, but for the bans and criminal penalties imposed by SB2. For example, Plaintiff Schwartz regularly carries his personal firearm for self-defense when entering all of the challenged locations in SB2. *See* Schwartz Decl. ¶¶ 14–25. Similarly, Plaintiff Ham regularly carries his personal firearm for self-defense when entering privately owned commercial establishments open to the public, attending public gatherings, visiting parks and amusement parks, and traveling on public transportation. *See* Ham Decl. ¶¶ 8, 10–13. And all three individual Plaintiffs would carry their personal firearms for self-defense in bars, restaurants, and other

establishments serving alcohol for consumption on the premises, but for SB2 and the instructions in their CCW permit application.[2] *See* Carralero Decl. ¶ 12; Ham Decl. ¶ 9; Schwartz Decl. ¶ 14. When doing so, they would not consume alcohol. *See* Carralero Decl. ¶ 12; Ham Decl. ¶ 9; Schwartz Decl. ¶ 14. All these individuals are thus stripped of their Second Amendment right to public carry in the challenged locations.

**ARGUMENT**

### I.   Preliminary Injunction Standard

Plaintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm without preliminary relief; (3) the balance of equities favors them; and (4) the injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). Likelihood of success on the merits is "[t]he most important" factor. *Junior Sports Mags., Inc. v. Bonta*, No. 22-56090, 2023 WL 5945879, at *3 (9th Cir. Sept. 13, 2023); *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018). If Plaintiffs show that a law is likely unconstitutional, the other three *Winter* factors favor an injunction. *See id*. And because "even a brief deprivation of a constitutional right causes irreparable injury," this Court should act "expeditiously" in ruling on Plaintiffs' motion. *Baird v. Bonta*, No. 23-15016, 2023 WL 5763345, at *8–9 (9th Cir. Sept. 7, 2023).

### II.   The Challenged Provisions Likely Violate Plaintiffs' Second Amendment Rights.

"[T]he Second Amendment guarantees a general right to public carry," meaning ordinary, law-abiding citizens may "'bear' arms in public for self-defense." *Bruen*,

---

[2]  For years, California apparently required CCW permit applicants to sign away their rights to carry at establishments whose "primary purpose" is to dispense alcoholic beverages. *See* Carralero Decl. ¶ 12; Ham Decl. ¶ 9; Schwartz Decl. ¶ 14; *see also* Standard Initial and Renewal Application for License to Carry a Concealed Firearm at 5, CAL. DEP'T OF JUST., https://tinyurl.com/5dzdff49 (last visited Sept. 26, 2023). While this restriction does not appear to be based on any legal authority, Plaintiffs comply with it anyway for fear of prosecution. *See* Carralero Decl. ¶ 12; Ham Decl. ¶ 9; Schwartz Decl. ¶ 14.

142 S. Ct. at 2135. Accordingly, the "general right to public carry" cannot be restricted absent "exceptional circumstances." *Id.* at 2156.

To determine whether a governmental restriction on carry is constitutional, the *Bruen* analysis ensures the Second Amendment is implicated, and then places the burden on the government to justify its regulation of constitutionally protected conduct. If the Second Amendment's text covers an individual's conduct, the Constitution presumptively protects that conduct. *See id.* at 2129–30. If Plaintiffs satisfy that requirement, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* In other words, it is the State's burden to "affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127; *see also id.* at 2150 ("[W]e are not obliged to sift the historical materials for evidence to sustain [the State's] statute. That is respondents' burden.").

California will be unable to show that the challenged provisions of SB2 are part of a historical tradition of firearm restrictions or analogous to permissible "sensitive place" restrictions. *Id.* at 2132–34. Thus, this Court must enjoin them.

**A.   The Second Amendment's Plain Text Covers Plaintiffs' Conduct.**

Plaintiffs' proposed course of conduct—licensed carry in various public places—falls within the Second Amendment's plain text. *Bruen*, 142 S. Ct. at 2126. So "the Constitution presumptively protects that conduct." *Id.*

The Supreme Court has already defined the Second Amendment's key terms relevant here. "The people" includes "all Americans"; "Arms" includes "all instruments that constitute bearable arms[,]" including handguns; and, to "bear" simply means to "carry." *District of Columbia v. Heller*, 554 U.S. 570, 580–82, 584 (2008); *Bruen*, 142 S. Ct. at 2132. Importantly, "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep

and bear arms." *Bruen*, 142 S. Ct. at 2134. Thus, the "definition of 'bear' naturally encompasses public carry" for self-defense. *Id.* at 2134–35.

The Supreme Court's binding interpretation of these words and phrases establishes that Plaintiffs' proposed conduct is presumptively protected by the Second Amendment. Plaintiffs and their members are Americans who seek to carry bearable arms (handguns) for self-defense in public during their daily lives. As in *Bruen*, these undisputed facts end the textual inquiry. *See Bruen*, 142 S. Ct. at 2134.

### B.    The State Cannot Meet Its Burden to Offer Historical Analogues.

Under *Bruen*, the burden now shifts to California. It must show that the challenged provisions are "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2135. And it must do so by offering persuasive legal history. *See id.* at 2130 n.6 (courts "decide a case based on the historical record compiled by the parties"). But no historical tradition of analogous regulation exists. Under *Bruen*, three considerations must guide the State's presentation (and the Court's consideration) of the State's historical evidence.

First, any proffered historical analogue must be from at or around the Founding, centering on 1791, when the Second Amendment was ratified. *See Bruen*, 142 S. Ct. at 2136. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller*, 554 U.S. at 634–35; *see also Bruen*, 142 S. Ct. at 2136. Thus, "not all history is created equal," and courts must be careful not to overweigh historical evidence that long predates or postdates the Founding. *Bruen*, 142 S. Ct. at 2136; *see also* Mark W. Smith, *'Not all History is Created Equal': In the Post-Bruen World, the Critical Period for Historical Analogues Is When the Second Amendment Was Ratified in 1791, and not 1868*, SSRN, Oct. 1, 2022, https://bit.ly//3CMSKjw. By looking to 1791, the Court in *Bruen* continued its practice of focusing on the Founding era when analyzing constitutional rights. *See, e.g.*, *Ramos v. Louisiana*, 140 S. Ct. 1390, 1396 (2020) (discussing the history of a unanimous jury right by referencing "young American states" and the "backdrop" of

the ratification of the Bill of Rights in 1791); *Timbs v. Indiana*, 139 S. Ct. 682, 687–88 (2019) (discussing "colonial-era provisions" and the "constitutions of eight States" when analyzing the Eighth Amendment excessive fines clause); *Virginia v. Moore*, 553 U.S. 164, 168 (2008) (looking to the "statutes and common law of the founding era to determine the norms that the Fourth Amendment was meant to preserve"); *cf. Lynch v. Donnelly*, 465 U.S. 668, 674 (1983) (finding the decisions of the 1789 Congress to be of "special significance" to the Court's Establishment Clause analysis).

While the *Bruen* Court noted that an *academic* debate exists about whether history from 1868 (when the Fourteenth Amendment was adopted) may be relevant, the Court found no need to address that question. *Bruen*, 142 S. Ct. at 2138. The Court confirmed that it has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* at 2137.[3] Thus, "to the extent later history contradicts what the text [of the Second Amendment] says, the text controls." *Id.* at 2137; *see also id.* at 2163 (Barrett, J., concurring) (noting that "freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning" of the Second Amendment is improper). And the Court's precedents teach that even extensive history will not move the needle if it long post-dates the Founding. *See, e.g.*, *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2258–59 (2020) (finding unpersuasive "more than 30" provisions of state law from the "second half of the 19th Century" because they were not grounded in Founding-era practices regarding the Free Exercise Clause). At most, the Supreme Court has looked to 19th century evidence as "mere confirmation of what the Court thought had already been established" at the Founding. *Id.* at 2137.

---

[3]  The *Bruen* Court also reiterated that "individual rights enumerated in the Bill of Rights and made applicable to the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 142 S. Ct. at 2137. Because 1791 is the relevant historical period for assessing historical analogues in the face of *federal* government infringement on rights, it applies equally to alleged *state* government infringement.

Second, to be a "proper analogue," a law must be "relevantly similar" based on "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2132–33. In other words, the modern regulation must impose a "comparable burden on the right of armed self-defense" as did the historical regulation, and for a similar reason. *Id.* at 2133. This requirement means that Founding era laws arising in different contexts, and for different reasons, will be inapt comparators. For example, hunting regulations in 1791 tell us little about whether California can ban carry in establishments selling alcohol. Such Founding era laws regulated the right to carry firearms in a particular circumstance—when hunting (the "how"). And the rationale for such restrictions included regulating hunting and reducing the taking of certain animals (the "why"). Neither has much resemblance to an individual's right to self-defense at a restaurant with a liquor license in California today.

Third, historical analogues must be representative. Laws existing in only a few jurisdictions—historical "outlier[s]"—should be disregarded. *Bruen*, 142 S. Ct. at 2133. A smattering of regulations is not a "historical tradition" of regulation sufficient to inform the original public meaning of the right at the Founding. *See, e.g.*, *id.* at 2153 (rejecting restrictions in one state statute and two state court decisions as not representative); *id.* at 2142 (doubting that "three colonial regulations could suffice to show a tradition of public-carry regulation" (emphasis omitted)); *Koons v. Platkin*, No. 22-7464, 2023 WL 3478604, at *68 (D.N.J. May 16, 2023) (finding three Reconstruction era laws non-representative); *see also id.* at *85 (finding one state law and 25 local ordinances, covering less than 10% of the nation's population, insufficient). Similarly, laws in the territories are afforded "little weight" because they were "localized," "rarely subject to judicial scrutiny," and "short lived." *Bruen*, 142 S. Ct. at 2154–55; *see also Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 332 (N.D.N.Y. 2022) (*Antonyuk II*) (rejecting laws from the territories).

In sum, what matters under *Bruen* is the "public understanding of the right to keep and bear arms" during and around 1791, as revealed by relevantly similar and representative historical analogues. *Bruen*, 142 S. Ct. at 2136.

### 1.     The Challenged Provisions in SB2 Are Inconsistent with the Historical Tradition of Firearm Regulation.

#### a.     The no-carry default in private businesses

Rather than presuming licensed law-abiding citizens have constitutional rights to carry, SB2 does the opposite. It places the burden on individuals to secure consent from businesses open to the public before they can exercise their right to carry firearms for self-defense. *See* Cal. Pen. Code. § 26230(26). This turns our Nation's traditional regulatory approach on its head. At the Founding, "private property owners" had principal responsibility to "exclude others from their property." *Christian v. Nigrelli*, 642 F. Supp. 3d 393, 407 (W.D.N.Y 2022); *accord* Kopel & Greenlee, *The "Sensitive Places" Doctrine*, 13 CHARLESTON L. REV. 205, 290–91 (2018). As such, carrying on private property is "generally permitted absent *the owner's* prohibition." *Christian*, 642 F. Supp. 3d at 407 (emphasis added).

These principles stem from the law of trespass, specifically "the well-developed concept of implied license." *Koons*, 2023 WL 3478604, at *58. Generally, the public has implied consent to enter property open to the public, "unless such consent is conditioned or subsequently revoked by the property owner." *Id.* And because "[t]he right to armed self-defense follows the individual everywhere he or she lawfully goes" in public, *Bruen*, 142 S. Ct. at 2155, carrying on property open to the public is permitted unless the owner "withdraw[s] consent," *Koons*, 2023 WL 3478604, at *61. Given these principles, California will be unable to point to any relevant Founding era firearm regulation supporting the no-carry default. The State's effort to flip a longstanding Second Amendment presumption cannot stand.

And the reason the State has sought to flip the default rule is obvious. "Given the inertial tendency to stick with the status quo, lawmakers should expect that a

'prohibited-unless permitted' default would radically expand the private spaces where guns could not be carried." Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J. L. MED. & ETHICS 183, 184 (2020). After all, a "default rule" of interaction with strangers—including members of the public coming to a property open to the public—is particularly "sticky." *See generally* Omri Ben-Shahar & John A.E. Pottow, *On the Stickiness of Default Rules*, 33 FLA. ST. U. L. REV. 651, 653 (2006). By "sticky," legal scholars mean that individuals have a well-known tendency to stick by the default rule even when they would otherwise take a different position. *Id.* at 651–54.

Thus, California businesses, which might otherwise allow or be indifferent to licensed carry on their property, may stick to the new default. If they do, it "might have knockon effects, reducing preferences to carry and possess firearms more generally, as it becomes increasingly inconvenient to do so." Ayres & Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, *supra*, at 184. This is likely for the Individual and Organizational Plaintiffs who have all declared that they would drastically reduce their carry of guns for self-defense when the no-carry default at private businesses goes into effect. *See* Carralero Decl. ¶ 10; Ham Decl. ¶ 8; Schwartz Decl. ¶ 15. And the right of self-defense may well become necessary for Plaintiffs at one of these private business, as violent actors may enter them at any time. *See, e.g.*, Orlando Mayorquin, *Store Owner is Fatally Shot by Man Who Confronted Her About Pride Flag,* N.Y. TIMES (Aug. 20, 2023), https://nyti.ms/3rbCMOg.

In sum, California cannot flip a constitutional presumption. The default is that Plaintiffs and their members—indeed all law-abiding Americans—have a "right to 'bear' arms in public for self-defense." *Bruen*, 142 S. Ct. at 2135. No historical analogue supports the no-carry default in SB2 and it cannot stand.

b.      **Places selling liquor for consumption on the premises**

SB2 also bans licensed carry in places selling liquor for consumption on the premises. Cal. Pen. Code § 26230(9). But California will be unable to establish a historical tradition banning possession of firearms in such places. Taverns, public houses, restaurants serving alcohol, and other establishments where alcohol is present obviously existed at the Founding. *See, e.g.*, *Antonyuk II*, 639 F. Supp. 3d at 335 (describing the Founding era existence of taverns, inns, public houses, 'tippling houses,' 'victualing houses,' or 'ordinaries'").

Indeed, "[i]n all states" during the Founding era, "tavern legislation was involved and constantly changing." Christine Sismondo, AMERICA WALKS INTO A BAR: A SPIRITED HISTORY OF TAVERNS, SALOONS, SPEAKEASIES AND GROG SHOPS 15 (Oxford 2011). Nevertheless, Plaintiffs are unaware of any Founding era tradition banning mere possession of firearms in these places, even though violence in and around them is nothing new. While California may point to a historical outlier or two, this Court cannot "stake [its] interpretation of the Second Amendment upon a law in effect in a single State, or a single city, 'that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms' in public for self-defense." *Bruen*, 142 S. Ct. at 2154 (quoting *Heller*, 554 U.S. at 632). Under *Bruen*, the lack of relevant historical analogues is dispositive. *See id.* at 2131 ("[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment.")

Finally, if California argues that guns and alcohol should not mix, such policy arguments carry no weight for this Court's constitutional analysis. *See Bruen*, 142 S. Ct. at 2129, 2131. And in any event, bars and other establishments selling liquor are locations where exercising one's Second Amendment right to self-defense may become necessary. *See, e.g.*, Shawn Hubler et al., *Gunman Kills 3 at Biker Bar in*

*California, Then Dies in Shootout*, N.Y. TIMES (Aug. 24, 2023), https://tinyurl.com/yc3hjhdp. And Plaintiffs are not asserting a right to carry a firearm *while drinking* alcohol, but rather merely to carry a firearm where *others* may be drinking alcohol. *See, e.g.*, Carralero Decl. ¶ 12; Ham Decl. ¶ 9; Schwartz Decl. ¶ 14.

### c.  Gambling establishments

SB2 similarly bans licensed carry in buildings "used for gambling or gaming," including "casinos, gaming clubs, bingo operations, facilities licensed by the California Horse Racing Board, or a facility wherein banked or percentage games, any form of gambling device, or lotteries, other than the California State Lottery, are or will be played." Cal. Pen. Code § 26230(9). This restriction has no basis in the nation's history or tradition.

On the contrary, America "has a long history of gambling establishments." *Koons*, 2023 WL 3478604, at *88. "Gambling in the English-speaking world was a powerful economic and social force from the 1660s . . . into the 1800s." Ed Crews, *Gambling: Apple-Pie American and Older than the Mayflower*, COLONIAL WILLIAMSBURG J. (Autumn 2008), https://tinyurl.com/23db8pzk. The practice "crossed the Atlantic" into America, and "colonial gaming gained a character all its own[,]" developing into a "pastime." *Id.* Louisiana eventually established a casino in 1753. *See* Jay Precht, *Legalized Gambling*, 64 PARISHES (Nov. 16, 2011), https://tinyurl.com/bdepz9rn. And Founding era Americans frequently bet on horse races. *See* Crews, *Apple-Pie American and Older than the Mayflower*, *supra*. Indeed, gambling was so pervasive that General Washington had to admonish soldiers in the Continental Army for it. *See id.*

Despite the presence of gambling at the Founding, California will be unable to offer any historical tradition of arms bans at gaming establishments. *See Koons*, 2023 WL 3478604, at *88–*89; *Antonyuk v. Hochul*, 635 F. Supp. 3d 111, 144 (N.D.N.Y. 2022) (*Antonyuk I*). Yet these locales, too, are places where the right to self-defense may mean the difference between life and death. *See, e.g.*, Jonathan Lloyd, *Security*

*Guard Injured in Shootout with Armed Robbers at Hustler Casino,* NBC L.A. (Aug. 4, 2022), https://bit.ly/3PoVBp8. This provision of SB2 must also be enjoined under *Bruen*.

### d.     Stadiums, arenas, and amusement parks

SB2 also bans carry in any stadium, arena, or the parking lots of such venues, *see* Cal. Pen. Code § 26230(16), and in amusement parks, *id.* § 26230(19). As before, similar venues existed at the Founding. For example, racetracks were prevalent in the early colonies. *See, e.g.*, JANE CARSON, COLONIAL VIRGINIANS 108 (1965); BARBARA PEPE, FREEHOLD: A HOMETOWN HISTORY 81 (2003) (In New Jersey, "[h]orses were an integral part of the Freehold community and horseracing in Freehold dates back at least to the 1830s, when farmers brought their fastest horses to a makeshift racetrack at the same location as today's Freehold Raceway."); T.H. Breen, *Horses and Gentlemen: The Cultural Significance of Gambling Among the Gentry of Virginia*, 34 WM. & MARY Q. 239, 251 (1977) ("By 1700, there were at least a dozen tracks, important enough to be known by name, scattered throughout the counties of the Northern Neck and the James River valley.").

Despite widespread existence of venues analogous to stadiums and amusement parks, no traditional ban on carry in those places existed. *See, e.g.*, *Koons*, 2023 WL 3478604, at *87–*88 (finding no historical tradition of restricting weapons in "entertainment facilities," which include stadiums); *Siegel v. Platkin*, No. 1:22-cv-7463, 2023 WL 1103676, at *14 (D.N.J. Jan. 30, 2023) (same). It is not enough for the State to say that because crowds gather in such places, it may restrict carry. *See Bruen*, 142 S. Ct. at 2133–34. The lack of any historical analogue in these contexts is again dispositive. These provisions of SB2 must be enjoined.

### e.     Museums and libraries

SB2 also bans carry of firearms in any public library, *see* Cal. Pen. Code § 26230(17), and in museums, *see id.* § 26230(20). There is no well-established, representative historical tradition banning firearms in these locations. Museums and

libraries date back to the colonial era in the United States. For example, the Charleston Museum dates to 1773. *See About Us*, Charleston Museum, https://bit.ly/3MPYhMB (last visited Sept. 25, 2023). The Peabody Essex Museum was founded by sea captains in Salem, Massachusetts in 1799 as the East India Marine Society. *See A Museum of Art and Culture*, Peabody Essex Museum, https://bit.ly/439jDtl (last visited Sept. 25, 2023). The Peale Center in Baltimore opened its doors in 1814. *See Our History*, The Peale, https://bit.ly/41KAZvC (last visited May 23, 2023). New York's first museum opened in 1804. *See About Us*, N.Y. Hist. Soc'y Museum & Library, https://bit.ly/3WkCcZF (last visited Sept. 25, 2023). And Benjamin Franklin founded America's first lending library in Philadelphia in 1731. "At The Instance of Benjamin Franklin": A Brief History of The Library Company of Philadelphia 5 (2015), https://bit.ly/3vdBGQk.

Despite the existence of museums and libraries in America during the Founding and years after, the State will be unable to point to regulations that support a historical tradition of banning firearms. *See Koons*, 2023 WL 3478604, at *86. And while it may seem that these areas are unlikely places for violence, mere presence in them, too, may call upon individuals to exercise self-defense rights. *See, e.g.*, Karla Rendon et al., *1 Killed, 1 Injured in Shooting at San Diego Central Library: SDPD,* NBC7 San Diego (May 23, 2023), https://bit.ly/3ZmYk73. These provisions must be enjoined under *Bruen*.

### f.     Hospitals and health care facilities

SB2 bans carry of firearms in any "public or private hospital . . . mental health facility, nursing home, medical office, urgent care facility, or other place at which medical services are customarily provided." Cal. Pen. Code § 26230(7). No historical tradition supports such a ban.

As the District Court of New Jersey recently held, "hospitals and medical care facilities existed before and after this Nation's founding." *Koons*, 2023 WL 3478604, at *93. For example, Bellevue Hospital opened in New York City in 1736 and is the

nation's "oldest operating hospital." *Bellevue History*, NYC HEALTH + HOSPITALS, https://bit.ly/4240MiB (last visited Sept. 25, 2023). And Benjamin Franklin helped found the Pennsylvania Hospital in 1751. *See Koons*, 2023 WL 3478604, at *93. Weill Cornell Medical Center opened as New York Hospital in 1791. *Id.* And "[u]p north, Massachusetts opened the Boston Medical Dispensary in 1796—today Tufts Medical Center—and then the Massachusetts General Hospital in 1811." *Id.*

There can be no doubt that the medical profession existed at the Founding. Nevertheless, the State will be unable to demonstrate a longstanding tradition of "relevantly similar" regulations prohibiting firearms in medical facilities. *Bruen*, 142 S. Ct. at 2133. And "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131.

> **g.**     **Parks, areas controlled by California wildlife agencies, and zoos**

SB2 also bans carry in any "park, athletic area, or athletic facility that is open to the public and a street or sidewalk immediately adjacent to those areas[.]" Cal. Pen. Code § 26230(12). Similarly, it prohibits carry in any "property under the control of the Department of Parks and Recreation or Department of Fish and Wildlife," except designated hunting areas. *Id.* § 26230(13). And it prohibits carry in zoos. *See id.* § 26230(20).

Parks obviously existed before and during the Founding. For example, Boston Common is considered "America's oldest park" and was established in 1634. *See Koons*, 2023 WL 3478604, at *83. It was commonly used for militia purposes—by definition gun-friendly, rather than gun-free. *See id.* And "[t]he Common also served as a site for informal socializing and recreation" including "[s]trolling," "[h]orse- and carriage-riding," "sports," "entertainment," and "raucous celebrations." *See* Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century*

*Boston, New York, and Philadelphia*, 40 LANDSCAPE J. 1, 3–6 (2021). In New York, City Hall Park began as a "public common" in the 17th century. *The Earliest New York City Parks*, N.Y. CITY DEP'T. OF PARKS & REC., https://tinyurl.com/4fckn7r4 (last visited Sept. 26, 2023). Similarly, New York's Bowling Green Park was established "for the Recreation & Delight of the Inhabitants of [New York] City" in 1733. *Id.* And in the South, Savannah was planned around public squares—open green spaces which became the landscaped parks that residents know today. *See* Turpin Bannister, *Oglethorpe's Sources for the Savannah Plan*, 20 J. OF SOC'Y OF ARCH. HIST. 47, 48 (1961) (noting that Savannah's squares started initially as "open, unplanted plazas" and were "remodel[ed] . . . around 1800 . . . into landscaped neighborhood parks").

Government-controlled state parks resemble those early parks, but at even greater scale. California is home to 279 state parks spanning some 1.6 million acres. *See* 2021 Annual Report, PARKS CALIFORNIA, https://tinyurl.com/4b7w7sdc. Many visitors, including Plaintiff Carralero, enjoy hiking, camping, and recreating in these state parks. And much, if not all, of this land are "vast expanses" of the great outdoors "where people are generally free to roam." *Antonyuk II*, 639 F. Supp. 3d at 325. Like city parks, the State will simply be unable to point to any historical tradition of banning firearms in State-controlled nature preserves either. Even prior to *Bruen*, courts had rejected such locations as "sensitive places." *See, e.g.*, *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 658 (Del. 2017) (holding that State parks and State forests were not "sensitive places" and that the State's ban on firearms in such places was unconstitutional under Delaware's version of the Second Amendment); *People v. Chairez*, 2018 IL 121417, 104 N.E.3d 1158, 1176 (2018) (holding that an Illinois statute that banned the possession of a firearm within 1000 feet of a public park violated the Second Amendment, rejecting the argument that the area was a "sensitive" place); *Morris v. Army Corps of Eng'rs*, 60 F. Supp. 3d 1120, 1123–25 (D. Idaho 2014), *appeal dismissed sub nom.*, *Nesbitt v. Army Corps of Eng'rs*, No. 14-

36049, 2017 WL 11676289 (9th Cir. Dec. 15, 2017) (rejecting the government's argument that U.S. Army Corps of Engineers' outdoor recreation sites were sensitive places); *Solomon v. Cook Cnty. Bd. of Comm'rs*, 559 F. Supp. 3d 675, 690–96 (N.D. Ill. 2021) (finding a forest preserve district was not a "sensitive place").

Finally, zoos. While there do not appear to have been zoos in 1791 or a few decades thereafter, they originated "in public parks, such as New York City's Central Park, Philadelphia's Fairmount Park, and Chicago's Lincoln Park" during Reconstruction. *Koons*, 2023 WL 3478604, at \*80; *see also id.* at \*80 n.59 (collecting examples of Reconstruction-era zoos). Yet California will be unable to supply evidence of a historical tradition banning firearms in zoos, much like it will fail to do so for parks, possibly the best Founding era analogue for zoos. Indeed, two district Courts have already held that there is no historical tradition of banning firearms in zoos. *See Antonyuk II*, 639 F. Supp. 3d at 326 ("No historical statutes have been cited by the State Defendants (or located by the Court) expressly prohibiting firearms in 'zoos' . . . despite the fact that, between 1864 and 1883, zoos appeared to have opened in cities[.]"); *Koons*, 2023 WL 3478604, at \*81 ("[T]he laws reveal a lack of consensus among the state about carrying firearms in public, particularly in states that had zoos . . . three localized restrictions do not establish a historical tradition of banning firearms at zoos.").

In sum, despite the existence of parks dating to the Founding, there is no relevantly similar historical tradition of banning firearms by ordinary, law-abiding citizens while in them. Indeed, to the extent militias trained in some parks, the opposite is true.

### h.   Public gatherings or special events

SB2 likewise bans carry in "[a] public gathering or special event conducted on property open to the public that requires the issuance of a permit from a federal, state,

or local government and sidewalk or street immediately adjacent to the public gathering or special event[.]" Cal. Pen. Code § 26230(10).

This category is exceptionally broad, likely encompassing everything from political rallies to public markets to neighborhood block parties. Public gatherings of all sorts obviously existed at the Founding. Indeed, the Founders themselves used such public gatherings to speak to fellow citizens about American Independence. *See, e.g.*, "American Independence," Samuel Adams Speech (Aug. 1, 1776), https://tinyurl.com/3zued27k (delivered on the steps of the Philadelphia State House). Similarly, to protest British rule and gather to discuss the issues of the day, colonists frequently erected "Liberty Poles" around which they gathered. *See, e.g.*, *Monuments of Colonial New York: George III and Liberty Poles*, GOTHAM CTR. (Oct. 15, 2020), https://tinyurl.com/bdzkafap (General Thomas Gage once remarked that "[i]t is now as common here to assemble on all occasions of public concern at the Liberty Pole and Coffee House as for the ancient Romans to repair to the Forum. And orators harangue on all sides[.]"). There is no identifiable historical tradition that firearms were banned at any of the numerous public gatherings at the Founding. Indeed, colonists sometimes arrived armed to political gatherings in which they could potentially clash with British soldiers. *See, e.g.*, *id.*; *see also Koons*, 2023 WL 3478604, at *72–*73 ("The colonial generation recognized that citizens attending public gatherings exposed themselves to violent attack . . . To abate that risk, American colonists obligated their citizenry to arm themselves for protection."). So too today when violence at public gatherings persists. *See, e.g.*, Lauren Hepler et al., *Gilroy Shooting: Two Children Among the Dead at California Festival,* N.Y. Times (July 29, 2019), https://nyti.ms/3PtDbTY. This provision of SB2 must also be enjoined under *Bruen*.

### i.     Public Transportation

SB2 also restricts carry while in various forms of public transportation, including buses, trains, and other forms of state-sponsored transportation. Cal. Pen.

Code § 26230(8). And the ban extends to parking areas and buildings "under the control of a transportation authority supported in whole or in part with public funds." *Id.*

While modern trains or buses obviously did not exist at the Founding, public transportation itself is not a new phenomenon. For example, passengers used to share stagecoaches on journeys throughout the colonies before the Revolution and in the states after it. *See, e.g.*, Oliver W. Holmes, *The Stage-Coach Business in the Hudson Valley*, THE Q. J. OF THE N.Y. STATE HIST. ASS'N 231–33 (1931) ("Staging had developed somewhat in the colonies before the Revolution, especially around Boston and Philadelphia."). Additionally, the public used riverboats and ferries during the Founding. And they carried arms on these forms of transportation. For example, South Carolina established a "public ferry" as early as 1725 and mandated "free" "ferriage" for "all persons under arms in times of alarms and expresses." 9 STATUTES AT LARGE OF SOUTH CAROLINA 61 (1841). And arms, such as blunderbusses, were carried on stagecoaches. *See* Nicholas J. Johnson et al., SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 2195 (3d ed. 2021) ("Stagecoach guards and travelers carried blunderbusses, or other short guns, such as traveling or coaching carbines, or (most often) a pair of ordinary pistols."). Plaintiffs are not aware of any Founding era tradition of banning the possession of a firearm while traveling on these public modes of transportation.

\*\*\*\*\*

In sum, for each of SB2's challenged provisions, California will be unable to point to a relevant, representative historical analogue. Without that evidence, the State cannot prevail under *Bruen*.

## 2. SB2's Location Specific Bans Are Not Analogous to Permissible "Sensitive Place" Restrictions.

Recognizing that it lacks analogous Founding era regulations to support restriction of carry in the locations just discussed, California will fall back on *Bruen*'s

suggestion that carry restrictions are permissible in "sensitive places." But the State impermissibly stretches that narrow exception to swallow the general rule of public carry for self-defense.

SB2's laundry list of locations renders most publicly frequented areas of California a "sensitive place." Indeed, the challenged provisions effectively render licensed carry outside of one's home impossible in many circumstances. A Californian taking public transportation to go grocery shopping and then go to a park for a picnic can leave the threshold of her house with a gun but cannot enter any of her other destinations with it. There was no public understanding in 1791 that the government could so broadly restrict licensed public carry in this way.

Most problematically, defining sensitive places to encompass essentially all locations flouts the Supreme Court's instructions in *Bruen*. While the Court did not delineate an all-encompassing list of sensitive places, it mentioned only three such locations at the Founding "where weapons were altogether prohibited": legislative assemblies, polling places, and courthouses. *See Bruen*, 142 S. Ct. at 2133; *see also* Kopel & Greenlee, *The "Sensitive Places" Doctrine*, *supra*, at 289–90. Accordingly, this Court may analogize to "*those* historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Id.* (emphasis added). But it cannot accept California's likely attempt to link its location-specific bans to these narrow categories.

Indeed, the three sensitive places *Bruen* identified all shared a key characteristic at the Founding. Legislative assemblies, polling places, and courthouses were all securable locations that were protected by heightened government-provided security, greatly reducing the public's need for individual weapons. *See e.g.*, Kopel & Greenlee, *The "Sensitive Places" Doctrine*, *supra*, at 292 ("When armed guards are present, the government takes the responsibility for having armed force at the ready to protect citizens."); Amicus Br. of The Ctr. for Human Liberty at 8–17, *Antonyuk v. Nigrelli*,

No. 22-2908, ECF No. 313 (2d Cir. Feb. 9, 2023); Amici Br. of Citizens Comm. for the Right to Keep & Bear Arms, et al. 8–17, *Koons v. Platkin*, No. 23-1900, ECF No. 91 (3d Cir. Aug. 16, 2023).[4] The sensitive nature of these places was never a matter of simple government fiat.

The closest thing to the comprehensive security provided at the Founding in legislative assemblies, polling places, and courthouses today is that of TSA at the airport or guards and metal detectors at entrances to courthouses. *See Koons*, 2023 WL 3478604, at *90 ("Airports have many security measures such as Transportation Security Administration (TSA) officers, air marshals, police officers, metal detectors, and luggage scanners that all check people and their baggage for weapons and dangerous devices, like explosives."); *Hardaway v. Nigrelli*, No. 22-CV-771 (JLS), 2022 WL 16646220, at *14 (W.D.N.Y. Nov. 3, 2022) (explaining that sensitive places are "typically secured locations").

That the government can prohibit firearms in these places is significantly different than the breadth of California's prohibition here. The historic central purpose of the Second Amendment is ensuring Americans can be "armed and ready" for "ordinary self-defense needs." *Bruen*, 142 S. Ct. at 2150. But when the government

---

[4] Other examples of Founding Era regulations in these places include: THE PUBLIC LAWS OF THE STATE OF SOUTH CAROLINA 271 (Grimke ed. 1790) ("The Said sheriffs shall by themselves, or their lawful deputies respectively, attend all the courts hereby appointed, or directed to be held, within their respective districts"); VOTES AND PROCEEDINGS OF THE HOUSE OF DELEGATES OF THE STATE OF MARYLAND: NOVEMBER SESSION 1791, at *2 (Green ed., 1795) (appointing sergeant at arms and door-keeper for state legislature); PENNSYLVANIA STATUTES AT LARGE, VOLUME X: 1779-81, 378 (Stanley Ray ed., 1904) ("sergeant-at-arms" and "door-keeper" for legislature); 1 LAWS OF THE STATE OF NEW YORK 176 (2d ed., Albany: Websters & Skinner 1807) (requiring during court "all justices of the peace, coroners, bailiffs, and constables within their respective counties, that they be then and there in their own persons…. And the said respective sheriffs and their officers shall then and there attend in their own proper persons."); ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA 42 (Davis ed., 1796) (court's "serjeant at arms"); A DIGEST OF THE LAWS OF THE STATE OF GEORGIA, 1800 Ga. Laws 611 (Watkins ed., 1800) ("[T]he sheriff of each county or his deputy, is required to attend at such elections, for the purpose of enforcing the orders of the presiding magistrates in preserving good order."); 1 LAWS OF THE STATE OF NEW JERSEY 36 (Bloomfield ed., 1811) (polling places); 2 LAWS OF THE STATE OF DELAWARE 984 (Samuel & John Adams eds., 1797) (polling places).

secures a location and protects those in it, there is less of a need for ordinary, law-abiding Americans to be ready to defend themselves. *See id.* at 2133. The problem for California is that state-provided comprehensive security is nowhere to be found at the challenged provisions in SB2. No Californian walks past numerous armed guards and through metal detectors to eat at a restaurant, picnic in a park, to take public transportation, or to go hiking in the wilderness. Notably, California previously *allowed* licensed individuals to carry for self-defense in many of the challenged locations pre-*Bruen*. And some 121,000 Californians held licenses. *See, e.g.*, *California Concealed Carry Overview*, CONCEALED COAL., https://tinyurl.com/3kjvwcnp (last visited Sept. 26, 2023). Simply because more people can get licenses post-*Bruen* does not mean that places where licensees used to carry become "sensitive" overnight.

In sum, California, defying *Bruen*, has designated large swaths of public life "gun free zones." In doing so, it ignores the Supreme Court's instruction that "sensitive places" are "few" and "exceptional." *Bruen*, 142 S. Ct. at 2133, 2156; *Range v. U.S. Att'y Gen.*, 69 F.4th 96, 105 (3d Cir. 2023) ("[H]istorical restrictions on firearms in 'sensitive places' do not empower legislatures to designate any place 'sensitive' and then ban firearms there[.]"). This Court should join the growing chorus of cases holding that such broad-based locations restrictions on public carry violate the Second Amendment after *Bruen. See, e.g.*, *Antonyuk II*, 639 F. Supp. 3d 232; *Christian*, 642 F. Supp. 3d 393; *Koons*, 2023 WL 3478604; *Siegel*, 2023 WL 1103676.

## III.     The Other Factors Favor a Preliminary Injunction.

Plaintiffs must also show that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction is in the public interest. *Winter*, 555 U.S. at 20. When the Government is a party, the final two preliminary injunction factors—the balance of the equities and the public interest—merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). More, when a party "has established likelihood of success on the merits of a constitutional

claim—particularly one involving a fundamental right—the remaining *Winter* factors favor enjoining the likely unconstitutional law." *Junior Sports Mags.*, 2023 WL 5945879, at *8; *see also Baird*, 2023 WL 5763345, at *4 (noting that when a plaintiff shows likelihood of success on the merits of a constitutional claim, it "tips the merged third and fourth favors decisively in his favor").

So too here. It is evident that SB2 causes Plaintiffs irreparable harm by depriving them of their fundamental right to carry in public spaces. And as the Ninth Circuit recently noted in the Second Amendment context, the "deprivation of constitutional rights unquestionably constitutes irreparable injury." *Baird,* 2023 WL 5763345, at *4 (cleaned up). As for the final two factors, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002); *see also Baird*, 2023 WL 5763345, at *4 ("The government . . . cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." (cleaned up)). Thus, the remaining factors favor injunctive relief.

## IV.     The Court Should Waive Bond or Require Only Nominal Security.

Because the State will not suffer monetary hardship and this matter involves a constitutional violation and the public interest, the Court should either waive Rule 65(c)'s bond requirement or impose only a nominal bond. *See, e.g., Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999) (district court has "discretion as to the amount of security required, if any"); *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005) ("requiring nominal bonds is perfectly proper in public interest litigation").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For all these reasons, this Court should issue a preliminary injunction prohibiting enforcement of the challenged provisions of California's SB2.

Dated:  September 26, 2023             BENBROOK LAW GROUP, PC


By  s/ Bradley A. Benbrook
BRADLEY A. BENBROOK
Attorneys for Plaintiffs