Rob Bonta
Attorney General of California
Matthew Wise
Mark R. Beckington
Supervising Deputy Attorneys General
Todd Grabarsky
Jane Reilley
Lisa Plank
Robert L. Meyerhoff
Deputy Attorneys General
State Bar No. 298196
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6177
  Fax:  (916) 731-2144
  E-mail:  Robert.Meyerhoff@doj.ca.gov
*Attorneys for Rob Bonta, in his Official Capacity as
Attorney General of the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Reno May, an individual, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**Robert Bonta, in his official capacity as Attorney General of the State of California, and Does 1-10,**<br><br>Defendants. | Case Nos. 8:23-cv-01696 CJC (ADSx)<br>8:23-cv-01798 CJC (ADSx)<br><br>**DECLARATION OF PROFESSOR SHARON MURPHY IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**<br><br>Date:          December 20, 2023<br>Time:          1:30 p.m.<br>Courtroom:  9B<br>Judge:        Hon. Cormac J. Carney |
| **Marco Antonio Carralero, an individual, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**Robert Bonta, in his official capacity as Attorney General of California,**<br><br>Defendant. | |

1

Declaration of Prof. Sharon Murphy
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

## DECLARATION OF PROFESSOR SHARON MURPHY

I, Sharon Ann Murphy, declare under penalty of perjury that the following is true and correct:

1.    I am over the age of eighteen (18) years, competent to testify to the matters contained in this declaration, and testify based on my personal knowledge and information.

2.    I am a Professor of History and Chair of the Department of History and Classics at Providence College in Providence, Rhode Island, where I have worked as an academic since 2005. I have been an associate editor of *Enterprise and Society: The International Journal of Business History* since 2011, and I am currently serving as president of the Business History Conference (2023-2024), which is the largest international organization in the field of business history.

3.    Sharon Ann Murphy is my maiden name, which I use for all professional work, even though I changed my name legally in 1996 when I married.

## BACKGROUND AND QUALIFICATIONS

4.    I received my B.A. (1996), M.A. (1999), and Ph.D. (2005), all from the University of Virginia. I am a financial historian of the United States, with a particular interest in the complex interactions between financial institutions and their clientele. I focus on understanding why financial institutions emerged, how they were marketed to and received by the public, and what the reciprocal relations were between the institutions and the community at large. My first book, *Investing in Life: Insurance in Antebellum America* (Johns Hopkins University Press, 2010), won the 2012 Hagley Prize for the best book in business history. It considers the creation and expansion of the American life insurance industry from its early origins in the 1810s through the 1860s, and examines how its growth paralleled and influenced the emergence of the middle class. My third book, *Other People's Money: How Banking Worked in the Early American Republic* (Johns Hopkins University Press, 2010) traces the evolution of banking from the nation's founding

Declaration of Prof. Sharon Murphy
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

to the creation of the national banking system during the Civil War, and how the monetary and banking structures that emerged from the Civil War provided the basis for our modern financial system under the Federal Reserve. My most recent book, *Banking on Slavery: Financing Southern Expansion in the Antebellum United States* (Chicago University Press, 2023) examines the critical role played by southern banks in supporting and promoting the system of slavery on the frontier, particularly through the use of enslaved lives as loan collateral. I have also published several articles on early financial institutions, including the entry on "Banking and Finance from the Revolution to the Civil War" for the *Oxford Research Encyclopedia of American History* (Oxford University Press, 2019).

5.     I have delivered dozens of presentations on early American financial institutions at universities in the U.S. and abroad, including Yale University, Columbia University, the University of Pennsylvania School of Law, Brown University, Princeton University, University of Virginia, New York University, the University of Louisville School of Law, University of Maryland, the George Washington University School of Business, University of Missouri, the John F. Kennedy Institute for North American Studies at Freie Universität (Berlin), and Wake Forest University. I have also presented my work to various professional forums including the Treasury Historical Association, the Connecticut Supreme Court Historical Society, the International Conference on Risk and the Insurance Business in History (Seville, Spain), the American Society for Legal History, the Texas Supreme Court Historical Society, the Business History Conference, and the Society for Historians of the Early American Republic. My research on financial institutions has been supported by grants from the National Endowment for the Humanities, the American Council of Learned Societies, the American Antiquarian Society, and the American Philosophical Society, among other organizations.

6.     I have been retained by the Office of the Attorney General of California to provide expert testimony in litigation challenging California's restrictions on the

Declaration of Prof. Sharon Murphy
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

concealed carry of firearms in sensitive locations. I am being compensated at a rate of $200/hour for my work on this matter. My compensation is not contingent on the results of my analysis or the substance of any testimony.

7.    I have not worked as an expert witness on any previous cases. A true and correct copy of my curriculum vitae is attached as Exhibit 1 to this declaration.

## PURPOSE AND SUMMARY

8.    I have been asked to provide an explanation of the function of financial institutions in American society at the founding in 1791, with an overview of how financial institutions later evolved into our modern institutions. Below I make two basic points. First, financial institutions were extremely rare in 1791. The overwhelming majority of Americans would have had no contact with financial institutions at the time of the nation's founding, although these institutions would soon develop rapidly beginning around the turn of the century and especially during the 1810s and 1820s. Second, even following the rapid growth of financial institutions in the decades after the founding, the function of these institutions—and consequently how the public interacted with these institutions—was entirely different from the function of modern financial institutions.

## I.    FINANCIAL INSTITUTIONS WERE EXTREMELY RARE IN 1791.

9.    **Colonial Finance.** During the colonial period, neither government-sanctioned commercial banks nor private bankers (individuals or groups engaging in banking activities without government sanction) existed. As one banking historian unequivocally states, "There were no commercial banks in the British North American colonies. Arrangements for clearing business transactions and providing short-term credit were underdeveloped, just as they were in the provinces of eighteenth-century England."[1] There were a few attempts by the colonists to create so-called "land banks." These were government institutions that lent

---

[1] Benjamin J. Klebaner, *American Commercial Banking: A History* (Boston: Twayne Publishers, 1990), 3.

landholders state-issued paper money up to half the value of their property, which borrowers paid back over the course of several years with interest. Yet unlike a true commercial bank, loan offices provided no financial intermediation services (i.e., bringing together lenders and borrowers). They did not accept money on deposit or provide other financial services. They primarily served as a means of injecting much-needed liquidity into the economy.[2] Additionally, all of these land banks were ruled illegal under British colonial law, which many monetary historians "cite as the prime reason for the stunted institutional development of American finance."[3] Nor did colonists attempt to bypass this legal restriction by engaging in banking activities without government sanction (i.e., private banking.) As a leading expert on colonial finance writes: "In the colonies, surviving records point to no private bankers who issued even modest amounts of currency over a sustained period of time. Some merchants may have signed IOUs that passed from hand to hand in limited geographical areas, but no American firm called itself a private bank and proceeded to solicit deposits and issue bank notes against fractional specie reserves."[4] The limited banking functions required by the colonists were "performed by merchants with access to London and Glasgow."[5]

10.   **Revolutionary Finance.** The first American bank to open its doors was the Bank of North America in 1782. In creating this bank, the Continental Congress hoped that the bank would help with the continued financing troubles of the Revolutionary War effort, just as the Bank of England had helped Britain

---

[2] Theodore Thayer, "The Land-Bank System in the American Colonies," *Journal of Economic History* 13 (Spring 1953), 146; Edwin J. Perkins, *American Public Finance and Financial Services, 1700–1815* (Columbus, OH: Ohio State University Press, 1994), 44–46; Katie A. Moore, "America's First Economic Stimulus Package: Paper Money and the Body Politic in Colonial Pennsylvania, 1715–1730," *Pennsylvania History: A Journal of Mid-Atlantic Studies* 83 (Autumn 2016), 529–57.
[3] Perkins, 41.
[4] Perkins, 41.
[5] Klebaner, 4.

Declaration of Prof. Sharon Murphy
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

successfully finance major wars for almost a century. Although intended to help with war financing, the Bank of North America did not open its doors until the fighting was virtually over. Congress later rescinded the national charter for the bank, and from 1783 it continued to function as a state-chartered commercial bank in Pennsylvania.[6] However, as banking historian Howard Bodenhorn (economics professor at Clemson University) notes, "After the war, however, the bank was dominated by Philadelphia's elite merchants who were loathe to lend to other than their own. Most of the city's inhabitants and many of the state's legislators, perhaps rightly, considered the bank of little practical use."[7]

11. **Finance during the Founding Era.** The only other banks to begin operations before the passage of the Bill of Rights by Congress in 1789 were the Bank of Massachusetts in Boston (1784) and the Bank of New York, which began operations in 1784 but did not receive a state charter until 1791 (a year after that state had ratified the Bill of Rights).[8] As the late financial historian Edwin Perkins (former professor of history at the University of Southern California) writes, this creation of chartered commercial banks was "the most radical departure from the colonial past,"[9] yet it was initially also highly limited in its scope. "The private commercial bank was an innovative institution in the immediate postwar period, but its debut came in only three major port cities along the Atlantic coast during the 1780s."[10] Maryland would add a fourth bank in 1790, but this was several months after that state had already ratified the Bill of Rights in December 1789. Similarly, Rhode Island would add the Bank of Providence in 1791, several months after that

---

[6] Perkins, 113-15.
[7] Howard Bodenhorn, *A History of Banking in Antebellum America: Financial Markets and Economic Development in an Era of Nation-Building* (Cambridge University Press, 2000), 35.
[8] J. Van Fenstermaker, *The Development of American Commercial Banking: 1782-1837.* (Kent,Ohio: Kent State University, 1965).
[9] Perkins 187.
[10] Perkins, 136.

Declaration of Prof. Sharon Murphy
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

state had ratified the Bill of Rights in June 1790.[11] By the time Alexander Hamilton issued his *Report on the Bank* in December of 1790, which called for the creation of a federally chartered commercial bank, nine states had already ratified the Bill of Rights. The Bank of the United States would receive its charter in July 1791, but not formally open its doors for operation at its headquarters in Philadelphia until December 12, 1791, just three days before Virginia finally ratified the Bill of Rights and it became the law of the land.[12]

12. **Rarity of Banks.** At the time of the ratification of the Second Amendment, banks were a novel innovation, largely limited to elite merchants in the few cities of the nation. Although this would begin to change rapidly during the 1790s and into the nineteenth century, the statement made in Plaintiffs' Memorandum of Points and Authorities in Support of Plaintiff's Motion for Preliminary Injunction [Case No.: 8:23-cv-01696 CJC (ADSx)] that "Banks have existed since the Founding (and long before)" is a gross over-simplification and does not accurately reflect the historical record.

**II.   LATE-EIGHTEENTH AND NINETEENTH-CENTURY FINANCIAL INSTITUTIONS FUNCTIONED VERY DIFFERENTLY FROM THEIR MODERN COUNTERPARTS.**

13. **Modern commercial banks.** Commercial banks today are an integral part of their local communities and perform a wide variety of services for the general public, from offering checking and savings accounts; to providing car loans, small business loans, mortgages, and credit cards; to offering small investments such as certificates of deposit and other services such as safe deposit boxes; to providing government-sanctioned services such as the notarization of documents.[13] Since the colonial period, notary publics have been essential public officials. While

---

[11] J. Van Fenstermaker, *The Development of American Commercial Banking: 1782-1837*. (Kent, Ohio: Kent State University, 1965).
[12] David J. Cowen, *The Origins and Economic Impact of the First Bank of the United States, 1791-1797*. (New York: Garland Publishing, 2000).
[13] Board of Governors of the Federal Reserve System, "What is Financial Stability?" https://www.federalreserve.gov/financial-stability/what-is-financial-stability.htm [accessed October 27, 2023.]

Declaration of Prof. Sharon Murphy
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

notary publics were initially appointed by the President of the United States, "the legislatures of the states eventually took control by passing statutes regulating the appointment and supervision of notaries, which was usually delegated to the secretary of state."[14] This remains the procedure today. As the National Notary Association states, "A Notary Public is an official of integrity appointed by state government—typically by the secretary of state—to serve the public as an impartial witness in performing a variety of official fraud-deterrent acts related to the signing of important documents."[15] On the one hand, "The notary public is a government appointee, a creature strictly of legislation, and scores of case decisions…have pronounced that notaries are public officials."[16] Yet these government appointees are now commonly found in modern commercial banks, where they notarize documents not only directly related to bank business, but for any "customers who carry documents to the bank for notarization."[17] While the presence of notaries in commercial banks has been common throughout the twentieth century, it was not a feature of early banks. In fact, several states specifically barred this practice. For example, an 1840 Pennsylvania law stated that "no person, being a stockholder, director, cashier, teller, clerk, or other officer in any bank or banking institution, or in the employment thereof,…shall, at the same time, hold, exercise or enjoy the office of notary public." This Pennsylvania law continued to be enforced at least through the 1890s.[18] Similarly, the Ohio Court of Appeals ruled in the 1890s that a

---

[14] Michael L. Closen and G. Grant Dixon III, "Notaries Public from the Time of the Roman Empire to the United States Today, and Tomorrow," *North Dakota Law Review*, 68 N.D. L. Rev. 873, (1992), 876.

[15] *National Notary Association,* "What is a Notary," https://www.nationalnotary.org/knowledge-center/about-notaries/what-is-a-notary-public [Accessed October 28, 2023]

[16] Michael L. Closen, "The Public Official Role of the Notary," *John Marshall Law Review*, 31 J. Marshall L. Rev. 651, (Spring 1998), 651.

[17] Closen, "The Public Official Role," 678.

[18] *Commission of Notary Public*, 4 Pa. D. 269, (April 27, 1895), 269.

"relation…between a bank and a notary public" was "in contravention of sound public policy, and therefore void."[19]

14. **Presence of Children and Families.** In the twenty-first century, families bring their children to these commercial banks both as a matter of convenience as they go about their days and as a way to teach them about financial responsibility. For example, commercial banks today permit parents to open savings accounts for their children. While all of these activities and services are typical of banks since the mid-twentieth century, they were either atypical or nonexistent prior to the Civil War. Few people held money on deposit; loans were short-term and reserved for businesses; the average person had no reason to interact directly with a bank; and children were rarely, if ever, present in banks. As economic historian Naomi Lamoreaux (emerita professor at Yale) writes in her seminal work on early banking in New England, "Despite their large numbers, early banks—unlike modern institutions—rarely provided financial services to ordinary households. Their customers consisted almost entirely of local businessmen whose borrowings took a very different form from what is common today."[20]

15. **The functions of early commercial banks.** Commercial banks bring together lenders and borrowers. For early banks, the main means of accumulating loanable funds was through the sale of stock shares in the bank, which gave the shareholder partial ownership of the bank and (hopefully) earned them dividends based on the bank's profits. Bank charters usually required that this bank stock— which typically cost from $50 to several hundred dollars per share—be purchased wholly in specie, although this gold or silver could be paid in several installments over time. Thus, only wealthy individuals could purchase bank shares, and only a small segment of society had occasion to visit or otherwise directly interact with

---

[19] *The Ohio National Bank of Washington v. Hopkins*, 8 App.D.C., (March 5, 1896), 153.

[20] Naomi Lamoreaux, *Insider Lending: Banks, Personal Connections, and Economic Development in Industrial New England* (Cambridge University Press, 1996), 1.

9

Declaration of Prof. Sharon Murphy
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

these banks. As Lamoreaux summarizes: "Early banks obtained the funds they lent to borrowers from very different sources than modern banks. Today, for example, the most important component of a bank's liabilities is deposits, but these were relatively insignificant during the early nineteenth century, making up only about 10 to 20 percent of the total, depending on locality…the preponderance of the banks' liabilities consisted of shares of their own capital stock. This pattern contrasts sharply with that of modern banks. Today such securities account typically for only a minuscule part of total liabilities—a few percentage points at most."[21] Although banks also accepted money on deposit, this was not a common practice until the nineteenth century when banks started paying interest on deposits and the use of checks became more common. According to Perkins, "Most commercial banks in the early national and antebellum periods did not concentrate on deposit growth as a key means of expanding the volume of loanable funds but looked instead to the augmentation of capital."[22]

16. **Bank loans.** The most common type of lending engaged in by commercial banks was discounting, which was a specific type of short-term loan for businesspeople engaged in trade. A merchant would obtain goods from a seller by issuing a promissory note known as commercial paper, promising to pay the full amount at a specified future date after he had sold the goods in question. The seller could then take this note to a bank to be discounted; the bank would loan him the face value of the note (in banknotes) less a discount reflecting the interest rate. When these discounted notes became due, usually after thirty to ninety days, the loan recipient could repay his or her debt or request a renewal of the loan for an additional discount.[23] These loans were necessarily short term and self-liquidating,

---

[21] Lamoreaux, 3.
[22] Perkins, 122.
[23] Robert E. Wright, "Origins of Commercial Banking in the United States, 1781-1830," in *Online Encyclopedia of Economic and Business History*, ed. Robert (continued…)

meaning that as soon as a sale was completed, the note would be repaid. The short-term nature of the arrangement was its key feature; this feature is also what made these loans of little use to the agricultural sector. According to the US Census Bureau, in 1800 only 6.1% of the population lived in urban areas (defined as "incorporated cities and towns with at least 2,500 people"); and as late as 1870, almost 50% of the population was still employed in agriculture.[24] Therefore, the vast majority of individuals in the early republic had no access to or contact with commercial paper, and thus had no means of obtaining loans from commercial banks. As Lamoreaux has documented for early New England banks, "Directors often funneled the bulk of the funds under their control to themselves, their relatives, or others with personal ties to the board. Though not all directors indulged in this behavior, insider lending was widespread during the early nineteenth century and most conspicuously differentiates early banks from their twentieth-century successors."[25] She thus concludes, "Although we call these early-nineteenth-century institutions banks, in actuality they functioned more like investment clubs."[26] In examining Philadelphia banks, Bodenhorn adds, "By 1803 Philadelphia merchants had again grown dissatisfied with the existing banks. The Bank of North America still catered to an elite few and the Bank of Pennsylvania's resources were tied up with state business."[27]

17.  **The expansion of commercial banking in the early nineteenth century.** While banks were rare at the moment of the founding, by 1800 there were 29 banks with an authorized capital of $27.42 million, although these were still primarily located in the major port cities of the nation. By 1819, the year of the

---

Whaples. https://eh.net/encyclopedia/origins-of-commercial-banking-in-the-united-states-1781-1830; Perkins, 124-126.
[24] Steven Hirsch, "Rural America by the Numbers," *Generations: Journal of the American Society on Aging,"* Vol. 43, No. 2 (Summer 2019), 9-10.
[25] Lamoreaux, 4.
[26] Lamoreaux, 5.
[27] Bodenhorn, 36.

nation's first major economic panic, that number had ballooned to 342 banks with $195.98 million in authorized capital. Many of these banks were now opening in more rural parts of the country, although they still catered to a merchant clientele by focusing on short-term discount loans. By 1837, at the time of the nation's next major panic, there existed 657 commercial banks.[28] It was only much later in the nineteenth century that commercial banks began lending to a wider swathe of the public. "By mid-century, bank lending had changed…No longer closely tied to the mercantile community, banks became increasingly specialized and offered credit to organizations in proportion to their representation within the local business community. Merchants no longer received the bulk of the banks' funds, nor did they receive credit on more favorable terms than others."[29]

18. **Savings banks.** Distinct from for-profit commercial banks were mutual savings banks, which emerged in the 1810s as philanthropic organizations to help the working classes save money for emergencies and old age. These banks possessed no capital stock. Instead, they accumulated funds by accepting small amounts of money on deposit. Working-class men and women from all occupations would deposit as little as a nickel or a dime in their account each week. These deposits were recorded in bankbooks, which they would be required to present in order to withdraw their funds, although they were often required to request withdrawals in advance and could not withdraw funds on demand. Savings banks expanded even more rapidly than commercial banks during the twenty years prior to the Civil War. The industry grew from 61 institutions with $14 million on deposit in 1840 to 278 banks with $149 million in deposits by 1860.[30]

---

[28] Wright, "Origins of Commercial Banking in the United States, 1781-1830"; Warren E. Weber, Census of Early State Banks in the United States (2005), https://www.minneapolisfed.org/people/warren-e-weber; Warren E. "Early State Banks in the United States: How Many Were There and When Did They Exist," *Journal of Economic History* 66, no. 2 (June 2006): 433–55.

[29] Bodenhorn, 219-220.

[30] R. Daniel Wadhwani, "Citizen Savers: Family Economy, Financial Institutions, and Public Policy in the Northeastern United States," *Enterprise and*

(continued…)

12

Declaration of Prof. Sharon Murphy
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

19.  **How the public interacted with early commercial banks.** The earliest commercial banks were designed to meet the needs of elite merchants in the major port cities. The average citizen would have had almost no contact with banks themselves, having neither the funds to purchase stock or place money on deposit, nor the business paper upon which discount loans would be granted. This remained true through the end of the Civil War. The main way people would interact with the banking system was through banknotes, which circulated in the local economy. While in theory these banknotes were redeemable for specie upon presentation at the bank, in practice people would continue to circulate the notes in the economy rather than go through the hassle of redemption. The time and effort required to return a banknote to its bank of issue for redemption meant that the average person rarely engaged in this practice. Instead, merchants who specialized as note brokers attempted to acquire banknotes trading at a discount and then bring them to the bank of issue for redemption at par.[31]

20.  **Anti-banking and early banking in California.** In the aftermath of the panics of 1837 and 1839, especially in those states of the Midwest and Southwest that experienced the worst banking failures, anti-banking legislators rose to power. Louisiana passed a new state constitution in 1845 that banned the incorporation of new banks. Texas's first constitution, also in 1845, declared that "[n]o corporate body shall hereafter be created, renewed or extended with banking or discounting privileges," while Arkansas passed a constitutional amendment in 1846 stating that "[n]o Bank or Banking Institution, shall be hereafter incorporated, or established in

*Society* 5 (December 2004): 617-624; R. Daniel Wadhwani, "The Institutional Foundations of Personal Finance: Innovation in U.S. Savings Banks, 1880s-1920s," *The Business History Review*, Vol. 85, No. 3 (Autumn 2011), 504.

[31] John Lauritz Larson, *The Market Revolution in America: Liberty, Ambition, and the Eclipse of the Common Good* (New York: Cambridge University Press, 2010), 26, 39-45; Perkins, 118-123; Gary M. Walton and Hugh Rockoff, *History of the American Economy* (New York: Dryden Press, 1994), 254-257; Stephen Mihm, *A Nation of Counterfeiters: Capitalists, Con Men, and the Making of the United States* (Boston: Harvard University Press, 2007), 1-19; Joshua R. Greenberg, *Banknotes and Shinplasters: The Rage for Paper Money in the Early Republic* (University of Pennsylvania Press, 2020), 45-58.

Declaration of Prof. Sharon Murphy
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

this State."[32] According to one history of California banking, "In 1849, at least six banks operated in San Francisco. Most of the early bankers were exchange dealers, offering certificates of deposit or other types of notes in return for gold…The early banks also offered loans and 'borrowed' gold from customers."[33] But these banks were soon banned. The new constitution of California (1849) stated that "No association may issue paper to circulate as money" and "No person can act as a bank or circulate money.[34] California would charter zero banks before the outbreak of the Civil War.[35] The ban on charters for banks in California would remain until the 1879 revision of the state constitution removed the statement.[36]

21. **Bank robbery.** During the antebellum period, armed robberies of banks were virtually unknown. Indeed, according to one study of the topic, "In nineteenth-century cities, robbery in the modern sense—that is armed robbery—was quite rare."[37] Another study of bank robbery asserts that "The first armed bank robbery by a civilian in America happened…on December 16, 1863, when a heavily indebted postmaster named Edward Green shot and killed a bank clerk in a robbery of $5,000 from Malden Bank, in Malden, Massachusetts, north of Boston. Other early armed bank robberies took place during the Civil War."[38] Prior to the Civil War, bank robberies using firearms do not appear in the historical record; if they occurred, they were likely extremely rare. The nation's first *known* bank robbery,

---

[32] *Constitution of the State of Texas* (Houston, 1845), 20; "Notice," *Weekly Arkansas Gazette* (Little Rock), May 5, 1845, 3; Larry Schweikart, *Banking in the American South from the Age of Jackson to Reconstruction* (Baton Rouge: Louisiana State University Press, 1987), 167.

[33] Lynne Pierson Doti, *Banking in an Unregulated Environment: California, 1878-1905* (London: Taylor & Francis, 2012), 30-31.

[34] Doti, 32.

[35] Warren E. Weber, Census of Early State Banks in the United States (2005), https://www.minneapolisfed.org/people/warren-e-weber; Warren E. Weber, "Early State Banks in the United States: How Many Were There and When Did They Exist," *Journal of Economic History* 66, no. 2 (June 2006): 433–55.

[36] Doti, 33-34.

[37] Roger Lane, "Urban Police and Crime in Nineteenth-Century America," *Crime and Justice* (1992), vol. 15: 43.

[38] Jerry Clark and Ed Palattella, *A History of Heists: Bank Robbery in America* (Rowan & Littlefield, 2015), 5.

for example, involved the theft of $162,821.21 (approximately $3.2 million today) from the vault of the Bank of Pennsylvania in September 1798. But the culprit in this case accessed the vault by using a key that he had secretly copied while working for the bank's locksmith, with the additional help of the bank's porter; it was an inside job.[39] The next major recorded theft of a bank, which occurred at City Bank of New York in 1831, was likewise an inside job. "The heist at the City Bank is also credited as an impetus for the introduction of the bank safe in the United States in 1834—one of the first measures designed to foil bank robbers." It was only later in the century, approaching the Civil War, that bank robbers became "more adept and more violent."[40]

22.   **Armed robbery in transit.** Prior to the Civil War, armed robberies involving banknotes were much more likely to take place in transit, such as on stagecoach routes. In the spring of 1820, the *National Recorder* of Dover, Delaware, published the harrowing tale of a young woman's encounter with an armed robber. This popular account told the story of a farmer's daughter who traveled by horseback to town to exchange a large $100 banknote for smaller notes. On arrival, she quickly discovered that the bank had shut down and the local merchants would no longer accept her banknote; her paper money was apparently worthless. Suddenly, a seemingly kind man appeared who rode alongside her on the way back home. On reaching a remote area, the stranger pulled a gun on the woman and demanded that she turn over the technically defunct banknote. The robber knew that the banknote still potentially had value—if he could pass it off to someone in another community who lacked knowledge of that specific bank's failure. By a twist of fate, a puff of wind blew the money out of her hand. When the man dismounted to chase after the note, the woman quickly set her horse to gallop. The robber fired his gun, spooking his now unoccupied horse, which followed the

---

[39] Clark and Palattella, 5-7.
[40] Clark and Palattella, 15.

Declaration of Prof. Sharon Murphy
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

woman back to the farm. Once home, the farmer and his daughter soon discovered that the robber's saddle bags contained both a large quantity of counterfeit banknotes and "fifteen hundred dollars in good money"—meaning banknotes of banks still in existence. Although they had lost the $100 uncurrent banknote—meaning a banknote that no longer had worth as currency due to the bank's closure—they surmised that the robber's horse itself was worth as much. Called "A Good Story," newspapers from around the country soon reprinted this saga—the nineteenth-century version of "going viral." Whether or not the details of this story are all true (it is more than likely an apocryphal tale), the story clearly resonated with early Americans and presents a snapshot of the concerns of average Americans in dealing with money in the early 1820s.[41]

23.   **Stagecoach Robberies.** The first armed robbery of a stagecoach in California was recorded in 1856. "In California's earliest years there was a rapid growth in the number of footpads, those who lay in ambush along trails and pathways waiting to rob unsuspecting travelers. When gold and silver began to accumulate at mining camps, and was then transported to some major community by mule train, gangs began to form to overwhelm the armed guards that accompanied these treasure shipments."[42] This type of theft was more successful than trying to break into a bank vault, since they could grab the treasure box carrying the valuable cargo and flee. "One of the advantages in robbing stagecoaches was that the work could be done at some isolated location, allowing the road agents time to flee before a posse could be organized and ride to the scene. The preferred place for a robbery was where the stagecoach would naturally travel

---

[41] "A Good Story," *New-York Daily Advertiser*, May 20, 1820; *Newburyport* [MA] *Herald*, May 26, 1820; *Providence* [RI] *Patriot*, May 27, 1820; *American Mercury* [CT], May 30, 1820; *Cherry-Valley* [NY] *Gazette*, May 30, 1820; *Connecticut Courant*, May 30, 1820; *Westchester* [NY] *Herald*, May 30, 1820; *Middlesex* [CT] *Gazette*, June 1, 1820; *Washington* [NJ] *Whig*, June 5, 1820; *Rochester* [NY] *Telegraph*, June 6, 1820; *Republican Advocate* [NY], June 9, 1820; *Vermont Gazette*, June 10, 1820; *Edwardsville* [IL] *Spectator*, June 27, 1820;
[42] R. Michael Wilson, *Stagecoach Robberies in California: A Complete Record, 1856-1913* (McFarland & Co., Inc., 2014), 3.

Declaration of Prof. Sharon Murphy
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

at a slow pace, such as when the coach was ascending a steep or long grade, driving across soft sand, crossing a narrow bridge, or where there was a sharp curve in the road. A stagecoach could be stopped by almost anything, or by nothing more than a man stepping in front of the horses, pointing his gun at the driver, and ordering him to halt."[43] A result of this increasing risk was the emergence of a private security industry. "Wells Fargo started guarding stagecoaches in 1852, and Brink's Security, which would become the armored car company, began its operations in 1859." The best known of these security firms was the Pinkerton Detective Agency.[44]

24. **The Rise of Violent Armed Bank Robbery after the Civil War.** The emergence of Jesse James and his gang during the late-nineteenth century first established bank robbery in the public mind as a major problem. "They held up banks and trains, which also had safes, by deploying deception, shock, and other paramilitary techniques they mastered as Confederate guerrillas. The Jameses' robberies often ended in unprecedented displays of violence—the result of the depth of Missouri's internecine hatred and the increase in the public availability of firearms after the Civil War."[45] As one book on the history of bank robbery asserts: "even today many bank robberies, especially those that are the successful work of skilled serial thieves, follow the pattern that James established."[46]

25. **Bank Robberies during the Great Depression.** The incidence of bank robberies jumped sharply during the Great Depression and was part of a wider crime spree that led to the creation of the Department of Justice's Division of Investigation in 1933 (the direct forerunner of the Federal Bureau of Investigation [FBI]). "As 1934 started, [Attorney General] Cummings and [President] Roosevelt focused on federal involvement in the control of bank robbery and other crimes." That same year, the federal government passed the Federal Bank Robbery Act,

---

[43] Wilson, 7.
[44] Clark and Palattella, 30.
[45] Clark and Palattella, 21.
[46] Clark and Palattella, 20-21.

Declaration of Prof. Sharon Murphy
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

making bank robbery a federal crime for the first time. "Other bills would make the interstate flight of felons a federal crime if they were trying to avoid prosecution; strengthen the federal kidnapping law; and require the registration of machine guns, sawed-off shotguns, and rifles—the types of weapons gangsters favored."[47]

26. **Bank Stability Essential to the Operation of the United States Economy.** The smooth operation of banks and other financial institutions is essential to the health of the overall economy. As the Board of Governors of the Federal Reserve notes, "A financial system is considered stable when banks, other lenders, and financial markets are able to provide households, communities, and businesses with the financing they need to invest, grow, and participate in a well-functioning economy." On the other hand, "in an unstable system, an economic shock is likely to have much larger effects, disrupting the flow of credit and leading to larger-than-expected declines in employment and economic activity."[48] These types of economic shocks can take many forms, but widespread fear for one's safety is one potential disruptor. A recent in-depth quantitative study of the economic effects of gun violence on communities by the Urban Institute concludes that "retail and service industries" including financial services are "disproportionately affected by gun violence levels."[49] This report finds "a significant relationship between gun violence and the ability of businesses to open, operate, and grow in the affected communities."[50] While many bank services today can be conducted online, a significant proportion of the population still accesses

[47] Clark and Palatella, 77-78.
[48] Board of Governors of the Federal Reserve System, "What is Financial Stability?" https://www.federalreserve.gov/financial-stability/what-is-financial-stability.htm [accessed October 27, 2023.]
[49] Yasemin Irvin-Erickson, Bing Bai, Annie Gurvis, Edward Mohr, "The Effect of Gun Violence on Local Economies," (Urban Institute, 2016), p. 17. https://www.urban.org/sites/default/files/publication/85401/the-effect-of-gun-violence-on-local-economies_2.pdf.
[50] Yasemin Irvin-Erickson, Bing Bai, Annie Gurvis, Edward Mohr, "The Effect of Gun Violence on Local Economies," (Urban Institute, 2016), p. v. https://www.urban.org/sites/default/files/publication/85401/the-effect-of-gun-violence-on-local-economies_2.pdf.

Declaration of Prof. Sharon Murphy
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

1  bank services in-person, including some of the most vulnerable segments of the

2  population like "older households."[51]

3      I declare under penalty of perjury under the laws of the United States of

4  America that the foregoing is true and correct.

5      Executed on __10/31/2023__, at __Providence, RI__.

6

7                                   _____

8                                   Sharon Ann Murphy

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27  _____
    [51] "2021 FDIC National Survey of Unbanked and Underbanked Households
28  Executive Summary," *https://www.fdic.gov/analysis/household-survey/2021execsum.pdf*, page 4.

# Exhibit 1

Exhibit 1
Page 20



# DEPARTMENT OF HISTORY AND CLASSICS
## PROVIDENCE COLLEGE

**Sharon Ann Murphy, Ph.D.**     (401) 865-2380

Professor and Chair                    sharon.murphy@providence.edu

**EDUCATION**

2005    **Ph.D.**  University of Virginia, Charlottesville, VA          Department of History
                Major Field: 19th & 20th Century U.S.        Minor Field: Latin America
                Specialty: Social, Economic, and Business History
                [committee: Mark Thomas, Peter Onuf, Charles McCurdy, John James]

1999    **M.A.**  University of Virginia, Charlottesville, VA          Department of History
                Thesis: "Wealth Accumulation and Economic Mobility in Mid-Nineteenth-
                Century America"

1996    **B.A.**  University of Virginia, Charlottesville, VA        Major: History Minor: Economics
                With Distinction, Phi Beta Kappa
                Mayonian Award for best undergraduate thesis in history

**TEACHING and RELATED EXPERIENCE**

2021-24    Chair, Department of History and Classics
2023-24    President, Business History Conference [President-elect 2022-23]
2014-        Professor Providence College
2011-        Associate Editor *Enterprise & Society: The International Journal of Business History*
2014-18    Assistant Chair, Department of History and Classics
2016        IES Abroad, Rome, Italy
2009-14    Associate Professor Providence College
2005-09    Assistant Professor Providence College
2005        Postdoctoral Fellow, The Program in Early American Economy and Society at The
                Library Company, Philadelphia
2005        Research Associate, The McNeil Center for Early American Studies, U. of Penn.
2004        Instructor Sweet Briar College
2002-04    Instructor University of Virginia

**Foreign Language**  *Spoken*: Italian (proficient), French (proficient)
                        *Reading*: French (advanced), Italian (prof.), Spanish (intermed.), German (elem.)

**PUBLICATIONS: Books**

*Banking on Slavery: Financing Southern Expansion in the Antebellum United States*, University of Chicago Press, 2023. https://press.uchicago.edu/ucp/books/book/chicago/B/bo190178034.html

*Other People's Money: How Banking Worked in the Early American Republic*, Johns Hopkins University Press, 2017. https://jhupbooks.press.jhu.edu/content/other-peoples-money

*Anglo-American Life Insurance, 1800-1914* (co-edited with Timothy Alborn), Pickering & Chatto, 2013 [paperback Routledge, 2016]. https://www.routledge.com/Anglo-American-Life-Insurance-18001914/Alborn-Murphy/p/book/9781848933521

*Investing in Life: Insurance in Antebellum America*, Johns Hopkins University Press, 2010 [paperback 2013].  **Winner of the 2012 Hagley Prize for the best book in business history.** https://jhupbooks.press.jhu.edu/content/investing-life

Exhibit 1
Page 21

**PUBLICATIONS: Articles, Book Chapters, and Cases**

"How to Define (or Not to Define) the New History of Capitalism," for a forum in *Enterprise & Society: The International Journal of Business History* [forthcoming November 2023]

"Enslaved Financing of Southern Industry: The Nesbitt Manufacturing Company of South Carolina, 1836-1850," *Enterprise & Society: The International Journal of Business History*, v. 23, no. 3, September 2022 (online February 2021): 746-789.

"Gone to Texas: Deadbeat Debtors and their Human Property," *Journal of the Texas Supreme Court Historical Society*, v. 11, no. 2, Winter 2022: 27-43.
https://www.texascourthistory.org/Content/Newsletters//TSCHS%20Winter%202022%202-18%20(2).pdf

"The Financialization of Slavery by the First and Second Banks of the United States," *Journal of Southern History*, v. 87, no. 3, August 2021: 385-426.

"Collateral Damage: The Impact of Foreclosure on Enslaved People during the Panic," for a Forum on the Panic of 1819 in *The Journal of the Early Republic*, v. 40, no. 4, Winter 2020: 691-696.

"Agents, Regulations, and Scandals: US Life Insurance Companies in Late-Nineteenth-Century Latin America," in *Risk and the Insurance Business in History,* Robin Pearson and Jeronía Pons Pons (eds.), Fundación Mapfre, 2020: 61-89. **Winner of the Mansutti Foundation Best Paper Prize.**
https://www.fundacionmapfre.org/documentacion/publico/es/consulta/registro.do?id=171682

"Financing Faith: Latter-day Saints and Banking in the 1830s and 1840s," in *Business and Religion: The Intersection of Faith and Finance*, Matthew C. Godfrey and Michael Hubbard MacKay (eds.), Brigham Young University Press, 2019.

"The Panic of 1819 and the Second Bank of the United States," (co-authored with Robert Bruner), Darden Business School case, July 2018.

"The Myth and Reality of Andrew Jackson's Rise during the Election of 1824," in *A Companion to the Era of Andrew Jackson*, Sean Patrick Adams (ed.), Blackwell Publishing, 2013: 260-279.

"Banks and Banking in the Early American Republic," *History Compass*, Blackwell Publishing, 2012: 409-422.

"How to Make a Dead Man: Murder, Fraud and Life Insurance in 19th-century America," *Financial History*, Kristin Aguilera (ed.), Museum of American Finance, Spring 2010.

"'Doomed…to Eat the Bread of Dependency'? Insuring the Middle Class Against Hard Times," *Common-place*, Michael Zakim (ed.), American Antiquarian Society, April 2010.

"Selecting Risks in an Anonymous World: The Agency System for Life Insurance in Antebellum America" *Business History Review*, Spring 2008: 1-30.

"Securing Human Property: Slavery, Life Insurance, and Industrialization in the Upper South," *The Journal of the Early Republic*, v. 25, Winter 2005: 615-652.

"The Advertising of Installment Plans During the 1920s," in *Turning Points in World History – The Roaring Twenties*, Phillip Margulies (ed.).  San Diego: Greenhaven Press, 2004.

"The Advertising of Installment Plans During the 1920s," in *Essays in History*, volume 37, Corcoran Department of History, University of Virginia, 1995.

**PUBLICATIONS: Book Reviews**

*Review of* Sara T. Damiano, *To Her Credit: Women, Finance, and the Law in Eighteenth-Century New England Cities* (Johns Hopkins University Press, 2021) and Joshua R. Greenberg, *Bank Notes and Shinplasters: The Rage for Paper Money in the Early Republic* (Philadelphia: University of Pennsylvania Press, 2020) in *Reviews in American History* [forthcoming]

*Review of* Dale Tomich (ed.), *Slavery and Historical Capitalism During the Nineteenth Century* (Lexington Books, 2017) in *The Journal of Southern History*, August 2019.

*Review of* Josh Lauer, *Creditworthy: A History of Consumer Surveillance and Financial Identity in America* (Columbia, 2017) and Anne Fleming, *City of Debtors: A Century of Fringe Finance* (Harvard, 2018) in "Up Close and Personal with the American Debtor," *Reviews in American History*, June 2019.

*Review of* Tatiana Seijas and Jake Frederick, *Spanish Dollars and Sister Republics: The Money that Made Mexico and the United States* (Rowman & Littlefield, 2017) in *The Journal of the Early Republic,* Summer 2019.

*Review of* Christy Clark-Pujara, *Dark Work: The Business of Slavery in Rhode Island* (NYU, 2016) in *Agricultural History,* Winter 2018.

*Review of* Jane Ellen Knodell, *The Second Bank of the United States: "Central" banker in an era of nation-building, 1816-1836* (Routledge, 2016) in *Enterprise and Society*, March 2018.

*Review of* Noam Maggor, *Brahmin Capitalism: Frontiers of Wealth and Populism in America's First Gilded Age* (Harvard, 2017) in *Business History Review*, Winter 2017.

*Review of* Rowena Olegario, *The Engine of Enterprise: Credit in America* (Harvard, 2016) in *The Journal of American History*, Oxford University Press, September 2017.

*Review of* Gautham Rao, *National Duties: Custom Houses and the Making of the American State* (Chicago, 2016) in *The American Historical Review,* Robert A. Schneider (ed.), Oxford University Press, June 2017.

*Review of* Donald Ratcliffe, *The One-Party Presidential Contest: Adams, Jackson, and 1824's Five-Horse Race* (Kansas, 2005), in "A Not-So-Corrupt Bargain," *Common-place*, Anna Mae Duane and Walter W. Woodward (eds.), American Antiquarian Society, http://common-place.org/book/a-not-so-corrupt-bargain/ Vol. 16, No. 4, September 2016.

*Review of* Timothy Kistner, *Federalist Tycoon: The Life and Times of Israel Thorndike* (Maryland: University Press of America, 2015), in *New England Quarterly*, Jonathan M. Chu (ed.), Massachusetts Institute of Technology Press, December 2015.

*Review of* Jonathan Levy, *Freaks of Fortune: The Emerging World of Capitalism and Risk in America*, (Cambridge: Harvard University Press, 2012), in *Journal of the Civil War Era*, William A. Blair (ed.), University of North Carolina Press, March 2014.

*Review of* Scott Gabriel Knowles, *The Disaster Experts: Mastering Risk in Modern America*, (Philadelphia: University of Pennsylvania Press, 2011), in *American Historical Review*, Robert A. Schneider (ed.), Oxford University Press, October 2013.

*Review of* Geoffrey Clark, et. al. (eds.), *The Appeal of Insurance*, (Toronto: Univ. of Toronto Press, 2010), in EH.NET Book Reviews http://eh.net/bookreviews, Robert Whaples (ed.), 2011.

*Review of* Timothy Alborn, *Regulated Lives: Life Insurance and British Society, 1800-1914*. (Toronto: University of Toronto Press, 2009), in *Connecticut Insurance Law Journal*, Adam J. Allegro (ed.), University of Connecticut School of Law, 2011.

*Review of* Brian P. Luskey, *On the Make: Clerks and the Quest for Capital in Nineteeth-Century America*, (New York: New York University Press, 2010), in *The Historian*, Richard Spall (ed.), Phi Alpha Theta History Honor Society, Summer 2011.

*Review of* Timothy Alborn, *Regulated Lives: Life Insurance and British Society, 1800-1914*. (Toronto: University of Toronto Press, 2009), in EH.NET Book Reviews http://eh.net/bookreviews, Robert Whaples (ed.), 2010.

*Review of* Andrew M. Schocket, *Founding Corporate Power in Early National Philadelphia.* (DeKalb, IL: Northern Illinois University Press, 2007), in *Pennsylvania Magazine of History and Biography*, Tamara G. Miller (ed.), Historical Society of Pennsylvania, April 2008.

*Review of* Joshua Greenberg, *Advocating the Man: Masculinity, Organized Labor, and the Market Revolution in New York, 1800-1840.* (Columbia University Press/Guteberg-e, 2007) in "Bread and Butter Activism," *Common-place*, Edward G. Gray (ed.), American Antiquarian Society, http://common-place.org/book/bread-and-butter-activism, Vol. 8, No., 2, January 2008.

*Review of* Michael Zakim, *Ready-Made Democracy: A History of Men's Dress in the American Republic, 1760-1860*.  (Chicago: University of Chicago Press, 2003), in *The Journal of Economic History*, C. Knick Harley and Jeremy Atack (eds.), Cambridge University Press, September 2004.

**PUBLICATIONS: Reference Articles**

"Banking and Finance from the Revolution to the Civil War." In *Oxford Research Encyclopedia of American History*, Jon Butler (ed.). New York: Oxford University Press, 2019 [10,000 words].

"Slave Insurance," in *Encyclopedia of Virginia*, Brendan Wolfe (ed.). Charlottesville, VA: Virginia Foundation for the Humanities, 2018 [2800 words]. https://www.encyclopediavirginia.org/Slave_Insurance

"Economy," and "Labor, Non-Agricultural," in *Enslaved Women in America: An Encyclopedia*, Daina Ramey Berry (ed.).  Santa Barbara, CA: ABC-CLIO, 2012, p. 69-72, 162-166 [3300 words].

"New York State Insurance Department," "Henry Wells," and "John Butterfield," in *The Encyclopedia of New York State*, Peter Eisenstadt (ed.).  New York: Syracuse University Press, 2005, p. 246, 778, 1683 [800 words].

"Life Insurance," in *The Encyclopedia of American Business History*, Owen Lancer (ed.), New York: M.E. Sharpe, Inc., 2004 [1000 words].

"Regulation of Insurance Companies" and "United States Bureau of Corporations," in *The Encyclopedia of the Gilded Age and the Progressive Era,* John D. and Joseph D. Buenker (eds.). New York: M.E. Sharpe, Inc., 2004 [1000 words].

"Life Insurance in the United States before World War I," in *Online Encyclopedia of Economic and Business History*.  Robert Whaples (ed.), 2002 [3500 words]. http://eh.net/encyclopedia/life-insurance-in-the-united-states-through-world-war-i/

"Railroads," in *Encyclopedia of the Great Depression and the New Deal*, James Ciment (ed.).  New York: M.E. Sharpe, Inc., 2001, p. 216-219 [2000 words].

**Other Scholarly Products and Media Appearances**

Interview for *The Reckoning: Facing the Legacy of Slavery in Kentucky* radio and podcast series, September 30, 2020 (premier), episodes 1 & 2 https://reckoningradio.org/podcast/

"Other People's Money," for *Historically Thinking* podcast, May 13, 2020, http://historicallythinking.org/

"How Banking Worked in the Early American Republic," for *The Age of Jackson Podcast,* July, 2018, https://theageofjacksonpodcast.com/2018/07/06/episode-30-how-banking-worked-in-the-early-american-republic-with-sharon-ann-murphy/

"Providence College Professors Investigates Slavery and Banking," for *Morning Edition* on Rhode Island Public Radio, May 10, 2018. http://ripr.org/post/providence-college-professor-investigates-slavery-and-banking#stream/0

"Follow the Money: Uncovering How Banking Financed Slavery" for *Uncovering the Civil War* podcast with Antonio Elmaleh, episode 109, January 2018. https://uncoveringthecivilwar.com/upcoming-podcasts/

*Other People's Money* featured on The Republic blog, SHEAR, May 16, 2017. http://www.shear.org/2017/05/16/other-peoples-money-how-banking-worked-in-the-early-republic/

Historian for episode of *Who Do You Think You Are?* on TLC [aired March 26, 2017].

*Other People's Money* featured on The Page 99 Test blog, March 22, 2017. http://page99test.blogspot.com/2017/03/sharon-ann-murphys-other-peoples-money.html

*Other People's Money* featured on The Campaign for the American Reader blog, March 22, 2017. http://americareads.blogspot.com/2017/03/pg-99-sharon-ann-murphys-other-peoples.html

*Other People's Money* excerpted for Johns Hopkins University Press Blog, "Why is ~~Andrew Jackson~~ Harriet Tubman on the $20 Bill?," March 13, 2017. *https://www.press.jhu.edu/news/blog/why-a%CC%B6n%CC%B6d%CC%B6r%CC%B6e%CC%B6w%CC%B6-%CC%B6j%CC%B6a%CC%B6c%CC%B6k%CC%B6s%CC%B6o%CC%B6n%CC%B6-harriet-tubman-20-bill*

*Other People's Money* excerpted for Time.com, "Early American Colonists had a Cash Problem. Here's How They Solved It," February 27, 2017. http://time.com/4675303/money-colonial-america-currency-history/?xid=homepage

Quoted in Rachel L. Swarns, "Insurance Policies on Slaves: New York Life's Complicated Past," *New York Times*, December 18, 2016. http://www.nytimes.com/2016/12/18/us/insurance-policies-on-slaves-new-york-lifes-complicated-past.html

Interview for *All In: A History of Gambling in America* for Back Story with the History Guys, May 6, 2016. http://backstoryradio.org/shows/all-in/

Interview about *Investing in Life: Insurance in Antebellum America* for New Books in American Studies, October, 19, 2013. https://newbooksnetwork.com/sharon-ann-murphy-investing-in-life-insurance-in-antebellum-america-johns-hopkins-up-2010/

"Security in an Uncertain World: Life Insurance and the Emergence of Modern America" in Summaries of Doctoral Dissertations, *The Journal of Economic History*, C. Knick Harley and Jeremy Atack (eds.), Cambridge University Press, June 2007.

"A History of the Baltimore Life Insurance Company," Introduction to *Baltimore Life Insurance Company Genealogical Abstractions,* Jerry M. Hynson.  Westminster, MD: Heritage Books, 2004.

## FELLOWSHIPS, GRANTS, and AWARDS

| | |
|---|---|
| 2020 | National Endowment for the Humanities Fellowship (taken Spring 2021) |
| 2020 | Harold F. Williamson Prize of the Business History Conference, for a "mid-career" scholar who has made significant contributions to the teaching and writing of business history |
| 2019 | American Antiquarian Society-National Endowment for the Humanities Fellow (fall) |
| 2019 | Mansutti Foundation Prize for the best paper presented at the Risk and the Insurance Business in History conference, Seville, Spain |
| 2019 | Outstanding Faculty Scholar Award, Providence College |
| 2018-19 | American Council of Learned Societies (ACLS) Fellowship (fall-spring) |
| 2018-19 | Franklin Research Grant, American Philosophical Society |
| 2018 | Hugh L. McColl Library Fund Research Fellowship, Wilson Special Collections Library, University of North Carolina at Chapel Hill |
| 2017-18 | CAFR Research Grant, Providence College |
| 2017 | National Endowment for the Humanities (NEH) Summer Scholars Stipend |
| 2016 | IES Abroad Teaching Grant Award |
| 2015 | Providence College Interdisciplinary Faculty Seminar on "Value" |
| 2014-15 | Providence College Nominee for 2015 NEH Summer Scholars Stipend |
| 2013-14 | Providence College Nominee for 2014 NEH Summer Scholars Stipend |
| 2012 | Hagley Prize for the best book in business history |
| 2010-11 | CAFR Research Grant, Providence College |
| 2006 | Finalist: Allen Nevins Dissertation Prize in American Econ. Hist., Economic History Assoc. |
| 2005 | K. Austin Kerr Prize for the best first paper delivered at the annual meeting of the Business History Conference by a new scholar |
| 2005 | The Library Company of Philadelphia Post-Doctoral Fellow, Program in Early American Economy and Society (PEAES) |
| 2003-04 | Economic History Association Dissertation Award |
| 2002-03 | Dissertation Year Fellowship, UVa Graduate School of Arts and Sciences |
| 2001-02 | John E. Rovensky Fellowship in Business and Economic History |
| 2001-02 | Alfred D. Chandler, Jr. Traveling Fellowship, Harvard Business School |

2001-02    Bankard Fund for Political Economy Predoctoral Fellowship, UVa Office of Research and Public Service

2001       State Farm Companies Foundation Doctoral Dissertation Award

1997-2001  Philip Francis du Pont Fellowship, UVa Graduate School of Arts and Sciences

1996       Mayonian Award for best undergraduate thesis in history, University of Virginia

1994       Phi Beta Kappa Honor Society

## CONFERENCE PAPERS and PRESENTATIONS
**by competitive selection**

"Banking, Slavery, and Public Education in Louisiana," Organization of American Historians, New Orleans, Louisiana, April 11-14, 2024.

"Merchant Bankers and Plantation Finance in Antebellum Louisiana," WMQ-EMSI workshop on "Money in Vast Early America," Huntington Library, December 7-9, 2023.

"The Political-Economic Implications of Anti-Banking in the 1840s on the Southern Frontier," Society for Historians of the Early American Republic Annual Meeting, Philadelphia, PA, July 13-16, 2023.

"Stabilizing Plantation Economies through Mercantile Capitalism," Society for Historians of the Early American Republic Annual Meeting, New Orleans, LA, July 21-24, 2022.

"Gone to Texas: Deadbeat Debtors and their Enslaved Property," American Society for Legal History Conference, New Orleans, LA, November 4-6, 2021.

 "Collateral Damage: The Impact of Bank Failures on the Enslaved," Organization of American Historians, Chicago, IL [virtual conference], April 15-18, 2021.

"Slaves, Banks, and Married Women's Property Rights," Organization of American Historians, Washington, DC, April 2-4, 2020 [canceled due to Covid-19].

"Gone to Texas: Deadbeat Debtors and their Enslaved Property," Business History Conference, Charlotte, NC, March 12-14, 2020.

"Bad Bicentennial: A Roundtable on the Panic of 1819 and the History of Capitalism Boom," Society for Historians of the Early American Republic Annual Meeting, Cambridge, MA, July 18-21, 2019.

"Agents, Regulations, and Scandals: US Life Insurance Companies in Late-Nineteenth-Century Latin America," International Conference on Risk and the Insurance Business in History, Seville, Spain, June 11-14, 2019. **Winner of the Mansutti Foundation Prize for best paper.**

"Slavery and the Second Bank of the United States," Society for Historians of the Early American Republic Annual Meeting, Cleveland, OH, July 19-22, 2018.

"Free Banking in Louisiana during the 1850s," Business History Conference, Baltimore, MD, April 5-7, 2018.

"Making Free Banking Legitimate: Marketing Louisiana Banks in the 1850s," Society for Historians of the Early American Republic Annual Meeting, Philadelphia, PA, July 20-23, 2017.

"Bank Financing of Slavery during the 1840s and 1850s," Histories of Capitalism v. 2.0, Cornell University, Ithaca, NY, September 29 – October 1, 2016.

"1824 Reconsidered: A Roundtable on Donald Ratcliffe, *The One Party Presidential Contest: Adams, Jackson, and the 1824's Five-Horse Race,"* Society for Historians of the Early American Republic Annual Meeting, New Haven, CT, July 21-24, 2016.

"Taking the Moral Lead? The Public Expectations of State Banks around the Panic of 1819," Organization of American Historians, Providence, RI, April 7-10, 2016.

"Banks, Slavery, and the Civil War," Business History Conference, Portland, OR, March 31-April 2, 2016.

"When Banks Fail: Stockholders, Stakeholders, & the Moral Economy around the Panic of 1819," Business History Conference/European Business History Association, Miami, FL, June 24-27, 2015.

"Banks and Civic Life in the Early Republic," American Historical Association Annual Meeting, Washington, DC, January 2-5, 2014.

"The Literature of Banking in the Early Republic," Society for Historians of the Early American Republic Annual Meeting, St. Louis, MO, July 18-21, 2013.

 "The Public Response to Commercial Banks during the Panic of 1819," Business History Conference, Columbus, OH, March 21-23, 2013.

"Banking on the Public's Trust: The Image of Commercial Banks in Kentucky, 1815-1824," Business History Conference, St. Louis, MO, March 31 – April 2, 2011.

"Banking on the Public's Trust: The Image of Commercial Banks in the Early American Republic," American Historical Association Annual Meeting, Boston, MA, January 6-9, 2011.

"Banking on the Public's Trust: The Image of Commercial Banks in Pennsylvania around the Panic of 1819," Boston Early American History Seminar, Mass. Historical Society, Dec. 9, 2010.

"Banking on the Public's Trust: The Image of Commercial Banks in Pennsylvania around the Panic of 1819," Crisis and Consequence Conference of the Center for the History of Business, Technology, and Society, Hagley Museum and Library, November 4-5, 2010.

"Making Charity Fashionable: Female Reformers and the Prevention of Pauperism in Antebellum America," Business History Conference, Milan, Italy, June 11-13, 2009.

"Public Interest, Private Industry: Life Insurance and the State in Antebellum America," The Policy History Conference, St. Louis, MO, May 29 – June 1, 2008.

"Selecting Risks in an Anonymous World: The Life Insurance Agency Network of Early America," Society for Historians of the Early American Rep. Annual Mtg, Worcester, MA, July 19-22, 2007.

"Selecting Risks in an Anonymous World: The Life Insurance Agency Network of Early America," Economic & Business Historical Society Conference, Providence, RI, April 26-28, 2007.

"Protecting Middle-Class Families: Life Insurance in Antebellum America," Social Science History Association Annual Meeting, November 2-5, 2006.

"Security in an Uncertain World: Life Insurance and the Emergence of Modern America," presentation for the Allen Nevins Dissertation Prize in American Economic History, Economic

History Association Annual Meeting, September 15-17, 2006.

"The Money Value of a Man: Insuring Life in the Early Republic," Society for Historians of the Early American Republic Annual Meeting, Philadelphia, PA, July 21-24, 2005.

"Protecting Middle-Class Families: Life Insurance in Antebellum America," Business History Conference Annual Meeting, Minneapolis, MN, May 19-21, 2005. **Winner of the J. Austin Kerr Prize for best first paper presented.**

"Nineteenth-Century Rural Wealth Accumulation: A Microeconomic Analysis," The Cliometrics Society Conference, University of Arizona, May 18-20, 2001.

"The Myth and Reality of Economic Opportunity: A Case Study of the Rural United States from 1850 to 1870," New Frontiers Graduate Student History Conference, York University, Toronto, March 16-17, 2001.

## CONFERENCE PAPERS and PRESENTATIONS
### by invitation

Book Talk: "Banking on Slavery: Financing Southern Expansion in the Antebellum United States," Treasury Historical Association Lecture Series (online), December 13, 2023.

Book Talk: "Banking on Slavery: Financing Southern Expansion in the Antebellum United States," Julis-Rabinowitz Center for Public Policy & Finance, Economic History Workshop, Princeton University, November 2, 2023.

Book Talk: "Unearthing a Dark Legacy: Banking on Slavery," George Washington University School of Business, Washington, DC, October 11, 2023.

"Merchant Bankers and Plantation Finance in Antebellum Louisiana," George Washington University Finance Department Seminar Series, Washington, DC, October 10, 2023.

Keynote Speaker: "Banking on Slavery: Financing Southern Expansion in the Antebellum United States," Financial History Network Webinar Series, June 12, 2023.

Author Talk: "Banking on Slavery: Financing Southern Expansion in the Antebellum United States," Massachusetts Historical Society, May 22, 2023.

Guest lecturer on banking and finance for "Breonna Taylor's Louisville: Race, Equity and Law" course at the Louis D. Brandeis School of Law, University of Louisville, October 29, 2020.

"Enslaved Financing of Southern Industry: The Nesbitt Manufacturing Company of South Carolina, 1836-1850," Brown University Early American Money Symposium, October 2020.

"America's First Nationwide Financial Panic," Maine Historical Society Forum: Maine & the Nation in 1820, July 11, 2020.

"Bad Bicentennial: Reflections on the Panic of 1819," Kinder Institute on Constitutional Democracy, University of Missouri, October 18, 2019.

"Banking on Slavery in the Antebellum American South," Columbia University Seminar in Economic History, Columbia University, December 13, 2018.

Keynote Speaker: "Business, Wealth, Enterprise, and Debt: The Economic Side of Mormon History, 1830-1930," Symposium on Mormon History, Brigham Young University, Provo, UT, March 1-2, 2018.

"Slavery and Life Insurance," Edward V. Sparer Symposium on "What Institutions Owe," University of Pennsylvania Law School, January 19, 2018.

*Other People's Money* book talk and signing, The Filson Historical Society, Louisville, KY, June 12, 2017.

"Free Banking in Louisiana during the 1850s," The Tobin Project's History of American Democracy conference, Cambridge, MA, June 1-2, 2017.

"Slavery and Finance in the Antebellum American South," Economic History Workshop, Yale University, May 1, 2017.

"A Divergence of Interests: When Banks Fail," A Re-Union of Interests Conference for the Program in Early American Economy and Society, Philadelphia, PA, October 6-7, 2016.

"Risky Investments: Banks and Slavery in the Antebellum American South," workshop on Uncertainty and Risk in America: (Un)Stable Histories from the Late Colonial Period to the Gilded Age, John F. Kennedy Institute for North American Studies, Freie Universität, Berlin, Germany, June 30 – July 2, 2016.

Keynote Speaker: "How to Make a Dead Man: Murder, Suicide, and Insurance Fraud in Nineteenth-Century New England," Connecticut Supreme Court Historical Society, May 12, 2016. http://jud.ct.gov/HistoricalSociety/annual_0416.htm

"Slavery, Finance, and Risk in the Antebellum American South," Uncertainty/Risk/Management Workshop, John F. Kennedy Institute for North American Studies, Freie Universität, Berlin, Germany, October 26, 2015.

"Slavery and Finance in the Antebellum American South," Perilous Passages – The History of Risk in 19th Century American Culture, Schloss Thurnau, Germany, October 23-24, 2015.

"Bank Financing of Antebellum Slavery," University of Virginia's MADCAP: Movements and Directions in Capitalism Workshop, Charlottesville, VA, September 1, 2015.

Roundtable Panelist: "The New History of Capitalism and Southern History," Southern Historical Association, Atlanta, GA, November 13-16, 2014.

"In Search of the Common Good: Banks and the Panic of 1819," Brown University's 19th Century US History Workshop, Providence, RI, November 8, 2013.

"The Public Perception of Banks in the Early American Republic," Providence College Post-Sabbatical Lecture Series, Providence, RI, March 18, 2013.

"The Public Interest in a Private Industry: Life Insurance Regulation in Antebellum America," The Insurance and Society Study Group, Boston, MA, February 29, 2008.

"Protecting Women and Children 'in the hour of their distress:' Insuring Lives after the Panic of 1837," The Panic of 1837 Conference of the Program in Early American Economy and Society, Philadelphia, PA, October 10-11, 2007.

"Securing Human Property: Slavery, Life Insurance, and Industrialization in the Upper South," New York University, Stern School of Business, Financial History Seminar, April 7, 2006.

"Addressing Moral Hazards: Life Wagers, Murder, and Insurance Fraud in the Early American Republic," University of Maryland Early American History Seminar, March 9, 2006.

"Creating Markets: The Adaptation, Innovation, and Diffusion of Life Insurance in the Early Republic," The Library Company of Philadelphia Program in Early American Economy and Society Seminar, March 18, 2005.

"Threats to Actuarial Soundness and Reputation: Life Wagers, Murder, and Insurance Fraud," Wake Forest University Economic History Workshop, March 21, 2002.

## CONFERENCE PAPERS and PRESENTATIONS
### as chair/discussant

Panel Chair/Discussant: "Divine Business," The Business History Conference, Detroit, Michigan, March 16-18, 2023.

Panel Chair: "Experiments in Finance," The Business History Conference, Mexico City, Mexico, April 6-9, 2022.

Panel Chair/Discussant: "Money and Politics in Early America," The Business History Conference [virtual conference], March 11-13, 2021.

Discussant: "Waterways, Wolves, and World Fairs: Nineteenth-Century Southern Entrepreneurs in Brazil, Mexico, and Central America," Southern Historical Association Convention [virtual conference], November 19-21, 2020.

Panel Chair/Discussant: "Rethinking Hard Money in the Age of Bitcoin," Organization of American Historians Annual Meeting, Philadelphia, PA, April 2019.

Panel Chair/Discussant: "International Financial Crises and Regulatory Responses" and "Risk and Insurance," The Business History Conference, Cartagena, Colombia, March 14-16, 2019.

Discussant: "Risky Matters: Perspectives on the Beginning of Insurance in North America," Davis Center Seminar, Princeton University, April 27, 2018.

Panel Chair/ Discussant: "Pimps, Rebels, and 'Fancy Girls': Troubled Circulations in the North American Slave Trade," Organization of American Historians Annual Meeting, New Orleans, LA, April 6-9, 2017.

Panel Chair/Discussant: "Converting Social Networks into Bonds in the Early Republic, Antebellum, and Civil War Eras," Business History Conf., Denver, CO, March 30 – April 1, 2017.

Panel Discussant: "Managing Risk and Uncertainty in the Agricultural Marketplace," Business History Conference, Portland, OR, March 31-April 2, 2016.

Panel Chair/ Discussant: "Three Centuries of Brewing: Canada, Amsterdam, and the UK," Business History Conference/European Business History Assoc., Miami, FL, June 24-27, 2015.

Panel Chair/ Discussant: "The Culture of Savings," Business History Conference, Frankfurt, Germany, March 13-15, 2014.

Panel Chair: "Setting Up Shop: Domesticating Global Business in the Age of Revolution," Business History Conference, Columbus, OH, March 21-23, 2013.

Panel Discussant: "Fueling Panic: Energy and Economic Crisis in American History," Policy History Conference, Richmond, VA, June 6-9, 2012.

Panel Discussant: "Banking on Change," Business History Conf., Athens, GA, March 25-28, 2010.

Exhibit 1
Page 31

Panel Discussant: "Timothy Alborn's *Regulated Lives: Life Insurance and British Society, 1800-1914*," The Insurance and Society Study Group, UConn Law School, February 11, 2010.

Panel Discussant: "Risky Business: Mortgaging, Warranting, and Insuring Slaves in the Antebellum U.S. South," Southern Historical Association Convention, Richmond, VA, October 31 – November 3, 2007.

Panel Chair: "Public-Private Regulation and Bank Entry in the Nineteenth Century US," Business History Conference, Cleveland, OH, May 31 – June 2, 2007.

## COURSES TAUGHT
**upper level/majors**

Honors Thesis in History Writing Seminar

American Business History: Corporations and Entrepreneurs in US History

Panics and Depressions US History, 1789-present

Marketing Campaigns in US History, c. 1850-present

Creating a Nation from Founding to Civil War (1789-1877)

The Gilded Age, 1877-1897

History of the United States, 1815-1900

History of the United States, 1900 to the Present

America's Obsession with Information and Communication from Poor Richard's Almanac to the World Wide Web [junior/senior writing seminar]

Reform Movements in Antebellum America [junior/senior writing seminar]

Financial Markets and Institutions [Finance Department, Providence College Business School]

Marketing and Consumption in Twentieth-Century Italy [IES Study Abroad, Rome, Italy]

**lower level/surveys**

Thinking and Writing about History: Religion in America in the 1920s [freshmen/sophomore methodology course]

United States History, 1865-Present

America, Origins to 1877

Development of Western Civilization: From the French Revolution to the Present

Development of Western Civilization (pt. III): From Absolutism to the Industrial World

Development of Western Civilization (pt. IV): From New Imperialism to the Present

Development of Western Civilization Colloquium: Capitalism: The Good, the Bad, the Ugly

## PROFESSIONAL AFFILIATIONS and SERVICE

National Endowment for the Humanities Tier-2 Fellowship Selection Panelist, 2023

Associate Editor of *Enterprise & Society*, July 2011-present

University of New Hampshire, dissertation committee, 2020-2023

*Journal of the Early Republic,* Ralph D. Gray Article Prize selection committee, 2022

Southern Historical Association, Bennett H. Wald Award selection committee, 2019-2020

University of Tennessee Department of History, dissertation committee, 2019

University of Virginia Department of History, History of Capitalism Ph.D. candidate examiner, 2015

Massachusetts Historical Society Short-term Fellowship Committee, 2015

Business History Conference: member since 2002
        President, 2023-2024
        Budget Committee, 2022-2026
        Program Committee, 2023-2024
        Henry Kaufman Financial History Fellowship Program Committee, 2023-2024
        Executive Committee, 2022-2024
        President-elect, 2022-2023
        Hagley Prize Selection Committee, 2016-2018, 2020-2021
        Nominating Committee [elected], 2018-2020
        Doctoral Colloquium Advisory Committee, 2017-2018
        Emerging Scholars Committee, 2008-2011
        Trustee [elected], 2010-2013
        Kerr Prize Selection Committee, 2010-2012 (chair 2011)
        Electronic Media Oversight Committee, 2010-2013 (chair 2012)
            responsible for recruiting, vetting, and appointing:
            1.  a new editor for the organization's on-line publication BEH-online
            2.  a new web editor for the overall organization

Society for Historians of the Early American Republic: member since 2004

Article manuscript referee for:
        *American Historical Review*
        *Business History Review*
        *Connecticut Insurance Law Journal*
        eh.net Encyclopedia
        *Enterprise & Society*
        *Explorations in Economic History*
        *Financial History Review*
        *Journal of the Early Republic*
        *Oxford University Press Bibliographies*
        *Sibley's Harvard Graduates*
        *Studies in American Political Development*
        *Western Journal of Black Studies*
        *William and Mary Quarterly*
Book manuscript referee for:
        Columbia University Press
        Johns Hopkins University Press
        Macmillan Education; Bedford/St. Martin's
        Princeton University Press
        University of Chicago Press
        University of Georgia Press
        University of North Carolina Press
        University of Pennsylvania Press

Yale University Press

Tenure & promotion evaluator for:

Bucknell University

Tulane University

University of Delaware

Miami University

Faculty Consultant, US History Advanced Placement Reading, 2001-2007 (table leader 2007)

**SERVICE to Providence College**

| | |
|---|---|
| 2021-24 | Chair, Department of History and Classics |
| 2017- | Phi Beta Kappa Committee (college-wide) |
| 2013- | Oversight of History Department's Gladys Brooks Foundation Endowment ($225,000) |
| 2010- | Oversight of Honors Thesis in History |
| 2006- | Department Liaison for students interested in pursuing graduate study |
| 2006- | Advising of history majors |
| 2020-23 | Committee on Academic Rank and Tenure (college-wide) |
| 2020-21 | History Department Task Force on Diversity and Inclusion |
| 2019-21 | Oversight of History Department Internships and Career Development |
| 2009-18 | History Department Committee to Promote Research |

2012-18   Making History Student Conference

2010-18   Making History Faculty Lecture Series

2009       creation of Honors Thesis in History

| | |
|---|---|
| 2016-18 | Arts & Sciences Summer Scholar Selection Committee (college-wide) |
| 2016-17 | Committee to redesign the Business Studies Program (college-wide) |
| 2015-16 | Post-Baccalaureate Fellowships and Scholarships Committee (college-wide) |
| 2014-18 | Assistant Chair, Department of History and Classics |
| 2013-15 | History Department Committee for the Revision of Tenure and Promotion Standards |
| 2013-14 | Job Search Committee in British History |
| 2012-14 | Undergraduate Research Committee (college-wide): School of Arts & Sciences Rep. |
| 2010 | Adjunct Job Search Committee in American History |
| 2009-11 | Joseph R. Accinno Faculty Teaching Award Selection Committee (college-wide) [chair 2010-11] |
| 2006-09 | Academic Appeals Committee (college-wide) |
| 2007-08 | Job Search Committee in 19th/20th century American history |
| 2007 | Seminar Standards Committee for department curriculum review |
| 2006 | Communications Skills Subcommittee of the Core Curriculum Review Com. (college-wide) |
| 2006 | Address for the Phi Alpha Theta History Honor Society Induction, March 24, 2006 "Addressing Moral Hazards: Life Wagers, Murder, and Insurance Fraud in Nineteenth-Century America" |
| 2005-06 | Departmental Secretary |