ROB BONTA
Attorney General of California
MARK R. BECKINGTON
R. MATTHEW WISE
Supervising Deputy Attorney General
TODD GRABARSKY
JANE REILLEY
LISA PLANK
ROBERT L. MEYERHOFF
Deputy Attorneys General
State Bar No. 298196
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
Telephone: (213) 269-6177
Fax: (916) 731-2144
E-mail: Robert.Meyerhoff@doj.ca.gov
*Attorneys for Rob Bonta, in his Official Capacity as Attorney General of the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RENO MAY, an individual, et al.,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**ROBERT BONTA, in his official capacity as Attorney General of the State of California, and Does 1-10,**<br><br>Defendants. | Case Nos. 8:23-cv-01696 CJC (ADSx)<br>8:23-cv-01798 CJC (ADSx)<br><br>**DECLARATION OF PROFESSOR TERENCE YOUNG IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: December 20, 2023<br>Time: 1:30 p.m.<br>Courtroom: 9B<br>Judge: Hon. Cormac J. Carney |
| **MARCO ANTONIO CARRALERO, an individual, et al.,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**ROBERT BONTA, in his official capacity as Attorney General of California,**<br><br>Defendant. | |

**DECLARATION OF PROFESSOR TERENCE YOUNG**

I, Terence Young, declare under penalty of perjury that the following is true and correct:

1. I have been retained by the Office of the Attorney General of the California Department of Justice to provide expert opinions and testimony in this case. I submit this declaration on the basis of my training, professional expertise, and research. For this engagement, I was asked to provide expert opinions about the history of parks in the United States.

2. This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

**BACKGROUND**

3. Since fall 2020, I am Emeritus Professor of Geography in the Department of Geography & Anthropology, California Polytechnic State University, Pomona.

4. I was an Assistant, Associate, and full Professor of Geography, Department of Geography & Anthropology, California Polytechnic State University, Pomona between fall 2002 and spring 2020. During the same period, I was also an adjunct in the university's Regenerative Studies program. Before fall 2002, I held academic positions as a geographer at California State University, Long Beach, University of Southern California, UCLA, Clemson University, George Washington University, and Mary Washington University. In 1996-1997, I was Acting Director of Studies in Landscape Architecture, Dumbarton Oaks Library and Research Center, Harvard University, Washington, DC.

5. I earned a Bachelor of Arts in Anthropology at UC Berkeley (1973), a Master of Arts in Geography at UCLA (1987), and a Ph.D. in Geography at UCLA (1991).[1]

[1] For a full CV, please see **Exhibit 1** to this Declaration.

6. As a scholar, I have studied the history and historical geography of the American park movement, including from its earliest years, the meanings, purposes, developments, designs, and usages of various types of protected areas since I began work on my doctoral degree in fall 1987. In my professional capacity, I authored award-winning scholarly books, book chapters, and journal articles concerning American protected areas and the American park movement. These publications have been cited by authors in multiple disciplines, including history, geography, anthropology, natural resources management, and more.

7. I am aware of these lawsuits, have reviewed the Complaints filed by Plaintiffs Reno May, et al. and Marco Antonio Carralero, et al. ("Plaintiffs") in this matter, and am familiar with the claims and allegations of the Complaints.

8. I am being compensated for services performed in the above-entitled case at an hourly rate of $200 for reviewing materials and preparing reports; and $400 per hour for depositions and court appearances. My compensation is not contingent on the results of my analysis or the substance of any testimony.

9. The testimony in this Declaration is based upon a combination of my professional training, research, and work experiences in my various academic roles; and, from personally reviewing relevant documents, rules, regulations, and historical sources of information regarding the public parks and forests. Any information I obtained from those outside sources is consistent with my own understanding.

**OVERVIEW OF OPINIONS**

10. America's tradition of public parks was launched in the 1850s. Prior to that era, privately owned taverns and similar establishments had popular gardens while most publicly owned open spaces were utilitarian rather than ornamental spots for sociability and relaxation. The American park movement emerged from the idea that American urban society was flawed and that parks could repair and reform it. Specifically, urban parks would foster a healthier, wealthier, more

democratic, and less criminal urban society.  Backed by a Romantic ideology, this social transformation occurred because parks contained natural scenery, which when quietly and passively contemplated, was thought to improve someone's mind and body, and thus society.  In keeping with a park's purpose and its function as a society-improving device, any features or actions in a park that interfered with natural scenery contemplation were excluded from a park, including firearms, which were specifically prohibited.

11.    Near the end of the nineteenth century, a rationalistic ideology joined the earlier Romantic one.  The new ideology emphasized such active recreation in parks as baseball and bicycling because these were also thought to lead to a healthier, wealthier, more democratic and less criminal society.  However, the new ideology did not eliminate the passive contemplation of natural scenery.  Instead, urban parks were re-designed to provide separate spaces for both active play and for quiet contemplation.  These two uses of public urban parks continue to this day, each with its own spaces.

12.    In the late nineteenth and early twentieth centuries, America's natural national parks were also created to protect landscapes of natural scenery.  Like their urban counterparts, they were romantic places for quiet and passive contemplation in order to improve urban society.  Later, national parks also became places for active recreation, but it was never as important as in the urban parks.  Today's national parks remain places for the contemplation of natural scenery and, to a lesser degree, for active play.

13.    At roughly the same time that national parks were being created, state parks appeared.  Like urban and national parks, they were protected to be places for contemplating natural scenery and for active play.  They remain so to this day.

## THE NINETEENTH CENTURY PARKS MOVEMENT

### I. URBAN PARKS

14. The development of the American park system and the park movement evolved over decades and centuries in response to existing societal concerns and circumstances.

15. During the colonial era and into the early American Republic, public spaces were created in some settlements (for instance, the pre-planned squares of Savannah, Georgia and Philadelphia, Pennsylvania), but the best known of these are the "greens" or "commons" of southern New England. Today, the remnants of these once larger spaces may be manicured with lawns and ornamental plants, but such elements are relatively recent additions. As early as 1961, the colonial legal historian, John D. Cushing, wrote about the origins and evolution of these spaces because "there are few …aspects of New England culture and history about which so much misinformation prevails." Dismissing the notion that the current appearance, purpose, and use of a place like the Boston Common tells us about their origins, he stated instead that "the idea that any common laid out either in the seventeenth or early eighteenth centuries was designed as an ornamental center for the community… [is] absurd" (Cushing, 1961, 86). Instead, they were multi-purpose utilitarian spaces until the mid-nineteenth century. At the beginning, a settlement's town common included a Puritan house of worship called a "meetinghouse," which is why in earlier times these spaces were called "meetinghouse lots." The open space surrounding the meetinghouse often contained the "close" or paddock for assembling and temporarily holding town livestock before the animals were led to the much larger common pasturage outside the settlement. The meetinghouse lot usually also contained a town's cemetery or "burying ground." And, sometimes, if it was large enough, a site for a community's men to practice basic military exercises as an organized militia.

16.     In contrast to today, these men practicing military exercises for a militia were not individuals visiting a public park but an organized community activity for its common defense.  According to historian John Stilgoe (1982, 19-20), "Every town insisted that its men drill once every three months at least, on 'muster day'; and it provided that its [meetinghouse] lot be used as a parade ground, where all men and boys of military age lined up for weapons inspection, close order drill, and lessons in advanced tactics by experienced officers."  As support for such militia training, meetinghouse lots could contain a "magazine" for storing gunpowder and other supplies as well as a "gunhouse" for cannon and such (Cushing 1961, 91).

17.     Meetinghouse lots usually shrank in area over the decades as portions were re-purposed, sold, given away, and appropriated for roads.  Furthermore, additional uses were found for what did remain of a given lot through the eighteenth century and into the nineteenth.  By the middle of the eighteenth century, for example, innkeepers throughout this region knew that it was profitable to locate their taverns and any outdoor spaces nearby, adjacent to, or even upon the meetinghouse lot (Stilgoe, 22).  In 1770, Salem, Massachusetts built a workhouse on its meetinghouse lot and, in 1782, Newburyport, Massachusetts ordered smallpox victims transported "to the pest house in the common pasture" in the town center.  Newburyport repeated this order in 1788 and again in 1803 (Stilgoe, 20).  It was during the nineteenth century that these spaces began to be called "the green" (Stilgoe, 20).

18.     Beyond a green's meetinghouse, graveyard, and other structures, the lot was generally neglected.  According to Cushing (1961, 92), "Generally speaking, most commons were barren, unsightly plots from the earliest days until well after 1835.  Brush, stumps, stones, rubbish, dead trees and stagnant pools, swarming in summer with disease-carrying insects, typified a great many meetinghouse lots for centuries."  They were not analogs to today's public parks,

nor were they their predecessors except in the sense that some of these utilitarian spaces, most famously the Boston Common, survived long enough to be adaptively re-used as community parks.

19. A different approach was taken in Savannah, Georgia when that colonial-era town was laid out in 1733. Each "ward" of residents surrounded a civic square of approximately two acres. While today these squares are ornamented with plants, walks, fountains, and the like, they, like New England's greens, initially served several utilitarian purposes. The principal instigator of the town, James Oglethorpe, wrote that each square would be "reserved for a Market place, and for exercising the Inhabitants" (quoted in Wilson, 2012, 86). It would also provide a place for public gatherings as well as be a parade ground for militia training and for defense. "The town," explains Thomas D. Wilson, historian of Savannah's plan, was "organized into militia units that together formed a battalion. Units of the battalion would train in civic squares placed at regular intervals in the town and would form in those squares to defend against attack" (Wilson, 2012, 71). The situation began to change during the early nineteenth century. In 1808, one visitor described the squares as "each …has a pump in the centre [for fire fighting], surrounded by a small plantation of trees," but it was not until the 1830s that the squares were developed with railings, walks, and lawns, (De Vorsey, 2012, 97).

20. Savannah's plan led to similar squares in the Georgia towns of New Ebenezer, Sunbury, and Brunswick, but that was it. They were neither widespread nor abundant in number like the greens of New England. According to Architectural Historian Turpin C. Bannister (1961, 62), "the promoters of later colonial and early republican new towns were so eager to exploit their land for maximum profit that the most generous felt expansively prodigal if he contributed a small central plaza for a market."

21. The situation in Philadelphia, Pennsylvania was analogous to that of Savannah. Pennsylvania's proprietor, William Penn, included five public squares

of either eight or ten acres in his 1682 plan for Philadelphia. Today, the remaining squares are popular public spaces that incorporate walks, fountains, lawns, flowers, and other ornamental features. The path to these features, however, was a twisted one. According to landscape architect, Anne Beamish (2021, 11), these publicly-owned sites were originally laid out and planned as formal public spaces, but "the squares were not used as such until the nineteenth century" because Philadelphia's population was small and could not support them and the city included many popular, privately owned taverns and inns with adjacent gardens (Beamish, 2021, 11). The largest square, Centre Square (now the site of City Hall), was mostly used for horse racing, militia training, and as the site for the city gallows until the very end of the eighteenth century when it was chosen to be the location for a new water pumping station. Like Centre Square, the other four squares "were not used for public pleasure and 'were completely without charm'" (Beamish, 2021, 12). Northeast (now Franklin) Square, for instance, included a city magazine for storing gunpowder and as a place for selling hay, straw, and lime. Southeast (now Washington) Square was designated a "burial ground for strangers, or potter's field" in 1706 (quoted in Beamish, 2021, 12). And, even though the city ordered the cemetery removed for public improvements in 1795, it was still renting out the square for grazing in 1813 (Beamish, 2021, 12). Again, these activities were mostly utilitarian in character.

22. New York, New York was different than Savannah and Philadelphia in that it did not include an identified series of public squares in its original planning. Instead, many of its public spaces, like the greens of New England, emerged as adaptive re-uses of pre-existing sites. Beamish (2021, 2) points to three specific spaces where New Yorkers "experimented with leisure activities and socializing and where the demand for [later, publicly owned] recreational spaces developed" – The Battery, The Bowling Green, and The Fields. Also like New England, Savannah, and Philadelphia, the early uses of these spaces were utilitarian rather

than recreational.  The Battery, for example was a defensive military site with a cannon.  The Bowling Green was the site of a marketplace and the city's first public well.  And, The Fields was an animal grazing area that also enclosed a "magazine" (Beamish, 2021).  Moreover, when The Bowling Green became a leisure site, it was a privately operated space rather than a public one.  The city rented the site to some local residents to run as a place of beauty, ornament, and recreation.  The Battery did not begin to function as a meeting place for the wealthy until about 1802 and the Fields, which later became the site of today's City Hall, was re-named City Hall Park during the building's construction (1803-1812).  Neither The Battery nor The Fields inspired a direct wave of imitations elsewhere in the United States.

23.     The small public spaces of southern New England, Savannah, Philadelphia, New York and elsewhere would only widely become urban greenspaces after the American public park movement arose with the appearance of Romanticism and urban expansion.

24.     During the early American Republic, cities were necessarily compact, usually about three square miles in area, and densely built.  Despite the resulting crowded conditions, most residents could readily retreat to relaxing rural areas nearby.  However, as the national economy shifted and cities developed into primary engines of commerce, their populations and physical sizes necessarily grew.  For example, from 1830 to 1860, the population of New Haven grew from 10,000 to 39,000, Boston from 61,000 to 178,000, Philadelphia from 80,000 to 566,000, and New York from 203,000 to 814,000.

25.     The push for larger greenspaces in cities began in earnest in the pre-Civil War years as increasing numbers of Americans chose to live in cities.  Early proponents of expanded urban greenspace drew upon the example of the recently popular "rural" cemeteries.  America's earliest cemeteries were undesigned graveyards and churchyards.  The first designed cemetery was New Haven's New Burying Ground of 1796, but it, unlike its successors, was gridded and rectilinear.

In 1831, the Massachusetts Horticultural Society created the first of and prototype for the many subsequent "rural" cemeteries – Boston's Mount Auburn.  These cemeteries, which were romantic in design, incorporated extensive tracts of suburban land with lawns, hills, woods, water features, and scenic vistas.  By the mid-nineteenth century, these cemeteries were popular tourist attractions drawing thousands each year (Linden-Ward, 1989).

26.    Rural cemeteries, however, inadequately addressed the societal concerns of the pre-Civil war era arising from increased urbanization because they were privately owned, did not permit full public access, and being suburban were inaccessible to many city dwellers due to their distance.  Moreover, they were inaccessible to most working people.  In the 1840s and 1850s, urban greenspace proponents applied the lessons of cemeteries when arguing for large publicly owned parks.

27.    New York's 843-acre Central Park was the first to achieve this goal and was based on an 1858 design by Frederick Law Olmsted and Calvert Vaux.  Unlike the small public spaces mentioned above, Central Park would stimulate a rapidly expanding and durable tradition of American parks.  Before the Nineteenth Century ended, America's best-known urban parks had appeared, including Boston's Franklin Park, Brooklyn's Prospect Park, Philadelphia's Fairmount Park, Chicago's Washington and Jackson Parks, San Francisco's Golden Gate Park, Los Angeles's Griffith Park, and San Diego's Balboa Park.  The initiation and development of each park was unique, but they all occurred where supported by a significant portion of the population, were relatively large in area, were generally over 500 acres, adopted the same design principles, and swiftly promulgated similar prohibitions concerning the carrying of firearms.  They did so because they shared a common purpose – the improvement of American society (Schuyler, 1986; Young, 2004).

28. The creation of large urban parks began in the 1850s and in these rapidly growing cities for cultural reasons that go back to the early Republic – a national mistrust of and suspicion about urban life. Thomas Jefferson, for example, had argued in 1787's *Notes on the State of Virginia* that the ideal society would flourish where the economy was agricultural and the settlements small and dispersed. Invoking a geographic contrast, Jefferson promulgated a valorized rural-urban imaginary that regarded the former as healthy and positive while casting the latter as damaging and negative. Farmers, he insisted, were the backbone of America. "Those who labor in the earth are the chosen people of God, if ever he had a chosen people, whose breasts he has made his peculiar deposite (sic) for substantial and genuine virtue." Manufacturing and cities, in contrast, were sources of vice. Drawing a particularly repulsive word picture, Jefferson suggested that "The mobs of great cities add just so much to the support of pure government, as sores do to the strength of the human body." The roots of the republican nation, urged Jefferson, lay in a rejection of urban life (Jefferson, 1829, 171-173; Young, 2022).

29. In the immediate pre-Civil War years, industrialization increased rapidly, surface transportation encouraged urban spreading, and cities grew in area and population numbers. This concentration of people accentuated social problems, making them more obvious to more people. Cities were increasingly perceived as socially degraded places in contrast to virtuous rural America. In line with this perception, cities were condemned as unhealthy, impoverished, undemocratic, and crime ridden. A range of solutions were proposed to remedy these urban vices (Boyer, 1978), including municipal parks. In a large park, urban residents could "retreat" from the city to be back in touch with nature, which would lead to social reform and improvement. Parks, proponents and supporters argued, would produce a virtuous society characterized by health, wealth, equality, and little crime (Young, 2004).

30.     Park proponents believed that society's characteristics were strongly shaped by its physical environments.  Urban environments of noise, traffic, pollution, crowding, and ugly buildings led to a vicious society while an urban park's "natural" environment would lead to a virtuous one.  Urban vice did not occur because society was evil by nature but because its members were out of touch with nature, a principal source of goodness.  In other words, publicly owned urban parks were devices for social reform.  They would succeed best where urban environments and urban ways of life were excluded from a greenspace (Young, 2004).  For example, according to an 1867 Newark, New Jersey park report, a park was designed to produce "a certain [positive] effect upon the mind and the character of those who approach it" (Schuyler and Turner Censer, 1992, 211).  Forty years later, Charles Mulford Robinson made a similar link between society and its surroundings.  A leader in the "City Beautiful" movement that sought visible expressions to Progressive Era reforms aimed at revitalizing public life and instilling civic awareness, Robinson argued for the creation of public flower beds, new parks, and street trees because "Social problems are to a large degree problems of the environment."  Create parks where adults and children can find "brightness, entertainment, and fellowship without throwing them into temptation… and many of sociology's hardest problems will be solved" (Robinson, 1909, 245).

31.     The foundation for the ideology of the early urban park proponents and supporters lies in Romanticism and the Romantic Movement.  While the philosophy and movement had diverse expressions, it can be broadly recognized by a rejection of rationalism, a regard for history and a focus on perception and beauty, particularly that of nature.  Moreover, the movement embraced the belief that a group of people's character or nationality grew organically and emerged over a long period of time.  In addition, Romanticism contributed to the growth of democracies, to a belief in progress and to the more open societies that are common features of modern life (Barzun 1961).  Romantic park supporters, like many

contemporary artists and scientists (Novak 1995), saw nature as an interrelated world of mind, body, and being, an organic whole that included God, people, and the physical world.  Social problems resulted from the physical disjunction that developed between nature and people in any city large enough to be dominated by streets and buildings.  Ignoring the benefits from urban life, they viewed the city as a dangerous environmental aberration that could lead to the dissolution of society.  Parks were the necessary corrective because they brought nature, which was God's handiwork, balanced and inherently good, back into cities.  As the minister Henry Ward Beecher enunciated in 1869, for "the multitude," natural beauty was a gift of God "without price." It could "confer pleasure and profit from merely the looking at it" (Beecher, 281-284).

32.    As the Beecher quote suggests, nature in this era was approached as scenery, but it was not simple and unconsidered.  Park designers and their supporters believed nature appeared best in parks as three landscape art categories or "genres": the "Beautiful" (also called the "Pastoral" by Frederick Law Olmsted), the "Picturesque," and the "Sublime."  Each was yoked to a set of unique attributes.  Smallness, roundness, smoothness, delicacy, and color best captured the Beautiful, making it the preferred genre for parks with extensive lawns or water features bordered by shrubs and trees.  The Sublime countered the Beautiful, being linked to terror, obscurity, difficulty, power, vastness, majesty, and infinity, but it remained beyond the ability of urban park designers because their landscapes were too restricted to create it.  However, it informed the selection of and lay behind the drive for the national parks discussed below.  The Picturesque mediated the two extremes, expressing the pleasure gained by abrupt, unexpected, or rude forms and textures, as well as the roughness that could exist at any scale.  Many large urban parks incorporated Picturesque elements as a stimulating contrast to Beautiful ones, but Picturesque rarely dominated (Novak, 1995; Young 2004).

33.     And, like some landscape scene in a painting, municipal parks' "naturalistic" landscapes were intended to support only pastoral and picturesque activities.  These large urban parks were places for "passive recreation," which meant sitting, strolling, slow horse riding, and other quiet activities while contemplating the scenery.  Activities that were fast-moving, active, boisterous or worse, ran counter to a park's purpose.  In support of these aesthetics, Parade Grounds were isolated from the park proper in both Olmsted and Vaux's Prospect Park and in Olmsted's unbuilt 1866 plan for San Francisco (Graff 1985; Young 2018).  Places for military exercises and displays, Parade Grounds were spaces "for citizens to demonstrate their commitment to defense of their government" (Rosenzweig and Blackmar, 1992, 143).  According to Olmsted (1990b, 532), these places may have been necessary, but they were not to conflict with "the safety or the quiet of those not interested in them."  That is, a park's visitors.  Consequently, Parade Grounds were closed off or moved away from a park proper.  They were, argued Schuyler (1986, 131), "locations for functions that, while essential in a city, would be antithetical to the tranquility of a naturalistic landscape."

34.     In addition to being informed by the same ideology and designed using the same three landscape genres, America's large urban parks embraced firearms prohibitions shortly after they came into existence.  Again, the official prohibitions began with Central Park.  In March 1858, one month before Central Park's Commissioners awarded a plan for the new park, they voted seven to two to adopt their initial set of rules and regulations concerning it.  (Board of Commissioners, 1858, 166, **Exhibit 2**.)  Their attitude toward firearms in Central Park could not have been clearer.  "All persons are forbidden …To carry fire-arms or to throw stones or other missiles within it."  The public did not necessarily know how to behave in their new park, so the commissioners adopted rules to prompt proper behavior and decorum.  Aligned with these rules and regulations, and as a practical matter, they also created a force of Park Keepers in 1859 to control activities

deemed inappropriate.  "A woods shared by 'thousands' demanded a different kind of care than woods visited by a few," noted historian David Thacher before quoting the *New York Times* of February 21, 1859: "Nature in the neighborhood of large towns needs rules and regulations to enable her to do herself justice, just as certainly as in the country she does better without them" (Thacher, 2015, 591).  Proponents and supporters of large urban parks understood that the heavy use of the nature in a park that would result from its being easily accessible, necessarily mandated rules and regulations to control and direct visitors in order to allow nature to reform society.

35.     The Central Park Commissioners' prohibition on carrying firearms in their park, often using the same or nearly the same language, was embraced by authorities in the other large parks that rapidly appeared across the United States. The Central Park Commissioners reprinted their prohibition exactly in 1861 (Board of Commissioners, 106, **Exhibit 3**).  In 1866, as the development of Olmsted and Vaux's next park, Prospect Park, was getting underway, the Brooklyn Park Commissioners adopted the same language as their peers at Central Park: "All persons are forbidden… To carry firearms, or to throw stones or other missiles within the park" (Brooklyn Park Commissioners, 1873, 136, **Exhibit 4**).  Two years later, in 1868, the rules and regulations for Philadelphia's Fairmount Park included a similar prohibition: "No person shall carry fire arms or shoot birds in the park or within fifty yards thereof, or throw stones or other missiles therein" (Laws of the General Assembly, 1868, 1088, **Exhibit 5**).  In April 1870, the Commissioners of San Francisco's new Golden Gate Park were appointed and authorized to begin the park's development.  Eighteen months later, they adopted a firearms prohibition similar to Central Park's: "Within the said grounds [i.e., Golden Gate and Buena Vista Parks] all persons are hereby forbidden …To carry and especially to discharge firearms" (Board of Supervisors, 1875, 887, **Exhibit 6**).  The following year, 1873, the city of Chicago adopted a comparable prohibition for its "Parks and

Public Grounds": "All persons are forbidden to carry firearms or to throw stones or other missiles within any one of the public parks" (Chicago, Illinois, 1873, 88, **Exhibit 7**). And, in 1874, the Buffalo, New York Park Commissioners adopted an ordinance corresponding to that of Central Park and its successors to date: "All persons are forbidden to carry fire-arms or fire at or shoot any bird or animal, or throw stones or missiles within the several parks, approaches thereto or streets connecting the same" (Buffalo Park Commissioners, 1874, 24, **Exhibit 8**). For approximately another decade, similarly purposed, Romantically inspired, and scenically designed parks appeared in cities across the country and their commissioners or similar authorities adopted comparable prohibitions or fines: Hyde Park, Illinois in 1875 (President and Board of Trustees, 1876, 310, **Exhibit 9**), Phoenixville, Pennsylvania in 1878 (Borough of Phoenixville, 1906, 135, **Exhibit 10**), Chicago reprinted its earlier prohibition in 1880 (Jamieson and Adams, 1881, 391, **Exhibit 11**), St. Louis in 1881 (Sullivan, 1881, 635, **Exhibit 12**) and then extended it to a new park in 1883 (MacAdam, 1883, 117, **Exhibit 13**), and Danville, Illinois in 1883 (Mann and Frazier, 1883, 83, **Exhibit 14**). This is not a coincidence. It is a firearms regulation tradition grounded in the purpose, form, and use of America's post-Central Park urban parks.

36. Beginning in the late 1880s, an increasing number of American urban park advocates and supporters embraced a new rationale for municipal parks, what I term "rationalistic" parks. American cities continued to be plagued by poverty, disease, undemocratic acts, and crime, but these new park proponents did not abandon the idea of urban social improvement through parks. Instead, they stepped back from the romantic idea that scenic park landscapes alone reformed society and also embraced a more Darwinian and mechanistic view of nature. As their perspective grew in importance, the value of nature contemplation somewhat retreated, and parks were re-imagined as favored settings for organized play and

other leisure-time activities.  Flower gardens, museums, baseball diamonds, and children's playgrounds became common park features as rationalistic park proponents pursued their formula for encouraging the good society.  These advocates saw romantically designed parks as underdeveloped rather than mis-designed, so they did not seek to remove and replace the features of romantic-era parks.  Instead, they wished to share the space of a large park by introducing the features they believed would reform society.  In addition, municipal park authorities created parkways and numerous, generally small greenspaces throughout cities in order to bring the reforming abilities of parks into neighborhoods.  Visitors would no longer have to travel long distances to the large parks.  These small parks utilized both romantic and rationalistic characteristics and were more tools in the effort to improve urban society (Young, 2004).

37.     Despite the addition of a rationalistic ideology and new landscape layouts, urban park authorities continued to publish prohibitions on the carrying of firearms in them: Boston's Park Commissioners declared in 1886 that "it is forbidden: …To throw stones or other missiles; to discharge or carry fire-arms, except by members of the Police Force in the discharge of their duties" (Boston, Massachusetts, 1888, 86, **Exhibit 15**).  In 1887, the city of Reading, Pennsylvania announced that firearms would not be allowed in its new park, "Penn's Common": "No person shall carry firearms, or shoot in the common, or within fifty yards thereof" (Richards, 1897, 240, **Exhibit 16**).  The following year, 1888, Saint Paul, Minnesota's Board of Park Commissioners published its Laws Relating to Parks, which included: "No person shall carry firearms or shoot birds in any Park or within fifty yards thereof" (Saint Paul, Minnesota, 1889, 689, **Exhibit 17**).  Salt Lake City, Utah also published a similar prohibition concerning its park in 1888: "No person shall, within Liberty Park, …Carry or discharge firearms" (Salt Lake City, Utah, 1888, 248, **Exhibit 18**).  And, in 1890, Trenton, New Jersey listed among its ordinances: "No person shall carry firearms or shoot birds in said park or

squares, or within fifty yards thereof, or throw stones or other missiles therein" (Trenton, New Jersey, 1903, 390, **Exhibit 19**).  Additional examples of parks where the carrying of firearms was prohibited include the parks of: Berlin, Wisconsin (1890, 76, **Exhibit 20**) and Williamsport, Pennsylvania (1900, 141, **Exhibit 21**) in 1890; Grand Rapids, Michigan (Campbell, 1906, 163, **Exhibit 22**), Milwaukee, Wisconsin (Park Commissioners of the City, 1892, 32, **Exhibit 23**), and Springfield, Massachusetts (1897, 82, **Exhibit 24**) in 1891; Cincinnati, Ohio (Board of Park Commissioners, 1893, 28, **Exhibit 25**), Lynn, Massachusetts (1892, 23, **Exhibit 26**), Peoria, Illinois (Slemons, Pinkney and Raum, 1892, 667, **Exhibit 27**), and Spokane, Washington (Connor, 1903, 316, **Exhibit 28**) in 1892; and, Pittsburgh, Pennsylvania (Thomson, 1897, 496, **Exhibit 29**) and Wilmington, Delaware (1893, 571, **Exhibit 30**) in 1893.  Before the decade ended, comparable prohibitions were published, republished or extended to new urban parks in: Saint Paul, Minnesota (Giltinan, 1896, 208, **Exhibit 31**); Canton, Illinois (Chiperfield, 1895, 240, **Exhibit 32**) ; Detroit, Michigan (Local Acts, 1895, 596, **Exhibit 33**); Centralia, Illinois (Noleman and Bundy, 1896, 188, **Exhibit 34**); Indianapolis, Indiana (Brown and Thornton, 1904, 648, **Exhibit 35**; Rochester, New York (Board of Park Commissioners, 1898, 97-98, **Exhibit 36**); Wilmington, Delaware (Board of Park Commissioners, 1898, 24, **Exhibit 37**); Kansas City, Missouri (Rozelle and Thompson, 1898, 657, **Exhibit 38**); New Haven, Connecticut (1898, 293, **Exhibit 39**); and, Boulder, Colorado (Greene, 1899, 157, **Exhibit 40**).  As these many incidences indicate, prohibitions on carrying firearms in urban parks were considered fundamental to the function of these spaces – urban social reform.

38.    Today, the romantic and rationalistic ideals still thrive in America's urban parks.

39.    At no point did my research reveal any evidence that supported the carrying of firearms for self-defense in urban parks.  This would have been

inconsistent with romantic and rationalistic ideals and antithetical to the social purpose of urban parks as promoted by those ideals.

## II. NATIONAL PARKS

40. The emergence and development of America's national parks followed an ideological arc quite similar to urban parks and for much the same purpose – the improvement of American society. Like urban parks, national park advocates and supporters initially embraced Romanticism. The creation of American national parks and state parks (see below) began in 1864 when President Lincoln signed legislation ceding the Yosemite Valley and Mariposa Big Tree Grove to the state of California for "public use, resort, and recreation; [and] inalienable for all time" (Dilsaver, 2016a, 4). Frederick Law Olmsted, who lived in California at the time, was appointed a commissioner on the new park's board and supervised the creation of the report for its administration. In addition to this "skillful" plan for the park's administration, "he advocated a policy of establishing national parks across the nation and laid the foundation for our current national park system" (Freeman, 1989, 172).

41. For Olmsted, the creation of national parks was not a gift but a duty. "It is the main duty of government, if it is not the sole duty of government, to provide means of protection for all its citizens in the pursuit of happiness" (Olmsted, 1990a, 502). Where Romantic urban parks had employed the Beautiful and the Picturesque, California's Yosemite Park improved society through a blend of the Beautiful and the Sublime. The new park was, argued Olmsted, a "union of the deepest sublimity with the deepest beauty of nature, not in one feature or another, not in one part or one scene or another, not any landscape that can be framed by itself, but all around and wherever the visitor goes, constitutes the Yo Semite the greatest glory of nature" (Olmsted, 1990a, 500). Immersed in the park's natural beauty, visitors were improved through passive interaction with the scenery. "[T]he enjoyment of scenery," stated Olmsted, "employs the mind without fatigue

and yet exercises it, tranquilizes it and yet enlivens it; and thus, through the influence of the mind over the body, gives the effect of refreshing rest and reinvigoration to the whole system" (Olmsted, 1990a, 504).  Consequently, Olmsted thought the principal duty of the park's commissioners was "to give every advantage practicable to the mass of the people to benefit by that which is peculiar to this ground" (Olmsted, 1990a, 506).  At the same time, he cautioned that constraints had to be applied to the "mass" of visitors in order for the park to benefit society both in the present and in the future.  "[I]t should be remembered that in permitting the sacrifice of anything that would be of the slightest value to future visitors to the convenience, bad taste, playfulness, carelessness, or wanton destructiveness of present visitors, we probably yield in each case the interest of uncounted millions to the selfishness of a few individuals" (Olmsted, 1990a, 507).  Finally, he pointed to the uniqueness that had "caused Congress to treat [Yosemite Valley and Mariposa Big Tree Grove] differently from other parts of the public domain" and to that which would guide the creation of subsequent national parks.  "This peculiarity consists wholly in its natural scenery" (Olmsted, 1990a, 506).

42.    In less than a decade, the first, officially designated "national park" was created in 1872: Yellowstone.  A large, protected area of approximately 2.2 million acres, its origin lay in the Romantic path of scenery identified by Olmsted.  "Yellowstone's awesome natural phenomena had inspired a political phenomenon" (Sellars,1997, 7).  In the authorizing act, the park was "hereby reserved and withdrawn from settlement, occupancy or sale… and dedicated and set apart as a public park or pleasuring ground for the benefit and enjoyment of the people."  Placed under the Interior Secretary, the act directed the Secretary "to make and publish such rules and regulations as he may deem necessary or proper for the care and management of the same."  Among these, the Secretary "shall provide against the wanton destruction of the fish and game found within said park" and he "generally shall be authorized to take all such measures as shall be necessary or

proper to fully carry out the objects and purposes of this act" (Dilsaver, 2016b, 20-21).  Over the next 40 years, Congress and the President designated (and sometimes transferred) numerous natural preserves under federal jurisdiction, including Sequoia, Yosemite, Mount Rainier, Glacier, and Rocky Mountain National Parks.  Like the original Yosemite cession and Yellowstone National Park, these subsequent parks were large, relatively distant from most of America's population because they were out west while the people were back east, and "preserved largely for their aesthetic qualities," which like urban parks, were thought to improve society (Mackintosh, 2005, 14).

43.    The rationalistic rationale began to inform national park features and usage toward the end of the Nineteenth and the beginning of the Twentieth Centuries.  As the public, which increasingly lived in America's cities, came to expect urban parks to be both scenic and places for museums, bicycling, and other forms of active play, they also came to see county, state, and national parks as serving the same purpose.  Consequently, Interior Secretary Franklin K. Lane (Dilsaver, 2016c, 37) instructed Stephen T. Mather that "All outdoor sports which may be maintained consistently with the observation of the safeguards thrown around the national parks by law will be heartily endorsed and aided wherever possible.  Mountain climbing, horseback riding, walking, motoring, swimming, boating, and fishing will ever be the favorite sports.  Wintersports will be developed in the parks that are accessible throughout the year."  In contrast, however, "Hunting will not be permitted in any national park."

44.    The American Civic Association (ACA), a private, eastern-based organization that had originated in the nineteenth century and promoted the creation of all parks as social reforming devices, incorporated all types of parks—municipal, county, state, or national—in their reform agenda because they believed that any given park comprised the local expression of a more durable concept, that all parks were socially impactful when they shared three important features: nature, scenery,

and play, which when combined properly, created the ideal of the park. According to the ACA's president, J. Horace McFarland (1912, 3), this park performed a valuable social function; it "act[s] immediately and favorably on the health and the orderliness of the community, and consequently increase[s] materially the average of individual efficiency. In other words, they pay dividends in humanity." That is, such parks at every geographic scale reformed a rapidly urbanizing America. National parks, like urban parks, would foster a virtuous society characterized by health and wealth. The ACA further claimed that national parks would foster democracy and patriotism among Americans (Young, 1996).

45. Today, the same rationales applicable to urban parks guide the public's expectations and inform the actions of national park proponents and supporters.

46. Again, at no point in my research did I discover any evidence of support for the carrying of firearms for self-defense in national parks. This would have been inconsistent with romantic and rationalistic ideals and antithetical to the social purpose of national parks as promoted by those ideals.

## III. STATE PARKS

47. America's state parks today appear in every state and in types that vary from state to state and sometimes even within a single state. The history of their designation and development reveals a halting and uneven pattern, but it nonetheless followed the same ideological arc that guided the unfolding of urban and national parks, and for much the same purpose – the improvement of society. Like national park advocates and supporters, state park activists thought striking scenic places would lead to a society that was healthier, wealthier, more democratic and more socially coherent.

48. As noted above, the first state and national park was Yosemite valley and grove (Engbeck, 1980). But before California returned it to the federal government in 1906 for inclusion in Yosemite National Park, the valley and grove had inspired such scenic state parks as Big Basin in California, Palisades and

Watkins Glen in New York, and Mount Mitchell in North Carolina, as well as "sites uniquely worth preserving" in Connecticut, Indiana, Iowa, and Wisconsin (Cutler, 1989, 195). Most state parks, however, did not appear until the Twentieth Century when, as J. Horace McFarland (1910, 9) noted, they came to be seen as the logical extension between city or county parks and national parks. "If, when a natural wonder is found to be of national importance and to need national protection, it may properly be controlled by the nation, surely a location or opportunity too large for local or municipal control may as properly be controlled by the state." During the first quarter of the Twentieth Century, state parks came to incorporate both romantic and rationalistic features as people increasingly saw them as places for the passive admiration of the scenery and for play. Nevertheless, state parks were not common.

49. After the initial meeting of the National Conference on Parks in 1921 (later, the National Conference on State Parks), the pace of state park creation increased. Park proponents kept recommending new sites for designation, but they often did so to the new National Park Service. The Park Service recognized that many of these recommendations had merit, but they did not rise to the level of national significance so instead of just rejecting the recommendations, it organized the National Conference on Parks to facilitate the designation of these sites protected by the states. The conference transformed the state park movement, stimulating more widespread interest in their creation.

50. Furthermore, the National Park Service developed a plan during the Great Depression to create "a healthier and happier citizenry by developing a nationwide system of state parks. The goal was to 'cure the ills of society' by constructing a park within fifty to one hundred miles" of the American populace. And, since a rationalistic park ideology was premier by the 1930s, "one of the primary principles of the plan was to place recreational parks within the reach of every citizen" (Smith, 2013, 207). Working with the Civilian Conservation Corps,

the National Park Service dramatically increased the number of state parks by building 800 between 1933 and 1942.

51. At no point in my research did I discover any evidence of support for the carrying of firearms for self-defense in state parks. This would have been inconsistent with romantic and rationalistic ideals and antithetical to the social purpose of state parks as promoted by those ideals.

52. This Declaration is presented in a form that is much different from academic writings. It reflects an accurate recounting of my research and conclusions regarding this historical period and the subject matter discussed. However, given the time constraints at issue in this case, as well as the fact it was prepared in connection to a pending lawsuit, it is not drafted at the level of depth that would be expected for academic writing. This declaration was prepared in approximately one week, so the research was limited to my own office bookshelves and short searches on the internet. If I had more time to travel to libraries and to more thoroughly review primary documents, I would likely be able to frame a more focused case with greater detail. Thus, I reserve the opportunity to supplement this declaration to reflect any additional research or context that may be necessary as this case proceeds.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 2, 2023, at Cambria, Calif.

Terence Young

**Citations**

- Bannister, Turpin C. 1961. "Oglethorpe's Sources for the Savannah Plan" Journal of the Society of Architectural Historians 20(2): 47-62.
- Barzun, Jacques. 1961. Classic, Romantic and Modern, 2nd Ed., Boston: Little, Brown & Co.
- Beamish, Anne. 2021. "Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia" Landscape Journal 40(2): 1-17.
- Beecher, Henry Ward. 1869. Eyes and Ears, Boston: Fields, Osgood, and Co. Berlin, Wisconsin. 1890. The Municipal Code of Berlin Comprising the Charter and the General Ordinances of the City Codified and Revised, Berlin: Courant Steam Print. (**Exhibit 20**)
- Board of Commissioners. 1858. Minutes of the Proceedings of the Board of Commissioners of the Central Park, for the Year Ending April 30, 1858, New York: Wm. C. Bryant & Co. (**Exhibit 2**)
- Board of Commissioners. 1861. Fourth Annual Report of the Board of Commissioners of the Central Park, New York: Wm. C. Bryant & Co. (**Exhibit 3**)
- Board of Park Commissioners. 1893. Annual Report of the Board of Park Commissioners for the Year Ending December 31, 1892, Cincinnati: The

Commercial Gazette Job Print. (**Exhibit 25**)

- Board of Park Commissioners. 1898. Report of the Board of Park Commissioners of the City of Rochester, N.Y., 1888 to 1898, Rochester: Union and Advertiser Press. (**Exhibit 36**)

- Board of Park Commissioners. 1898. Report of the Board of Park Commissioners, of Wilmington, Del. For the Year Ending December 31st, 1897, Wilmington: The John M. Rogers Press. (**Exhibit 37**)

- Board of Supervisors. 1875. San Francisco Municipal Reports for the Fiscal Year 1874-5, Ending June 30, 1875, San Francisco: Spaulding & Barto, Printers. (**Exhibit 6**)

- Borough of Phoenixville. 1906. A Digest of the Ordinances of Town Council of the Borough of Phoenixville, Phoenixville: "The Daily Republican" Printers. (**Exhibit 10**)

- Boston, Massachusetts, Department of Parks. 1888. Thirteenth Annual Report of the Board of Commissioners for the Year 1887, Boston: Printed for the Department. (**Exhibit 15**)

- Boyer, Paul. 1978. Urban Masses and Moral Order in America, 1820-1920, Cambridge: Harvard University Press.

- Brooklyn Park Commissioners. 1873. "Seventh Annual Report of the Commissioners of Prospect Park, 1867" in Annual Reports of the Brooklyn

Park Commissioners, 1861-1873, Brooklyn: Brooklyn Park Commissioners. (**Exhibit 4**)

- Brown, Edgar A. and William W. Thornton, coll. and annot. 1904. The General Ordinances of the City of Indianapolis, Indianapolis: Wm. B. Burford, Printer and Binder. (**Exhibit 35**)

- Buffalo Park Commissioners. 1874. Fourth Annual Report of the Buffalo Park Commissioners, Buffalo: Warren, Johnson & Co., Printers. (**Exhibit 8**)

- Campbell, Colin P., comp. and index. 1906. Compiled Ordinances of the City of Grand Rapids, Containing all Ordinances Passed by the Common Council, of the City of Grand Rapids, in force September 1, 1906, Grand Rapids: Common Council. (**Exhibit 22**)

- Chicago, Illinois. 1873. Laws and Ordinances Governing the City of Chicago, Chicago: Murray F. Tuley. (**Exhibit 7**)

- Chiperfield, B.M., 1895. Revised Ordinances of the City of Canton, Illinois, Revised 1894-1895, Canton: Daily Register Press. (**Exhibit 32**)

- Connor, E.O., rev., comp. and cod. 1903. Municipal Code of the City of Spokane, Washington, Spokane: The Inland Printing Company. (**Exhibit 28**)

- Cushing, John D. 1961. "Town Commons of New England, 1640-1840" Old-Time New England 51(3): 86-94.

- Cutler, Phoebe. 1989. "State Parks" in American Landscape Architecture:

Designers and Places, Washington, DC: Preservation Press, 194-199.

- De Vorsey, Louis. 2012. "The Origins and Appreciation of Savannah, Georgia's Historic City Squares" Southeastern Geographer 52(1): 90-99.

- Dilsaver, Lary M. 2016a. "An Act Authorizing a Grant to the State of California of the 'Yo-Semite Valley,' and of the land Embracing the 'Mariposa Big Tree Grove." Approved June 30, 1864 (13 Stat. 325)" in America's National Park System: The Critical Documents, 2nd Ed. Lanham: Rowman and Littlefield, 4-5.

- Dilsaver, Lary M. 2016b. "An Act to Set Apart a Certain Tract of Land Lying Near the Headwaters of the Yellowstone River as a Public Park, Approved March 1, 1872 (17 Stat. 32)" in America's National Park System: The Critical Documents, 2nd Ed. Lanham: Rowman and Littlefield, 20-21.

- Dilsaver, Lary M. 2016c. "Secretary Lane's Letter on National Park Management, May 13, 1918" in America's National Park System: The Critical Documents, 2nd Ed. Lanham: Rowman and Littlefield, 35-39.

- Engbeck Jr., Joseph H. 1980. State Parks of California, from 1864 to the Present, Portland: C.H. Belding.

- Freeman, Raymond L. 1989. "National Parks" in American Landscape Architecture: Designers and Places, Washington, DC: Preservation Press, 172-175.

- Giltinan, John A., comp. 1896. General Ordinances and Private Ordinance of a Public Nature of The City of St. Paul, Ramsey County, Minnesota, Up to and Including December 31st, 1895, St. Paul: Pioneer Press Co. (**Exhibit 31**)
- Graff, M.M. 1985. Central Park-Prospect Park: A New Perspective, New York: Greensward Foundation.
- Greene, Oscar F.A., comp. 1899. Revised Ordinances of the City of Boulder, Boulder: Printed by Ricketts & Kerr, at the News Office. (**Exhibit 40**)
- Jamieson, Egbert and Francis Adams. 1881. Municipal Code of Chicago: Comprising the Laws of Illinois Relating to the City of Chicago, and the Ordinances of the City Council; Codified and Revised, Chicago: Beach, Barnard & Co., Legal Printers. (**Exhibit 11**)
- Jefferson, Thomas. 1829 (1787). Notes on the State of Virginia, Boston: Wells & Lilly.
- Landrum, Ney. 2004. The State Park Movement in America: A Critical Review, Columbia: University of Missouri Press.
- Laws of the General Assembly of the State of Pennsylvania Passed at the Session of 1868, Harrisburg: Singerly & Myers. (**Exhibit 5**)
- Linden-Ward, Blanche. 1989. “Cemeteries” in American Landscape Architecture: Designers and Places, Washington, DC: Preservation Press, 120-125.

- Local Acts of the Legislature of the State of Michigan Passed at the Regular Session of 1895. 1895, Lansing: Robert Smith & Co. State Printers and Binders. (**Exhibit 33**)
- Lynn, Massachusetts. 1892. Third Annual Report of the Park Commissioners of the City of Lynn, For the Year Ending December 20, 1891, Lynn: Whitten & Cass, Printers. (**Exhibit 26**)
- Mackintosh, Barry. 2005. The National Parks: Shaping the System, Rev. Ed., Harpers Ferry: Harpers Ferry Center.
- Mann, Calhoun & Frazier, Rev. & Arrang. 1883. The Revised Ordinances of the City of Danville, Danville, IL: Bowman & Freese, Book and Job Printers. (**Exhibit 14**)
- MacAdam, David H. 1883. Tower Grove Park of the City of St. Louis, Review of its Origin and History, Plan of Improvement, Ornamental Features, Etc., with Illustrations. Prepared by Order of the Board of Commissioners, St. Louis: R.P. Studley & Co., Printers. (**Exhibit 13**)
- McFarland, J. Horace. 1910. “Are State Parks Worth While?” typed manuscript, J. Horace McFarland Papers, Pennsylvania Historical and Museum Commission, Harrisburg.
- McFarland, J. Horace. 1912. “Are National Parks Worth While?” typed manuscript, J. Horace McFarland Papers, Pennsylvania Historical and

Museum Commission, Harrisburg.

- New Haven, Connecticut. 1898. Ordinances of the City of New Haven Together with Legislative Acts Affecting Said City, Revised to February 1, 1898, New Haven: Press of the Price, Lee & Adkins Co.

- Novak, Barbara. 1995. Nature and Culture: American Landscape and Painting, 1825-1875, Rev. Ed., New York: Oxford.

- Noleman, Frank F. and William F. Bundy, rev. and codif. 1896. The Centralia City Code, Centralia: Centralia Daily Sentinel – T.L. Joy & Co. (**Exhibit 34**)

- Olmsted, Frederick Law. 1990a (1865). "Preliminary Report upon the Yosemite and Big Tree Grove" in The Papers of Frederick Law Olmsted, Volume V: The California Frontier, 1863-1865, VP Ranney, GJ Rauluk, and CF Hoffman, Eds. Baltimore: The Johns Hopkins University Press, 488-516.

- Olmsted, Frederick Law. 1990b (1865). "Preliminary Report in Regard to a Plan of Public Pleasure Grounds for the City of San Francisco" in The Papers of Frederick Law Olmsted, Volume V: The California Frontier, 1863-1865, VP Ranney, GJ Rauluk, and CF Hoffman, Eds. Baltimore: The Johns Hopkins University Press, 518-546.

- Park Commissioners of the City of Milwaukee. 1892. First Annual Report of the Park Commissioners of the City of Milwaukee, Milwaukee: Ed. Keogh,

Printer. (**Exhibit 23**)

- President and Board of Trustees of the Village of Hyde Park. 1876. Laws and Ordinances Governing the Village of Hyde Park, Hyde Park: Consider H. Willett. (**Exhibit 9**)

- Richards, Louis, comp. 1897. A Digest of the Laws and Ordinances for the Government of the Municipal Corporation of the City of Reading, Pennsylvania, In Force April 1, 1897, Reading, PA: Eagle Book Print. (**Exhibit 16**)

- Robinson, Charles Mulford. 1909. Modern Civic Art; or, The City Made Beautiful, 3rd Ed., New York: G.P. Putnam's Sons.

- Rosenzweig, Roy and Elizabeth Blackmar. 1992. The Park and the People: A History of Central Park, Ithaca: Cornell University Press.

- Rozelle, Frank F. and George R. Thompson, comp., arrang., annot., and index. 1898. Charter of Revised Ordinances of Kansas City, 1898, Kansas City: Lawton & Burnap, Printers and Stationers. (**Exhibit 38**)

- Saint Paul, Minnesota. 1889. Annual Reports of the City Officers and City Boards of the City of Saint Paul, For the Fiscal Year Ending December 31, 1888. (**Exhibit 17**)

- Salt Lake City, Utah. 1888. The Revised Ordinances of Salt Lake City, With the City Charter and Amendments Thereto, February 14, 1888, Salt Lake

City: Star Printing Company. (**Exhibit 18**)

- Schuyler, David. 1986. The New Urban Landscape: The Redefinition of City Form in Nineteenth-Century America, Baltimore: The Johns Hopkins University Press.

- Schuyler, David and Censer, Jane Turner, Eds. 1992. The Papers of Frederick Law Olmsted, Volume VI: The Years of Olmsted, Vaux & Company, 1865-1874, Baltimore: The Johns Hopkins University Press.

- Sellars, Richard West. 1997. Preserving Nature in the National Parks, A History, New Haven: Yale University Press. (**Exhibit 39**)

- Slemmons, Wilbert I, Israel C. Pinkney, and Daniel F. Raum, rev. and edit. 1892. Laws and Ordinances of the City of Peoria, Illinois, Peoria: J.W. Franks & Sons, Printers and Binders. (**Exhibit 27**)

- Smith, Langdon. 2013. "Democratizing Nature Through State Park Development" Historical Geography 41: 207-223.

- Springfield, Massachusetts. 1897. Park Commissioners' Report, Springfield: Springfield Printing and Binding Co. (**Exhibit 25**)

- Stilgoe, John R. 1982. "Town Common and Village Green In New England: 1620-1981" in On Common Ground: Caring for Shared Land from Town Common to Urban Park, RF Fleming and LA Halderman, Eds. Harvard, MA: The Harvard Common Press, 7-36.

- Sullivan, M.J. 1881. The Revised Ordinance of the City of St. Louis, St. Louis: Times Printing House. (**Exhibit 12**)

- Thacher, D. 2015. "Olmsted's police" Law and History Review 33(3): 577-620.

- Thomson, W.W. prep. 1897. A Digest of the Acts of Assembly Relating to, And the General Ordinances of the City of Pittsburgh From 1804 to Jan. 1, 1897, Pittsburgh: W.T. Nicholson Sons, Printers and Binders. (**Exhibit 29**)

- Trenton, New Jersey, Common Council. 1903. Charter and Ordinances; Also Certain Acts of the Legislature Relating to Municipal Departments, Trenton: The John L Murphy Publishing Co., Printers. (**Exhibit 19**)

- Williamsport, Pennsylvania. 1900. A Digest of the Laws and Ordinances For the Government of the Municipal Corporation of the City of Williamsport, Pennsylvania In Force August 1, 1900, Part III, Newark, NJ: Soney and Sage. (**Exhibit 21**)

- Wilmington, Delaware. 1893. The Charter of the City of Wilmington As Amended to May 6th, 1893; Acts of the General Assembly Relating to the City, Including the Session of 1893; and Ordinances, and Rules and Regulations of Departments of the City Government, As Amended and in Force September 1st, 1893, Wilmington: Diamond Printing Company. (**Exhibit 30**)

- Wilson, Thomas D. 2012. The Oglethorpe Plan: Enlightenment Design in Savannah and Beyond, Charlottesville: University of Virginia Press.

- Young, Terence. 1996. "Social Reform Through Parks: The American Civic Association's Program for a Better America" Journal of Historical Geography 22(4): 460-472.

- Young, Terence. 2004. Building San Francisco's Parks, 1850-1930, Baltimore: The Johns Hopkins University Press.

- Young, Terence. 2018. "Frederick Law Olmsted's Abandoned San Francisco Park Plan" in The American Environment Revisited, Geoffrey L. Buckley and Yolonda Youngs, Eds. Lanham: Rowman & Littlefield, 145-160.

- Young, Terence. 2022. "Outdoor Imaginaries: The Emergence of Camping in Modern America" *Mondes du Tourisme* 21: http://journals.openedition.org/tourisme/4790

# Exhibit 1

Exhibit 1
Page 36

# CURRICULUM VITAE

Terence George Young
672 Warwick Street
Cambria, CA 93428
626-716-5927 (cell)
tgyoung@cpp.edu
https://www.cpp.edu/faculty/tgyoung/

**Ph.D.** - University of California, Los Angeles, 1991 (Cultural-Historical Geography)

**POSITIONS HELD**

Academic

**2020 – present** – Professor Emeritus of Geography, Department of Geography & Anthropology, California State Polytechnic University, Pomona, California 91768

**2002 – 2021** – Assistant to Full Professor of Geography, Department of Geography & Anthropology (and Adjunct Professor, Lyle Center for Regenerative Studies through 2013), California State Polytechnic University, Pomona, California 91768

Consultations

**forthcoming** – On the history and ideology of American parks in relation to firearms regulation in TBD, in US District Court for the District of TBD, for Attorney General's Office, Providence, RI

**2023** – On the history and ideology of American parks in relation to firearms regulation in Jason Wolford, Alison Wolford, Atom Kasprzycki, Hawaii Firearms Coalition v. Anne E. Lopez, US District Court for the District of Hawaii, for Attorney General's Office, Honolulu, HI

– On the history and ideology of American parks in relation to firearms regulation in David J. Nastri v. Katie Dykes, US District Court for the District of Connecticut, for Attorney General's Office, Hartford, CT

**PUBLICATIONS**

Periodicals – Peer Reviewed

**2022** – "Outdoor Imaginaries: The Emergence of Camping in Modern America" *Mondes du Tourisme* 21: http://journals.openedition.org/tourisme/4790

**2021** – "From Competition to Cooperation: A History of Canada-US National Park Relations" *Environment and History* 27(4): 607-634 (co-authored with Alan MacEachern and Lary Dilsaver)

**2018** – "E.P. Meinecke and the Development of the Modern Auto Campground" *IdeAs - Idées d'Amériques* 12(Automne/Hiver): https://journals.openedition.org/ideas/3502

– "'Green and Shady Camps': E.P. Meinecke and the Restoration of America's Public Campgrounds" *The George Wright Forum* 31(1): 69-76

**2011** – "Collecting and Diffusing 'the World's Best Thought': International Cooperation by the National Park Service" *The George Wright Forum* 28(3): 269-278 (co-authored with Lary Dilsaver)

**2010** – "On Camping and Its Equipment" *Environmental History* 15(1, January 2010): 120-128

**2009** – "'A Contradiction in Democratic Government': W.J. Trent, Jr. and the Struggle for Non-Segregated National Park Campgrounds" *Environmental History* 14(4, October 2009): 651-682

**2007** – "U.S. Parks and Protected Areas: Origins, Meanings and Management" *Historical Geography* 35: 5-9 (co-authored with Lary Dilsaver)

Periodicals – Non-peer Reviewed

**2020** – "Pandemics & Public Lands" *National Parks Traveler* (August 26): https://www.nationalparkstraveler.org/2020/08/essay-pandemics-public-lands

**2018** – "Murray's Rush: The Adirondack Beginning of American Camping" *NY Archives Magazine* 18(1): 11-17

– "Why Americans Invented the RV" in *What It Means to be American*: *A Conversation Hosted by the Smithsonian and Arizona State University* (September 4). Available at: http://www.zocalopublicsquare.org/2018/09/04/americans-invented-rv/ideas/essay/

**2017** – "The Religious Roots of America's Love for Camping" *What It Means to be American*: *A Conversation Hosted by the Smithsonian and Arizona State University* (October 12). Available at: http://www.whatitmeanstobeamerican.org/encounters/the-religious-roots-of-americas-love-for-camping/
**2014** – "The End of Camping: Coming Home to the City" *BOOM: A Journal of California* 4(3): 70-75
**2008** – "Four Visions of Nature in American Protected Areas" *Past Place* 16(2, Spring/Summer): 8-10 (Newsletter of the Historical Geography Specialty Group, Association of American Geographers)

Periodical – Special Issue Edited
**2007** – "US Parks and Protected Areas" for *Historical Geography* 35: 5-213 (co-edited with Lary Dilsaver)

Books – Authored
**2017** – *Heading Out: A History of American Camping*, Cornell University Press (Winner of the American Association of Geographers' J.B. Jackson Prize for 2018; Winner of the Western History Association's Hal K. Rothman Prize for 2018)
**2004 –** *Building San Francisco's Parks: 1850-1930,* The Johns Hopkins University Press

Books – Edited
**2002 -** *The Landscapes of Theme Parks: Antecedents and Variations*, Terence Young and Robert Riley, eds., Dumbarton Oaks Library and Research Center Press

Book Chapters
**2018** – "Frederick Law Olmsted's Abandoned San Francisco Park Plan" in *The American Environment Revisited: Environmental Historical Geographies of the U.S.* (Lanham: Rowman & Littlefield), 145-160
**2014** – "The Passionate Geographer" in *North American Odyssey: Historical Geographies for the Twenty-first Century* (Lanham: Rowman & Littlefield), 315
**2008** – "Urban Parks, Leisure and the Good Society" in *Loisir et Liberté en Amérique du Nord*, P. Lagayette, Editor (Paris: Université Paris-Sorbonne, Paris IV), 59-71

**PODCASTS**
**2021** – "William Coffin Coleman and The History of the Coleman Company" on The RV Atlas, June 25, available at: https://thervatlas.com/podcast/william-coffin-coleman-and-the-history-of-the-coleman-company/
**2020** – "Pandemics & the National Parks" on National Parks Traveler, August 23, available at: https://www.nationalparkstraveler.org/podcast/2020-08-23-national-parks-traveler-episode-80-pandemics-and-national-parks
**2019** – "Heading Out: A History of American Camping" on Writing Westward Podcast, March 8, available at: http://reddcenter.byu.edu/Blogs/redd-center-blog/Post/writing-westward-podcast-episode-007---terenc
**2017** – "Heading Out: The History of Camping" on The Art of Manliness, August 3, available at: http://www.artofmanliness.com/2017/08/03/podcast-327-heading-history-camping/

**AWARDS & GRANTS**
Awards
**2023 –** California State University Emeritus and Retired Faculty & Staff Association, Research Grant of $600.00 for travel to Washington, DC. Title: "The African Student Program, 1961-1969."
**–** Brigham Young University, The Redd Center, John Topham and Susan Redd Butler Off-Campus Faculty Research Award of $2,000.00 for travel to Washington, DC and Amherst, MA. Title: "'To Learn the Value of Conservation': Diffusing America's Protected-Area Methods to Post-Colonial Africa, 1961-1974."
**2018** – J.B. Jackson Prize from the American Association of Geographers for *Heading Out: A History of American Camping* published by Cornell University Press
- Hal K. Rothman Prize from the Western History Association for *Heading Out: A History of American Camping* published by Cornell University Press
**2013 –** Association of American Geographers, Research Grant of $1,000.00 for travel to Washington, DC and Yellowstone National Park. Title: "US National Park Service Cooperation with Canada and In Africa."
**2008 – 2018 –** US National Park Service, Park History Program, Washington, DC – Volunteers in Parks

Program – $4,600.00 and continuing for travel and research expenses. Titles: "International Cooperation and the National Park Service" and "Yosemite State Park and the US National Parks"
**2008-2009** - California State Polytechnic University – Pomona, Research, Scholarship, and Creative Activities Grant of $4,736.00 for one course release to compose a scholarly article for a journal *Environmental History*. Title: "The Smooth Way to Rough It: Pilgrimage, McDonaldization and the Evolution of Camping Equipment."

**PRESENTATIONS**
Papers:
**2023** – Annual Meeting of the American Association of Geographers, Denver, CO, March 24: "Diffusing America's 'Effective Methods' to Africa"
**2022** – Annual Meeting of the Association of Pacific Coast Geographers, Bellingham, WA, October 7: "'To Learn the Value of Conservation and Preservation': Diffusing America's Approach to Protected Areas through the African Student Program, 1961-1965"
– Annual Meeting of the European Society for Environmental History, Bristol, UK, July 4: "'Nature is not something optional': Essentialism and the History of American Urban Greening" (presented via Zoom)
– Annual Meeting of the American Society for Environmental History, Eugene, OR, March 26: "An Appreciation for Conservation and Wildlife Management": The National Park Service's African Student Program, 1961-1965"
– Annual Meeting of the American Association of Geographers, New York, NY, February 25: "The Potential African Leaders of Tomorrow": The National Park Service's African Student Program, 1961-1965 (presented via Zoom)
**2021** – Annual Meeting of the American Association of Geographers, Seattle, WA, April 8: "Essential Nature: Biophilia and the Greening of American Cities" (presented via Zoom)
**2019** – Annual Meeting of the Western History Association, Las Vegas, Nevada, Friday, October 18: "'To Keep in Touch with the Real America': The Wally Byam Foundation's Trailer-Camping Program of National Discovery and Re-Discovery"
**2018** – Annual meeting of the American Association of Geographers, New Orleans, LA, April 10: "'Nature is not something optional': Biophilia, Essentialism, and the Greening of American Cities"
– Annual meeting of the American Society for Environmental History, Riverside, CA, March 17: "'Nature is not something optional': Biophilia, Essentialism, and the Greening of American Cities"
**2017** – Annual meeting of the Association of Pacific Coast Geographers, Chico, CA, October 27: "'The Most Elaborate and Valuable Apparatus': Transnational Politics and the Linking of Canadian and American Park Agencies"
– Annual meeting of the American Association of Geographers, Boston, MA, April 7: Roundtable in honor of Nicholas Entrikin
– Annual meeting of the American Association of Geographers, Boston, MA, April 7: "For what did Lavoy Finicum die?"
– Biennial meeting of the George Wright Society, Norfolk, VA, April 3: "Yosemite and the Origins of America's National Parks"
**2016** – Annual meeting of the Association of Pacific Coast Geographers, Portland, OR, October 7: "Yosemite and the Origins of America's National Parks"
– Annual meeting of the American Association of Geographers, San Francisco, CA, April 1: "*In Media Res*: California as National Park-State Park Intersection"
**2015** – Annual meeting of the Association of Pacific Coast Geographers, Palm Springs, CA, October 23: "Christian Nationalism and the Antimodern Origins of the Pacific Crest Trail"
– Triennial meeting of the International Conference of Historical Geographers, London, United Kingdom, July 6: "Frederick Law Olmsted's Abandoned San Francisco Park Plan"
– Biennial meeting of the George Wright Society, Oakland, CA, March 30: "Renewing Our Faith and Ideals: Christian Nationalism and the Origins of the Pacific Crest Trail"
– Annual meeting of the American Society for Environmental History, Washington, DC, March 21: "'An Outstanding Feature of Our Relations': The Melding of Canadian and US Park Management after World War II"
**2013** – Annual meeting of the Association of American Geographers, Los Angeles, CA, April 9: "'To Think and Feel and Become Sanctified': Camping as American Pilgrimage"

– Biennial meeting of the George Wright Society, Denver, CO, March 11: "'The Illusion of Wildness' in America's Automobile Campgrounds"

Invited Lectures & colloquia:
**2022** – "Camping in America: Its 19th Century Beginning," Torrance Public Library, Torrance, CA, August 5
**2020** – Keynote Speaker – "Outdoor Imaginaries: Camping in Modern America," Tourist Imaginaries and Mobility in the United States Conference, American Studies Program, University of Versailles Saint-Quentin-en-Yvelines, Versailles, France, February 6
**2019** – "'Roughing It Smoothly': American Autocamping in the Early Twentieth Century," Ohio University, Athens, OH, November 5
– "Modernity & Nature in America," Dumbarton Oaks Graduate Seminar, Washington, DC, May 21
– "Heading Out: To Walk in the Woods" at the Huntington Westerners, Pasadena, CA, May 4
**2018** – "'Roughing It Smoothly': The Appeal and Aftereffects of American Autocamping" at Montana State University, November 1
– "'Roughing It Smoothly': The Appeal and Aftereffects of American Autocamping" at Idaho State University, October 30
– "To Feel at Home in the Wild: E.P. Meinecke's Modern Autocampground" at Dumbarton Oaks, Washington, DC, October 17
– "Heading Out: To Walk in the Woods" at the Historical Society of Crescenta Valley, La Crescenta, CA, August 20
– "Heading Out: To Walk in the Woods" at the Pasadena Museum of History's At Home Series, May 22
– "Three California Connections" at Flintridge Bookstore, La Canada-Flintridge, CA, March 22
**2017** – "Values, Conflicts and America's Protected Lands" at Department of Geography and Environmental Studies, California State University San Bernardino, November 16 (for Geography Awareness Week)
– "The Value of Parks" in the District Planning and Compliance Course, California State Parks at the California Citrus Historic State Park, Riverside, CA, October 9
– "Fashionable Twaddle": Murray's Rush and America's First Camping Controversy" at the Kelly Adirondack Center, Union College, Schenectady, NY, August 9
– "Fashionable Twaddle": Murray's Rush and America's First Camping Controversy" for the public lecture series of the Adirondack Experience, Blue Mountain Lake, NY, August 7
– "Smoothing Out the Roughness: The Evolution of Camping Gear," National Museum of American History, Smithsonian Institution, Washington, DC, August 1
**2014** – "Swept Up in 'Murray's Rush': The Adirondack Beginnings of Camping in America" for the public lecture series of the Adirondack Museum, Blue Mountain Lake, NY, July 28

**GRADUATE STUDENTS**
Ph.D. Committees
Robert Dye, Department of Parks, Recreation and Tourism Management, Clemson University, Clemson, SC
Kathleen Mengak, Department of Parks, Recreation and Tourism Management, Clemson University, Clemson, SC

M.A./M.S./M.L.A. Committees
Angelica Rocha, Regenerative Studies Program, California State Polytechnic University – Pomona (Co-chair of committee) (MS awarded 2019)
Norma Saldana, Regenerative Studies Program, California State Polytechnic University – Pomona (MS awarded 2019)
Crystal Weintrub, Regenerative Studies Program, California State Polytechnic University – Pomona (MS awarded 2014)
Rachel Boldt (nee Camp), Regenerative Studies Program, California State Polytechnic University – Pomona (Chair of committee) (MS awarded 2012)
April Garbat, Department of Landscape Architecture, California Polytechnic State University – Pomona

(MLA awarded 2011)
Jacob Feldman, Regenerative Studies Program, California State Polytechnic University – Pomona (MS awarded 2011)
Martin Hogue, Department of Landscape Architecture, University of Toronto (MLA degree awarded 2010)
Leslie Johnson, Department of Art, California State University – Long Beach (MA degree awarded 2007)
Doug Kent, Regenerative Studies Program, California State Polytechnic University – Pomona (MS degree awarded 2006)
Keith Miller, Department of Geography, California State University – Long Beach (MA degree awarded 2003)

Manuscripts and proposals reviewed for:
*Agricultural History, Association of Pacific Coast Geographers Yearbook, California History,* Center for American Places/University of Chicago Press, *cultural geographies, Ecumene, Environmental History, Gender, Place and Culture, Geographical Review, GeoJournal, Historical Geography, Journal of Cultural Geography, Journal of Historical Geography, Journal of Planning History, Journal of Urban Design, Land Use Policy, Landscape Journal, Landscape Research,* Louisiana State University Press, National Science Foundation, *Pacific Historical Review, Park Stewardship Forum, Philosophy and Geography, Society and Space, Studies in the History of Gardens and Designed Landscapes,* US National Park Service, University of Georgia Press, University of Massachusetts Press, University of Virginia Press, *Western Historical Quarterly*

**PROFESSIONAL SERVICE**
Memberships
American Society for Environmental History, American Association of Geographers, Association of Pacific Coast Geographers, European Society for Environmental History, George Wright Society

Community Work
**2021-present** – Advisory Member, Publications Committee, George Wright Society
**2022-present** – Secretary, Association of Pacific Coast Geographers
**2023-2024** – Chair, Protected Areas Specialty Group, American Association of Geographers
**2020-2023** – Vice Chair, Protected Areas Specialty Group, American Association of Geographers
**2013-2017** – Member, Editorial Board, *Environmental History*
**2013-2014** – Local Arrangements Committee for American Society for Environmental History's 2014 annual meeting in San Francisco, CA

# Exhibit 2

Exhibit 2
Page 42

## TUESDAY, MARCH 16, 1858.

REGULAR MEETING—3 P. M.

PRESENT:

| | | | |
|---|---|---|---|
| Commissioner | Gray, | Commissioner | Fields, |
| " | Dillon, | " | Green, |
| " | Russell, | " | Strong, |
| " | Butterworth, | " | Hogg. |
| " | Hutchins, | | |

On motion, the reading of the minutes of the previous meeting was dispensed with.

On motion of Mr. BUTTERWORTH, it was

*Resolved*, That the Annual Report of this Board to the Common Council, dated January 30, 1858, be printed as one of the documents of this Board.

As follows:

*Ayes*—Messrs Dillon, Butterworth, Gray, Fields, Green, Strong, Hogg—7.

On motion of Mr. DILLON, the ordinances recommended by the Superintendent were adopted, as follows:

"Be it ordained by the Commissioners of the Central Park:

All persons are forbidden

To enter or leave the Park except by the gateways.

To climb or walk upon the wall.

To turn cattle, horses, goats or swine into the Park.

To carry fire-arms or to throw stones or other missiles within it.

To cut, break, or in any way injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, bridges, or other constructions upon the Park;

Or to converse with, or in any way hinder those engaged in its construction.

Digitized by Google

# Exhibit 3

Exhibit 3
Page 44

Case 8:23-cv-01798-CJC-ADS Document 20-13 Filed 11/03/23 Page 45 of 148 Page ID #:999

# APPENDIX.

---

## A.

### ORDINANCES OF THE CENTRAL PARK.

The Board of Commissioners of the Central Park do ordain as follows:

All persons are forbidden—

To enter or leave the Park except by the gateways.

To climb or walk upon the wall.

To turn cattle, horses, goats, or swine into the Park.

To carry firearms or to throw stones or other missiles within it.

To cut, break, or in any way injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, or other constructions upon the Park ;

Or to converse with, or in any way to hinder those engaged in its construction.

Two pounds are hereby established within the Central Park, for the impounding of horses, cattle, sheep, goats, dogs, swine, and geese found trespassing upon said Park. All such animals found at large upon the Park may be taken by any person or persons, and driven or carried to one of the said pounds, and may be kept enclosed therein during five days, at the end of which time, if not previously claimed, they may be sold at public auction; provided that within two days after they shall have been impounded, notice of the sale shall have been conspicuouly posted in the pound.

Any person claiming property in such impounded animals before the day of sale, may recover the same after suitable proof of his or her right thereto, upon payment for each animal

Generated on 2023-10-24 16:42 GMT / https://hdl.handle.net/2027/hvd.32044106439805
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from HARVARD UNIVERSITY

Exhibit 3
Page 45

# Exhibit 4

Exhibit 4
Page 46

# PARK ORDINANCE, No. 1.

The Commissioners of Prospect Park, in the city of Brooklyn, do ordain as follows:

ARTICLE I.—All persons are forbidden,

1. To take or carry away any sod, clay, turf, stone, sand, gravel, leaves, muck, peat, wood, or anything whatever belonging to the park, from any part of the land embraced within the boundaries of the park;

2. To climb upon, or in any way cut, injure, or deface any tree, shrub, building, fence, or other erection within the park;

3. To turn cattle, horses, goats, swine, or poultry of any description upon the park;

4. To carry firearms, or to throw stones or other missiles within the park;

5. To hinder or in any manner delay or interfere with men employed upon the park;

6. To expose any article or thing for sale, or engage in any picnic or game upon the park, except by permission derived from the Board of Commissioners;

7. To post or otherwise display any bill, notice, advertisement, or other paper or device upon any tree, structure, or other erection within the park, or upon any of its inclosures.

ARTICLE II.—Any person who shall violate or offend against any of the provisions of the foregoing article, shall be deemed guilty of a misdemeanor, and shall be punished on conviction, before any court of competent jurisdiction in the county of Kings, by a fine not exceeding fifty dollars, and in default of payment, by imprisonment not exceeding thirty days.

Generated on 2023-10-24 16:49 GMT / https://hdl.handle.net/2027/uc1.c070473596
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from UNIVERSITY OF CALIFORNIA

# Exhibit 5

Exhibit 5
Page 48

confirmed by the court, the valuation made shall be forthwith payable by the city of Philadelphia.

City to effect loans to make compensation for grounds taken, &c.

SECTION 11. The city of Philadelphia shall be authorized and required to raise, by loans from time to time, such sums of money as shall be necessary to make compensation for all grounds heretofore taken or to be taken for said Fairmount park, and for the laying out and construction thereof for public use, for the permanent care and improvement thereof, and for all culverts and other means for preserving the Schuylkill water pure for the use of the citizens of said city, and shall annually assess taxes for keeping in repair and good order the said park, and shall also provide for the payment of the interest on all said loans and the usual sinking fund for the redemption thereof.

Commissioners to appoint officers, agents, &c.

SECTION 12. The said park commissioners shall from time to time appoint such officers, agents and subordinates as they may deem necessary for the purposes of this act and the act to which this is a supplement, and they shall prescribe the duties and the compensation to be paid them; and so much of the second section of the act to which this is a supplement, as requires that the secretary shall be chosen from the commissioners, be and the same is hereby repealed.

May acquire and sell lands situate in part within boundaries mentioned.

SECTION 13. It shall be lawful for said park commissioners to acquire title to the whole or any tract of land, part of which shall fall within the boundaries mentioned in the first section of this act, and to take conveyance thereof in the name of the city of Philadelphia; and such part thereof as shall lie beyond or within the said park limits again to sell and convey in absolute fee simple to any purchaser or purchasers thereof by deeds, to be signed by the mayor under the seal of the city, to be affixed by direction of councils, either for cash or part cash, and part to be secured by bond and mortgage to the city, paying all cash into the city treasury: *Provided*, That the proceeds of such sales shall be paid into the sinking fund for the redemption of the loan created under the provisions of this act: *Provided also*, That no commissioner nor any officer under the park commission shall in any wise be directly or indirectly interested in any such sale of lands by the commissioners as aforesaid; and if any commissioner or officer aforesaid shall act in violation of this proviso, he shall, if a commissioner, be subject to expulsion, if an officer, to be discharged by a majority of votes of the board of park commissioners, after an opportunity afforded of explanation and defence.

Proviso.

Proviso.

To make report to mayor annually.

SECTION 14. The said board of commissioners shall annually hereafter, in the month of December, make to the mayor of the city of Philadelphia a report of their proceedings and a statement of their expenditures for the preceding year.

May lease houses, &c., within park limits.

SECTION 15. The said park commissioners shall have exclusive power to lease from year to year all houses and buildings within the park limits, which may be let without prejudice to the interests and purposes of the park by leases, to be signed by their president and secretary, and to collect the rents and pay them into the city treasury.

Buildings erected on grounds by boat clubs, &c., relative to.

SECTION 16. All houses and buildings now built or to be built on any part of the park grounds, by or for boat or skating clubs, or zoological or other purposes, shall be taken to have rights subordinate to the public purposes intended to be subserved by acquiring and laying out the park, and shall be subject to the regulations of said park commissioners under licenses, which shall be approved by the commission and signed by the president and secretary, and will subject them to their supervision and to removal or surrender to the city whensoever the said commissioners may require.

Commissioners may accept property upon trusts.

SECTION 17. The said park commissioners shall have power to accept in the name and behalf of the city of Philadelphia devises, bequests and donations of lands, moneys, objects of art and natural history, maps and books, or other things, upon such trusts as may be prescribed by the testator or donor: *Provided*, Such trusts be satisfactory to the commission and compatible with the purposes of said park.

Proviso.

Debts to bind commissioners, how created.

SECTION 18. None of the park commissioners nor any person employed by them shall have power to create any debt or obligation to bind said board of commissioners, except by the express authority of the said commissioners at a meeting duly convened.

Management, &c., of park

SECTION 19. The said park commissioners shall have the power to govern, manage, lay out, plant and ornament the said Fairmount park, and to maintain the same in good order and repair, and to construct all proper bridges, buildings, railways and other improvements therein, and to repress all disorders therein under the provisions hereinafter contained.

May license laying down of passenger railways.

SECTION 20. That the said park commissioners shall have authority to license the laying down and the use for a term of years from time to time of such passenger railways as they may think will comport with the use and enjoyment of the said park by the public, upon such terms as said commissioners may agree, all emoluments from which shall be paid into the city treasury.

Rules and regulations.

SECTION 21. The said park shall be under the following rules and regulations, and such others as the park commissioners may from time to time ordain:

I. No person shall turn cattle, goats, swine, horses or other animals loose into the park.

II. No person shall carry fire arms or shoot birds in the park or within fifty yards thereof, or throw stons or other missiles therein.

III. No one shall cut, break, or in anywise injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, structures or statuary, or foul any fountains or springs within the park.

IV. No person shall drive or ride therein at a rate exceeding seven miles an hour.

V. No one shall ride or drive therein upon any other than upon the avenues and roads.

VI. No coach or vehicle used for hire shall stand upon any part of the park for the purpose of hire, nor except in waiting for persons taken by it into the park, unless, in either case, at points designated by the commission.

Exhibit 5
Page 50

# Exhibit 6

Exhibit 6
Page 51

## ORDINANCE No. 2.

[Adopted September 24th, 1872.]

AN ORDINANCE TO PROVIDE FOR THE REGULATION AND GOVERNMENT OF THE AVENUE AND PUBLIC PARKS IN THE CITY AND COUNTY OF SAN FRANCISCO, IN CHARGE OF THE PARK COMMISSIONERS.

SECTION 1. The objects of this Ordinance are those grounds which are known as Golden Gate and Buena Vista Parks, and the Avenue leading to said Golden Gate Park, all particularly described in the first section of an Act of the Legislature of the State of California, entitled "An Act to provide for the improvement of Public Parks in the City of San Francisco," approved April 4th, 1870.

SEC. 2. Within the said grounds all persons are hereby forbidden:

1. To turn in or let loose any cattle, horses, goats, sheep, or swine.
2. To carry and especially to discharge firearms.
3. To cut, break, or in any way injure or deface any trees, shrubs, plants, buildings, fences, or structures of any kind.
4. To bathe in, or otherwise pollute the water of any pond, lake, or pool.
5. To chase, set snares for, catch, or destroy any rabbits, quails, or other wild quadrupeds or birds.
6. To make or kindle a fire of any kind.
7. To camp, lodge, or tarry over night.
8. To ride or drive any horse or other animal, with vehicle or without, elsewhere than on the roads or drives for such purposes provided.
9. To indulge in riotous, boisterous, or indecent conduct, or language.
10. To drive or ride at a furious speed.

SEC. 3. No dray, truck, wagon, cart, or other vehicle carrying, or if not carrying, employed regularly in carrying goods, merchandise, manure, soil, or other articles, shall be allowed to travel upon the drive of said avenue for any other purpose than to cross immediately at the regular street intersections, nor upon the drives of said parks. For the present the road now and heretofore commonly traveled to and from "The Central Macadamized Toll Road," is excepted from this rule. But all such vehicles shall be driven over the least worked portion of such excepted road as directed by the Superintendent or any of the Park police officers hereinafter mentioned, unless compelled to turn out in obedience to the "rule of the road," as hereinafter laid down.

The provisions of this subdivision shall also apply to light vehicles regularly driven for business purposes between the country beyond the parks and the city.

SEC. 4. The rule of the road for equestrians or vehicles meeting upon the avenue or park drives shall be: PASS TO THE RIGHT.

Digitized by Google

# Exhibit 7

Exhibit 7
Page 53

Case 8:23-cv-01798-CJC-ADS Document 20-13 Filed 11/03/23 Page 54 of 148 Page ID #:1008

# CHAPTER 31.

## PARKS AND PUBLIC GROUNDS.

SECTION.
1. Names established.
2. What games are prohibited in—Penalty.
3. Duty of board of public works to superintend
4. Ingress and egress regulated.
5. Animals to be excluded.
6. Firearms, etc., prohibited in – Injury to shrubbery.
7. Hindering employes prohibited.
8. Speed in driving regulated.
9. Animals, etc., to keep on drives.
10. Obstruction of ways prohibited.
11. Hacks, etc., not to ply for hire.
12. Peddling in, prohibited.
13. Certain vehicles prohibited.
14. Fortune telling, gaming, indecency, etc., prohibited.
15. Power to close part of parks.

SECTION.
16. When parks to be open.
17. Right to open and close parks.
18. Conduct of visitors regulated.
19. Bathing, fishing, etc. in forbidden.
20. Fireworks prohibited.
21. Perambulators on walks.
22. Posting bills forbidden.
23. Processions, fire apparatus, etc. prohibited, when.
24. Funeral processions prohibited.
25. Fires prohibited.
26. To keep off grass, except when.
27. Power of police in.
28. Chapter applies to public squares.
29. Penal clause.
30. Use of grass grown.

**1.** NAMES ESTABLISHED.] *Rev. Ord.* 1866. The several public parks, squares and grounds in the city of Chicago, shall be known and designated by the names applied thereto respectively on the map of the city of Chicago published by Mr. J. Van Vechten in the year 1872.

**2.** GAMES IN PROHIBITED—PENALTY.] No person shall play at ball, cricket, or at any other game or play whatever, in any of the inclosed public parks or grounds in this city, under the penalty of five dollars for every offense.

**3.** BOARD OF PUBLIC WORKS—DUTY OF.] It shall be the duty of the board of public works to superintend all inclosed public grounds and keep the fences thereof in repair, the walks in order and the trees properly trimmed, and improve the same according to plans approved by the common council. They shall likewise cause printed or written copies of the prohibitions of this chapter to be posted in the said grounds or parks.

**4.** WALLS AND FENCES.] *Ord. Jan.* 11, 1869. No person shall enter or leave any of the public parks of the city of Chicago, except by their gateways; no person shall climb or walk upon their walls or fences.

**5.** ANIMALS TO BE EXCLUDED.] Neither cattle, horses, goats, swine or other animals, except as herein provided, shall be turned into any one of the said parks by any person.

**6.** FIREARMS AND MISSILES PROHIBITED—PROTECTION OF SHRUBBERY.] All persons are forbidden to carry firearms or to throw stones or other missiles within any one of the public parks. All persons are forbidden to cut, break or in any way injure or deface the trees, shrubs, plants, turf or any of

Exhibit 7
Page 54

Digitized by Google

the buildings, fences, bridges, or other construction or property, within or upon any of the said parks.

**7.** HINDERING EMPLOYES.] No person shall converse with, or in any way hinder those engaged in their construction.

**8.** SPEED OF DRIVING.] No animal shall travel on any part of either of the said parks at a rate exceeding six miles per hour.

**9.** VEHICLES AND ANIMALS ON DRIVES.] No vehicle, or horse, or other animal shall be permitted on the foot walks, the same being devoted exclusively to pedestrians; nor shall any vehicle, horse or animal of burden go upon any part of either of the parks, except upon the carriage drives and upon such places as are appropriated for carriages at rest.

**10.** OBSTRUCTION OF WAYS.] No animal or vehicle shall be permitted to stand upon the drives or carriage roads of any of the public parks of the city, or any part thereof, to the obstruction of the way, or to the inconvenience of travel, nor shall any person solicit passengers within either of said parks.

**11.** HACKS, ETC., NOT TO PLY FOR HIRE.] No hackney coach, carriage' or other vehicle for hire, shall stand upon either of the parks of the city of Chicago for the purpose of taking in any other passengers, or persons, than those carried to the park by said coach, carriage or vehicle.

**12.** PEDDLING IS NOT ALLOWED.] No person shall expose any article or thing for sale upon any of said parks, except such person shall have been previously licensed by the board of public works, nor shall any hawking or peddling be allowed therein.

**13.** PROHIBITED VEHICLES.] No omnibus or wagon with or without passengers, nor any cart, dray, wagon, truck or other vehicle carrying goods, merchandise, manure, soil or other article, or solely used for the carriage of goods, merchandise, manure or other articles, shall be allowed to enter any part of either of the said parks. This, however, does not apply to vehicles engaged in the construction of such parks, nor private family wagons.

**14.** BOISTEROUS LANGUAGE—FORTUNE TELLING—GAMING—INDECENCY.] No threatening, abusive, insulting or indecent language shall be allowed therein whereby a breach of the peace may be occasioned. No person shall be allowed to tell fortunes or play at any game of chance at or with any table or instrument of gaming, nor to do therein any obscene or indecent act.

**15.** POWER TO CLOSE PART OF PARKS.] In case of any emergency, where life or property is endangered, all persons, if required so to do by the superintendent or any of his assistants, shall remove from the portion of either of said parks specified by the superintendent or his assistants, and remain off the same until permission is given to return.

**16.** PARKS—WHEN OPEN.] Lincoln park and Union park shall be open daily to the public during the months of December, January and February from seven o'clock in the morning until eleven o'clock in the evening; during the months of March, April, May, October and November from six o'clock in the morning until ten o'clock in the evening, and during the months of June, July, August and September, from five o'clock in the morning until eleven o'clock in the evening.

**17.** POWER TO OPEN AND CLOSE PARKS.] The superintendent may, for

Exhibit 7
Page 55

Digitized by Google

# Exhibit 8

Exhibit 8
Page 56

# ORDINANCES

For the Use, Regulation, Protection and Government of the Parks, Approaches Thereto and Streets Connecting the Same.

The Park Commissioners, appointed under and by virtue of the statute of the State of New York, entitled, "An act to authorize the selection and location of certain grounds for public parks in the City of Buffalo, and to provide for the maintenance and embellishment thereof," passed April 14, 1869, and the acts amendatory thereof, do hereby, in pursuance of the power conferred by said act, make and enact the following ordinances for the use, regulation, protection and government for the said park or parks, approaches thereto and streets connecting the same, to wit:

## CHAPTER I.

Section 1. All persons are forbidden to carry fire-arms or fire at or shoot any bird or animal, or throw stones or missiles within the several parks, approaches thereto or streets connecting the same.

§ 2. All persons are forbidden to climb, break, cut down, remove or in any way injure or deface the trees, plants, shrubs, flowers, turf, or any of the buildings, fences, bridges, or other constructions within the parks, or approaches thereto, or streets connecting the same.

§ 3. No person shall drive or ride any horse or team upon any of the parks, approaches thereto or streets connecting the same, at a rate of speed exceeding ten (10) miles per hour.

§ 4. No animal or vehicle shall be permitted to stand upon the drives or carriage roads of the parks or parkways, or any part thereof (except the concourses) to the obstruction of the way, or to the inconvenience of travel; nor shall any person solicit or invite passengers for hire therein.

Generated on 2023-10-24 17:03 GMT / https://hdl.handle.net/2027/mdp.39015063722063
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google
Digitized by Google
Original from UNIVERSITY OF MICHIGAN

# Exhibit 9

Exhibit 9
Page 58

Case 8:23-cv-01798-CJC-ADS Document 20-13 Filed 11/03/23 Page 59 of 148 Page ID #:1013

# LAWS AND ORDINANCES

GOVERNING THE

# VILLAGE OF HYDE PARK

TOGETHER WITH ITS

## CHARTER AND GENERAL LAWS

AFFECTING MUNICIPAL CORPORATIONS; SPECIAL ORDINANCES AND CHARTERS UNDER WHICH CORPORATIONS HAVE VESTED RIGHTS IN THE VILLAGE. ALSO, SUMMARY OF DECISIONS OF THE SUPREME COURT RELATING TO MUNICIPAL CORPORATIONS, TAXATION AND ASSESSMENTS.

---

PRINTED AND PUBLISHED BY
AUTHORITY OF THE PRESIDENT AND BOARD OF TRUSTEES
OF THE VILLAGE OF HYDE PARK.

---

REVISED AND ARRANGED
BY CONSIDER H. WILLETT,
VILLAGE ATTORNEY.

CHICAGO HISTORICAL SOCIETY

HYDE PARK:
1876.

Exhibit 9
Page 59

§ 2. The bonds authorized to be issued by the act of which this is amendatory and supplemental, may be issued, sold, and the proceeds applied for acquiring said lands, and for any and all purposes in the said act mentioned. Said bonds shall be retired and canceled as fast as the money for that purpose can be obtained, by the collection of the money due upon the special assessment provided for in section seven of the act hereinbefore mentioned, and a sufficient amount of any bonds that may be issued by the city of Chicago under any law now in force or hereinafter enacted, and received oy said commissioners, shall be applied to the purpose of retiring the bonds authorized by said act.

§ 3. The ninth section of said act is hereby so amended that the words "during the current year," shall read "during the next succeeding year."

§ 4. That the twelfth section of said act be and the same is hereby amended so as to read as follows: The said commissioners, or either of them, may be removed from office by the judge of the circuit court of Cook county, upon the petition presented to him in term time, or in vacation, by one hundred freeholders of said towns of South Chicago, Hyde Park and Lake, if it shall appear after hearing proof before said judge, that the said commissioners, or either of them, have been guilty of misdemeanor or malfeasance in office under this act; and if the said judge shall remove any one or more of said commissioners from office for any cause before the expiration of their term of office, he is hereby authorized and empowered to fill the vacancy or vacancies thus created by appointing other commissioners in their place, who shall serve during the unexpired terms of the commissioners so removed.

§ 5. The commissioners to be appointed under said act are hereby vested with the same powers and duties as are conferred by said act in relation to lands designated for parks, over all streets running longitudinally along and adjoining any and all of the proposed parks, or strips of land designated in said original act, as are conferred by said act in relation to such parks and strips of land, as may be necessary to improve and keep in repair the same, in connection with the said parks or strips of land without obstructing the fences or other structures, free access to the said streets from existing roads and streets, and by owners of land abutting on the same.

§ 6. The elections held in the towns of South Chicago, Hyde Park and Lake, on the twenty-third day of March, A. D. 1869, under and by virtue of the eighteenth section of the act to which this is an amendment, are hereby legalized and confirmed, and said act shall be held and deemed to have been regularly and legally adopted by the legal voters of said towns, and shall remain in full force and effect, and shall be liberally construed in all courts, with a view to carry out and enforce the intent and meaning of the same.

§ 7. This act is hereby declared a public act, and shall take effect and be in force from and after its passage.

## SOUTH PARK ORDINANCES.

Whereas, by an act of the general assembly of the State of Illinois, entitled an act to provide for the location and maintenance of a park for the towns of South Chicago, Hyde Park and Lake, it is provided as follows, to-wit:

"The said board shall have full and exclusive powers to govern, manage and direct said park; to lay out and regulate the same; to pass ordinances for the regulation and government thereof; to appoint such engineers, surveyors, clerks, and other officers, including a police force, as may be necessary; to define and prescribe their respective duties and authority; to fix the amount of their compensation; and, generally, in regard to said park, they shall possess all the powers and authority now by law conferred upon or possessed by the common council of the city of Chicago, in respect to public squares and places in said city."

*Therefore, be it ordained by the South Park Commissioners as follows:*

§ 1. The said park, which is under the management and direction of the South Park Commissioners, shall be, and the same is hereby designated, as the South Park.

§ 2. No person shall, without the consent of the superintendent, play at ball, cricket, or any other game or play whatever, in said park.

§ 3. No person shall climb or walk upon any wall or fence of said park.

§ 4. Cattle, horses, goats, swine, or other animals, or domestic fowls, shall not be turned into said park, or allowed to run at large therein.

§ 5. No dog or bitch, or domestic fowl, belonging to any officer or employee of said commissioners residing within the limits of said park, shall be permitted to run at large.

§ 6. All persons are forbidden to carry fire arms, or to throw stones or other missiles within said park. All persons are forbidden to cut, break, or in any way injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, bridges, or other construction or property within or upon said park.

§ 7. No person shall converse with, or in any manner hinder those engaged in constructing or repairing said park.

§ 8. No animal shall be driven or ridden in said park, at a rate of speed exceeding eight miles per hour.

§ 9. No vehicle, or horse, or other animal, shall be permitted on the foot walks, the same being assigned exclusively to pedestrians; nor shall any vehicle, or horse or other animal of burden, go or be taken upon any part of said park, except upon the carriage drives and upon such places as are appropriated for carriages at rest.

§ 10. No vehicles or animals shall be permitted to stand upon the drive or carriage roads of said park, or of any part thereof, to the obstruction of the way, or the inconvenience of travel; nor shall any person solicit passengers within said park without consent of the board.

§ 11. No person shall, within said park, expose for sale any article or thing, nor shall any hawking or peddling be allowed therein.

§ 12. No omnibus, wagon, cart, dray, truck, or other vehicle for carrying goods, merchandise, manure, or other articles, except such as are engaged in repairing or constructing said park, shall be allowed to enter the same.

§ 13. No language, abusive, insulting, obscene, or calculated to occasion a breach of the peace, shall be permitted in said park, nor shall persons tell fortunes, play at any game of chance, at any table or instrument, be drunk, or do any indecent acts therein.

Exhibit 9
Page 61

# Exhibit 10

Exhibit 10
Page 62

Case 8:23-cv-01798-CJC-ADS Document 20-13 Filed 11/03/23 Page 63 of 148 Page ID #:1017

tered at large in the minute book, and said Council shall proceed to a reconsideration of such ordinance or resolution. If after such reconsideration two-thirds of all the members elected to said Council shall vote to pass such ordinance or resolution it shall become and be of as full force and effect as if said Chief Burgess had signed it; but in such cases the votes of the members of Council shall be determined by the yeas and nays, and the names of the members voting shall be entered on the minutes of said Council: *Provided*, That when the number of Councilmen is less than nine, a majority of Council and one vote more shall be required to pass an ordinance over the veto. If such ordinance or resolution shall not be returned by the Chief Burgess at the next regular meeting of said Council after the same shall have been presented to him, the same shall likewise become and be in as full force and effect as if he had signed it: *Provided*, That before any ordinance shall come into force and effect as aforesaid the same shall be recorded in the Borough ordinance book with the certificate of the secretary and be advertised as heretofore required by law.

To be presented to chief burgess

Veto and passage over

## PARADISE STREET.

Ord. 25 Feb. 1875

1. The width of * * * Paradise street from Nutts avenue to the Borough line * * * shall be * * * forty feet.

Ord. 26 Feb. 1877. § 4

2. Ordained * * * that Paradise street begin at a limestone in Nutts avenue, a corner of lands of Benjamin Moyer and Joseph Rapp, thence south thirty-two and one-half degrees west 508 feet six inches to an iron monument planted to indicate the centre of Pennsylvania avenue, thence the same course 250 feet to the centre of Chester avenue, thence the same course continued 250 feet to the centre of Columbia avenue, thence the same course continued 980 feet six inches to a spike at the Borough line.

## PARK ALLEY.

Ord. 23 Sept. 1874

Dedicated and accepted

1. Ordained, etc., that an alley twenty feet wide 150 feet east of Main street, dedicated by the Phoenix Iron Company to the use of the public, running in a parallel line with Main street from Washington avenue to Second ave-

Digitized by Google

Case 8:23-cv-01798-CJC-ADS Document 20-13 Filed 11/03/23 Page 64 of 148 Page ID #:1018

nue, be and the same is hereby accepted and ordered to be marked on the Borough plot.

2. Park alley be and is hereby continued from Third avenue south to Fifth avenue, the centre line of said alley to be 190 feet east of the centre line of Main street, said alley to be twenty feet wide, or ten feet on each side of above described centre line. **Ord. 5 Aug., 1895** **Continued**

3. The owners of lots or lands bounding on and opposite the sidewalks along * * * both sides of Park alley from Washington avenue to Second avenue * * * are hereby required to put up curbstones at the edge of the sidewalks and to pave and gutter the said sidewalks under the direction of the Borough Surveyor and the Street Committee. * * * **Ord. 3 Aug., 1886** **Curb, pave and gutter**

[If neglected after thirty days' notice Street Committee to have work done and file lien therefor. See Quick street § 4.]

## PARKS.

1. The following rules and regulations shall be adopted for the government and protection of Reeves Park, in the Borough of Phoenixville: **Ord. 2 July, 1878**

SECTION 1, PENAL.

1. No person shall enter or leave the park except by such gates or avenues as may be for such purposes arranged. **Rules of Reeves' Park**

2. No person shall indulge in any threatening, abusive, insulting or indecent language in the park.

3. No person shall engage in gaming or commit any obscene or indecent act in the park.

4. No person shall carry fire-arms or shoot birds or throw stones or other missiles therein.

5. No person shall cut, break or in anywise injure or deface the trees, shrubs, plants, turf or any of the buildings, seats, fences, lamps or statuary in the park.

6. No person shall turn cattle, goats, swine, horses, dogs or other animals loose into the park.

7. No person shall injure, deface or destroy any notices, rules or regulations posted, or in any other manner permanently fixed for the government of the park.

8. No person shall engage in any play at baseball,

Digitized by Google

# Exhibit 11

Exhibit 11
Page 65

Case 8:23-cv-01798-CJC-ADS Document 20-13 Filed 11/03/23 Page 66 of 148 Page ID #:1020

THE

# MUNICIPAL CODE

OF

# CHICAGO:

COMPRISING THE

LAWS OF ILLINOIS RELATING TO THE CITY OF CHICAGO,

AND THE

ORDINANCES OF THE CITY COUNCIL;

CODIFIED AND REVISED

BY

EGBERT JAMIESON AND FRANCIS ADAMS.

PUBLISHED BY AUTHORITY OF THE CITY COUNCIL.

CHICAGO:
BEACH, BARNARD & CO., LEGAL PRINTERS.
1881.

Exhibit 11
Page 66

person who shall be convicted of any such breach shall be adjudged to pay a fine of not less than three dollars nor more than one hundred dollars.

1683. In every prosecution brought for a violation of any ordinance of the city of Chicago, where the offense charged is one punishable under the laws of the State of Illinois as a misdemeanor, the court or magistrate trying the cause may upon conviction in lieu of the fine imposed by the ordinance or in addition thereto, cause the offender to be imprisoned in the house of correction for a period not exceeding three months.

1684. All the printed books containing the revised ordinances shall be deposited with the city comptroller. He shall deliver one copy thereof to each officer of the city, and to such other persons as the city council may direct.

1685. The mayor shall have power to extend to or reciprocate courtesies of other cities, by presenting to them a copy of the revised ordinances bound at the expense of the city in such manner as to him may seem suitable.

## Article XLIII.

### *Parks and Public Grounds.*

1686. The several public parks, squares and grounds in the city of Chicago, shall be known and designated by the names applied thereto respectively on the map of the city of Chicago published by J. Van Vechten and Snyder in the year 1877.

1687. It shall be the duty of the commissioner of public works to superintend all inclosed public grounds and keep the fences thereof in repair, the walks in order and the trees properly trimmed and improve the same according to plans approved by the city council. He shall likewise cause printed or written copies of prohibitions of this article to be posted in the said grounds or parks.

1688. No person shall enter or leave any of the public parks of the city of Chicago except by their gateways; no person shall climb or walk upon their walls or fences.

1689. Neither cattle, horses, goats, swine or other animals, except as herein provided, shall be turned into any one of the said parks by any person.

1690. All persons are forbidden to carry firearms or to throw stones or other missiles within any one of the public parks. All persons are forbidden to cut, break or in any way injure or deface

the trees, shrubs, plants, turf or any of the buildings, fences, bridges or other construction or property within or upon any of the said parks.

1691. No person shall converse with or in any way hinder those engaged in their construction.

1692. No person shall expose any article or thing for sale upon any of said parks, except such person shall have been previously licensed by the commissioner of public works, nor shall any hawking or peddling be allowed therein.

1693. No threatening, abusive, insulting or indecent language shall be allowed in any part of either of the said parks whereby a breach of the peace may be occasioned. No person shall be allowed to tell fortunes or play at any game of chance at or with any table or instrument of gaming, nor to do therein any obscene or indecent act.

1694. In case of any emergency where life or property is endangered, all persons if required so to do by the superintendent or any of his assistants, shall remove from the portion of either of said parks specified by the superintendent or his assistants and remain off the same until permission is given to return.

1695. The commissioner of public works may direct that any of the entrances to the public parks be closed at any time.

1696. No person shall bathe or fish in, or go or send or ride any animal in any of the waters of either of the said public parks, nor disturb any of the fish, water fowl or other birds in any of said parks, or any deer, sheep or other animal belonging to and preserved therein, nor throw or place any article or thing in the waters within either of said parks.

1697. No person shall post or otherwise affix any bills, notice or other paper upon any structure or thing within either of said parks nor upon any of the gates or inclosures thereof.

1698. No person shall without the consent of the commissioner of public works, play upon any musical instrument nor shall any person take into or carry or display in the said public parks any flag, banner, target or transparency. No military or target company civic or other shall be permitted to parade, drill or perform therein any military or other evolutions or movements. Nor shall any fire engine, hook and ladder truck, hose cart or other machine on wheels commonly used for the extinguishing of fires be allowed on any part of said parks without the previous consent of the commissioner of public works.

# Exhibit 12

Exhibit 12
Page 69

# ARTICLE XI.

## PROTECTION OF BIRDS.

SECTION
1. Disturbance of birds or nests prohibited.
2. Penalty for disturbing same.
3. Throwing stones, wood, &c., prohibited.

SECTION
4. Penalty for throwing same.
5. Protection of all birds, except hawks, &c., intended.
6. Duty of police.

SECTION 1. All persons are forbidden to molest, injure or disturb in any way, any small bird in the city of St. Louis, or the nest, young or brood of any small bird in said city.

*Birds, or nests not to be disturbed. Ord. 8436, sec. 1.*

SEC. 2. If any person shall willfully injure, molest, take or disturb in any way, any small bird in the city of St. Louis, or the nest, eggs, young or brood of any such small bird, he shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall forfeit and pay to said city not less than five dollars for each bird so by him injured, molested, taken or disturbed, and not less than twenty dollars for each nest of eggs or brood of young of any such small bird in the city of St. Louis, so by him injured, molested taken or disturbed.

*Penalty for disturbing birds or nests. Ibid. sec. 2.*

SEC. 3. No person shall throw from his hand any fragment of stone, wood, metal or other missile capable of inflicting injury, in any street, alley, walk or park of the city of St. Louis, or use or have in his possession ready for use in any street, alley, walk or park of the city of St. Louis, any sling, cross bow and arrow, air gun or other contrivance for ejecting, discharging or throwing any fragment, bolt, arrow, pellet, or other missile of stone, metal, wood or other substance capable of inflicting injury or annoyance.

*Throwing stones, wood, &c., prohibited. Ibid. sec. 3.*

SEC. 4. If any person shall throw from his hand, in any alley, street, walk or park of the city of St. Louis, any missile of wood, stone, metal or other substance, or sub-

*Penalty. Ibid. sec. 4.*

Generated on 2023-10-24 17:30 GMT / https://hdl.handle.net/2027/nyp.33433014085702
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google
Digitized by Google
Original from NEW YORK PUBLIC LIBRARY

stances capable of inflicting injury or annoyance, or use or have in his possession, ready for use in any street, alley, walk or park of the city of St. Louis, any sling, air gun, cross bow and arrow, or other contrivance for ejecting, discharging or throwing any missile, pellet, fragment or bolt of stone, metal, wood or other substance, or substances capable of causing injury or annoyance, he shall be deemed guilty of a misdemeanor, and on conviction thereof, be punished by a fine of not less than one nor more than twenty dollars for each offense.

All birds to be protected, except hawks, &c. Ibid. sec. 5.

SEC. 5. The birds intended to be protected by this article shall be and are defined as all varieties of birds except hawks, vultures and owls.

Duty of police. Ibid. sec. 6.

SEC. 6. It is made the special duty of the police force of the city of St. Louis, to enforce the provisions of this article, and arrest and bring to trial, all offenders against the same; and any member of the police force conniving at any breach of the foregoing provisions, by failing to arrest or report the offender, shall, on conviction thereof, be subject to a fine of not less than five dollars.

Generated on 2023-10-24 17:30 GMT / https://hdl.handle.net/2027/nyp.33433014085702
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from NEW YORK PUBLIC LIBRARY

# Exhibit 13

Exhibit 13
Page 72

## RULES AND REGULATIONS.

In accordance with the authority conferred by the Act creating Tower Grove Park, the Board of Commissioners have adopted the following rules and regulations:

All persons are forbidden —

1. To enter or leave the park except by the gateways.

2. To climb the fences.

3. To turn cattle, horses, goats or swine into the park or the avenues surrounding the park.

4. To carry firearms or to throw stones or other missiles within it.

5. To cut, break, or in any way injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, bridges, or other constructions upon the park;

6. Or to converse with, or in any way hinder, those engaged on the work of the park.

7. A pound is hereby established within the Tower Grove Park for the impounding of horses, cattle, sheep, goats, dogs and swine found trespassing upon said park or the adjacent avenues. All such animals found at large may be taken by any person or persons and driven or carried to the pound, and may be kept enclosed therein during five days, at the end of which time, if not previously claimed, they may be sold at public auction; provided, that, within two days after they shall have been impounded, notice of the sale shall have been conspicuously posted in the pound or vicinity.

Any person claiming property in such impounded animals before the day of sale, may recover the same, after suitable proof of his or her right thereto, upon payment for each animal of the sum of two dollars and the expenses of keeping; the expenses of keeping to be reckoned as follows:

For each horse, dog, or head of neat stock, sixty cents per day;

For each goat, swine, or sheep, twenty-five cents per day.

These charges shall be paid to the chief park keeper of Tower Grove Park, and the money thus collected shall by him be handed over within one week to the comptroller of the board.

If within one month after the sale of any impounded animals their former owner shall appear and claim the same, the treasurer shall, after deducting the full amount of the charges provided for above, pay over to him the proceeds of their sale; otherwise the amount shall be added to the funds of the board.

8. No animal shall travel on any part of the Tower Grove Park, except upon the drive or carriage road, at a rate exceeding six miles per hour. Persons on horseback shall not travel on the drive or equestrian road at a rate exceeding seven miles per hour.

9. No vehicle or riding shall be permitted on the walks, the same being devoted exclusively to pedestrians; nor shall any vehicle, horse, or burden, go

Digitized by Google

# Exhibit 14

Exhibit 14
Page 74

# THE REVISED

# ORDINANCES

OF THE

# CITY OF DANVILLE.

PUBLISHED BY AUTHORITY OF THE CITY COUNCIL.

REVISED AND ARRANGED BY

MANN, CALHOUN & FRAZIER.

DANVILLE, ILL.:
BOWMAN & FREESE, BOOK AND JOB PRINTERS.
1883.

Case 8:23-cv-01798-CJC-ADS Document 20-13 Filed 11/03/23 Page 76 of 148 Page ID #:1030

## CHAPTER XIX.

### PARKS.

SECTION.

1. Committee on public grounds, etc. to have charge.
2. Entering Parks, etc.—Climbing on fences.
3. Turning animals into park, etc.
4. Firearms—Shooting—fire works prohibited.
5. Injury to trees, grass, buildings.
6. Selling, hawking, peddling, etc. forbidden.
7. Bathing, fishing, etc. prohibited.
8. Abusive, profane language, etc. prohibited.
9. Gaming, etc. prohibited.
10. Intoxicated persons, indecent or unlawful acts.
11. Fires in parks forbidden.
12. Carriages on turf, etc.— hitching horses to trees, etc.
13. Throwing stones, rubbish, etc. in parks.
14. Posting bills, etc. forbidden.

COMMITTEE ON PUBLIC GROUNDS, ETC., TO HAVE CHARGE OF PARKS.] § 1. It shall be the duty of the committee on Public Grounds and Buildings to superintend all inclosed public grounds or parks in said city, and keep the fences thereof in repair, the walks in order, the trees properly trimmed, and to improve the same according to plans approved by the city council.

PENALTY FOR LEAVING PARK EXCEPT AT GATEWAYS—CLIMBING ON FENCE, ETC.] § 2. Whoever shall enter or leave any of the public parks of this city except by their gateways, or shall walk or climb upon any of the fences inclosing, or in the same, shall be fined not less than one dollar nor more than ten dollars for each offense.

TURNING ANIMALS INTO PARK PROHIBITED.] § 3. Whoever shall turn any cattle, horses, goats, swine or other animals into any park of said city, or permit the same, or any of them, to run therein, shall be fined not less than three dollars, nor more than fifty dollars, for each offense.

FIRE-ARMS AND FIRE-WORKS FORBIDDEN.] § 4. Whoever shall carry any fire-arms into said parks, or shall fire off or discharge the same in, or into said parks, or any of them; or whoever shall shoot, fire or discharge any kind of fire-works therein, shall be fined not less than one dollar nor more than one hundred dollars, for each offense.

INJURY TO TREES, GRASS, BUILDINGS, ETC.] § 5. Whoever shall cut, break or injure in any way any tree, shrub or plant, in any such park; or shall cut, tramp, or injure in any way the turf or grass therein, or shall walk or lie upon the grass at any place where placards are posted directing persons to keep off, or not to walk upon the same; or shall cut, mark, deface or in any way injure any of the buildings, fences, bridges, or other constructions, or property of any kind, in any such park, shall be fined not less than one dollar, nor more than one hundred dollars for each offense.

Exhibit 14
Page 76

# Exhibit 15

Exhibit 15
Page 77

## PARK ORDINANCES.

IN BOARD OF PARK COMMISSIONERS, Aug. 20, 1886.

*Voted*, That the following rules, under the title of Ordinances, be adopted for the use and government of the Public Parks. *Provided*, *however*, that said rules shall not invalidate any pending prosecution or procedure, or any liability of any person for breach of any previous rule.

The Board of Park Commissioners of the City of Boston, by virtue of its authority to make rules for the use and government of the Public Parks of said city, and for breaches of such rules to affix penalties, hereby ordains that within the Public Parks, except with the prior consent of the Board, it is forbidden : —

1. To cut, break, injure, deface, defile or ill use any building, fence, or other construction, or any tree, bush, plant or turf, or any other thing or property.

2. To have possession of any freshly-plucked tree, bush or plant, or portion thereof.

3. To throw stones or other missiles ; to discharge or carry fire-arms, except by members of the Police Force in the discharge of their duties ; to discharge or carry fire-crackers, torpedoes, or fire-works ; to make fires ; to play musical instruments ; to have any intoxicating beverages ; to sell, offer or expose for sale, any goods or wares ; to post or display signs, placards, flags, or advertising devices ; to solicit subscriptions or contributions ; to play games of chance, or have possession of instruments of gambling ; to make orations, harangues or loud outcries ; to enter into political canvassing of any kind ; to utter profane, threatening, abusive, or indecent language, or to do any obscene or indecent act ; to bathe or fish ; to solicit the acquaintance of, or follow, or otherwise annoy other visitors.

4. To allow cattle, horses, or other animals, to pass over or stray upon the Park lands ; provided that this shall not apply to

Digitized by Google

# Exhibit 16

Exhibit 16
Page 79

30 Dec. 1887. Gaming and obscenity.

(7) No person shall engage in any gaming, nor commit any obscene or indecent act in the common.

Firearms, etc.

(8) No person shall carry firearms, or shoot in the common, or within fifty yards thereof, or throw stones or other missiles therein.

Disturbance of fish, birds or animals. Fireworks. Placards.

(9) No person shall disturb the fish or water fowl in the pool or pond, or birds in any part of the common, or annoy, strike, injure, maim or kill any animal kept by direction of the commissioners, either running at large or confined in a close, nor discharge any fireworks, nor affix any bills or notices therein.

Injury to trees, shrubbery, statuary, etc.

(10) No person shall cut, break, or in any wise injure or deface the trees, shrubs, plants, turf or any of the buildings, fences, bridges, structures or statuary, or foul any fountains or springs within the common.

Dead animals, etc.

(11) No person shall throw any dead animal or offensive matter or substance of any kind within the boundaries of Penn's Common.

Animals at large. Impounding and disposition of estrays.

(12) No person shall turn cattle, goats, swine, horses, dogs or other animals loose into the common. Nor shall they be permitted in or around the common, unless accompanied by the owner; and whether accompanied by the owner or not, if any of said animals are found running at large in and about the said common, it shall be lawful for, and the park watchman or any of his assistants shall have full power and authority to impound them, or any of them, and if the said animals or any of them are not called for by their respective owners within forty-eight hours after the impounding of the same, it shall be lawful for the city authorities to sell and dispose of the said animals or kill the same.[1]

Tearing down notices.

(13) No person shall injure, deface or destroy any notices, rules or regulations for the government of the common, posted or in any other manner permanently fixed by order or permission of the commissioners of Penn's Common, within the limits of the same.

Leading of horses.

(14) No person shall be permitted to bring or lead horses within the limits of Penn's Common, or a horse that is not harnessed and attached to a vehicle, or mounted by an equestrian.

Fakirs.

(15) No person shall expose any article for sale within the common, without the previous license of the commissioners.

Musical entertainments, etc. Parades or funeral processions.

(16) No person shall have any musical, theatrical or other entertainment therein, nor shall any military or other parade or procession, or funeral, take place in or pass through the limits of the common, without the license of the common commissioners.

Public meetings.

(17) No gathering or meeting of any kind, assembled through advertisement, shall be permitted in the common without the previous permission of the commissioners.

Games of sport.

(18) No person shall engage in any play at base ball, cricket, shinney, foot ball, croquet, or at any other games with ball and bat, nor shall [any] foot race or horse race be permitted within the limits of the common, except on such grounds only as shall be specially designated for such purpose.

[1] This rule amended as above by ordinance of June 26, 1895, Jour. 1895-96, App. 549.

Digitized by Google

# Exhibit 17

Exhibit 17
Page 81

## RULES AND REGULATIONS OF THE PUBLIC PARKS AND GROUNDS OF THE CITY OF SAINT PAUL.

1. No person shall drive or ride in any Park in the City of Saint Paul at a rate exceeding seven (7) miles per hour.

2. No person shall ride or drive upon any other part of any Park than the avenues and roads.

3. No coach or vehicle used for hire shall stand upon any part of any Park for the purpose of hire, unless licensed by the Board of Park Commissioners.

4. No person shall indulge in any threatening or abusive, insulting or indecent language in any Park.

5. No person shall engage in any gaming nor commit any obscene or indecent act in any Park.

6. No person shall carry firearms or shoot birds in any Park or within fifty yards thereof, or throw stones or other missiles therein.

7. No person shall disturb the fish or water fowl in any pool or pond or birds in any part of any Park, or annoy, strike, injure, maim or kill any animal kept by direction of the Board of Park Commissioners, either running at large or confined in a close; nor discharge any fireworks, nor affix any bills or notices therein.

8. No person shall cut, break or in anywise injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, bridges, structures or statuary, or foul any fountain, well or spring within any Park.

9. No person shall throw any dead animal or offensive matter, or substance of any kind into any lake, stream or pool, within the limits of any Park.

10. No person shall go in to bathe within the limits of any Park.

11. No person shall turn cattle, goats, swine, horses, dogs or other animals loose in any Park, nor shall any animals be permitted to run at large therein.

12. No person shall injure, deface or destroy any notices, rules or regulations for the government of any Park, posted or in any other way fixed by order or permission of the Board of Park Commissioners within the limits of any Park.

13. Complaints against any employe of any Park may be made at the office of the Superintendent of Parks.

14 No person shall use any Park drive for business purposes, or for the transportation of farm products, dirt or any like material, or for the passage of teams employed for such purposes.

Any person who shall violate any of the foregoing rules and regulations shall be guilty of a misdemeanor, and for each and every offense shall be fined not less than the sum of Five Dollars ($5), nor more than Fifty Dollars ($50), which sum shall be paid into the city treasury for park purposes.

JOHN D. ESTABROOK,
Superintendent.

Exhibit 17
Page 82

Digitized by Google

# Exhibit 18

Exhibit 18
Page 83

Case 8:23-cv-01798-CJC-ADS Document 20-13 Filed 11/03/23 Page 84 of 148 Page ID #:1038

[PUBLISHED BY AUTHORITY.]

# THE REVISED ORDINANCES

OF

# SALT LAKE CITY,

M

Ordinances, etc.

WITH THE

## CITY CHARTER AND AMENDMENTS THERETO.

---

FEBRUARY 14, 1888.

---

SALT LAKE CITY, UTAH:
PRINTED BY THE STAR PRINTING COMPANY.
1888.

# CHAPTER XXVII.

## OF LIBERTY PARK.

1. Mayor to control Park and appoint Keepers. Keepers given police powers.
2. When gates to be closed.
3. Drays, trucks, etc., not to travel upon drives.
4. Rate of speed. Racing prohibited.
5. Vending in Park prohibited.
6. Injuring property. Disturbance. Animals trespassing, etc. Firearms.
7. Rule in meeting vehicles.
8. Associations, etc., to get permit.
9. Penalty.

SECTION 1. The Mayor shall have the control and charge of Liberty Park, and shall have power to appoint one or more Park Keepers, whose duties shall be to have charge of the Park ,under the Mayor's direction, and to see that the provisions of this chapter are carried into effect; and for that purpose they are hereby given police powers and authorized to arrest any person violating any of the provisions of this chapter.

Mayor to control Park and appoint Keepers.

Keepers given police powers.

SEC. 2. All the gates of Liberty Park shall be closed at nine o'clock each evening; and all travel on the roads of said Park, or other use of the grounds between nine o'clock P. M. and five o'clock A. M., shall be unlawful except by permission of the Mayor.

When gates to be closed.

SEC. 3. No dray, truck, wagon, cart or other vehicle carrying, or if not carrying, employed regularly in carrying goods, merchandise, manure, soil or other article of commerce or trade, shall be allowed to travel upon the drives of said Park.

Drays, trucks, etc., not to travel upon drives.

SEC. 4 All persons are hereby prohibited from riding or driving upon the roads within said

Rate of speed.

Park at a rate of speed exceeding eight miles per hour, and it shall be unlawful for two or more persons to engage in racing with animals in said Park except by consent of the Keeper thereof.

Racing prohibited.

Vending in Park prohibited.

SEC. 5. No person shall vend or sell, or offer to vend or sell any article or thing whatever within said Park without the consent of the City Council.

Injuring property.

SEC. 6. No person shall, within Liberty Park, cut, break, or in any way injure or deface any trees, shrubs, plants, buildings, fences or property of any kind; or indulge in noisy, boisterous, riotous, or indecent behavior, or use any boisterous or offensive language; or, except authorized by the Mayor: 1—Let loose any cattle, horses, goats, sheep or swine. 2—Drive a herd of said animals through the grounds. 3—Carry or discharge firearms. 4—Camp, lodge or tarry over night. 5—Ride or drive any horse or other animal, with or without vehicle, elsewhere than on the roads or drives for such purposes provided. 6—Catch or kill any birds or fish of any kind.

Disturbance.

Animals trespassing, etc.

Firearms.

Rule in meeting vehicles.

SEC. 7. All persons in riding or driving in said Park, when meeting other animals or vehicles, shall pass to the right.

Associations, etc., to get permit.

SEC. 8. When any company or association of persons exceeding fifty in number desire to resort to the Park for any lawful purpose, they, or one representing them, shall first get the permission of the Mayor.

Penalty.

SEC. 9. Any person violating any of the provisions of this chapter shall, upon conviction, be liable to a fine of not to exceed fifty dollars.

# Exhibit 19

Exhibit 19
Page 87

to the amount to be raised by taxes in said city; and said portion of the principal so raised shall be paid yearly to the sinking fund commission of the city of Trenton, to be used exclusively for the liquidation of said bonds; *provided, however,* that whenever the amount of moneys in the hands of said commission shall be sufficient for the redemption of said bonds, no further sums shall be raised by taxation.

When to take effect.

9. That this ordinance shall take effect immediately.

**An Ordinance providing for the government and protection of public parks and squares of the city of Trenton.**

Vol. 6, p. 181.

Approved June 26th, 1890.

*The Inhabitants of the City of Trenton do ordain:*

Rate of speed for driving or riding.

1. No one shall drive or ride in Cadwalader park at a rate exceeding seven miles an hour.

Driving, where allowed.

2. No one shall ride or drive in or upon any of the public squares of this city or upon any other part of said park than upon its avenues and roads.

What vehicles not allowed in park.

3. No vehicle of burden or traffic shall pass through said park.

How persons shall enter.

4. No person shall enter or leave said park or squares except by such gates or avenues as may be for such purpose arranged.

Wagons not to stand in park for hire.

5. No coach or vehicle used for hire shall stand upon any part of said park for the purpose of hire.

No threatening language to be used.

6. No person shall indulge in any threatening, abusive, insulting or indecent language in said park or squares.

No obscene act to be permitted.

7. No person shall engage in any gaming nor commit any obscene or indecent act in the said park or squares.

No person to carry firearms.

8. No person shall carry firearms or shoot birds in said park or squares, or within fifty yards thereof, or throw stones or other missiles therein.

No person to annoy any of the animals.

9. No person shall disturb the fish or water fowl in the pools, ponds or other waters, or birds in any part of said park or squares, or annoy, strike, injure, maim or kill any animal kept by direction of common council or the park committee thereof, either running at large or confined in a close, nor discharge any fireworks nor affix any bills therein.

Not to deface trees or buildings.

10. No person shall cut, break or in anywise injure or deface the trees, shrubs, plants, turf, or any of the

Digitized by Google

# Exhibit 20

Exhibit 20
Page 89

Case 8:23-cv-01798-CJC-ADS Document 20-13 Filed 11/03/23 Page 90 of 148 Page ID #:1044

hundred feet of any building, and no person shall build any fire upon any lot or on any street and leave the same uncared for, under a penalty of three dollars for each offense.

SEC. 256. No pipe of any stove shall be put up in any house or other building in this City unless it is conducted into a chimney made of brick or stone, without first obtaining consent of the Fire Warden of the district in which said building is situated, nor shall any person at at any time set fire to any chimney for the purpose of cleaning the same, without first obtaining the consent of the said Fire Warden And it shall not be lawful to conduct any stovepipe through any partition, floor or wood-work of any building unless the same is securely fixedwith stone or brick-work, or in place thereof a tin or earthen tube or safe, so called, or other metallic fixture; and any person offending against any provision of this section shall forfeit as a penalty the sum of three dollars, and the further penalty of three dollars for every twenty-four hours that the violation shall continue after having been notified by the Fire Warden of the proper district to discontinue such violation.

SEC. 257. Every chimney hereafter erected within the limits of the City of Berlin shall be plastered on the inside with lime and sand morter at the time it is erected, under a penalty of twenty-five dollars, to be collected either of the person or persons for whom such chimney is built, or of the person or persons erecting the same.

ARTICLE VII.—FIRE ARMS, FIRE WORKS AND CANNONS.

SECTION 258. Any person who shall fire or discharge any gun, pistol, fowling piece, or other fire arm, within the limits of the City of Berlin except in the necessary defense of his person or property, shall pay a fine of not less than one dollar, nor more than ten dollars for each offense.

SEC. 259. Any person who shall sell, loan or furnish to any minor, any gun, pistol, fowling piece or other firearm within this City, shall pay a fine of not less than five dollars, nor more than twenty-five dollars for each such offense.

SEC. 260. Any person who shall fire, discharge or set off within the limits of the City of Berlin, any rocket, cracker, torpedo, squib or other fire works or thing containing any substance of explosive nature, shall pay a fine of not less than one dollar nor more than ten dollars for each such offense. Provided that the Mayor may by proclamation permit the use of fire works on the Fourth day of July and on such other days as he may deem proper.

SEC. 261. Any person who shall discharge, or fire off any cannon, or piece of artillery in any street, or avenue, alley, park or place,

Generated on 2023-10-24 17:50 GMT / https://hdl.handle.net/2027/uiuo.ark:/13960/t56f0rp4h
Public Domain / http://www.hathitrust.org/access_use#pd

Digitized by INTERNET ARCHIVE
Original from UNIVERSITY OF ILLINOIS AT URBANA-CHAMPAIGN

# Exhibit 21

Exhibit 21
Page 91

15. No person shall have any musical or other entertainment in the park, nor shall any parade or procession take place in or pass through the park, nor shall any picnic, gathering or public meeting of any kind be permitted therein without the previous permission of the commissioners. Parades, etc., prohibited.

16. No person shall engage in any play at base ball, cricket, shinny, foot-ball, croquet, or at any other athletic games within the limits of the park, except on such grounds only as shall be specially designated for such purposes by the park commissioners. Games prohibited.

17. No person shall introduce any spirituous, malt or brewed liquors into said park, either for his own use, to sell, or to give away, nor shall any intoxicated person enter or remain in said park. Liquors prohibited.

18. No person shall curse or swear or use threatening or abusive language, or fight or throw stones, or behave in a riotous or disorderly manner in said park. Swearing.

19. No person shall indulge in any insulting or indecent language, or commit a nuisance in the park. Nuisances.

20. No person shall engage in playing cards or gambling in said park. Gambling.

21. No person shall carry fire-arms, or shoot in the park, or discharge any fire-works, or throw stones or missiles therein. Firearms.

SEC. 2. Any person who shall violate any of said rules and regulations shall be liable to a fine of not less than five dollars nor more than fifty dollars, to be recovered before any alderman of the city of Williamsport, with costs, together with judgment of imprisonment not exceeding thirty days, if the amount of said judgment and costs shall not be paid, which fines shall be paid into the city treasury for park purposes. Penalty.

SEC. 3. Packer street, where it passes through the park, is hereby abandoned as a public highway and declared to be a part of the park, subject to the rules and regulations adopted for its government and protection. Street vacated.

APPROVED—June 18th, 1890.

F. H. KELLER,

*Mayor.*

Digitized by Google

# Exhibit 22

Exhibit 22
Page 93

Grand Rapids, Mich. Ordinances, etc.

# COMPILED ORDINANCES

c F

OF THE

# City of Grand Rapids

Containing all Ordinances passed by the Common Council, of the City of Grand Rapids, in force September 1, 1906

---

Compiled and Indexed
Under Authority of the Common Council
By
COLIN P. CAMPBELL. LL. M.

---

PUBLISHED BY AUTHORITY OF THE COMMON COUNCIL

1907?

The Public Lib
Jan 27. 1912

dollars and costs of prosecution, or by imprisonment at hard labor in the common jail of the County of Kent, or in any penitentiary, jail, work-house, house of correction, or alms-house of said city, in the discretion of the court or magistrate before whom the conviction may be had, for a period of not less than five days, nor more than ninety days; and in case such court or magistrate shall only impose a fine and costs, the offender may be sentenced to be imprisoned at hard labor in the common jail of the County of Kent, or in any penitentiary, jail, work-house, house of correction, or alms-house of said city, until the payment of such fine and costs, for a period of not less than five days nor more than ninety days.

### Repealing Clause.

Sec. 429 (14). The following ordinances are hereby repealed, to-wit: An ordinance entitled "An Ordinance Relative to Public Lamps and Lamp Posts in the City of Grand Rapids," passed March 1, 1873;

Also an ordinance entitled, "An ordinance Relative to Public Parks and Places in the City of Grand Rapids," passed March 8, 1873;

Also an ordinance entitled, "An Ordinance Relative to the Protection, Preservation and Use of Bridges Across Grand River in the City of Grand Rapids, belong to said city," passed June 21, 1873;

Also an ordinance entitled, "An Ordinance Relative to the Preservation of Public Property of the City of Grand Rapids," passed March 1, 1873;

Also all other ordinances and parts of ordinances in anywise contravening the provisions of this ordinance.

**An Ordinance to Regulate the Use of the Public Parks of the City of Grand Rapids, and to Provide for the Preservation of Public Property Therein. Passed May 4, 1891. Amended June 20, 1892, and October 11, 1897.**

The Common Council of the City of Grand Rapids do ordain as follows:

### Parks—Injury to Trees, Etc.—Animals, Etc.—Handbills.

Sec. 430 (1). No person shall break, cut, mutilate, injure,

SEC. 429. Record A of Ordinances, p. 143.
SECS. 430-435. Charter, Section 73.
SECS. 430-432. Record B of Ordinances, p. 130.

overturn, remove or carry away any tree, shrub, plant, flower, stone, or stone-work, bench, chair, seat, bower, stand, house, arbor, structure, fence or property, or anything whatsoever in, upon o1 belonging to any park, spuare or open space, in the City of Grand Rapids, or in any street, avenue, or highway in, adjoining to or around the same; nor shall any person climb up, or upon, any building, house, fence, table, seat or other structure in said park, place or square; nor shall any person kill, disturb, or molest any bird or bird's nest, or any fish or animal within, belonging to or being therein; nor shall any person paste or affix or inscribe any hand-bill, sign, poster, card, device or inscription to, upon or against any fence, tree, structure, or property of or on such park, place, square or highway, in or adjoining the same; nor shall any person disfigure or injure any sward, gravel, sand, turf or earth, or any tree, fence or structure therein, or adjoining thereto; nor shall any person fasten or hitch any animal to any tree, fence or structure in, or upon, the same, unless the same shall be designated and set apart for such purpose; nor shall any person ride or drive any animal or vehicle therein except upon the proper roadways, avenues and drives, and shall not drive therein at a speed exceeding eight miles per hour.

### Parks—Speeches in.

Sec. 431 (2). No person shall deliver any oration, address, speech, sermon or lecture therein unless he shall have first received permission from the Common Council of the City of Grand Rapids, or the Mayor or other lawful authority so to do; nor shall any public meeting be held therein unless leave is first obtained.

### Parks—Dogs in—Fire Arms.

Sec. 432 (3). No person shall allow or permit any domestic animal to go, be, or run at large within any such park, place or square; nor shall any person carry any rifle, gun, or other fire arm of any kind within any park of the City of Grand Rapids, and no dog shall be allowed therein except when fastened or led by a cord or string not exceeding six feet in length.

### Parks—Disorderly Language—Games—Handbills—Peddlers—Picnics in.

Sec. 433 (4). (As amended October 11, 1897.) No person shall

---

SEC 433. Record B of Ordinances, p. 448.

use any threatening, obscene, profane or indecent language in any such park, open place or square, or be guilty of any disorderly or indecent conduct; nor shall any person indulge in any games, acts or demeanor calculating or tending to mar or disturb the feelings or enjoyment of the visitors attending such parks, places or squares; nor shall any person or persons deposit any rubbish or refuse in or upon such park, place or square, except the same be deposited in waste baskets to be provided by the Committee on Parks; nor shall any person post, exhibit or distribute any advertisement, circular or hand bill therein; nor shall any peddler or petty dealer sell, or in any manner dispose of any article in or immediately adjoining any public park, place or square in said city, unless he shall first obtain express permission so to do from the Common Council of the City of Grand Rapids. Picnics and social parties may be allowed in such portions of said parks as shall be designated and set apart by the Park Committee of the Common Council of the City oif Grand Rapids from time to time.

### Hours When Parks Open to Public.

Sec. 434 **(5)**. (As amended June 20, 1892.) The three public parks belonging to said city and respectively named and known as the "John Ball Park," "Lincoln Park" and "Highland Park," shall be open to the public only between the hours of sunrise and 9 p. m. of each and every day, and it shall not be lawful for any person or persons, except the person and employes in charge of any such park, to enter therein before the hour above named for the opening of said park, or to remain therein after the hour above fixed for the closing thereof; Provided, however, That the Committee on Parks of the Common Council or Mayor of said city shall have the power, in their discretion, whenever special occasion may require it, to specially provide for all or any of said parks above named being opened at an earlier hour or closed at a later hour than the hours above designated.

Any person who shall violate any of the provisions or requirements of this section shall be liable to the punishment prescribed in Section 6 of this ordinance.

### Penalty.

Sec. 435 **(6)**. (As re-numbered June 20, 1892, and amended

SEC. 434. Record B of Ordinances, p 240. | SEC. 435. Record B of Ordinances, p. 240-448

# Exhibit 23

Exhibit 23
Page 98

Case 8:23-cv-01798-CJC-ADS Document 20-13 Filed 11/03/23 Page 99 of 148 Page ID #:1053

7. Neglect to treat all officers and other persons civilly and respectfully on all occasions.

8. Neglect to wear uniform while on duty according to regulations, or neglect to appear clean and tidy at all times.

9. Intoxication, disobedience, laziness or inattention to duty, lounging or sleeping while on duty, or any conduct unbecoming a police officer.

The following rules and regulations were adopted by the Park Commissioners of the City of Milwaukee, at the meeting of September 8th, 1891, in pursuance and by virtue of the power and authority contained in Chapter 488, of the Laws of 1889, and Chapter 179 of the Laws of 1891, amendatory thereof, and are published in accordance with the requirements contained in said Chapters:

SECTION 1. No person shall enter or leave the parks, except by the walks or drives.

SEC. 2. No animals shall be allowed loose in the parks.

SEC. 3. All persons are forbidden to carry fire-arms, or to throw stones or other missiles within the parks.

SEC. 4. All persons are forbidden to cut, break or in any way injure or deface the trees, shrubs, plants, turf or any of the buildings, fences, bridges or other construction or property within or upon the parks.

SEC. 5. No driving or riding shall be allowed on any part of the parks at a rate exceeding six miles per hour, except on such drives and at such times as may be designated by the Park Commissioners.

SEC. 6. No vehicle, horse or other animal shall go upon any part of the parks, except the carriage drives, and upon such

Generated on 2023-10-24 17:54 GMT / https://hdl.handle.net/2027/uiug.30112051213772
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from UNIVERSITY OF ILLINOIS AT URBANA-CHAMPAIGN

Exhibit 23 Page 99

# Exhibit 24

Exhibit 24
Page 100

# PARK ORDINANCES.

SPRINGFIELD, MASS., May 2, 1891.

The Board of Park Commissioners of the City of Springfield, by virtue of its authority to make Rules for the use and government of the Public Parks of said city, and for breaches of such rules to affix penalties, hereby ordains that within the Public Parks, except with prior consent of the Board, it is forbidden: —

1. To cut, break, injure, deface, defile, or ill-use any building, fence, or other construction, or any tree, bush, plant, or turf, or any other thing or property of said city, or to have possession of any freshly plucked tree, bush, or plant, or part thereof.

2. To allow animals of any kind to pass over or stray upon the Park lands, provided this shall not apply to dogs when closely led by a cord or chain not more than six feet long.

3. To throw stones, balls, or other missiles; to discharge or carry firearms, fire-crackers, torpedoes, or fireworks; to make fires; to play musical instruments; to have any intoxicating beverages; to sell, offer, or expose for sale any goods or wares; to post or display signs, placards, flags or advertising devices; to solicit subscriptions or contributions; to play games of chance, or to have possession of instruments of gambling; to make orations, harangues, or loud outcries; to enter into political canvassing of any kind; to utter profane, threatening, abusive, or indecent language, or to do any obscene or indecent act; to bathe or fish; to solicit the acquaintance of, or follow, or otherwise annoy other visitors.

4. To take birds, fish, or any live animal or birds' nest, or in any way interfere with cages, boxes, places, or inclosures for their protection.

5. To play ball or any other games in any Public Park except such portions thereof as may be set apart for that purpose.

6. To drive any carriage, cycle, cart, wheelbarrow, hand cart or horse, upon any Park except upon regular carriage roads, and no heavy teaming will be allowed whatsoever.

7. To drive or ride a horse or horses at a rate faster than eight miles an hour.

8. To drive or ride any horse or animal not well broken and under perfect control of the driver.

9. To ride a cycle at a rate faster than eight miles an hour.

10. To refuse to obey the orders or requests of either of the Commissioners, or of the Park Police or other agents of the Commissioners, and to refuse to assist them when required. Any person willfully doing either of the things above forbidden, shall be punished by fine not exceeding twenty dollars.

*Compliance with foregoing regulations is a condition of the use of these premises.*

DANIEL J. MARSH, *President*,
ORICK H. GREENLEAF,
JOHN E. TAYLOR,
EVERETT H. BARNEY,
WILLIAM F. CALLENDER, *Secretary*,
} *Park Commissioners.*

Exhibit 24
Page 101

Digitized by Google

# Exhibit 25

Exhibit 25
Page 102

Case 8:23-cv-01798-CJC-ADS Document 20-13 Filed 11/03/23 Page 103 of 148 Page ID #:1057

# RULES AND REGULATIONS

FOR THE PROTECTION AND GOVERNMENT OF THE PARKS OF CINCINNATI, O.

**Adopted by the Board of Park Commissioners May 16, 1892.**

---

The Board of Park Commissioners, as authorized by law, do hereby establish the following rules for the protection and government of the parks of the city of Cincinnati:

1. The parks will be opened to the public daily, except when special occasion may require any of them to be closed. The hours for opening and closing the different parks to be determined from time to time by the Board of Park Commissioners.

2. Visitors may walk upon any part of the lawns except those from which they are warned by signs.

3. In case of an emergency, such as blasting, or in any other case where life and property are endangered, all persons, if required to do so by the superintendent or his assistants, shall remove from the portion of the grounds specified by him, and shall remain off the same until permission is given to return.

4. No public meeting and no public discussion or debate shall be held within the limits of the parks.

5. No person shall be permitted, unless by the consent of the Board of Park Commissioners, to engage in any picnic or games, to play upon any musical instrument, or to take into or display in the park any flag, banner, target, or transparency; nor shall any military or target company, civic or other procession, or detachment of a procession, be permitted to drill, parade, or perform therein; nor shall any club or party of tricycle or bicycle riders make runs on or have parades therein.

Generated on 2023-10-24 18:02 GMT / https://hdl.handle.net/2027/nyp.33433084127376
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Exhibit 25
Page 103

Digitized by Google
Original from NEW YORK PUBLIC LIBRARY

6. No person shall post or otherwise affix any bill, notice, or other paper upon any structure, tree, or any thing within the limits of the parks, or upon any gates or inclosure thereof, or distribute circulars, handbills, or petitions of any description within the parks.

7. No person or persons shall be permitted to play at any game of chance nor do any obscene or indecent act whatever within the limits of the parks.

8. All persons are forbidden to take or carry away any sod, clay, turf, stone, sand, gravel, leaves, muck, peat, wood, or any thing whatever belonging to the parks from any part of the land embraced within the boundaries of the parks.

9. All persons are forbidden to cut, break, or have in their possession while in the parks any part of a tree, shrub, or flower, or any turf, or in any way to deface the same, or any part of the buildings, fences, or other construction within the parks, or in any way to hinder or interfere with those engaged in its improvement or the animals kept therein.

10. No person shall expose any thing for sale in the parks unless previously permitted so to do by the Board of Park Commissioners, nor shall any hawking or peddling whatever be allowed therein. No person shall expose any thing for sale on the sidewalks bounding the parks.

11. All persons are forbidden to turn cattle, horses, goats, swine, poultry of any kind, or dogs upon the parks. Any such animal found in the parks shall be impounded by the superintendent. When the superintendent is satisfied as to the ownership, and the regular fine and fees are paid to him, he will deliver the animal to the owner.

12. No threatening, abusive, insulting, or indecent language or disorderly conduct of any kind shall be permitted within the parks.

13. No person shall bring into or discharge within the parks any firearms or other device by which birds or animals may be killed, injured, or frightened; no person shall throw stones or missiles within the parks.

14. No fireworks shall be brought into the parks except by consent of the Board of Park Commissioners.

Generated on 2023-10-24 18:02 GMT / https://hdl.handle.net/2027/nyp.33433084127376
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from NEW YORK PUBLIC LIBRARY

# Exhibit 26

Exhibit 26
Page 105

Case 8:23-cv-01798-CJC-ADS Document 20-13 Filed 11/03/23 Page 106 of 148 Page ID #:1060

## ORDINANCES.

The Board of Park Commissioners of the City of Lynn, by virtue of its authority to make rules for the use and government of the Public Parks of said City, and for breaches of such rules to affix penalties, hereby ordains that within the limits of Lynn Woods, except with the prior consent of the Board, it is forbidden:

1. To cut, break, injure, deface, defile or ill use any building, fence, or other construction, or any tree, bush or turf, or any other thing or property.

2. To have possession of any freshly-plucked tree or bush.

3. To throw stones or other missiles; to discharge or carry firearms, except by members of the Police Force in the discharge of their duties; to discharge or carry firecrackers, torpedoes or fireworks; to make fires; to have any intoxicating beverages; to sell, to offer or expose for sale, any goods or wares; to post or display signs, placards, flags, or advertising devices; to solicit subscriptions or contributions; to play games of chance, or have possession of instruments of gambling; to utter profane, threatening, abusive or indecent language, or to do any obscene or indecent act; to bathe or fish; to solicit the acquaintance of, or follow, or otherwise annoy other visitors.

4. To allow cattle, horses, or other animals to pass over or stray upon the Park lands, provided that this shall not apply to those used for pleasure travel when on the ways or places provided and open for the purpose.

5. To drive a horse or horses at a rate faster than eight miles an hour.

6. To ride a horse at a rate faster than ten miles an hour.

7. To drive or ride any animal not well broken and under perfect control of the driver.

8. To play ball or other games or sports, except on grounds provided therefor.

9. To engage in conversation with men at work, or to obstruct, hinder or embarrass their movements.

Exhibit 26
Page 106
Digitized by Google

Case 8:23-cv-01798-CJC-ADS Document 20-13 Filed 11/03/23 Page 107 of 148 Page ID #:1061

10. To refuse to obey the orders or requests of either of the Commissioners, or of the Park Police, or other agents of the Commissioners, and to refuse to assist them when required.

Any person wilfully doing either of the things above forbidden shall be punished by fine not exceeding twenty dollars.

Compliance with the foregoing regulations is a condition of the use of these premises.

Digitized by Google

# Exhibit 27

Exhibit 27
Page 108

mitigated by any provision of this ordinance, such provision may, by the consent of the party affected, be applied to any judgment pronounced after this ordinance takes effect.

## ARTICLE 35.

### PARKS AND PUBLIC GROUNDS.

Section.
1721. Parks and Public Grounds--Superintendence of.
1722. Entrance and Egress.
1723. Animals Prohibited.
1724. Fire-arms, Missiles, etc.--Injury to Property.
1725. Sales--Peddling and Hawking—Prohibited.

Section.
1726. Indecent Words or Act--Fortune Telling—Gaming.
1727. Bill Posting Forbidden.
1728. Grass Not to be Trodden—Except.
1729. Police- Arrest of Offenders.
1730. Penalty.

---

**1721. Parks and Public Grounds—Superintendence of.]** § 1. The commissioner of public works of the city of Peoria, shall have supervision and control of all public parks, public squares, and public grounds, in the city of Peoria, and shall appoint such park janitors as the city council may authorize, and shall keep the fences thereof in repair, the walks in order, and the trees properly trimmed, and improve the same according to the plans approved by the city council.

**1722. Entrance and Egress.]** § 2. No person shall enter or leave any of the public parks, public squares, or public grounds of the city of Peoria, except by their gateways; and no person shall climb, or walk upon their walls or fences.

**1723. Animals Prohibited.]** § 3. Neither cattle, horses, goats, swine, or other animals, shall be turned into, or allowed in any of the parks, public squares, or public grounds, of the city of Peoria, by any person.

**1724. Fire Arms, Missiles, Etc.—Injury to Property.]** § 4. All persons are forbidden to carry fire arms, or to throw stones, or other missiles, within any of the public parks, public squares, or public grounds, within said city. All persons

Generated on 2023-10-24 18:16 GMT / https://hdl.handle.net/2027/uiuo.ark:/13960/t5m95pm7g
Public Domain / http://www.hathitrust.org/access_use#pd

Digitized by INTERNET ARCHIVE

Original from UNIVERSITY OF ILLINOIS AT URBANA-CHAMPAIGN

Case 8:23-cv-01798-CJC-ADS Document 20-13 Filed 11/03/23 Page 110 of 148 Page ID #:1064

are forbidden to cut, break, or in any way injure, or deface, the trees, shrubs, plants, turf, or any of the buildings, fences, bridges, or other property, within or upon any of the public grounds heretofore mentioned.

**1725. Sales, Peddling and Hawking Prohibited.]** § 5. No person shall expose any article or thing for sale upon any of said public parks, public squares or public grounds; nor shall any hawking, or peddling be allowed therein.

**1726. Indecent Words or Acts—Fortune Telling—Gaming.]** § 6. No threatening, abusive, insulting, or indecent language shall be allowed in any part of said public grounds, whereby a breach of the peace may be occasioned. No person shall be allowed to tell fortunes, or play at any game of chance, or with any table or instrument of gaming, nor to do therein, any obscene or indecent act.

**1727. Bill Posting Forbidden.]** § 7. No person shall post, or otherwise affix, any bills, notice, or other paper upon any structure or thing, within any of the said public grounds, nor upon any of the gates or enclosures thereof.

**1728. Grass Not to be Trodden—Except.]** § 8. No person shall go upon the grass, lawn, or turf of the parks, except when and where the word "common" is posted; indicating that persons are at liberty, at that time and place, to go on the grass.

**1729. Police—Arrest of Offender.]** § 9. Any member of the city police shall have power to arrest any person who shall not desist from any violation hereof, when directed, and cause him to be committed for examination.

**1730. Penalty.]** § 10. Any person who shall violate any or either of the provisions, of any section, or clause of this chapter or article, or who shall neglect, or fail, or refuse, to comply with any or either of the requirements thereof, shall, on conviction, pay a fine of not less than five dollars, nor more than one hundred dollars.

Generated on 2023-10-24 18:16 GMT / https://hdl.handle.net/2027/uiuo.ark:/13960/t5m95pm7g
Public Domain / http://www.hathitrust.org/access_use#pd

Digitized by INTERNET ARCHIVE

Original from UNIVERSITY OF ILLINOIS AT URBANA-CHAMPAIGN

# Exhibit 28

Exhibit 28
Page 111

Case 8:23-cv-01798-CJC-ADS Document 20-13 Filed 11/03/23 Page 112 of 148 Page ID #:1066

## ORDINANCE No. A170.

AN ORDINANCE RELATING TO PARKS AND PUBLIC SQUARES OF THE CITY OF SPOKANE.

The City of Spokane does ordain as follows:

SECTION 1. The management and control of all public parks and public squares of the city is vested in the Park Commission.

SECTION 2. It shall be the duty of the Park Commission to keep the fences of all enclosed public grounds in repair, and also all sidewalks around said public grounds.

SECTION 3. No person shall enter or leave any of the public parks or other enclosed public grounds of the City of Spokane except by their gateway. No person shall climb or walk upon their walls or fences.

SECTION 4. Neither cattle, horses, goats, swine or other animals, except as herein provided, shall be turned into any one of said parks, public squares or public grounds by any person. All persons are forbidden to carry firearms or to throw stone or other missiles within any one of the public parks or other public grounds of the city. All persons are forbidden to cut, break or in any way injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, or other constructions or property within or upon any of the said parks or public grounds.

SECTION 5. No person shall expose any article or thing for sale upon any ot said parks or other public grounds, except such person shall have been previously licensed by the Park Commission, nor shall any peddling or hawking be allowed therein.

SECTION 6. No threatening, abusive, insulting or indecent language shall be allowed in any parks or public grounds of the city whereby a breach of the peace may be occasioned. No person shall be allowed to tell fortunes or to play at any game of chance at or with any table or instrument of gaming, nor to do therein any obscene or indecent act.

Digitized by Google

Case 8:23-cv-01798-CJC-ADS Document 20-13 Filed 11/03/23 Page 113 of 148 Page ID #:1067

SECTION 7. The Park Commission may direct that any of the entrances to the public park be closed at any time.

SECTION 8. No person shall post or otherwise affix any bills, notice or other paper upon any structure or thing within any park or other public grounds of the city nor upon any of the gates or enclosures thereof

SECTION 9. No person shall, without the consent of the Park Commission, play upon any musical instrument, nor shall any person take into or carry or display in said public parks any banner, target or transparency. No military or target company, civic or other, shall be permitted to parade, drill or perform therein any military or other evolution or movement. Nor shall any fire engine, hose cart or other machine on wheels, commonly used for the extinguishing of fire, be allowed on any part of said parks or other public grounds without the previous consent of the Park Commission, except in case of fire.

SECTION 10. No person other than employees shall light, make or use any fire in said parks or other public grounds.

SECTION 11. No person shall go upon the grass, lawn or turf of the parks or other public grounds, except when and where the word "Common" is posted; indicating that persons are at liberty at that time and place to go on the grass. The Park Commission shall cause printed or written copies of prohibitions of this ordinance to be posted in said parks or grounds.

SECTION 12. Any member of the city police shall have power to arrest any person who shall not desist from any violations of this ordinance when directed, and cause him to be committed for examination.

SECTION 13. Any person who shall violate any provisions of this ordinance, or who shall neglect or fail or refuse to comply with any or either of the requirements thereof, shall, on conviction, pay a fine of not less than five dollars nor more than one hundred dollars, and the costs of prosecution.

SECTION 14. All ordinances and parts of ordinances in conflict herewith are heredy repealed.

Digitized by Google

SECTION 15. This ordinance shall take effect ten days after its passage.

Passed the City Council March 11, 1892.

---

## ORDINANCE No. A151.

AN ORDINANCE TO PROHIBIT THE PRINTING, PUBLICATION AND SALE OF OBSCENE AND IMMORAL PUBLICATIONS.

The City of Spokane does ordain as follows:

SECTION 1. No person, firm or corporation shall print or publish, sell, or offer for sale, or give away, or exhibit within the City of Spokane, any obscene, immoral or indecent publication, print, picture, illustration or paper.

SECTION 2. Any person, firm or corporation violating any provision of this ordinance shall, upon conviction thereof, be fined in any sum not less than ten dollars nor more than one hundred dollars and the costs of prosecution.

SECTION 3. All obscene, immoral and indecent prints, pictures, publications or papers, are hereby constituted and declared a nuisance, and the Chief of Police is hereby authorized at his discretion to summarily seize and abate the same, whenever found within the limits of the city.

SECTION 4. This ordinance shall take effect ten days after its passage.

Passed the City Council January 8, 1892.

Digitized by Google

# Exhibit 29

Exhibit 29
Page 115

## BUREAU OF PARKS.

July 31, 1893, § 1. O. B. 9, 262.

Bureau of parks created.

Officers and employees.

1. There shall be and is hereby created a bureau to be known as the "bureau of parks," which bureau shall consist of one superintendent whose compensation shall be two hundred dollars per month, one superintendent, whose compensation shall be one hundred and fifty dollars per month, and one assistant superintendent whose compensation shall be one hundred and twenty-five dollars per month, one clerk whose compensation shall be eighty-three dollars and thirty-three cents per month, and such foremen and laborers as may be required from time to time, at the same pay as like labor in other departments of the city (*a*).

July 6, 1896. O. B. 11, 139.

Preamble.

Preamble.

2. WHEREAS, The control, maintenance, supervision and preservation of the public parks is by law vested in the department of public works; and

WHEREAS, It is essential to proper exercise of these powers that persons should be employed as watchmen in the public parks for the protection of the public property therein.

Ibid § 1.

Watchmen compensation.

3. *Be it ordained, &c.*, That the director of the department of public works shall, and he is hereby authorized to employ such watchmen as may be necessary for the properly caring for, maintaining and protecting the public property in the public parks of this city at the daily compensation of two dollars and fifty cents each.

Ibid. § 2.

4. The compensation of such watchmen shall be paid out of appropriation No. 36, public parks.

July 27, 1893. § 1. O. B. 9, 260.

Rules adopted.

5. Upon the passage and approval of this ordinance the following rules and regulations shall be and are hereby established for the management and protection of the parks and public grounds of the city of Pittsburgh, to wit:

*First.* No person shall injure, deface or destroy any notices, rules or regulations for the government of the parks, posted or in any other manner permanently fixed by order of the chief of department of public works.

*Second.* No person shall be allowed to turn any chickens, ducks, geese or other fowls, or any cattle, goats, swine, horses or other animals loose within the parks or to bring led horses or a horse that is not harnessed and attached to a vehicle or mounted by an equestrian.

*Third.* No person shall be allowed to carry firearms, or to shoot or throw stones at or to set snares for birds, rabbits, squirrels or fish, within the limits of the parks or within one hundred yards thereof.

*Fourth.* No person shall cut, break, pluck or in anywise injure or deface the trees, shrubs, plants, turf or any of the buildings, fences, structures or statuary, or place or throw anything whatever in any springs or streams within the parks, or fasten a horse to a tree, bush or shrub.

(*a*) As amended by ordinance of Nov. 23, 1893, O. B. 9, p. 320, and ordinance of March 31, 1896. O. B. 11, p. 40.

Digitized by Google

# Exhibit 30

Exhibit 30
Page 117

# RULES AND REGULATIONS OF THE BOARD OF PARK COMMISSIONERS,

AS AMENDED AND IN FORCE SEPTEMBER 1ST, 1893.

1. No person shall ride or drive upon any other part of the Park than upon such roads as may be designated for such purposes. . . . . . . . . . . . . . . . . . . . Penalty, $5 00

2. No person shall be permitted to bring led horses within the limits of the Park, or to turn any horses, cattle, goats, swine, dogs, or other animals loose in the Park. . . . . Penalty. $5 00

3. No person shall indulge in any threatening, abusive, insulting, or indecent language in the Park. . . . . Penalty, $5 00

4 No person shall engage in gaming, or commit any obscene or indecent act in the Park. . . . . . . Penalty, $10 00

5. No person shall go into bathe in any of the waters within the Park. . . . . . . . . . . . . . . . . . . Penalty, $5 00

6. No person shall throw any dead animal or offensive matter or substance of any kind into the Brandywine, or into any spring, brook, or other water, or in any way foul any of the same, which may be within the boundaries of the Park Penalty, $5 00

7. No person shall carry fire-arms or shoot birds or other animals within the Park, or throw stones or other missiles therein. Penalty, $5 00

8. No person shall disturb birds, or annoy, strike, injure or kill any animal, whether wild or domesticated, within the Park. Penalty, $5 00

9. No person shall cut, break, or in anywise injure or deface any trees, shrubs, plants, turf or rocks, or any buildings, fences, bridges, or other structures within the Park.
Penalty, $10 00

10 No person shall injure, deface, or destroy any notices, rules or regulations for the government of the Park posted or in any other manner permanently fixed, by order or permission of the Board of Park Commissioners or their officers or employes. Penalty, $10 00

*Adopted October* 12, 1887.

Digitized by Google

# Exhibit 31

Exhibit 31
Page 119

# GENERAL ORDINANCES

AND

PRIVATE ORDINANCES OF A PUBLIC NATURE

OF

# THE CITY OF ST. PAUL

RAMSEY COUNTY, MINNESOTA.

UP TO AND INCLUDING DECEMBER 31ST, 1895.

---

COMPILED BY
JOHN A. GILTINAN, ESQ.,
MEMBER OF THE ST. PAUL BAR

UNDER THE SUPERVISION OF
EDWARD J. DARRAGH, ESQ., CORPORATION ATTORNEY.

---

PUBLISHED BY AUTHORITY OF
THE COMMON COUNCIL.

# ARTICLE LII.

## PARKS.

### § 680. Rules and regulations for management and protection of parks.

The board of park commissioners of the City of St. Paul having adopted certain rules and regulations for the management and protection of the parks of the City of St. Paul, as provided by the charter, for the purpose of fixing a penalty for the violation of said rules, the common council of the City of St. Paul do ordain as follows:

First—No person shall drive or ride in any public park or grounds in the City of St. Paul at a rate of speed exceeding seven (7) miles per hour.

Second—No person shall ride or drive upon any other part of any park than the avenues and roads.

Third—No coach or vehicle used for hire shall stand upon any part of any park, for the purpose of hire, unless specially licensed by the board of park commissioners.

Fourth—No person shall engage in any threatening, abusive, insulting, indecent language in any park.

Fifth—No person or persons shall engage in any gaming, nor commit any indecent or obscene act in any park.

Sixth—No person shall carry firearms or shoot birds in any park, or within fifty (50) yards thereof, or throw stones or other missiles therein.

Seventh—No person shall throw any dead animal or offensive matter or substance of any kind into any park or into any lake, stream, pool or pond within the limits of any park.

Eighth—No person shall disturb the fish or water fowl in any lake, stream, pool or pond in any part of any park, or annoy, strike, injure, maim, or kill any birds or other animals kept by or under the direction of the board of park commissioners, either running at large or confined in any close or cage, nor discharge any fireworks within any park.

Ninth—No person shall affix any bills or notices in any park.

Tenth—No person shall bathe in any lake, stream, pool or pond within the limits of any park.

Eleventh—No person shall cut, break or in anywise injure or deface the trees, shrubs, plants, flowers, turf, or any of the buildings, structures, fences, seats, benches, or statuary, or in any way foul or pollute any fountain, lake, stream, pool, pond, well, or spring within any park.

Twelfth—No person shall turn cattle, goats, swine, horses, dogs or any other animal loose in any park, nor shall any animals be permitted to run at large therein, unless by authority of the board of park commissioners.

Thirteenth—No person shall ride or drive any bicycle or other vehicle in or on any of the walks, paths, or grass plots, except in the avenues or roadways of any park.

Case 8:23-cv-01798-CJC-ADS Document 20-13 Filed 11/03/23 Page 122 of 148 Page ID #:1076

Fourteenth—No person shall walk on or over flower beds in any park, or on or over any grass plot which may be designated by any fence or sign as not open to the public.

Fifteenth—No person shall use any park for business purposes, or for any transportation of farm or other products, dirt or any like material, or for the passage of any teams employed for such purposes, except by permission of the board of park commissioners.

Sixteenth—No person shall injure, deface or destroy any notices, rules or regulations for the government of any park which are posted or affixed by order or permission of the board of park commissioners within the limits of any park.

(Ord. 1767, June 19, 1894, § 1.)

## § 681. Penalty.

Any person or persons violating any of the provisions of this ordinance or any of the rules established by the board of park commissioners of the City of St. Paul for the orderly management and protection of the parks of the City of St. Paul shall be fined for each offense not less than five (5) nor more than one hundred dollars ($100), or shall be punished by imprisonment for not less than five (5) nor more than eight-five (85) days.

(Id. § 2.)

Exhibit 31
Page 122

# Exhibit 32

Exhibit 32
Page 123

# REVISED ORDINANCES

OF THE

# CITY OF CANTON

## ILLINOIS.

REVISED 1894-1895

BY

B. M. CHIPERFIELD, *City Attorney*.

PUBLISHED BY AUTHORITY OF THE CITY COUNCIL.

CANTON, ILL.:
DAILY REGISTER PRESS:
1895.

advertise, by outcry or by the ringing of any bell or the blowing of any horn or the beating of any drum, his, her or their business, or any sale or sales at auction or otherwise. Any person violating any of the provisions of this section shall be fined not less than ten dollars nor more than one hundred dollars for each offense.

SEC. 20 *Sales on streets prohibited.* No person shall be allowed to sell at auction or public outcry, nor to erect or occupy a stand of any kind for the purpose of making sales, upon any of the streets, alleys, avenues, sidewalks, crossings or other public places in said city, nor shall any person be permitted to sell from any carriage, buggy or other vehicle, upon any of the streets, alleys, avenues, sidewalks, crossing, or other public place in said city, except as hereinafter provided, under a penalty of ten dollars for each offense.

SEC. 21. *Construction of foregoing section.* The foregoing section shall not be so construed as to apply to any person or persons coming into the city from the country with teams or otherwise with any produce for market raised by themselves, or to any person selling vegetables, berries, fruit, milk or other farm produce of their own production ; nor shall the same be so construed as to make it a penal offense to peddle newspapers, nor to apply to judicial sales ; Provided, that farmers or others selling under the provisions of this section shall not occupy a stand upon any sidewalk, alley or crossing, nor within a space of ten feet of any such sidewalk or crossing upon any street or public square, nor shall they allow their stand, wagon or other vehicle from which they may be selling to remain in front of any person's place of business without the consent of the occupant of such place of business, nor so as to obstruct the convenient travel of the street.

SEC. 22. *Telephone and telegraph poles.* No person or corporation shall set or cause to be set any telegraph, telephone or other poles upon any street or alley within the City of Canton, or string or hang any wire along or across any street or alley, unless authorized so to do by the City Council, under a penalty of ten dollars for each offense.

SEC. 23. *Public Parks shall be known by their respective names.* The several Public Parks, Squares and grounds in the City of Canton shall be known and designated by the names applied thereto respectively on the map of the City of Canton, that may be designated by ordinance.

SEC. 24. *Care of parks.* It shall be the duty of the Committee on Parks and Public Buildings of the City Council to superintend all public grounds and keep the fences thereof in repair, the walks in order, and the trees properly trimmed, and improve the same according to plans approved by the City Council. The said committee shall likewise cause printed or written copies of prohibitions of this article to be posted in the said Parks or Grounds.

SEC. 25. *Regulations of Parks.* No person shall enter or leave any of Public Parks of the City of Canton except by their gateways; no person shall climb or walk, sit or stand upon the walls or fences thereof.

SEC. 26. *Depredations not to be committed in Parks.* Neither cattle, horses, goats, swine or annimals, except as herein specified shall be turned into any one of the said Parks by any person. All persons are forbidden to carry firearms or to throw stones or other missiles within any one of these Public Parks. All persons are forbidden to cut, break or in any way injure or deface the trees, shrubs, plants, turf or any of the buildings, fences or other structure, or property within or upon any of the said Parks.

SEC. 27. *Bills are not to be posted in Parks.* No person shall post or otherwise use or affix any bills, notice or other paper upon any structure or thing within either of said Parks nor upon any of the gates nor enclosures thereof.

SEC. 28. *Persons in Parks must keep off the grass.* No person shall go upon the grass, lawn or turf of the Parks except when and where the word "common" is posted, indicating that persons are at liberty at that time and place to go on the grass. Any member of the city police shall have the power to arrest any person who shall not desist from any vio-

# Exhibit 33

Exhibit 33
Page 127

Proviso.

charge of the said commissioners: *Provided, however*, That ball, cricket, lawn tennis and other like games of recreation may be played upon such portions of said parks as may be designated from time to time by the commissioners and under such rules and regulations as may be prescribed by them.

Not to engage in sport liable to frighten horses.

SEC. 43. No person shall engage in any sport or exercise upon said boulevard or park as shall be liable to frighten horses, injure travelers, or embarrass the passage of vehicles thereon.

Not to discharge firearms or fireworks.

SEC. 44. No person shall fire or discharge any gun or pistol or carry firearms, or throw stones or other missiles within said park or boulevard, nor shall any person fire, discharge or set off any rocket, cracker, torpedo, squib or other fireworks or things containing any substance of any explosive character on said park or boulevard, without the permission of said commissioners, and then only under such regulations as they shall prescribe.

No person shall expose or offer any article or thing for sale, play any musical instrument, etc., without permission of commissioners.

SEC. 45. No person shall expose any article or thing for sale or do any hawking or peddling in or upon said parks or boulevard, and no person, without the consent of said commissioners, shall play upon any musical instrument, or carry or display any flag, banner, target or transparency, nor shall any military or target company, or band or procession parade, march, drill or perform any evolution, movement or ceremony within any of said parks, or upon or along said boulevard, without the permission of said commissioners, and no person shall do or perform any act tending to the congregating of persons on said boulevard or in said parks.

Gambling and disorderly conduct.

SEC. 46. No person shall gamble, nor make any indecent exposure of himself or herself, nor use any obscene language, or be guilty of disorderly conduct, or make, aid, countenance or assist in making any disorderly noise, riot, or breach of the peace, within the limits of the said parks or boulevards; and no person shall sell or dispose of any intoxicating liquors in or upon any public park without the consent of the said commissioners.

Intoxicating liquors.

All boats, carriages, railroad cars, and vehicles running for hire to be licensed.

SEC. 47. All boats and vessels, carriages, railroad cars and other vehicles running for hire to and from said Belle Isle park, or any other park, shall be duly licensed and shall be subject to all the rules and regulations that may be established by said commissioners or by the common council from time to time, and no person shall carry on the business of carrying passengers to and from either of said parks unless their vehicles shall be so licensed. And no person commanding or having charge of any boat, carrying passengers for hire shall land or permit any passengers therefrom to land at any dock on Belle Isle park, excepting such as may be designated for that purpose by the commissioners, and no person having charge of any vessel shall fasten or tie the same at any wharf or dock in Belle Isle park, excepting for the purpose of receiving or discharging passengers as permitted by this section.

SEC. 48. No person shall place or deposit or allow to be placed or keep or deposit on any part of said boulevard any

Exhibit 33
Page 128

# Exhibit 34

Exhibit 34
Page 129

Case 8:23-cv-01798-CJC-ADS Document 20-13 Filed 11/03/23 Page 130 of 148 Page ID #:1084

## CHAPTER XXXIII.

### PARKS.

**367. Central Park.**] § 1. That block 113 in the Railroad Addition to said city shall be called and hereafter known by the name of Central Park.

**368. Unlawful to Cut Grass, etc.**] § 2. That it shall not be lawful for any person to enter upon and cut or remove any grass or other article from Central Park without permission from the proper officer; nor to turn into said park any cattle, horses, hogs, or other animals; nor to hitch, fasten, or tie any animal whatever to any tree, fence or gate around the same; nor to cut, break, or deface the trees or fences around said park; nor to cut, injure, climb upon, break, bend, or destroy any tree, shubbery, plant, or ornament, or the boxing or railing around the same, growing or being in said park. Any person violating any of the provisions of this section shall be fined in any sum not less than ten dollars nor more than one hundred dollars for every offense.

**369. Offenses.**] § 3. All persons are forbidden to carry firearms, or to throw stones or other missiles in said park. All persons are forbidden to cut, break, or in any way injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, or other constructions, or property within or upon the said park. No person or persons shall lounge or loiter in said park after eleven o'clock of any night, nor shall any person or persons do therein any obscene or indecent act. Any person violating any of the provisions of this section shall be fined in any sum not less than ten dollars nor more than one hundred dollars.

**370. Committee on Public Grounds to Have Charge of.**] § 4. It shall be the especial duty of the Committee on Public Grounds to care for said Central Park and to see that the rules concerning the same are strictly enforced. Said committee shall see each spring that said park is supplied with suitable seats or benches, and that the same are painted and placed therein;

Generated on 2023-10-24 18:34 GMT / https://hdl.handle.net/2027/uiuo.ark:/13960/t9j46w49s
Public Domain / http://www.hathitrust.org/access_use#pd

Digitized by INTERNET ARCHIVE

Original from UNIVERSITY OF ILLINOIS AT URBANA-CHAMPAIGN

# Exhibit 35

Exhibit 35
Page 131

REVISION OF 1904

# THE GENERAL ORDINANCES

OF THE

# CITY OF INDIANAPOLIS

CONTAINING, ALSO

## ACTS OF THE INDIANA GENERAL ASSEMBLY

SO FAR AS THEY CONTROL SAID CITY

TO WHICH IS PREFIXED

## A CHRONOLOGICAL ROSTER OF OFFICERS

FROM 1832 TO 1904

## AND RULES GOVERNING THE COMMON COUNCIL

---

Collated and Annotated by Edgar A. Brown and William W. Thornton, Commissioners.

---

*PUBLISHED BY AUTHORITY OF THE CITY OF INDIANAPOLIS.*

---

INDIANAPOLIS
WM. B. BURFORD, PRINTER AND BINDER
1904

AN ORDINANCE regulating the use and enjoyment of parks, park grounds and parkways of the City of Indianapolis, providing penalties for the violation of the same, repealing all conflicting ordinances, providing for the publication thereof, and fixing the time when the same shall take effect.

[Approved June 30, 1896.]

**1968. When Open for Public—Entrance.** 1. *Be it ordained by the Common Council of the City of Indianapolis, Indiana,* That the parks shall be open to the public from 5:00 a. m. until 11:00 p. m., and no person other than employes shall be permitted to remain therein, except when open as herein specified, and no person at any time shall enter or leave any park except by the established entrances, walks or drives.

**1969. Writing on Park Buildings, etc.** 2. No person shall write, cut, mutilate or deface in any manner any building, fence, bench, masonry, statue, ornament, or tree in any public park.

**1970. Injury to Flowers or Trees.** 3. No person shall pull, pluck, break or touch any flowers or fruit, whether wild or cultivated; cut down, girdle or break down any sapling, tree, shrub or plant; break or bend limbs or branches of trees or bark trees; or bend, pluck, handle or injure any trees, flowers, shrubs or plants whatever, or limbs, twigs or leaves thereof, or climb any tree in any public park.

**1971. Discharging Fire-Arms.** 4. No person shall discharge any fire-arm, or have possession of any fire-arm within the limits of any public park.

**1972. Use of Profane or Abusive Language.** 5. No person shall use profane, obscene, threatening or abusive language, or fight or throw any stone or missile, or behave in a disorderly or improper manner, or commit any offense against decency or good morals in any public park.

**1973. Starting Fire in Park—Molesting Animals.** 6. No person not an employe shall make a fire for any purpose within the bounds of any park; and no person shall chase, catch, injure, molest or disturb any animal, bird or fish kept within any public park for the use, instruction or entertainment of the public, nor shall any person give or offer to give any such animal tobacco or other noxious article.

**1974. Animals or Fowls Trespassing on Parks.** 7. No person being the owner or having control of the same shall suffer or permit any chickens, ducks, geese, hogs, cattle, horses, sheep, or goats, or other animals or fowls to stray into, run at large or trespass upon any public park land.

**1975. Fastening Horse to Tree.** 8. No person shall fasten a horse to a tree, or bush, or building, or leave the same unattended, or be permitted to bring or lead horses within the limits of any public park, or a horse that is not harnessed and attached to a vehicle or mounted by a rider.

# Exhibit 36

Exhibit 36
Page 134

# PENAL ORDINANCES

## Relating to the Use and Government of the Public Parks and Parkways of the City of Rochester.

Passed August 26, 1896.

The Board of Park Commissioners of the city of Rochester do enact as follows:

### DEFINITIONS.

SECTION 1. The terms "parks" used herein shall be construed to include all lands and waters under the control of the Board of Park Commissioners of the city of Rochester, except parkways, and the term "said Board" shall be construed to mean the Board of Park Commissioners of said city.

### GENERAL RULES AS TO USE OF PARKS.

SECTION 2. The parks of the city of Rochester are for the benefit and pleasure of the public, and every person shall use said parks subject to the ordinances of said Board.

The roadways in the parks shall not be used by any vehicles except those employed for the purposes of pleasure; the rides and bridle paths shall be used only by persons on horseback or bicycles, and the walks shall be used exclusively by pedestrians, except that baby carriages and invalid chairs and children's carts and tricycles may be propelled thereon

This section shall not apply to vehicles used by order of said Board.

The parks shall be closed from 11 o'clock P. M., until 5 o'clock A. M., during the summer season, and from 10 o'clock P. M., until 7 o'clock A. M., during the winter season; and no persons except employes of said Board on duty, or members of said Board, shall go into, or remain in said parks, while closed. The summer season shall be from April 1st until November 15th, and the winter season shall be from November 15th until April 1st.

### ACTS PROHIBITED

SECTION 3. No person shall commit any of the following acts within said parks:

1. Commit any disorderly or immoral acts.
2. Be intoxicated.
3. Throw stones or missiles

Digitized by Google

4 Utter loud or indecent language.

5. Play any game of cards or chance.

6. Tell fortunes.

7. Beg.

8. Publicly solicit subscriptions.

9 Drive or lead a horse not well broken.

10. Allow any dog to run at large.

11 Throw or drain offensive substances into any park waters.

12. Bathe in park waters without having the body concealed by suitable covering extending from the knees to the shoulders.

ACTS PROHIBITED WITHOUT PERMISSION.

SECTION 4. No person shall commit any of the following acts within said parks without the consent of said Board, or some duly authorized person.

1. In any manner injure any tree, plant, grass, flower, fruit, turf or structure.

2. Keep or offer anything for sale.

3. Play any music.

4. Post or display any sign, banner or advertisement.

5. Deliver any public speech.

6. Solicit passengers for any boat or vehicle for hire.

7. Obstruct in any way a roadway or path

8. Discharge any firearm or fireworks or send up any balloon.

9. Permit any animal, except horses and dogs, to enter said parks.

10. Ride or drive any animal or vehicle at a speed exceeding eight miles per hour. This shall not apply to the vehicles of the fire or police departments, ambulances, nor vehicles used by physicians when actually engaged in responding to emergency calls or to driving on the "speedway" in Genesee Valley Park.

11. Hold any picnic at a place not designated by said Board for that purpose.

12. Hold any public meeting or engage in any marching or driving as members of a military, political or other organization.

13. Conduct any funeral procession nor vehicle containing the body of a deceased person.

14. Build any fire.

15. Write, paint or carve on any tree, bench or structure.

16. Climb any tree, nor tie any horse to a tree.

17. Enter any place upon which the words "No Admittance" shall be displayed.

18. Play baseball, tennis, nor any other game at a place not designated by said Board for that purpose.

19. Take ice from any park waters.

20. Fish in any park waters.

21. Bathe in any place not designated by said Board for that purpose.

Digitized by Google

# Exhibit 37

Exhibit 37
Page 137

# PARK REGULATIONS.

No person shall ride or drive upon any part of the Park except upon the roads intended for such purposes.

No person shall bring led horses within the limits of the Park nor turn any horses, cattle, goats, swine, dogs or other animals loose in the Park.

No person shall indulge in any threating, abusive, insulting or indecent language, or commit any obscene or indecent act in the Park.

No person shall carry firearms, shoot birds, or other animals, nor throw stones or other missiles, or in any way disturb or annoy the birds or animals within the boundaries of the Park.

No person shall throw any dead animals or other offensive matter into the Park, nor foul any spring, brook or other water within the boundaries of the Park.

No person shall cut, break or otherwise injure or deface any trees, shrubs, plants, turf, rock or any building, fence, bridge or other structure within the Park.

No person shall erect, paint, paste or otherwise affix or distribute any signs, advertisements or circulars within the Park.

No person shall injure, deface, destroy, or remove any notices or regulations for the government of the Park.

Penalties, $5.00 to $10.00

Digitized by Google

# Exhibit 38

Exhibit 38
Page 139

cause two (2) red lights to be placed in a conspicuous place, one at each end of such obstruction from dusk until sunrise in the morning of each day during the time such obstruction shall remain, and shall also construct and maintain proper safeguards and a good and safe plank sidewalk around such obstruction, which sidewalk shall be at least two (2) feet wide.

SEC. 9. No person shall play any game whatsoever in or upon any of the parks, boulevards, parkways or driveways under the control of the board of park commissioners; *provided*, however, that ball, cricket, lawn tennis and other games of recreation may be played upon such portions of said parks as may be designated from time to time by the board of park commissioners, and under such rules and regulations as may be prescribed by said board. The grass plots or lawns of public parks and parkways shall not be used by any person as thoroughfares in crossing from one roadway, walk or street to another roadway, walk or street. But this section shall not be construed to interfere with the use of public parks or parkways as pleasure grounds by the people for the purpose of recreation under such reasonable rules and regulations as may be prescribed by the board of park commissioners.

SEC. 10. No person shall engage in any sport upon any boulevard, parkway, park road or driveway under the control or supervision of the board of park commissioners which will be likely to frighten horses, injure passsengers or embarrass the passage of vehicles thereon.

SEC. 11. No person shall fire or discharge any gun or pistol, or carry fire-arms, or throw stones or other missiles, or fire, discharge or set off any rocket, cracker, torpedo, squib or other fireworks, or things containing any substance of an explosive character, within any park, boulevard, parkway or driveway of this city under the control or supervision of the board of park commissioners, except upon a permit first duly obtained or authority previously granted by said board and subject to such rules and regulations as said board may establish.

SEC. 12. No person shall expose any article or thing for sale, or do any hawking or peddling, or distributing hand-bills, or erect any sign-board, or paste or affix any notice or bill or other writing or printing on any tree, lamp post, hydrant, curbstone, sidewalk, coping, flagstone, fence, wall, building or other place in any park, boulevard, parkway, park road, driveway or other public grounds under the control or supervision of the board of park commissioners of said city. Nor shall any person drive

——42

Digitized by Google

any animal or vehicle displaying any placard or advertisement of any kind; nor shall any person display any placard or advertisement of any kind upon or along any boulevard, parkway, park road or in any park or other public grounds under the control and management of the board of park commissioners of said city.

SEC. 13. No person shall cut, break or in any way injure or deface any of the trees, shrubs, plants, turf, grass, lamp posts, fences, bridges, buildings or other constructions of property in or upon any park, boulevards, parkways, park roads or other public grounds of said city under the control or supervision of the board of park commissioners.

SEC. 14. All persons riding bicycles, tricycles and velocipedes in parks, or upon parkways, boulevards or park roads, shall be required to keep upon the paths specially provided for the same, or upon the roadway, and in no case shall be permitted to ride upon the foot-paths or upon the parking or grass.

SEC. 15. That no vehicles, other than those used for pleasure driving, or other than such carts or other vehicles as may be employed by the board of park commissioners in the construction of, or caring for said parks, shall be permitted to enter said parks.

SEC. 16. No person shall be guilty of disorderly, bawdy or lewd conduct, or of habitual loafing, or of sleeping on the ground or benches, or make, aid or assist in making any disorderly noise or riot or breach of the peace within the limits of any park, boulevard, parkway or other public grounds of the city.

SEC. 17. Any person who shall violate any of the foregoing provisions, rules and regulations, shall be deemed guilty of a misdemeanor and upon conviction thereof shall be punished by a fine of not less than five dollars ($5.00) nor more than one hundred dollars ($100) for each and every offense, and in addition to the members of the regular police force of Kansas City who may be specially detailed by the board of police commissoners for the enforcement of the foregoing rules and regulations and for service under the direction of the board of park commissioners, said board of park commissioners may employ and appoint additional persons to act as special guards in parks, boulevards and parkways, as it may find it expedient and deem necessary for the protection of the same and for the enforcement of the rules and regulations of said board and the ordinances of the city relating to the regulation and orderly government of parks and public grounds under the control and

Digitized by Google

management of the board of park commissioners, and all such special park guards shall be sworn into service of the city as special policemen, and shall be paid out of the general funds appropriated by the common council for the general expenses of the board of park commissioners and for other park purposes; but the number of such special policemen so appointed shall not exceed fifteen (15) per cent of the regular police force of said city without the consent or approval of the common council of said city.

SEC. 18. The common council finds and declares that the action of the common council herein has been recommended by the board of park commissioners of Kansas City, Missouri, as provided by law and that said board has adopted said rules and regulations and has recommended to the common council the establishment and enforcement of the same by ordinance as herein provided.

SEC. 19. All ordinances or parts of ordinances in conflict with this ordinance, insomuch as they conflict herewith, are hereby repealed.

Passed April 14, 1898.

JAMES G. SMITH,
Speaker, Lower House of the Common Council.

Passed April 18, 1898.

GEO. S. GRAHAM,
President, Upper House of the Common Council.

[SEAL] Attest:

C. S. CURRY,
City Clerk.
BY E. A. NORRIS, Deputy.

Approved April 18, 1898, 11:50 A. M.

JAMES M. JONES,
Mayor.

Digitized by Google

# Exhibit 39

Exhibit 39
Page 143

# NEW HAVEN PUBLIC PARKS.

## Rules and Regulations of the Park Commission.

1. No domestic animal, except dogs, shall be permitted to enter or to go at large in any of said parks, either with or without a keeper. Dogs must be held in leash by the owners, otherwise they may be killed by any park-keeper, special constable, or policeman.

2. No person shall pick any flowers, foliage or fruit, or cut, break, dig up, or in any manner mutilate or injure any tree, shrub, plant, grass, turf, railing, seat, fence, structure, or other thing in any of said parks, or cut, carve, paint, mark or paste on any tree, stone, fence, wall, building, monument, or other object therein, any bill, advertisement or inscription whatsoever.

3. No person shall carry or have any fire-arms on any of said parks, and no fire-arms shall be discharged from, or into any of the same. No stone or other missile shall be thrown or rolled from, into, within or upon any of said parks, except in such place as the commission may designate as a ball-field, in playing games in which a ball is used.

4. No person shall ride or drive on any road within any of said parks at a faster gait than eight miles per hour, and this shall apply to the use of cycles.

5. No threatening, abusive, boisterous, insulting or indecent language, or gesture shall be used on any of said parks, nor shall any oration, harangue, or other public demonstration be made, unless by special authority of said commission.

6. No person shall expose any article or thing for sale on any of said parks, unless licensed therefor by said commission.

7. No person shall bathe naked or otherwise in any waters in, or adjacent to any of said parks, or be naked within any of said parks, except in such places and subject to such regulations, as the commission may, from time to time, specially designate by a public notice set up for that purpose within the park.

8. No person, unless by authority of said commission, shall light, kindle, or use any fire on any of said parks.

9. No person shall ride or drive upon the grass, lawns, or foot-paths of any of said parks.

10. No person shall disturb or injure any bird, bird's nest or eggs, or any squirrel or other animal within any of said parks.

Digitized by Google

# Exhibit 40

Exhibit 40
Page 145

c

# REVISED

# ORDINANCES

— OF THE —

# CITY OF BOULDER

Published by Authority of the City.

o

OSCAR F. A. GREENE,

COMPILER.

1899:

Printed by Ricketts & Kerr, at The News Office,

BOULDER, COLORADO.

thirty-two in township one north of range seventy west, is hereby named and shall hereafter be known as VALVERDAN PARK.

**510. Washington Park.**

SEC. 5. That the city property in the west half of the south-west quarter of section twenty-five in township one north of range seventy-one west, shall be named and hereafter known as WASHINGTON PARK.

## PARKS.

An Ordinance for the Protection of the Several Parks Belonging to the City and of the Buildings and Reservoirs and Trees and Other Improvements at and Within Said Parks, and to Provide Penalties for Injuring the Same.

Passed October 4, 1898.

(With amendment as noted.)

**511. No firearms or shooting in.**

SECTION 1. Any person other than the police officers of the city who shall take or carry or cause to be taken or carried into any of the parks belonging to the City of Boulder, any gun, pistol, revolver, or other firearm, or who shall shoot any firearm at or towards or over or into or upon any of said parks, shall be deemed guilty of a misdemeanor. (As amended August 2, 1899.)

**512. No powder or explosives in.**

SEC. 2. Any person who shall take or carry or cause to be taken or carried into any of said parks, any powder of any quality or kind or any explosive or dangerous or inflammable or combustible substance, shall be deemed guilty of a misdemeanor.

**513. No fires or explosives.**

SEC. 3. Any person who shall start any fire or cause or permit to be started any fire in any of said parks, not

being thereunto first authorized by the Mayor, or who shall in any of said parks fire or explode any fire-crackers, torpedoes, or any other substance or thing containing powder or other explosive substance, shall be deemed guilty of a misdemeanor.

**514. Injury to property.**

SEC. 4. Any person who shall deface, tear down, destroy or injure in any manner whatsoever any fence, building, furniture, seat, structure, excavation, post, bracket, lamp, awning, fire plug, hydrant, water pipe, tree, shrub, plant, flower, railing, bridge, culvert, or any other property whatsoever belonging to the city or to any private corporation or persons in, at or upon any of said parks, shall be deemed guilty of a misdemeanor.

**515. Injury continued.**

SEC. 5. Any person who shall injure or damage in any manner whatsoever any property of the city at, in or upon any of said parks by cutting, hacking, bending, breaking, burning, daubing with paint or other substances, hitching of horses or other animals, or by means of fire, or by effecting such acts in any other manner, shall be deemed guilty of a misdemeanor.

**516. Violation—Misdemeanor Penalty.**

SEC. 6. Any person upon conviction of any misdemeanor specified in any of the five preceding sections herein shall be fined not less than five and not more than three hundred dollars.

## PARKS.

An Ordinance in Relation to Cottages in Texado Park.
Passed April 17th, 1899.

WHEREAS, a contract was made on, to-wit, the 19th day of March, A. D. 1898, at Boulder, Colorado, by and

Exhibit 40
Page 148