# Exhibit A

Christopher T. Casamassima (CA Bar No. 211280)
chris.casamassima@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, CA 90071
Tel. 213-443-5374

Counsel for *Amici Curiae*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| RENO MAY, an individual; ANTHONY MIRANDA, an individual; ERIC HANS, an individual; OSCAR A. BARRETTO, JR., an individual; ISABELLE R. BARRETTO, an individual; BARRY BAHRAMI, an individual; PETE STEPHENSON, an individual; ANDREW HARMS, an individual; JOSE FLORES, an individual; DR. SHELDON HOUGH, DDS, an individual; SECOND AMENDMENT FOUNDATION; GUN OWNERS OF AMERICA; GUN OWNERS FOUNDATION; GUN OWNERS OF CALIFORNIA, INC.; THE LIBERAL GUN CLUB, INC.; and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, <br><br> Plaintiffs, <br><br> v. <br><br> ROBERT BONTA, in his official capacity as Attorney General of the State of California, and DOES 1-10, <br><br> Defendants. | Hon. Cormac J. Carney <br><br> Case No.: 8:23-cv-01696-CJC-ADS <br><br><br> **BRIEF FOR PROFESSORS OF PROPERTY LAW AS AMICI CURIAE IN SUPPORT OF DEFENDANT BONTA'S OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION** |

| | |
|---|---|
| MARCO ANTONIO CARRALERO; GARRISON HAM; MICHAEL SCHWARTZ; ORANGE COUNTY GUN OWNERS PAC; SAN DIEGO COUNTY GUN OWNERS PAC; CALIFORNIA GUN RIGHTS FOUNDATION; and FIREARMS POLICY COALITION, INC., | Hon. Cormac J. Carney<br><br>Case No.: 8:23-cv-01798-CJC-ADS |
| Plaintiffs, | |
| v. | |
| ROB BONTA, in his official capacity as Attorney General of the State of California, | |
| Defendant. | |

# **TABLE OF CONTENTS**

Page

INTEREST OF AMICI CURIAE .................................................................1

INTRODUCTION ........................................................................................1

ARGUMENT ...............................................................................................3

I.   THE RIGHT TO EXCLUDE IS FOUNDATIONAL TO AMERICAN PROPERTY LAW AND ENABLED BY DEFAULT RULES ...................3

II.  CALIFORNIA'S PRIVATE-PROPERTY DEFAULT RULE DOES NOT IMPLICATE THE SECOND AMENDMENT BECAUSE THERE IS NO CONSTITUTIONAL RIGHT TO CARRY A WEAPON ONTO ANOTHER'S PRIVATE PROPERTY ...........................................................7

   A.   There Is No Constitutional Right To Carry Onto Private Property Over An Owner's Objection .................................................8

      1.   Extending the public right to carry onto private property would be an unprecedented break with constitutional tradition ............8

      2.   Nothing in *Bruen* indicates a break from longstanding constitutional principles ..........................................................11

   B.   There Is No Right To The Presumption That A Private Owner Welcomes Firearms Until The Owner Announces Otherwise ...........13

      1.   The *presumption* formulation is unprecedented and incompatible with *Bruen* ..........................................................14

      2.   Plaintiffs' only argument for the *presumption* formulation—that the right to carry is tied to the concept of "implied license" and can thus be withdrawn by private owners—is incoherent ........16

   C.   Alternative Theories As To How The Private-Property Default Rule Implicates The Second Amendment Likewise Fail ...........................17

      1.   An "effects" theory is untenable .............................................14

      2.   The rule does not implicate an owner's *Heller* right to possess or welcome guns ..................................................................16

CONCLUSION ...........................................................................................21

CERTIFICATE OF COMPLIANCE ...........................................................i

i

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc.*, 391 U.S. 308 (1968) ....................................................14

*Baker v. Howard County Hunt*, 188 A. 223 (Md. 1936) ...........................................8

*Breard v. Alexandria*, 341 U.S. 622 (1951)......................................................5, 10, 20

*Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021) .......................................2, 3

*Central Hardware Co. v. NLRB*, 407 U.S. 539 (1972)............................................12

*Central Hardware Co. v. NLRB*, 439 F.2d 1321 (8th Cir. 1971), *vacated by Lloyd Corporation v. Tanner*, 407 U.S. 539 (1972) ..................15

*Colby v. J.C. Penney Co., Inc.*, 811 F.2d 1119 (7th Cir. 1987)..............................11

*Delgado v. Trax Bar & Grill*, 113 P.3d 1159 (Sup. Ct. Cal. 1993).........................4

*Dietemann v. Time, Inc.*, 449 F.2d 245 (9th Cir. 1971)...........................................10

*GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012), *abrogated on other grounds by New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022) ...................................................8

*Koons v. Platkin*, 2023 WL 3478604 (D.N.J. May 16, 2023) .................................16

*Lloyd Corp. v. Tanner*, 407 U.S. 551 (1972).....................................................9, 14

*Marsh v. Alabama*, 326 U.S. 501 (1946)...........................................................9, 14

*Martin v. City of Struthers*, 319 U.S. 141, 147 (1943) ...........................................20

*New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022)...................................................................1, 7, 11, 12, 15, 18

*Oliver v. United States*, 466 U.S. 170 (1984) .........................................................17

*Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469 (1988)...................................13

*Police Department of Chicago v. Mosley*, 408 U.S. 92 (1972) ...............................13

*Project 80's, Inc. v. City of Pocatello*, 857 F.2d 592 (9th Cir. 1988) ....................20

ii

*Project 80's, Inc. v. Pocatello*, 942 F.2d 635 (9th Cir. 1991) ..................................20

*PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980) ..........................3, 9, 13

*R.A.V. v. City of St. Paul*, 505 U.S. 377, 387 (1992) ...........................................21

*Rowan v. U.S. Post Office Department*, 397 U.S. 728 (1970)................................10

*Schwartz-Torrance Investment Corp. v. Bakery & Confectionery
    Workers' Union, Local No. 31*, 394 P.2d 921 (Cal. 1964)...........................14

*Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1
    (2000)...............................................................................................................10

*Shelly v. Kraemer*, 334 U.S. 1 (1948) ..................................................................9

*Siegel v. Platkin*, 2023 WL 1103676 (D.N.J. Jan. 30, 2023)...............................8

*Spanish Church of God of Holyoke, Mass., Inc. v. Scott*, 794 F. Supp.
    2d 304 (D. Mass. 2011) .................................................................................10

*Spokeo v. Robins*, 578 U.S. 330 (2016) ................................................................13

*Sutherland v. Southcenter Shopping Center*, 478 P.2d 792 (Wash Ct.
    App. 1970), *overruled by Southcenter Joint Venture v. National
    Democratic Policy Committee*, 780 P.2d 1282 (Wash. 1989)......................14

*Watchtower Bible & Tract Soc'y v. Village of Stratton*, 536 U.S. 150
    (2002) .............................................................................................................20

*Wolford v. Lopez*, 2023 WL 5043805 (D. Haw. Aug. 8, 2023).................11, 12, 17

### STATUTES, RULES, AND REGULATIONS

Borough of Westville, NJ General Legislation § 187-1, -2 (2007) ...........................5

Cal. Civ. Code § 1708.8.............................................................................................4

Cal. Penal Code
    § 602 ...............................................................................................................4
    § 26230 .............................................................................................................1

City of Jersey City, NJ Code of Ordinances § 245-7 (1978).............................5, 20

Fla. Stat. § 934.50(3)(b) (2022) ................................................................................5

Haw. Rev. Stat. Ann.
 § 183D-26 (2019) ...........................................................................5
 § 521-70(c) (2019) ........................................................................5

## OTHER AUTHORITIES

Ayres & Jonnalagadda, *Guests with Guns: Public Support for "No
 Carry" Defaults on Private Land*, 48 J.L. Med. & Ethics 183
 (Winter 2020).....................................................................6, 15, 18, 19

Ayres & Vars, *Weapon of Choice: Fighting Gun Violence While
 Respecting Gun Rights* (Harv. U. Press, 2020) ................................1

Blocher, *The Right Not to Keep or Bear Arms*, 64 Stan. L. Rev. 1
 (2012)..............................................................................................19

Blocher & Miller, *What Is Gun Control? Direct Burdens, Incidental
 Burdens, and the Boundaries of the Second Amendment*, 83 U.
 Chi. L. Rev. 295 (2016) ....................................................................4

Cooley, *A Treatise on the Law of Torts or the Wrongs Which Arise
 Independent of Contract* 303 (1879) ..............................................16

Ellickson, *Of Coase and Cattle: Dispute Resolution Among Neighbors
 in Shasta County*, 38 Stan. L. Rev. 623 (1986) ...............................4

*Public*, Black's Law Dictionary (11th ed. 2019).....................................12

*Public*, Merriam Webster's Collegiate Dictionary (11th ed. 2014) .......................12

Strahilevitz, *Information Asymmetries and the Rights to Exclude*, 104
 Mich. L. Rev. 1835 (2006) ...............................................................3

### INTEREST OF AMICI CURIAE[1]

Amici curiae are professors specializing in property law.  Ian Ayres is Oscar M. Ruebhausen Professor at Yale Law School.  Fredrick Vars is Ira Drayton Pruitt, Sr. Professor of Law at University of Alabama School of Law.  Professors Ayres and Vars have written extensively on the relationship between property law and firearm regulation, including in their book *Weapon of Choice: Fighting Gun Violence While Respecting Gun Rights* (Harv. U. Press, 2020).

Amici have an interest in the doctrinal and policy issues implicated by this case, particularly as they relate to the constitutionality of SB2's private-property default rule codified at Cal. Penal Code § 26230(a)(26).  Because longstanding principles of property law clarify that an individual's constitutional right to carry ends at another's property line, this Court should find that the default rule does not implicate the text of the Second Amendment.

### INTRODUCTION

The legislative selection of default rules, including whether guns are presumptively permitted on private property, is part and parcel of States' enduring prerogative to reinforce private owners' right to exclude.  This selection does not implicate the Second Amendment's "plain text," *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111, 2129-2130 (2022), because the right to carry is not a right to trespass and thus does not extend beyond another's private property line.  California's private-property default rule, which construes a private commercial owner's silence on the permissibility of firearms as disallowance while preserving the owner's ability to welcome firearms if they so choose, is thus constitutional.

---

[1] The views of the amici expressed here do not necessarily reflect the views of the institutions with which they are or have been affiliated, whose names are included solely for purposes of identification.

As explained in Part I, the right to exclude—including the right to exclude firearms—inheres in all private property and is given effect through State-created default rules.  States have always been free to adjust default rules to suit private owners' expectations and preferences.  Aligning default rules with owners' general understanding as to what their *own* silence implies gives content to the right to exclude by ensuring that a property's operative terms of entry are underwritten by the owner's informed consent.  California's private-property default rule should be understood within this American property tradition.

As explained in Part II, the Second Amendment does not guarantee a right to carry onto another's property over that owner's objection.  The owner's right to exclude is "universally held to be a fundamental element of the property right," *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021), and necessarily encompasses the right to set terms of entry regarding firearms.  *Bruen* did not announce a right so sweeping as to displace centuries-old property rights.

And just as there is no individual right to bear arms on another's private property over an owner's objection, neither is there a freestanding constitutional right to a presumption that a private owner welcomes firearms until they say otherwise.  Constitutional rights do not operate in such a conditional manner.  Were there a right to carry firearms onto another's private property, it would trump an owner's objection—not rise or fall with their preference.  Such a sweeping right would vitiate the right to exclude and must be rejected.

Thus, California's private-property rule should be determined constitutional at *Bruen* Step One because Plaintiffs have not satisfied their burden of demonstrating that the rule implicates the text of the Second Amendment.[2]

---

[2] Though this brief focuses on the *Bruen* Step One question, amici fully agree with the State's *Bruen* Step Two historical analysis.  *See* Defendant's Op. at 43-45.  California's private-property default rule should thus be upheld if the Court were to reach Step Two.

## ARGUMENT

## I.   THE RIGHT TO EXCLUDE IS FOUNDATIONAL TO AMERICAN PROPERTY LAW AND ENABLED BY DEFAULT RULES

The right of private commercial owners to exclude firearms from their properties is no less at stake in this constitutional challenge than is the right to public carry.  Before Part II's examination of the private-property default rule under *Bruen* Step One (whether Plaintiffs have met their burden of demonstrating that the rule implicates the Second Amendment's text), it is helpful to begin by considering the connection between default rules and the right to exclude.

The right to exclude is "one of the most treasured" rights of property ownership.  *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021).  It inheres in private commercial property as much as in private homes, because property does not "'lose its private character merely because the public is generally invited to use it for designated purposes.'"  *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 81 (1980).  And it means that private owners retain broad authority over which individuals or objects to admit onto their premises, and generally cannot be forced by the State to grant access to unwanted entrants.  *See Cedar Point*, 141 S. Ct. at 2080 (a regulation granting a person access to another's property is a *per se* taking).

But an individual's right to exclude is not self-actualizing or exercised in isolation.  It is instead nested within a range of criminal, tort, and property laws that effectuate the right by regulating informational exchange between parties, imposing liability on those who violate an owner's terms of entry, and clarifying default rules around which owners and potential entrants can negotiate access.

*First*, States routinely shape how owners make decisions as to whom or what to exclude.  Legislation promoting the disclosure of information by prospective entrants can lower costs associated with the discovery of that information, enabling owners to execute terms of entry that more closely align with their preferences.

*See* Strahilevitz, *Information Asymmetries and the Rights to Exclude*, 104 Mich. L. Rev. 1835, 1837-1838 (2006).  Similarly, tort rules imposing liability for wrongdoing or injury arising on an owner's premises can influence owners' decisions to exclude certain forms of behavior.  For instance, a private owner bears a duty to protect guests from foreseeable dangers.  *See Delgado v. Trax Bar & Grill*, 113 P.3d 1159, 1169 (Sup. Ct. Cal. 1993).  In the context of firearms possession, such a liability rule shapes owners' decisions to admit guns onto their premises even though it does not explicitly regulate guns as such.  *See* Blocher & Miller, *What Is Gun Control? Direct Burdens, Incidental Burdens, and the Boundaries of the Second Amendment*, 83 U. Chi. L. Rev. 295, 298 (2016).

*Second*, States have long enforced private exclusion decisions through the law of trespass.  Trespass statutes peg an entrant's lawful status to the informed consent of the private owner, enabling owners to enforce their chosen terms of entry with the backing of the State's sanction.  *See* Cal. Penal Code § 602.  Civil trespass similarly reinforces an owner's chosen terms by empowering owners to demand compensation for unlawful entry.  *See* Cal. Civ. Code § 1708.8.

*Third*, a private owner's right to exclude is enforced through default rules fashioned by State legislatures and courts.  Default rules codify presumptions about an owner's terms of entry that govern until the owner states otherwise.  As such, every State has—and *must have*—default rules stipulating whether the absence of common signifiers of exclusion (*e.g.*, a physical fence) communicates consent to enter.  States have also long adopted and reformulated default rules calibrated to specific actions and items.  For example, most States over the course of the nineteenth century reversed the default rule as to whether domesticated cattle were permitted to graze on another owner's land, thereafter placing the burden on the visiting rancher to obtain that owner's express consent.  *See* Ellickson, *Of Coase and Cattle: Dispute Resolution Among Neighbors in Shasta County*, 38 Stan. L. Rev. 623, 660-661 & n.95 (1986).  Through to the present,

States continue to realign default rules with the needs and preferences of owners to support the integrity of private property.  *See, e.g.*, Haw. Rev. Stat. Ann. § 183D-26 (2019) (prohibiting hunting on private property without owner's consent); Borough of Westville, NJ General Legislation § 187-1, -2 (2007) (prohibiting graffiti on private property without owner's consent); Haw. Rev. Stat. Ann. § 521-70(c) (2019) (prohibiting tenant from using unit for a commercial purpose without owner's consent); City of Jersey City, NJ Code of Ordinances § 245-7 (1978) (prohibiting solicitation on private property without owner's consent); Fla. Stat. § 934.50(3)(b) (2022) (prohibiting drones over private property without owner's consent).

The significant variation in default rules, across American history and between the fifty States, makes evident that default rules are not and have never been fixed by the federal Constitution.  This flexibility is understandable considering that default rules do not ban private behavior—they simply establish baseline terms from which owners can easily depart.  It is also understandable considering that the regulation of private property is generally left to the States.

Indeed, States have always been free to tailor default rules to the expectations and preferences of private owners in order to reduce opt-out costs (thereby producing more efficient arrangements) and to better ensure that the flow of people and objects onto property is backed by the informed consent of owners. The Supreme Court recognized this very point in *Breard v. Alexandria*, 341 U.S. 622 (1951), a decision upholding a municipal default rule that disallowed door-to-door solicitation unless a private owner expressly consented.  The Court understood that the City's selected presumption, rather than its opposite, made it more likely that owners would have their preferred terms of entry enforced: "A householder depends for protection on his city board rather than churlishly guarding his entrances with orders forbidding the entrance of solicitors.  A sign would have to be a small billboard to make the differentiations between the

welcome and unwelcome that can be written in an ordinance once cheaply for all homes." *Id.* at 640.

California's shift from a "yes-carry" to a "no-carry" default was driven by a similar concern: that guns are being brought onto commercial property without informed consent from owners.  For one, there has been widespread public misunderstanding about the state of the law across California and the Ninth Circuit. Over 65 percent of California respondents in one study answered "I don't know" in response to the question of whether customers are allowed to bring guns without permission into private businesses, as did nearly 75 percent in response to whether a plumber is allowed to bring a gun without permission into one's home, and over 71 percent in response to whether a friend is allowed to bring a gun without permission into one's home.  Ayres & Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J.L. Med. & Ethics 183, tbl.A6 (Winter 2020).   And the small number of respondents who thought they knew the law were often mistaken—for instance, the 35 percent of California respondents who thought they knew whether customers are allowed to bring guns into private businesses without affirmative permission were nearly evenly split.  *Id.* The upshot of this confusion has been that owners who prefer not to have concealed guns inside their establishments are often unknowingly permitting them. Moreover, the "yes-carry" default raises a host of monitoring anxieties for owners, who have reason to fear that some carrying visitors will fail to notice "no firearms" signs and surreptitiously carry inside.  Owners may also fear that posting "no firearms" notices, even if reflective of their underlying preferences, would lead potential criminals to infer that the owner is unarmed and the business vulnerable.

Given these circumstances, the "yes-carry" default is not just bad policy; it also imperils the right to exclude and its foundational constitutional status.  But the "no-carry" default enhances the possibility of meaningful consent between landowner and entrant, thus bolstering the integrity of property ownership.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.   CALIFORNIA'S PRIVATE-PROPERTY DEFAULT RULE DOES NOT IMPLICATE THE SECOND AMENDMENT BECAUSE THERE IS NO CONSTITUTIONAL RIGHT TO CARRY A WEAPON ONTO ANOTHER'S PROPERTY

As a default rule, California's private-property rule does not ban the carrying of firearms onto commercial private property; it recasts the meaning of a private owner's silence on the issue.  Because Plaintiffs bear the burden of demonstrating that "the Second Amendment's plain text covers [their] conduct," they must demonstrate that the act of carrying a gun onto another's private commercial property without first obtaining affirmative permission—the "conduct" encumbered by the rule—is "cover[ed]" by the plain text.  *Bruen*, 142 S. Ct. at 2129-2130.

At the outset, Plaintiffs hardly even *acknowledge*—much less satisfy—their textual burden with respect to the private-property default rule.  The *Carralero* Plaintiffs devote but two paragraphs to the *Bruen* Step One question, *see Carralero* Amended Mem. at 6, only referencing *Bruen*'s rejection of a "home/public" distinction.  But this only begs the operative question of whether private commercial property is a "public" place where the right to carry extends.   And the *May* Plaintiffs make no mention of *Bruen* Step One at all, inexplicably jumping straight into the Step Two historical analysis.  *See May* Mem. at 4.

These defects aside, the conduct encumbered by the default rule—bringing a gun onto another's private commercial property without explicit consent—would only be covered by the Second Amendment if one of two propositions were true: that the Second Amendment provides a right to carry that supersedes the objection of a private owner, or that the Second Amendment provides a standalone right to the presumption that an owner welcomes firearms until the owner expressly states otherwise.  As considered in Section II.A and II.B respectively, both formulations should be rejected.

### A.     There Is No Constitutional Right To Carry Onto Private Property Over An Owner's Objection

Recognizing a constitutional right to carry onto another's property that trumps or overrides that owner's objection would be an unprecedented abrogation of the right to exclude, as it would bar owners from leveraging trespass laws to keep firearms off their property.  Understandably, this formulation of the right has been rejected by each of the five district courts to consider private-property default rules.  *See, e.g.*, *Siegel v. Platkin*, 2023 WL 1103676, at *16 (D.N.J. Jan. 30, 2023) ("[T]he Second Amendment does not include protection for a right to carry a firearm in a place … against the owner's wishes.").[3]

#### 1.     Extending the right to public carry onto private property would be an unprecedented break with constitutional tradition

In codifying a pre-existing common-law right, the Second Amendment "did not expand, extend, or enlarge the individual right to bear arms at the expense of other fundamental rights."  *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1264 (11th Cir. 2012), *abrogated on other grounds by Bruen*.  Rather, the right was understandably circumscribed by the common law of trespass, which predated the Second Amendment and reflected an expansive right to exclude without any special carve-out for firearms.  *See, e.g.*, *Baker v. Howard Cnty. Hunt*, 188 A. 223, 227-228 (Md. 1936) (surveying the history of "the relative rights of fox hunters" and finding "no doubt that … if the hunter himself goes on the lands of another against the owner's will, he is a trespasser").

---

[3] These courts have instead formulated the public carry right as a right to the *presumption* that an owner welcomes firearms *until the owner says otherwise*—a formulation that Plaintiffs now also seem to countenance.  *See, e.g.*, *May* Mem. at 26 ("If private businesses want to post signs telling people with CCW permits they are not welcome, they may do so … .").  But this *presumption* formulation fails for a host of reason, *see infra* Section I.B, which become especially evident once the defects in this first formulation are appreciated.

The historical absence of any firearms-related exception to the right to exclude reflects the more general relationship between an owner's right to exclude and the rights of non-owners.  Put simply, an entrant's constitutional rights have *virtually no* bearing on another's use of their private property.  Amici are aware of only two potential instances where a private owner's use of their property has been constrained by the constitutional rights of non-owners: the enforcement of racially restrictive covenants and restrictions on street expression in company towns.  But neither offers a rationale relevant to the Second Amendment.

In *Shelly v. Kraemer*, 334 U.S. 1 (1948), the Supreme Court prohibited the judicial enforcement of a racially restrictive covenant because the "[t]he owners of the properties were willing sellers" and that "but for the active intervention of the state courts, … petitioners would have been free to occupy the properties in question without restraint."  *Id.* at 19.  In other words, *Kraemer* did not concern the owners' right to exclude; it instead pitted the sellers' common-law right to disposition of the property and the buyers' constitutional right to equal treatment against the rights of the other neighborhood residents to enforce the covenant.  That property rights were involved on both sides of the ledger makes it additionally difficult to isolate the role of the equal-protection right in the Court's analysis.

*Marsh v. Alabama*, 326 U.S. 501 (1946)—which held that a company maintaining complete ownership over an Alabama town was barred by the First Amendment from forbidding street distribution of religious materials—is similarly inapposite.  The Court later limited *Marsh*'s reach to the company towns of the past, having recognized that "this Court has never held that a trespasser or an uninvited guest may exercise general rights of free speech on property privately owned."  *Lloyd Corp.*, 407 U.S. at 568; *see PruneYard*, 447 U.S. at 81 ("[W]hen a shopping center owner opens his private property to the public for purpose of shopping, the First Amendment to the United States Constitution does not thereby create individual rights in expression.").  Entrants thus do not have rights of

9

expression on private property, regardless of whether the property is "open" or "closed" to the public.  That remains true even though, of course, the text of the First Amendment—like that of the Second Amendment—does not draw an explicit distinction between public and private property.

Other First Amendment rights likewise end at the private-property line, regardless of whether the property is "open" or "closed" to the general community. *See, e.g.*, *Rowan v. U.S. Post Office Department*, 397 U.S. 728, 737-738 (1970) (holding that "[t]he asserted [First Amendment] right of a mailer [to send unwanted material to an unreceptive addressee] … stops at the outer boundary of every person's domain" because "[t]o hold less would tend to license a form of trespass"); *Breard*, 341 U.S. at 645 (upholding a municipality's no-solicitation default rule because "[i]t would be … a misuse of the great guarantees of free speech and free press to … force a community to admit the solicitors of publications to the home premises of its residents"); *Dietemann v. Time, Inc.*, 449 F.2d 245, 249 (9th Cir. 1971) ("The First Amendment [right to newsgathering] is not a license to trespass[.]"); *Spanish Church of God of Holyoke, Mass., Inc. v. Scott*, 794 F. Supp. 2d 304, 313 (D. Mass. 2011) (rejecting a defense to trespass based in the right to religious exercise).

In short, a private owner's fundamental control over their dominion means that they can prohibit firearms, just as they can prohibit handbill distributors, association members, newsgathering journalists, or religious observers.  Had the Court in *Bruen* wished to upset the constitutional status of the right to exclude and private property at large, it would have said so.  *Cf. Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*.").

## 2.     Nothing in *Bruen* indicates a break from longstanding constitutional principles

Plaintiffs assume—again, without giving any explanation—that *Bruen* announced a right to carry that extends onto private commercial property. Plaintiffs may believe this is so for the same reason animating the private-property default decisions of the Northern District of New York, Western District of New York, District of New Jersey, District of Hawaii, and District of Maryland district courts: that the term "public" as used in the *Bruen* phrase "the public right to carry" entails public property *and* private commercial property where people congregate. But this expansive (and sociological rather than property-law) understanding of the term "public" finds no support in *Bruen* itself. *Bruen* did not involve a request to carry onto another's private property and settled only that the right extends beyond the home into "public" areas. Those district courts erred in straying from background constitutional principles and the intuitive connection between "public carry" and public property. This Court should not follow suit. *Cf. Colby v. J.C. Penney Co., Inc.*, 811 F.2d 1119, 1124 (7th Cir. 1987) ("[D]istrict judges in this circuit must not treat decisions *by other district judges*, in this and *a fortiorari* in other circuits, as controlling," as those decisions are "entitled to no more weight than their intrinsic persuasiveness merits.").

Of the five courts to address this issue, four simply assumed that "public" encompasses private commercial property. The only court to justify its "'public' includes private property" approach was the District of Hawaii district court. *See Wolford v. Lopez*, 2023 WL 5043805, at *1 (D. Haw. Aug. 8, 2023). And its misapprehensions are instructive. The court began by focusing on *Bruen*'s pronouncement that "[n]othing in the Second Amendment's text draws a home/public distinction." *Id.* at *15. If there is no distinction between home and public, the court reasoned, then neither can there be "a distinction between public places" and so *Bruen* must support the right to carry onto private commercial

property, too. *Id*. But this only begs the operative question of whether private commercial property is a "public" place. The district court next invoked *Bruen*'s references to "'areas'" and "'locations frequented by the general community.'" *Id*. (quoting *Bruen*, 142 S. Ct. at 2135, 2148). Because private commercial property is frequented by the general community, the court thought, it falls within the Second Amendment's scope alongside public property. But neither *Bruen* passage suggests that an area's being frequented marks it as a relevant Second Amendment location; in those passages the Court only rejects New York's proposal that a lower standard of scrutiny be applied in crowded areas where safety concerns are pronounced. In other words, the fact that *an area covered by the Second Amendment* is crowded does not give the State additional leeway to regulate that area (*e.g.*, the right is not necessarily weaker in a public town square than in a public library). This observation hardly sheds light on whether private property is one such covered "public" area. As before, it only begs the question.[4]

The answer—that "public" refers to public property—becomes clear in view of the background constitutional principles described above. Further elucidative is the fact that the Court has been careful to use qualified language like "property open to the public" when referring to private commercial establishments in related constitutional contexts. *See, e.g.*, *Central Hardware Co. v. NLRB*, 407 U.S. 539, 547 (1972) ("The only fact relied upon for the argument that [private parking lots] have acquired the characteristics of a public municipal facility is that they are

---

[4] Recognizing that *Bruen* is underdetermining, the district court went on to consult extrinsic sources for interpreting "public." It cited a Black's Law Dictionary definition that defines the term as "[o]pen or available for all to use, share, or enjoy." *Wolford*, 2023 WL 5043805, at *16 (citing *Public*, Black's Law Dictionary (11th ed. 2019)). But, setting aside the fact that no private commercial establishment is actually "available for all to use [or] share" (*e.g.*, one cannot have a picnic in a grocery store), many other definitions equate "public" with "governmental." *See, e.g.*, *Public*, Merriam Webster's Collegiate Dictionary (11th ed. 2014) ("of or relating to a government").

'open to the public.'"); *PruneYard*, 447 U.S. at 81 (noting that private commercial property "does not 'lose its private character'").  And the construction "public *X*," as the Court used when referring to "right to public carry" or "public carry right" over fifty times across the *Bruen* majority opinion, typically indicates that public property is at issue—as in "public right to navigability," "public forum," and "public trust."  *See, e.g.*, *Spokeo v. Robins*, 578 U.S. 330, 345 (2016) (Thomas, J., concurring) (discussing "public rights" like "free navigation of waterways" and "passage on public highways"); *Police Department of Chicago v. Mosley*, 408 U.S. 92, 96, 99 & n.6 (1972) ("public forum"); *Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 472 (1988) ("public trust").

Thus, *Bruen* did not dramatically reconfigure the relationship between private property and the Constitution by announcing a right to carry inside another's private property—a right that, for the reasons explained next, would have the unprecedented effect of displacing a private owner's right to exclude firearms.

## B.   There Is No Right To The Presumption That A Private Owner Welcomes Firearms Until The Owner Announces Otherwise

Plaintiffs seem to argue that extending the right to carry into another's private property would not impede the owner's ability to exclude firearms because the right amounts only to the *presumption* that the owner permits firearms *until the owner states otherwise*.  *See May* Mem. at 26 ("If private businesses want to post signs telling people with CCW permits they are not welcome, they may do so….").  Formulating the right to carry as a freestanding constitutional right to only a presumption may seem like a practical compromise between the interests of licensed carriers and those of private owners, one that avoids the doctrinal disorder wrought by a right that supersedes a private owner's objection.  But this *sui generis* formulation is analytically and doctrinally incoherent.

### 1.     The *presumption* formulation is unprecedented and incompatible with *Bruen*

First, nothing in the Court's constitutional jurisprudence suggests that an individual right can exist in the partial or defeasible form of a rebuttable presumption conditioning exercise on the permission of another individual—here, a private owner.  Either there is a right to carry onto private property, in which case that right would supersede an owner's objection and States would be prohibited from enforcing an owner's opposition through criminal prosecution, or there is no right to carry onto another's property.

Consider the brief historical period after *Marsh*, 326 U.S. 501, when the Court temporarily suggested that First Amendment rights can extend onto private commercial property in special circumstances.  Before the Court reversed course and foreclosed any such possibility in *Lloyd Corporation v. Tanner*, 407 U.S. 551 (1972), it treated this right to free expression on private property as a trump—not a mere entitlement to a presumption in the pro-expression direction.  That right supplied a constitutional defense to trespass actions and thereby prevented owners from invoking trespass laws to exclude unwanted forms of expression.  *See Marsh*, 326 U.S. at 501 (overturning a criminal trespass conviction); *Amalgamated Food Emps. Union Loc. 590 v. Logan Valley Plaza, Inc.*, 391 U.S. 308, 319 (1968), *overturned by Lloyd Corp. v. Tanner*, 407 U.S. 551 (1972) (prohibiting the use of trespass laws "to exclude those members of the public wishing to exercise their First Amendment rights on the premises").[5]  So too here:  If this Court were to

---

[5] State courts and the lower federal courts similarly treated that right as a trump—never as a mere presumption—during this period.  *See, e.g.*, *Schwartz-Torrance Inv. Corp. v. Bakery & Confectionery Workers' Union, Loc. No. 31*, 394 P.2d 921, 922 (Cal. 1964) (prohibiting owner from enjoining as trespass a union protest); *Sutherland v. Southcenter Shopping Center*, 478 P.2d 792, 793 (Wash Ct. App. 1970) (holding that "unconsented invasion of the property rights of owners … to solicit signatures for an initiative is protected"), *overruled by Southcenter Joint Venture v. National Democratic Policy Committee*, 780 P.2d 1282 (Wash.

recognize a right to carry onto another's property, that right would likewise prevent owners from invoking trespass laws to exclude unwanted firearms.

The presumption formulation is further belied by *Bruen*'s command that Second Amendment rights be treated as trumps not subject to means-end scrutiny. The Court was clear that *Heller* and *McDonald* "expressly rejected the application of any 'judge-empowering' interest-balancing inquiry." *Bruen*, 142 S. Ct. at 2129, 2130. Courts are thus not free to balance the purported right to carry onto private property against the owner's right to exclude firearms, with the aim of fashioning a presumption that stops short of a trump. Instead, considering that a Second Amendment right where it does apply is not to be modulated by competing individual rights or societal demands, lower courts must be careful to define the Second Amendment's textual scope without displacing other constitutional guarantees. Here that means rejecting the notion that the right to carry extends onto private property.

Moreover, imaginatively recasting the right as a presumption hardly salvages the right to exclude. In theory, owners with legal knowledge might appreciate the need to affirmatively announce their opposition to firearms in a world where an unwritten constitutional presumption exists over their property. But the widespread expectation that silence does not confer an implied license to bring firearms into one's home or business, *see* Ayres, *Guests with Guns*, *supra*, tbl.A6, makes it unlikely that most owners seeking to exclude firearms will take an action necessary to override the presumption. A constitutionalized presumption, like the *per se* formulation of the right, thus displaces owners' expectations and intentions regarding the uses of their property.

---

1989); *Central Hardware Co. v. NLRB*, 439 F.2d 1321, 1328 (8th Cir. 1971) (holding that solicitation on company premises in violation of employer's explicit prohibition was protected), *vacated by Lloyd Corporation v. Tanner*, 407 U.S. 539 (1972).

**2.     Plaintiffs' only argument for the *presumption* formulation— that the right to carry is tied to the concept of "implied license" and can thus be withdrawn by private owners—is incoherent**

The only conceivable justification given by Plaintiffs for the *presumption* formulation of the right comes in the context of their *Bruen* Step Two historical analysis—not in the context of *Bruen* Step One—and relates to the common-law concept of "implied license."  According to Plaintiffs, because (1) "the public has implied consent to enter property open to the public," and (2) "because the right to armed self-defense follows the individual everywhere he or she lawfully goes in public," it follows that (3) "carrying on property open to the public is permitted unless the owner withdraws consent."  *Carralero* Mem. at 9 (citations and quotations omitted); *see also May* Mem. at 24.  Plaintiffs draw this "implied consent" rationale from the New Jersey district court's *Koons* opinion.  *See id.* (citing *Koons v. Platkin*, 2023 WL 3478604, at *58, *61 (D.N.J. May 16, 2023)).  But mapping the Second Amendment's scope along the concept of implied license makes little sense as a matter of property or constitutional law.

*First*, Plaintiffs' theory suggests that the community's implied license to enter commercial property *in fact* includes permission to bring guns inside commercial property.  But the notion that California's business owners generally intend to invite guns inside their businesses is dubious.

An implied license is shaped by shared expectations as to permissible behavior.  It is thus circumscribed and contextual—for instance, the implied license to enter a grocery store does not include license to picnic, just as license to enter a mall does not include running or riding a bike.  *See also* Cooley, *A Treatise on the Law of Torts or the Wrongs Which Arise Independent of Contract* 303 (1879) (observing that the license to enter a commercial establishment "is limited by the purpose" of the establishment); *May* Mem. at 24 (noting that "'positive law and social convention'" define the terms of permissible entry into commercial

16

property (quoting *Oliver v. United States*, 466 U.S. 170, 193 (1984) (Marshall, J., dissenting))). But before California's enactment of SB2, few Californians even knew whether permission to enter commercial businesses included permission to bring a gun. If the right's scope were to be mapped along implied license, the questionable status of such a license on private commercial property makes it difficult to see how Plaintiffs can satisfy their *Bruen* Step One burden.

*Second*, Plaintiffs' "implied license" theory *supports* the constitutionality of the mine run of potential prosecutions under the private-property default rule. On Plaintiffs' view, "the right to armed self-defense follows the individual everywhere he or she *lawfully goes* in public." *Carralero* Mem. at 9 (emphasis added). But virtually all police arrests of an entrant inside private commercial property will be preceded by some form of unlawful behavior or a directive from the owner to leave, at which point the entrant's license to remain on the premises—and the constitutional protection that, on Plaintiffs' view, attends that license—would be withdrawn. *Cf. Wolford*, 2023 WL 5043805, at *16 (an implied license "is not absolute, of course, and may be revoked if, for example, an invitee or licensee is engaging in … behavior that the business deems unacceptable"). Indeed, it is difficult to imagine scenarios where an entrant *would remain* a lawful entrant at the point of arrest.

### C.    Alternative Theories As To How The Private-Property Default Rule Implicates The Second Amendment Likewise Fail

Even accepting that there is neither a right to carry onto another's private property over an owner's objection nor a right that identifies an owner's silence with consent, Plaintiffs may argue that the rule still encumbers the (properly understood) *Bruen* right to carry on *public property* in one of two ways. First, Plaintiffs may insist that the rule implicates the Second Amendment not because of any formal incompatibility between the rule and the right, but because the rule may have the *effect* of reducing carry rates on public property (*i.e.*, gun owners who feel

disinclined from seeking consent to carry from private owners may decide to leave their guns at home).  Second, Plaintiffs may suggest that *owners* have a right to the presumption that their silence implies consent to carry.  Both theories fail.

### 1.     An "effects" theory is untenable

*First*, aside from the Supreme Court's passing references to potential as-applied challenges to "shall-issue" licensing regimes that in practice operate as "may-issue" regimes, *see Bruen*, 142 S. Ct. at 2138 n.9; *id*. at 2162 (Kavanaugh, J., concurring), nothing in either *Heller* or *Bruen* indicates concern for a statute's downstream effects on ownership or carry rates.  In fact, concern over a law's indirect impact on protected conduct is characteristic of the means-end analysis emphatically rejected in *Bruen*.  *See id.* at 2129.

*Second*, an "effects" theory would be without a limiting principle and sweep whole swaths of State regulation into the Second Amendment context.  Countless laws and regulations—including those that facially have nothing to do with firearms, like general tort or criminal liability for injuries caused by accidental discharges—have significant, if not comparatively greater, disincentivizing effects on carrying.  *See supra* Section I.A.  Even a general criminal-trespass statute in combination with the old "yes-carry" default rule has a substantial disincentivizing effect, as countless storekeepers and landowners will continue to prohibit guns by leveraging trespass liability under either default rule.  A criminal statute that prohibits the carrying of firearms over an owner's express objection would similarly have a significant disincentivizing effect and would likely be unconstitutional under such an "effects" theory.

*Third*, even if effects were to matter constitutionally, the relevant measurement is the reduction in carrying caused by owners who want to permit visitors to carry guns but for some reason fail to contract around the "no-carry" default.  But the size of this effect is likely limited given the broad support for a "no-carry" default.  *See* Ayres, *supra*, at 187-189, tbl.A6.

18

### 2.    The rule does not implicate an owner's *Heller* right to possess or welcome guns

In a separate vein, Plaintiffs suggest that the *Heller* right to possess guns on one's *own* property is implicated because the rule will purportedly impede owners' ability to invite guns onto their premises. *See May* Mem. at 24-25.  But the rule in no way restricts an owner's choice to admit gun-carrying entrants and is far less likely than the "yes-carry" rule to effectuate a choice contrary to owners' preferences.  *See* Ayres, *supra*, at 187-189, tbl.A6.[6]

Still, Plaintiffs insist that a business owner's *Heller* right to invite guns onto their own premises is a right that should operate *passively*—that is, a right that should kick in when an owner is silent or has yet to even contemplate, much less decide, whether to invite guns into their businesses.  But this view finds no support in *Heller* or *Bruen* and is especially odd considering that constitutional rights are typically exercised not unknowingly *but by choice*—*i.e.*, the choice to speak or to no speak, or to possess guns or to no possess guns.  *Cf.* Blocher, *The Right Not to Keep or Bear Arms*, 64 Stan. L. Rev. 1, 26-50 (2012) (the Second Amendment implies a right to not possess or host guns, just as the First Amendment implies a right to not speak).  On Plaintiffs' view of the *Heller* right, *all* business owners must exercise the right to invite guns into their establishments until they recognize as much and decide to stop exercising the right.  That turns conventional understanding on its head.

---

[6] Likewise, the private-property default rule does not impermissibly "compel" speech because (1) owners remain free to decide whether to post a notice to opt out of the "no-carry" default, and (2) a "yes-carry" default "compels" the posting of an opt-out notice in precisely the same manner, just in reverse.  There is no such thing as a neutral default: under either rule, some business owners will put up signs that may "alienate some of their customers."  *May* Mem. at 26.  This is also why the countless other default rules structuring owner-entrant interactions— including defaults against grazing, hunting, graffiti, and drone use, *see supra* pp. 4-5—do not implicate the First Amendment.

To draw support for this unintuitive view, the *May* Plaintiffs make passing comparison to a homeowner's First Amendment right to receive door-to-door solicitors—which, according to Plaintiffs, all owners unreflexively exercise until recognizing as much and deciding otherwise (by, *e.g.*, posting a "No Solicitation" sign). *See May* Mem. at 25. But this comparison fails. At the outset, the notion that an owner's right to receive solicitors must be exercised by default is incompatible with the Court's countenancing of "no-solicitation" default laws in *Breard v. Alexandria*, 341 U.S. 622 (1951). *See supra* p. 5. Such laws preserve an owner's authority to admit solicitors and receive speech and are thereby constitutionally distinguishable from no-solicitation *bans* or regulations that reappropriate authority over entry decisions to the *State. Compare Breard with Watchtower Bible & Tract Soc'y v. Village of Stratton*, 536 U.S. 150 (2002) (striking down ordinance requiring that solicitors first obtain a City official's permission); *and Martin v. City of Struthers*, 319 U.S. 141, 147 (1943) (striking down ban on solicitation because it no longer "leav[es] to each household the full right to decide whether he will receive strangers as visitor").[7]

Moreover, even if it were true that an owner's right to receive solicitors means that States are no longer constitutionally permitted to enact "no-solicitation" default laws (an odd assumption considering their ubiquity, *e.g.*, City of Jersey

---

[7] The *May* Plaintiffs cite *Project 80's, Inc. v. Pocatello*, 942 F.2d 635 (9th Cir. 1991), for the view that an owner should not need to post a "Solicitors Welcome" sign to receive solicitors. But that decision and its precursor, *Project 80's, Inc. v. City of Pocatello*, 857 F.2d 592 (9th Cir. 1988), did not override *Breard*. The Ninth Circuit assumed incorrectly that *Breard* had been impliedly abrogated because it "was decided at a time when commercial advertising was thought to be wholly unprotected by the First Amendment." *Id.* at 594. But the Court *did* afford commercial solicitation constitutional protection—it recognized that the advertising of periodicals "does not put them beyond the protection of the First Amendment"—while *also* recognizing that "[r]ights other than those of the advocates," like the privacy and exclusion rights of homeowners who did not want to constantly engage solicitors, "are involved." 341 U.S. at 642.

City, NJ Code of Ordinances § 245-7 (1978)), the comparison to "no-carry" defaults is misleading.  For one, solicitation involves only momentary presence on another's curtilage rather than an indefinite stint inside another's establishment.  More importantly, the First Amendment—unlike the Second Amendment—is ordered around content neutrality principles that are likely to subject *any law* regulating specific forms of speech like solicitation to heightened scrutiny (whether the law reflects a "yes-" or "no-solicitation" default).  *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 387 (1992).[8]  But there is no such Second Amendment neutrality principle rendering presumptively unconstitutional all laws referencing "firearms."  Otherwise, the Court in *Bruen* would have skipped the Step One inquiry entirely and started with Step Two.

*     *     *

In summary, the default rule does not implicate the Second Amendment's text.  Extending the public carry right onto private commercial property would be an unprecedented abrogation of the time-honored rights of owners to exclude firearms.  And this result cannot be avoided by restyling the right as a *presumption* to carry *until the owner says otherwise*; that *sui generis* formulation is without precedent and affirmatively foreclosed by *Bruen*.

## CONCLUSION

Enduring principles of property law make clear that California's private-property default rule is constitutional.  The Court should find the private-property

---

[8] This is why a default rule prohibiting the depiction of a hateful symbol on another's property without their permission would raise a constitutional problem.  Entrants, of course, have no right to post such a symbol on another's property.  Nor does an owner's right to invite an entrant in to post the symbol imply that *all owners* must exercise this invitation by default—that would be absurd.  But the State is still barred from singling out a particular message for regulation based on its content or viewpoint.

1  default rule constitutional in full, and therefore deny Plaintiffs' motions for
2  preliminary injunctions.
3
4    Dated: November 6, 2023          /s/ Christopher T. Casamassima
5             Los Angeles, CA          Christopher T. Casamassima (CA Bar No. 211280)
6                                       chris.casamassima@wilmerhale.com
                                        WILMER CUTLER PICKERING
7                                          HALE AND DORR LLP
8                                       350 South Grand Avenue, Suite 2400
                                        Los Angeles, CA 90071
9                                       Tel. 213-443-5374
10                                      *Counsel for Amici Curiae*
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

22

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Professors of Property Law, certifies that this brief contains 6,941 words, which complies with the word limit of L.R. 11-6.1.

Dated: November 6, 2023          /s/ Christopher T. Casamassima
             Los Angeles, CA          Christopher T. Casamassima (CA Bar No. 211280)