BENBROOK LAW GROUP, PC
BRADLEY A. BENBROOK (SBN 177786)
STEPHEN M. DUVERNAY (SBN 250957)
701 University Avenue, Suite 106
Sacramento, CA  95825
Telephone: (916) 447-4900
Facsimile: (916) 447-4904
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCO ANTONIO CARRALERO; GARRISON HAM; MICHAEL SCHWARTZ; ORANGE COUNTY GUN OWNERS PAC; SAN DIEGO COUNTY GUN OWNERS PAC; CALIFORNIA GUN RIGHTS FOUNDATION; and FIREARMS POLICY COALITION, INC., <br><br> Plaintiffs, <br><br> v. <br><br> ROB BONTA, in his official capacity as Attorney General of California, <br><br> Defendant. | Case No.:  8:23-cv-01798 (CJC) <br><br> **REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** <br><br> Hon. Cormac J. Carney <br><br> Date:  December 20, 2023 <br> Time:  1:30 p.m. <br> Courtroom:  9B <br> Judge: Hon. Cormac J. Carney |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................... iii

INTRODUCTION ................................................................................................... 1

ARGUMENT ........................................................................................................... 3

    I.    The Challenged Provisions Likely Violate Plaintiffs' Second
        Amendment Rights. ................................................................................... 3

        A. The Second Amendment's Plain Text Covers Plaintiffs'
            Conduct. ............................................................................................ 3

        B. California Ignores *Bruen*'s Methodological Instructions. ............... 5

            1. 1791 is the key time period for historical analysis. ............... 6
            2. Analogues must be well-established and relevantly
               similar. ..................................................................................... 9
            3. California erroneously claims that technological and
               societal changes alter the analogical inquiry. ...................... 10
            4. California improperly expands what qualifies as a
               sensitive place, ignoring *Bruen*'s reasoning. ...................... 10

        C.    California's Historical Evidence Fails To Establish An
            Analogous Tradition Of Regulation For Each Of The Locations
            At Issue Here. .................................................................................. 13

            1. The no-carry default in businesses open to the public. ....... 13

            2. Public gatherings and special events. .................................. 16

            3. Places Selling Alcohol for Consumption on the
               Premises. ................................................................................ 21

            4. Public Transportation ........................................................... 23

            5. Gambling establishments, stadiums, and
               amusement parks. .................................................................. 24

            6. Parks and zoos. ..................................................................... 26

            7. Health care facilities, museums, and libraries. .................... 27

1

8. Parking lots of the challenged locations. ..............................28

II.     The Other Factors Favor a Preliminary Injunction. ............................29

III.    The Court Should Waive Bond or Require Only Nominal Security. .29

IV. Enforcement of Any Injunction Should Not Be Stayed Pending Appeal. ...............................................................................................30

CONCLUSION .........................................................................................30

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

<u>**Cases**</u>                                                                                                    <u>**Page**</u>

*Antonyuk v. Hochul,*
    639 F. Supp. 3d 232 (N.D.N.Y. 2022) ....................................................5, 9, 27

*Baird v. Bonta*, 81 F.4th 1036
    (9th Cir. 2023)..........................................................................................5, 29

*Brown v. Ent. Merchs. Ass'n,*
    564 U.S. 786 (2011) .......................................................................................5

*Christian v. Nigrelli,*
    642 F. Supp. 3d 393 (W.D.N.Y. 2022) ........................................................4, 5

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ..................................................................4, 10, 17, 18

*Espinoza v. Mont. Dep't of Revenue,*
    140 S.Ct. 2246 (2020) ...................................................................................8

*Hill v. State,*
    53 Ga. 472 (1824) ......................................................................................21

*Junior Sports Mags. v. Bonta,*
    80 F.4th 1109 (9th Cir. 2023).......................................................................29

*Kipke v. Moore,*
    No. 23-cv-1293, 2023 WL 6381503 (D. Md. Sept. 29, 2023) .................5, 16

*Koons v. Platkin,*
    No. 22-cv-7464, 2023 WL 3478604
    (D.N.J. May 16, 2023) ...............................................4, 5, 9, 14, 19, 26, 27, 28

*New York State Rifle & Pistol Association v. Bruen,*
    142 S.Ct. 2111 (2022) ...................................1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 15,
    16, 17, 18, 19, 20, 21, 24, 25, 26, 29

*Ramos v. Louisiana,*
    140 S.Ct. 1390 (2020) ...............................................................................7, 8

*Sammartano v. First Jud. Dist. Ct.,*
    303 F.3d 959 (9th Cir. 2002).......................................................................29

*Save Our Sonoran, Inc. v. Flowers,*
    408 F.3d 1113 (9th Cir. 2005)......................................................................30

*Siegel v. Platkin,*
    653 F. Supp. 3d 136 (D.N.J. 2023) ...............................................................5

*State v. Hopping*,
    18 N.J.L. 423 (N.J. 1842) ................................................................. 14

*State v. Pigg*,
    85 Mo. App. 399 (Mo. Ct. App. 1900) ............................................ 21

*State v. Shelby*,
    2 S.W. 468 (Mo. 1886) ..................................................................... 21

*Timbs v. Indiana*,
    139 S.Ct. 682 (2019) .......................................................................... 7

*United States v. Alaniz*,
    69 F.4th 1124 (9th Cir. 2023) ........................................................ 7, 8

*United States v. Class*,
    930 F.3d 460 (D.C. Cir. 2019) ......................................................... 29

*Wolford v. Lopez*,
    No. 23-cv-265, 2023 WL 5043805 (D. Haw. Aug. 8, 2023) .......... 5, 9, 20, 27

*Worth v. Harrington*,
    No. 21-cv-1348, 2023 WL 2745673 (D. Minn. Mar. 31, 2023) .......... 13

**Constitutional Provisions and Rules**

U.S. CONST.
    amend. III ........................................................................................... 3
    amend. IV ........................................................................................... 3

FED. R. APP. P. 8(a)(1) ........................................................................... 30

**Other Authorities**

1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND (1765) ...... 14

1 LAWS OF THE STATE OF NEW JERSEY (Bloomfield ed., 1811) .............. 12

1 LAWS OF THE STATE OF NEW YORK
    (2d ed., Albany: Websters & Skinner 1807) ................................... 12

1 RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, IN
    NEW ENGLAND (Bartlett ed., 1856) ................................................................. 18

1 THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA,
    FROM THE FIRST SESSION OF THE LEGISLATURE (Hening ed., 1808) ........... 18

1 STATUTES AT LARGE OF VIRGINIA 152 (Shepherd ed., 1835),
    https://bit.ly/46aZdBo ........................................................................................ 23

2 LAWS OF THE STATE OF DELAWARE (Adams eds., 1797) ..................................... 12

6 WILLIAM WALLER HENING, THE STATUTES AT LARGE, BEING A COLLECTION OF
    ALL THE LAWS OF VIRGINIA FROM THE FIRST SESSION OF THE LEGISLATURE,
    IN THE YEAR 1619 (Richmond, Franklin Press 1819) .................................... 17

9 STATUTES AT LARGE OF SOUTH CAROLINA 61 (1841),
    https://bit.ly/3QPuoxL ...................................................................................... 23

A DIGEST OF THE LAWS OF THE STATE OF GEORGIA,
    1800 Ga. Laws 611 (Watkins ed., 1800) ........................................................ 12

ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA 42
    (Davis ed., 1796) ............................................................................................. 12

Act of May 28, 1746, *in* 3 ACTS & LAWS OF MASSACHUSETTS BAY 306 (1878).... 15

*Thursday Paper*, ALBANY WEEKLY HERALD (Sept. 28, 1893),
    https://bit.ly/3MJc075 ...................................................................................... 16

Janet Davis, *America's Big Circus Spectacular Has a Long and Cherished
    History*, SMITHSONIAN MAG. (Mar. 22, 2017), https://bit.ly/47b9P4M ........ 25

Amici Br. of Citizens Comm. for the Right to Keep & Bear Arms, et al.,
    *Koons v. Platkin*, No. 23-1900 (3d Cir. Aug. 16, 2023), Doc. 91 ................. 12

Amicus Br. of Ctr. for Hum. Liberty*,
    Antonyuk v. Nigrelli*, No. 22-2908 (2d Cir. Feb. 9, 2023), Doc. 313 ............ 12

Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and
    Church Autonomy*, 8 LIBERTY UNIV. L. REV. 653 (2014) ............................. 17

*Boston Common*, NAT'L PARK SERV., https://bit.ly/3SGumtc
    (last visited Nov. 9, 2023) ................................................................................ 26

Catie Carberry, *What's in a name? The Evolution of the Term 'Gun'*, DUKE CTR.
    FOR FIREARMS LAW (July 24, 2019),
    https://bit.ly/3MNPV7y...................................................................................... 15

*Charleston Museum*, VISIT HISTORIC CHARLESTON, https://bit.ly/3QPrrxe ........... 28

Clayton E. Cramer, *Colonial Firearm Regulation*,
    16 J. FIREARMS & PUB. POL'Y 1 (2004) ................................................... 11, 12

J. Hammond Trumbull, The Public Records of the Colony of Connecticut, Prior to the Union with New Haven Colony, (Brown & Parsons eds., 1850) ......................................................................17

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205 (2018) ........................................................11, 12, 13

Donald L. Grant, The Way it Was in the South: The Black Experience in Georgia (2001) ..............................................20

The Public Laws of the State of South Carolina (Grimke ed., 1790) ...........12

*Gun*, Webster's American Dictionary of The English Language (1828) .....15

*Saturday Paper*, Independent Gazetteer, (Aug. 31, 1782), https://bit.ly/3QQD6M8 ...........................................................................23

*Wednesday Paper*, Poughkeepsie Journal, (Apr. 18, 1787), https://bit.ly/3QO5rTq ..............................................................................23

John Adams, Argument for the Defense (Dec. 1770), Nat'l Archives: Founders Online, https://bit.ly/35FCuRh ....................17

Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, not 1868*, Harv. J. L. & Pub. Pol'y Per Curiam (Dec. 7, 2022), https://bit.ly/3RRRSmD ..............................................................................6

Mark W. Smith, *Enlightenment Thinker Cesare Beccaria and his Influence on the Founders*, 2020 Pepp. L. Rev. 71 (2020) ..........................................................2

3 Archives of Maryland (Browne ed., 1885) ..................................................18

1 Nathaniel B. Shurtleff, Records of the Governor and Company of the Massachusetts Bay in New England, (White ed., 1853)....................................................................................18

Nicholas J. Johnson et al., Second Amendment: Regulation, Rights, And Policy 2195 (3d ed. 2021) ...........................................................................23

Pennsylvania Statutes At Large, Volume X: 1779-81 (Ray ed., 1904).........................................................................................12

Richard Frothingham, Life and Times of Joseph Warren (1865)...................28

Soumya Karlamangla, *How the Supreme Court's Gun Case Could Affect California*, N.Y. Times (Nov. 10, 2021), https://bit.ly/40vik84 ....................2

Stephen P. Halbrook, Faux Histoire *of the Right to Bear Arms*: Young v. Hawaii, SSRN, https://bit.ly/3QyFZA5........................................................................19

*Monday Paper*, The Eugene Guard (May 15, 1893), https://bit.ly/3sCQt9A ...............................................................................16

*Thursday Paper*, THE PA. GAZETTE, (Apr. 30, 1761), https://bit.ly/40sLdSo .........23

*Tuesday Paper*, SOUTH-CAROLINA GAZETTE; AND COUNTRY JOURNAL,
    (Nov. 22, 1768), https://bit.ly/465hnV6.......................................................23

VERNON N. KISLING, RICK BARONGI, ZOO AND AQUARIUM HISTORY
    (2d ed. 2022) ...........................................................................................26

VOTES AND PROCEEDINGS OF THE HOUSE OF DELEGATES OF THE STATE OF
    MARYLAND: NOVEMBER SESSION 1791 (Green ed., 1795) ...........................12

**INTRODUCTION**

California cannot escape the fact that SB2's restrictions on public carry "eviscerate the general right to publicly carry arms for self-defense," *New York State Rifle & Pistol Association v. Bruen*, 142 S.Ct. 2111, 2134 (2022), and therefore violate the Second Amendment. Because SB2 bars carry in virtually every location open to the public in California but sidewalks, it turns *Bruen* on its head.

To justify its law, California and its historians rely on a tradition—stemming from the Statute of Northampton—that *Bruen* expressly rejected as irrelevant to broad prohibitions on public carry. The State fails to offer a shred of relevantly similar Founding-era analogues to its law, looking mostly to laws passed in southern states after the Fourteenth Amendment's ratification in 1868; since those laws are inconsistent with the Founding era's treatment of the right to carry, however, *Bruen* instructs that they are not relevant. And California cites laws from localities and territories without acknowledging *Bruen*'s instruction that they similarly carry little weight in the historical analysis. Perhaps most problematically, California distorts *Bruen* to contend that the historical inquiry shifts given technological and societal changes. The State's logic would effectively support any gun restriction today, given that society has certainly changed since 1791. That flies in the face of *Bruen*'s holding that the Second Amendment protects a general right to public carry by law-abiding citizens for self-defense.

Rather than ground its law in history, California advances a new framework for defining "sensitive places," namely that places are sensitive (1) because of the activities taking place there, including the exercise of constitutional rights, (2) because of their physical nature, including that they are crowded, and (3) because vulnerable people congregate there. *See, e.g.*, Opp'n Br. at 1, 3–4 ("Br."), Doc. 20. But as Plaintiffs will explain, both *Bruen* and Founding-era history refute these categories.

California and its historians spill much ink explaining that locations like the places covered by SB2 did not exist at the Founding. But California cannot seriously

dispute that Founding-era places existed where people assembled for a wide variety of reasons. Fatally, the State offers no relevantly similar historical tradition of guns being banned in such places—as measured by "how" and "why" those laws burden the general right to public carry. *Bruen*, 142 S.Ct. at 2132–33. Indeed, Plaintiffs have much evidence showing that carry was permitted, and at times even *required*, in such locations.

As California notes, its prior sensitive places regime was far more relaxed than SB2. *See* Br. 2–4. And while it was exceedingly difficult for Californians in many parts of the state to get carry permits, over 120,000 Californians had them.[1] What has changed to prompt California to enact draconian carry restrictions? The Supreme Court in *Bruen* has made clear that California must allow law-abiding citizens throughout the State to exercise their right to carry firearms for self-defense. But nothing has changed about the places California newly regulates. That is no basis for making basically every place of public assembly a putative gun-free zone. The right to carry does not evaporate based on the number of people exercising the right. Indeed, as the Founders well understood, because violent criminals cannot be expected to follow gun-control laws, "such laws make things worse for the assaulted and better for the assailants[.]" Mark W. Smith, *Enlightenment Thinker Cesare Beccaria and his Influence on the Founders*, 2020 PEPP. L. REV. 71, 83 (2020).

Because Plaintiffs show that the challenged provisions of SB2 likely violate their Second Amendment rights, they necessarily are likely to suffer irreparable harm. And because it is always in the public interest to prevent the violation of a party's constitutional rights, the remaining injunctive relief factors favor Plaintiffs.

---

[1] Soumya Karlamangla, *How the Supreme Court's Gun Case Could Affect California*, N.Y. TIMES (Nov. 10, 2021), https://bit.ly/40vik84.

# ARGUMENT[2]

**I.     The Challenged Provisions Likely Violate Plaintiffs' Second Amendment Rights.**

**A. The Second Amendment's Plain Text Covers Plaintiffs' Conduct.**

California concedes that Plaintiffs' proposed course of conduct—carrying firearms in various public places—falls within the Second Amendment's plain text for nearly all the locations they challenge. Br. 39. But the State singles out the no-carry default at private businesses, arguing that carry in these locations is not protected by the Second Amendment.

California is incorrect. The Second Amendment's plain text protects carrying firearms regardless of the location. This is so because "nothing in the Second Amendment's text draws a home/public distinction," *Bruen*, 142 S.Ct. at 2134—or for that matter, any distinction between locations at all. As California acknowledges, Br. 41, that makes the Second Amendment unlike other Amendments which do contain locational restrictions. *See* U.S. Const. amend. III ("No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law."); U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"). Thus, as a matter of plain text, the Second Amendment has long been understood to secure for citizens "the right to keep and carry arms wherever they went." *Bruen*, 142 S.Ct. at 2150–51 (cleaned up).

It also follows directly from *Heller* and *Bruen* that the Second Amendment's plain text protects carrying at private businesses open to the public. "The people" includes "all Americans"; "Arms" includes "all instruments that constitute bearable arms[,]" including handguns; and, to "bear" simply means to "carry," which "naturally

---

[2] Any new historical sources cited in this Brief are collected in the attached appendix.

encompasses public carry" for self-defense. *District of Columbia v. Heller*, 554 U.S. 570, 580–82, 584 (2008); *Bruen*, 142 S.Ct. at 2132, 2134–35. Because "confrontation can surely take place outside the home"—including in businesses and other private property open to the public—it follows that as a textual matter the right to carry firearms extends to private property open to the public. *Bruen*, 142 S.Ct. at 2134–35. That *Bruen* and *Heller* identified a few sensitive places as exceptions to this general rule does not mean that the general rule doesn't exist, as California suggests. *See* Br. 40. Moreover, those exceptions are defined by history, not by plain text. Thus, "the Constitution presumptively protects" Plaintiffs' licensed carry in private businesses open to the public. *Bruen*, 142 S.Ct. at 2126.

California also argues that private property is outside the "core" of the Second Amendment, but again, *Bruen* repudiates locational distinctions and any analysis about the "core" of the right. The State also claims that Plaintiffs are arguing for carry without consent in a manner that violates the common law of trespass. Br. 41–42. Not so. The constitutional defect Plaintiffs identify is that the default rule (a presumption of carry in public places) is flipped—carry is not permitted unless a business owner so states. *See, e.g.*, *Christian v. Nigrelli*, 642 F. Supp. 3d 393, 408 (W.D.N.Y. 2022) (reasoning that this Nation has historically permitted carrying on private property absent the owner's permission). The law of trespass, specifically the "well-developed concept of implied license," allows individuals to enter property open to the public with a firearm unless the owner "withdraw[s] consent." *Koons v. Platkin*, No. 22-cv-7464, 2023 WL 3478604, at *58, *61 (D.N.J. May 16, 2023). Just as it would implicate the First Amendment to prohibit customers from entering businesses open to the public wearing a hijab or a Trump 2024 shirt inside without the owner's express consent, it implicates the Second to do the same for firearms. *Bruen* squarely holds that the Second Amendment is not a disfavored right and thus must be accorded the same respect accorded other enumerated rights. *See* 142 S.Ct. at 2156.

Finally, California argues that there is no state action because property owners choose whether to allow carry at their businesses. Precisely the opposite. State action exists because California is using its sovereign authority to set a no-carry default rule backed by criminal penalties. While property owners have a common law right to exclude, "*the state* may not unilaterally exercise that right and, thereby, interfere with the Second Amendment rights of law-abiding citizens who seek to carry" at private businesses open to the public. *Christian*, 642 F. Supp. 3d at 398. Laws like California's "do not enforce [a property owner's] authority over [its property]; they impose *governmental* authority, subject only to a [property owner's] veto." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011).

Every court faced with a no-carry default since *Bruen* has found that the Second Amendment's plain text covers plaintiffs seeking to carry in private businesses open to the public. And all those Courts have held that no-carry defaults are likely unconstitutional. *See, e.g.*, *Koons*, 2023 WL 3478604, at *68; *Christian*, 642 F. Supp. 3d at 407; *Wolford v. Lopez*, No. 23-cv-265, 2023 WL 5043805, at *29 (D. Haw. Aug. 8, 2023); *Siegel v. Platkin*, 653 F. Supp. 3d 136, 156–58 (D.N.J. 2023); *Kipke v. Moore*, No. 23-cv-1293, 2023 WL 6381503, at *14 (D. Md. Sept. 29, 2023); *cf. Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 345–46 (N.D.N.Y. 2022) (enjoining a no-carry default under the First Amendment).[3]

## B. California Ignores *Bruen*'s Methodological Instructions.

California does not meet *Bruen*'s "demanding" requirement, *Baird v. Bonta*, 81 F.4th 1036, 1046 (9th Cir. 2023), to show that its restrictions are "consistent with this Nation's historical tradition of firearm regulation," *Bruen*, 142 S.Ct. at 2135. Indeed,

---

[3] Several courts of appeals stayed these decisions pending appeal without any reasoning. The Third Circuit denied a motion to stay this aspect of the district Court's preliminary injunction order in *Koons* and *Siegel*.

California largely ignores *Bruen*'s instructions as to how analogical reasoning should proceed.

### 1. 1791 is the key time period for historical analysis.

California notes, as it must given binding Supreme Court precedent, that "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them[.]" Br. 42. Because the people adopted the Second Amendment in 1791, the public understanding of the right around that time controls. *See Bruen*, 142 S.Ct. at 2136. Despite that admission, California equivocates and states that the Founding era is not the key period for identifying analogues under *Bruen*. *See* Br. 9.

California is wrong. *Bruen* was explicit that "not all history is created equal." 142 S.Ct. at 2136; *see also id.* at 2137 (Sources originating "75 years after the ratification of the Second Amendment…do not provide as much insight into its original meaning as earlier sources."). Evidence that long pre- or post-dates 1791 is less probative. *See id.* at 2136–37. And laws from the 20th-century are categorically entitled to little or no weight. *See id.* at 2154 n.28; *see also* Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022), https://bit.ly/3RRRSmD.

*Bruen*'s reasoning also underscores that 1791 carries the most weight. After initially rejecting "medieval English regulations," 142 S.Ct. at 2139, *Bruen* turned to sources leading up to the ratification of the Second Amendment, including the 1689 English Bill of Rights. *See id.* at 2141–42. After finding these sources somewhat probative of the Amendment's general original meaning (i.e., that the right to bear arms is an individual, not a collective, right), the Court focused on "the history of the Colonies and early Republic," plus "the first decade after [the Second Amendment's] adoption." *Id.* at 2142–45. And it found that the challenged law had "no historical basis" because no analogue in that relevant historical period supported it. *Id.* at 2145. The Court then considered evidence prior to the Fourteenth Amendment's Ratification

in 1868 because such evidence could have informed its drafters. *See id*. at 2145–50. But it again found no representative or relevant historical analogue. *See id.*

Only after canvassing the historical evidence from these three periods did the Court discuss post-1868 sources and the late-19th century. *See id.* at 2150–56. But the Court found that much of this later evidence "conflict[s] with the Nation's earlier approach to firearm regulation" and is "most unlikely to reflect the origins and continuing significance of the Second Amendment." *Id.* at 2154 (cleaned up). Thus, the Court declined to rely on such laws and regulations. *See id.* at 2154–55. And it cautioned courts to likewise "guard against giving postenactment history more weight than it can rightly bear." *Id*. at 2136. In other words, the Founding era is the benchmark against which examples from later historical periods must be measured.

*Bruen*'s primary focus on the Founding is nothing new. The Court has employed the same reasoning in cases involving other incorporated rights. *See, e.g.*, *Ramos v. Louisiana*, 140 S.Ct. 1390, 1396 (2020) (discussing the history of a unanimous jury right by referencing "young American states" and the "backdrop" of the ratification of the Bill of Rights in 1791); *Timbs v. Indiana*, 139 S.Ct. 682, 687–88 (2019) (discussing "colonial-era provisions" and the "constitutions of eight States" when analyzing the Eighth Amendment excessive fines clause). *Bruen* cited these authorities in explaining why the period surrounding 1791 is the key era for analysis. 142 S.Ct. at 2137–38. While California points to *United States v. Alaniz*, to support its contention that post-1791 history is relevant, *see* Br. 9, it declines to mention that the government there offered "a number of founding-era statutes," allowing the Ninth

Circuit to conclude that a historical tradition is well-established, 69 F.4th 1124, 1129 (9th Cir. 2023).[4]

California does not attend to the Supreme Court's repeated focus on 1791 when presenting its analogues. Instead, California mentions only a few Founding-era and pre-1868 restrictions, preferring to skip straight to laws passed long after 1868 and into the 20th century. Br. 10–50. But it fails to explain how evidence long *post-dating* the Ratification of the Fourteenth Amendment could possibly inform its original public meaning, even if 1868 were the key date for state laws (which it is not). *Cf. e.g.*, *Ramos*, 140 S.Ct. at 1396 (looking to the "backdrop" of many state constitutions against which the Founders drafted and the states ratified the Sixth Amendment). This "freewheeling reliance on historical practice from the mid-to-late 19th century[,]" cannot establish the Second Amendment's meaning in either 1868 or 1791. *Bruen*, 142 S.Ct. at 2163 (Barrett, J., concurring).

To be sure, *Bruen* did not "need [to] address" the extent to which 1868 matters because "the public understanding of the right" at issue was "the same" in both 1791 and 1868. *Id.* at 2138. But it looked at both periods and used the Founding as the benchmark against which later historical periods must be measured. Nowhere does *Bruen* suggest that Reconstruction-era history, or history stretching into the 20th century, could drive the inquiry to the exclusion of Founding-era history or was more probative than the Founding era. On the contrary, the Court confirmed that "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* at 2137 (cleaned up). *Accord Espinoza v. Mont. Dep't of Revenue*, 140 S.Ct. 2246, 2258–59 (2020) (finding unpersuasive "more than 30" provisions of state law from the "second half of the 19th Century" because they were not grounded in Founding-era

---

[4] To the extent *Alaniz* invoked 18th century sources, most were in the period preceding the Fourteenth Amendment's ratification, unlike the laws from the late 1870s to the 20th century that California cites.

1   practices regarding the Free Exercise Clause). In other words, all post-Founding
2   evidence functions as "mere confirmation of what the Court thought had already been
3   established." *Bruen*, 142 S.Ct. at 2137 (cleaned up).

4   **2. Analogues must be well-established and relevantly similar.**

5   Any historical tradition California offers must be based on well-established,
6   relevantly similar analogues. For an analogue to be well-established, it must be
7   widespread during the relevant historical period. *See id.* at 2142 (doubting that three
8   colonial restrictions are enough to establish a tradition of banning public carry). In
9   other words, historical "outliers," such as territorial and local laws, are insufficient to
10  establish a tradition. *See id.* at 2153–54. And an analogue is "relevantly similar" if it
11  is comparable in "how and why" it burdens individuals' Second Amendment rights.
12  *Id.* at 2132–33. For "a general societal problem that has persisted since the 18th
13  century," the degree of relevance must be particularly tight—the "lack of a distinctly
14  similar historical regulation addressing that problem is relevant evidence that the
15  challenged regulation is inconsistent with the Second Amendment." *Id*. at 2131.

16  California resists these instructions from *Bruen*, *see* Br. 8–9 & n.5, but a
17  growing chorus of courts confirms how those instructions should be applied. *See, e.g.*,
18  *Koons*, 2023 WL 3478604, at *78 (finding a sensitive place restriction
19  unconstitutional in part because "only a handful of [analogous] state laws" existed);
20  *Wolford*, 2023 WL 5043805, at *18 (suggesting it could not credit any analogous law
21  "unless it was done in a state where a significant percentage of the people…resided");
22  *Antonyuk*, 639 F. Supp. 3d at 336–37 (finding that four state laws were outliers based
23  on the percentage of the population of the nation those four states contained).

24  Perhaps recognizing that it lacks any relevantly similar analogues, California
25  pivots to argue that the Court should also consider non-legal sources such as
26  newspapers and journals. *See* Br. 9. But *Bruen* held that only the "Nation's historical
27  tradition of firearm *regulation*"—duly promulgated laws—matters. In any event,
28  California and its historians provide only a few examples of these sources, and they

involve isolated incidents of arms confiscation in the same city nearly fifty years after the Second Amendment's ratification. *See* Schrag Decl. ¶ 15, Doc. 20-11. These sources are not viable analogues and they do not help California establish a historical tradition supporting the challenged restrictions.

### 3. California erroneously claims that technological and societal changes alter the analogical inquiry.

Seizing on language from *Bruen*, California argues that a "more nuanced" approach is appropriate in cases involving unprecedented societal concerns or dramatic technological changes. *See, e.g.*, Br. 8. And it suggests that gun violence is a pressing societal concern today. *See, e.g.*, *id.* at 8, 49. But *Bruen* explained that there is nothing remotely unprecedented about "firearm violence" or "'handgun violence.'" 142 S.Ct. at 2131. Indeed, "gun violence" as a societal "problem" has existed since the Founding. *Heller*, 554 U.S. at 636. Thus, the new societal concern emphatically cannot be gun violence. And, as just explained, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century," any historical analogues must be "distinctly similar." *Bruen*, 142 S.Ct. at 2131. The Ninth Circuit recently confirmed as much: "Because states in 1791 and 1868 also grappled with general gun violence, California must provide analogues that are distinctly similar" to its restrictions "in how and why they curtailed individuals' right to carry firearms." *Baird*, 81 F.4th at 1046 (cleaned up). These precedents squarely hold that a "more nuanced" approach to analogical reasoning, *e.g.*, Br. 8, is not warranted based on the societal problem of gun violence. *Bruen*'s passing reference to "unprecedented societal concerns or dramatic technological changes" does not alter the remainder of the opinion's reasoning requiring relevantly similar analogues. 142 S.Ct. at 2132.

### 4. California improperly expands what qualifies as a sensitive place, ignoring *Bruen*'s reasoning.

*Bruen* did not undertake a comprehensive historical analysis of sensitive places because doing so would have exceeded the question presented. Instead, *Bruen*

"assume[d] it settled" that firearms could be prohibited at legislative assemblies, polling places, and courthouses at the Founding. *See id.* at 2133. California erroneously expands the list to include schools, other government buildings, and their parking lots. Br. 7, 36. But *Bruen* identified a specific subset of government buildings—"legislative assemblies, polling places, and courthouses[.]" 142 S.Ct. at 2133. And it expressly relied on the tradition of public carry by black Americans for self-defense at schools in the years before the Fourteenth Amendment's ratification. *See id.* at 2151. California also incorrectly argues that *Bruen* accepted only a few analogues as sufficient to establish these places as sensitive. If true, that would make *Bruen* internally inconsistent. *See, e.g.*, *id.* at 2142 (doubting that three colonial restrictions are enough to support a restriction).[5] In any event, California claims these locations are the regulatory "floor" and proceeds to define what connects them broadly. *See, e.g.*, Br. 1, 7. According to the State, places are sensitive (1) because of the activities taking place there, including the exercise of constitutional rights, (2) because of their physical nature, including that they are crowded, and (3) because vulnerable people congregate there. *See id.*

California's framing is far too broad. The first category would sweep in virtually any public place, which plainly cannot be the rule after *Bruen*. And *Bruen* refutes the second category by explaining that a place does not become sensitive "simply because it is crowded[.]" 142 S.Ct. at 2134. Finally, history reveals that the Founding-era tradition was to *require* the bearing of arms around vulnerable people, such as in churches, because disarming the vulnerable and their caretakers makes them more defenseless, not less. *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 CHARLESTON L. REV. 205, 232–34 & n.108, 244

---

[5] While traditions must be representative, applying *Bruen*'s analogical reasoning test is not a mere bean counting exercise. The question is whether the modern restriction is consistent with the broader tradition or a departure. If it is a departure, a small number of laws will not suffice. If it is consistent, a smaller number of analogues may be acceptable.

(2018); Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. FIREARMS & PUB. POL'Y 1 (2004).

California's arbitrary and ahistorical classifications of sensitive places ignore "how" and "why" courthouses, legislative assemblies, and polling places were deemed sensitive at the Founding. These locations were sensitive because the government treated them as such by providing enhanced security. *See e.g.*, Kopel & Greenlee, *supra* at 292 ("When armed guards are present, the government takes the responsibility for having armed force at the ready to protect citizens."); Amicus Br. of Ctr. for Hum. Liberty at 8–17, *Antonyuk v. Nigrelli*, No. 22-2908 (2d Cir. Feb. 9, 2023), Doc. 313; Amici Br. of Citizens Comm. for the Right to Keep & Bear Arms, et al. at 8–17, *Koons v. Platkin*, No. 23-1900 (3d Cir. Aug. 16, 2023), Doc. 91.[6] California suggests that "armed security and access restrictions were limited, if they existed at all, for many early legislative assemblies," but cites only the U.S. Capitol as an example. Br. 38. In so doing, California ignores the wealth of Founding-era laws,

---

[6] Examples of Founding Era regulations in these places include: THE PUBLIC LAWS OF SOUTH CAROLINA 271 (Grimke ed., 1790) ("The Said sheriffs shall by themselves, or their lawful deputies respectively, attend all the courts hereby appointed, or directed to be held, within their respective districts"); VOTES AND PROCEEDINGS OF THE HOUSE OF DELEGATES OF MARYLAND: NOVEMBER SESSION 1791, at *2 (Green ed., 1795) (appointing sergeant at arms and door-keeper for state legislature); PENNSYLVANIA STATUTES AT LARGE, VOLUME X: 1779-81, 378 (Ray ed., 1904) ("sergeant-at-arms" and "door-keeper" for legislature); 1 LAWS OF NEW YORK 176 (2d ed. Albany: Websters & Skinner 1807) (requiring during court "all justices of the peace, coroners, bailiffs, and constables within their respective counties, that they be then and there in their own persons…. And the said respective sheriffs and their officers shall then and there attend in their own proper persons."); ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA 42 (Davis ed., 1796) (court's "serjeant at arms"); A DIGEST OF THE LAWS OF GEORGIA, 1800 Ga. Laws 611 (Watkins ed., 1800) ("[T]he sheriff of each county or his deputy, is required to attend at such elections, for the purpose of enforcing the orders of the presiding magistrates in preserving good order."); 1 LAWS OF NEW JERSEY 36 (Bloomfield ed., 1811) (polling places); 2 LAWS OF DELAWARE 984 (Adams eds., 1797) (polling places).

*see supra* n.5, providing security to courthouses, legislative assemblies, and polling places. The sensitive nature of these places was never a matter of simple government fiat.

California also misunderstands why students could be disarmed at the Founding. *See* Br. 37. As their own historian concedes, early firearms regulations on college campus disarmed students not because they are vulnerable but because their schools exercised *in loco parentis* authority over them. *See* Brewer Decl. ¶ 22, Doc. 20-1. *Accord Worth v. Harrington*, No. 21-cv-1348, 2023 WL 2745673, at *12–14 (D. Minn. Mar. 31, 2023). And these laws were more limited than California suggests; they applied only to students, not to faculty, staff, or visitors who were on campus. *See* Kopel & Greenlee, *supra* at 249–52; Ctr. for Hum. Liberty Br. 20–22 (collecting laws).

### C.   California's Historical Evidence Fails To Establish An Analogous Tradition Of Regulation For Each Of The Locations At Issue Here.

Applying *Bruen*'s framework faithfully, the State's historical evidence is both too little and too late. And a closer look at its primary sources reveals that "how" and "why" California's analogues burdened Second Amendment rights differ, rendering them unpersuasive.

### 1.   The no-carry default in businesses open to the public.

SB2 requires business owners to affirmatively announce that they allow individuals to exercise their constitutional rights on the premises. California has offered no relevantly similar analogues supporting this provision.

The State cites four pre-1791 laws from Pennsylvania, New Jersey, and New York, *see* Br. 43, but none are similar in "how" or "why" they burden Second Amendment rights. Start with "why" these laws were enacted. All are hunting restrictions. They reference killing deer, specific seasons for hunting, and preserving the rights of property owners to hunt on their own land. The 1721 Pennsylvania law limited deer hunting to certain months and banned "shoot[ing] at or kill[ing] with a

firearm any pigeon, dove, partridge, or other fowl…in the gardens, orchards and inclosures adjoining upon and belonging to any of the dwelling houses" within city limits. Comp. Ex. 17. The 1722 New Jersey law also limited deer hunting to specific months, forbade the sale of deer skins or venison within those months, and barred hunting on the private property of others without permission. *See* Comp. Ex. 18. The 1763 New York law singled out the carrying, shooting, or discharging of "any Musket, Fowling-Piece, or other Firearm-Arm whatsoever, into, upon, or through any Orchard, Garden, Cornfield, or inclosed Land whatsoever, within the City of New-York, or the Liberties thereof." Comp. Ex. 25. And the 1771 New Jersey law limited deer hunting to specific days, defined who was "qualified" to hunt on the "waste and unimproved Lands in this Colony," restricted the size of any "Trap of Steel or Iron," but also made clear its statute would not "restrain the Owners of Parks, or of Tame Deer, from killing, hunting, or driving their own Deer." Comp. Ex. 26.

As Blackstone explained at the time, words in statutes must be read in context. *See* 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 60 (1765) ("[W]ords are always to be understood as having a regard" to the "subject matter."). These colonial-era laws indisputably regulate hunting. Their titles confirm as much. *See* Comp. Ex. 17 ("An Act to Prevent the Killing of Deer out of Season, and Against Carrying of Guns or Hunting by Persons Not Qualified"); Comp. Ex. 18 ("An Act to prevent Killing of Deer out of Season, and against Carrying of Guns and Hunting by Persons Not Qualified"); Comp. Ex. 25 ("An Act to prevent hunting with Fire-Arms in the City of New-York"). These laws were enacted to regulate the times and places where colonists could hunt. *Accord Koons*, 2023 WL 3478604, at *66.

Next consider "how" these laws burdened Second Amendment rights. They prohibit hunting on land owned by others, rather than entering businesses open to the public with firearms. For example, Pennsylvania's 1721 law, New Jersey's 1722 law, and New York's 1763 law all refer to "inclosed Land." Comp. Ex. 17, 18, 25. New Jersey's 1771 law similarly prohibits people from carrying firearms for hunting on

"any [l]ands" not their own, or others' private property. Comp. Ex. 26. As the Supreme Court of Judicature of New Jersey explained in 1842, "inclosures, or inclosed fields [are] lands fenced in, and thus withdrawn and separated from the wastes or common lands." *State v. Hopping*, 18 N.J.L. 423, 424 (N.J. 1842). Thus, the plain language of these statutes does not broadly prohibit carry in businesses open to the public. Indeed, the laws make no reference to businesses or indoor enclosures whatsoever. Instead, they are best read as aggravated trespassing laws—they punished people who brought a firearm onto land where they had no right to be.[7]

These laws (other than New York's) also only refer to long guns, not handguns. This is evident from the fact that they ban only "guns." As Noah Webster explained in 1828, "one species of fire-arms, the pistol, is never called a *gun*." *Gun*, WEBSTER'S AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828). Colonial era statutes confirm that pistols were not referred to as "guns." Pennsylvania's 1721 law banned carry of *guns* on enclosed plantations but shooting *with a firearm* any fowl in the open streets of Philadelphia. Comp. Ex. 17. Massachusetts in 1746 similarly banned people from "discharg[ing] any gun *or* pistol, charged with shot or ball, in the town of Boston[.]" *See* Act of May 28, 1746, *in* 3 ACTS & LAWS OF MASSACHUSETTS BAY 306 (emphasis added). As these examples show, the difference between naming "guns" and omitting "pistols" is significant. *See* Catie Carberry, *What's in a name? The Evolution of the Term 'Gun'*, DUKE CTR. FOR FIREARMS L. (July 24, 2019), https://bit.ly/3MNPV7y. Thus, the statutes California cites not only were targeted at trespassers, but further they banned *only* long guns. This reaffirms that these statutes relate to hunting and imposed a materially different burden on ordinary, law-abiding citizens.

---

[7] Another indication that the colonial hunting laws did not have the broad reach of California's no-carry default is the lack of any evidence of prosecutions for violating the laws based on carrying firearms in businesses and other similar properties open to the public. *See Bruen*, 142 S.Ct. at 2149. This "barren record of enforcement" is an "additional reason to discount [the laws'] relevance." *Id.* at 2149 n.25.

California also cites three laws enacted decades after the Founding. *See* Br. 44. These laws flunk the relevantly similar analogue test too. The 1866 Texas law prohibited the carrying of firearms onto the "inclosed premises or plantations of any citizen" and the 1865 Louisiana law prohibited carry on plantations without consent. Comp. Exs. 65, 68. And both statutes were part of those states' discriminatory Black Codes enacted before they were readmitted to the Union, and thus should be dismissed as unpersuasive. *See, e.g.*, *Kipke*, 2023 WL 6381503, at *13; *Bruen*, 142 S.Ct. at 2149 (concluding that two discriminatory statutes were "surely too slender a reed on which to hang a historical tradition"). And the 1893 Oregon law—doubly unpersuasive because of its great distance from the Founding—specifically references "trespass[ing] upon any enclosed premises or lands[.]" Comp. Ex. 163. Moreover, it was understood at the time to prevent hunters from trespassing.[8]  Laws prohibiting hunting on private land are a world away from SB2, which prohibits everyday carry by law-abiding citizens for self-defense in businesses open to the public without express consent. Even if these laws were relevantly similar in "why" and "how" they burden Second Amendment rights, *Bruen* held that a few restrictions do not suffice to establish a national tradition. *See* 142 S.Ct. at 2142–43. This Court should follow the lead of the many courts enjoining these provisions as unconstitutional under the Second Amendment.

### 2.  Public gatherings and special events.

California fails to show that its restriction on carry at public gatherings is justified as part of this Nation's historical tradition. Its premise is that crowded places are sensitive places. Br. 16. But as explained *supra*, Part I.B.4, *Bruen* eviscerates that

---

[8] *See, e.g.*, *Thursday Paper* at 3, ALBANY WEEKLY HERALD (Sept. 28, 1893), https://bit.ly/3MJc075 (discussing the law as a trespass law related to "sportsmen"); *Monday Paper* at 2, THE EUGENE GUARD (May 15, 1893), https://bit.ly/3sCQt9A (calling enactment a "very stringent hunting law").

logic: a place does not become sensitive "simply because it is crowded[.]" 142 S.Ct. at 2134.

California ignores the historical fact that public gatherings of all sorts existed at the Founding. *See* Pls.' Mot. for Prelim. Inj. ("MPI") at 18, Doc. 6-1. (explaining that the Founders used public gatherings to speak about Independence and that colonists gathered to share concerns publicly). At one public gathering, now remembered as the Boston Massacre, British soldiers opened fire on a crowd of colonists in 1770. In defending the soldiers at trial, John Adams conceded that, in this country, "every private person is authorized to arm himself, and on the strength of this authority, I do not deny the inhabitants had a right to arm themselves at that time, for their defence." John Adams, Argument for the Defense (Dec. 1770), NAT'L ARCHIVES: FOUNDERS ONLINE, https://bit.ly/35FCuRh.

Indeed, Founding-era laws even *required* individuals to arrive armed at certain public gatherings. For example, *Heller* cited a 1770 Georgia law requiring men to carry firearms "'to places of public worship.'" 554 U.S. at 601 (citing 19 COLONIAL RECORDS OF GEORGIA 137–39 (Candler ed., 1911 (pt. 1)). Virginia enacted a similar law in 1755, which persisted until 1878, allowing each county's chief militia officer to order all enlisted militiamen "to go armed to their respective parish churches." 6 WILLIAM WALLER HENING, THE STATUTES AT LARGE, BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA 534 (1819); *see also* Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 LIBERTY UNIV. L. REV. 653, 697–99 (2014) (reviewing colonial and founding-era historical precedent for requiring firearms at church services).

Laws dating back to the colonial era similarly required firearms in all manner of public meetings. *See* J. HAMMOND TRUMBULL, THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, PRIOR TO THE UNION WITH NEW HAVEN COLONY 95 (Brown & Parsons eds., 1850) (1643 order) (ordering "that one person in every severall howse wherein is any souldear or souldears, shall bring a musket, pystoll or

some peece, w[i]th powder and shott to e[a]ch meeting"); 1 NATHANIEL B. SHURTLEFF, RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 190 (White ed., 1853) (1639 order) (ordering that "all such persons…shall come to the publike assymblyes with their muskets, or other peeces fit for service, furnished w[i]th match, powder & bullets…."); 3 ARCHIVES OF MARYLAND 103 (Browne ed., 1885) (1642 order) (ordering that every man "able to bear arms" must carry a firearm while at church); 1 RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND 94 (Bartlett ed., 1856) (1639 order) (ordering that "noe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword; and that none shall come to any public Meeting without his weapon"); 1 THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE 174 (Hening ed., 1808) (1631 law requiring "[a]ll men that are fittinge to beare armes, shall bringe their pieces to the church").

California does not counter this evidence. Instead, the State and its historians reach back to the 1300s to derive a tradition from the Statute of Northampton that it claims carried over into the colonies. *See* Br. 17–18. But *Bruen* unequivocally held that that "the Statute of Northampton…has little bearing on the Second Amendment adopted in 1791." 142 S.Ct. at 2139. First, the Court explained that it is too old to inform the meaning of the Second Amendment at the Founding. *See id.* at 2139–41. Second, it noted that its prohibition on going or riding armed did not contemplate handguns because they had not been invented. Instead, it focused on large weapons used in combat. *See id.* Third, the Court reasoned that the Statute of Northampton confirmed and echoed the common law "affray" tradition that individuals cannot go armed to terrify others. *See id.*; *see also Heller*, 554 U.S. at 587 n.10 (citing CHARLES HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822), for the proposition that "[i]n this country the constitution guarranties to all

persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify people unnecessarily").

Because the 1786 Virginia law that California cites forbidding carry in fairs and markets, *see* Br. 18, stems from the Statute of Northampton and prohibits going armed to terrorize others, *Bruen* rejected it as a viable analogue to laws prohibiting public carry by law-abiding citizens for self-defense, *see* 142 S.Ct. at 2143–44. California and its historians also cite a 1792 North Carolina law. Br. 18; Rivas Decl. ¶ 39 n.56, Doc. 20-9. But this putative law—dated after the Declaration of Independence and the Ratification of the Constitution—references what people cannot do by order of the King of England. Comp. Ex. 33. As a recent article explains, this citation is "bogus": "The actual source was a 1792 book by a lawyer who thought he was compiling the English statutes in force in North Carolina," but "[l]ater compilers wrote that this work 'was utterly untrustworthy'" and inserted many laws which were never in force. Stephen P. Halbrook, Faux Histoire *of the Right to Bear Arms*: Young v. Hawaii at 21, SSRN, https://bit.ly/3QyFZA5 (citation omitted). California's citation to Blackstone's commentaries for the proposition that civilians did not carry when attending public meetings, Br. 16, is similarly misleading. The line the State cites appears in a footnote to a paragraph about petitioning the King or either house of Parliament and relates to the particular historical context of 1815 England. Nowhere does the source suggest that such a law appeared in Founding-era America or informed the Second Amendment's drafting. Indeed, the statute discussed appears to blatantly violate the First Amendment right to peaceably assemble, and thus should not be considered probative of Second Amendment rights either.

California cannot escape that the colonial and Founding-era laws discussed above evince a tradition of permitting (indeed, *requiring*) guns at places where the public assembled. *See Koons*, 2023 WL 3478604, at *72–73 ("The colonial generation recognized that citizens attending public gatherings exposed themselves to violent attack…To abate that risk, American colonists obligated their citizenry to arm

themselves for protection."). To the extent California presents *later* analogues that conflict with this earlier tradition, they are "most unlikely to reflect the origins and continuing significance of the Second Amendment" and are thus "not…instructive." *Bruen*, 142 S.Ct. at 2154 (cleaned up). This Court can thus dispense with California's citations to laws from Texas in 1870, Tennessee in 1869, Georgia in 1870, Missouri in 1874 and 1879, Arizona in 1889, Oklahoma in 1890 and 1893, Idaho in 1901, Montana in 1903, and various local ordinances on this basis alone. *See* Br. 18–20.

Even taken on their own terms, these laws fail to show a tradition of prohibiting carry in places of public assembly. Given the political turmoil present in the post-Civil-War South, laws from that era and region are unlikely to be probative of the Second or Fourteenth Amendment's original meaning, much less a "National" tradition. Other features of these laws also render them inapt analogues. The 1874 Missouri law differs in "how" it burdens Second Amendment rights because it only prohibits concealed carry. *See* Comp. Ex. 91. As for the 1870 Georgia law, there is evidence that it was only selectively enforced. *See* DONALD L. GRANT, THE WAY IT WAS IN THE SOUTH: THE BLACK EXPERIENCE IN GEORGIA 122 (2001) (noting that white supremacists went armed to the polls despite this law to prevent Republicans from voting).

The 1889 Arizona and 1893 Oklahoma laws are both territorial restrictions, which *Bruen* expressly said are not probative because they were "transitory" and "temporary." 142 S.Ct. at 2155. And the 1901 Idaho and 1903 Montana laws are so far removed from the Founding that they cannot possibly form a historical tradition. *See id.* This Court may also summarily dismiss California's local ordinances, Br. 19–20, because *Bruen* rejected reliance on "localized" restrictions, 142 S.Ct. at 2154. *See also Wolford*, 2023 WL 5043805, at *22 n.18 (emphasis omitted) ("[T]he reliance on local ordinances that were enacted after the ratification of the Fourteenth Amendment cannot sufficiently assist in determining the prevailing understanding of the right to bear arms in public at the time of ratification.").

California is left with judicial opinions from a smattering of states upholding the laws just dismantled as proper analogues. Br. 20. One of these decisions, *Hill v. State*, dealt with an indictment for carrying in a courthouse, which Plaintiffs do not contest is a sensitive place. 53 Ga. 472 (Ga. 1824). Indeed, *Hill* explains that the government has a duty to protect people in courthouses, *id*. at 478, which supports Plaintiffs' theory that sensitive places at the Founding were those that had comprehensive security. Three other decisions (*Owens, Brooks*, and *Alexander*) are all from post-bellum Texas, a time and location that the Supreme Court dismissed as an "outlier[]" considering Texas's unique state constitutional provision regulating firearms. *Bruen*, 142 S.Ct. at 2153. *State v. Shelby* is similarly unpersuasive because it discussed a conviction for carrying while drunk, rather than general public carry for self-defense. *See* 2 S.W. 468, 468 (Mo. 1886). And *State v. Pigg*, upheld a conviction for carrying concealed under a law that did not disturb open carry. 85 Mo. App. 399, 402 (Mo. Ct. App. 1900). These decisions do nothing to show a tradition, dating from the Founding, barring carry by law-abiding citizens for self-defense at public gatherings.

### 3. Places Selling Alcohol for Consumption on the Premises.

The tradition of public carry in places where people congregated at the Founding just discussed eviscerates California's restrictions on carry in places selling alcohol for consumption on the premises. And its additional analogues for this category are not relevantly similar either.

As California's own experts concede, bars were widespread at the Founding. *See, e.g.*, Mancall Decl. ¶ 10, ECF 20-7 ("Alcohol-selling establishments across colonial North America and in the early American republic played a central role in the life of towns and cities alike."); *see also id.* ¶ 14 (noting that in Philadelphia, there was an establishment selling alcohol for every 158 residents by 1769). Like today, bars were crowded. *See, e.g.*, Rivas Decl. ¶ 23 (noting that small taverns "became full to overflowing" on certain days). And even though such establishments were "clearly

the number one exhibit in early America of a business regulated by government," Mancall Decl. ¶ 11, California points to *zero* laws restricting guns in them. This utter lack of regulation is dispositive under *Bruen*.

California and its historians cite several Founding-era laws restricting the sale of alcohol to militiamen while on duty. *See* Br. 21; Charles Decl. ¶¶ 22–23, Doc. 20-2. But "how" these laws burdened Second Amendment rights is dissimilar because they applied only to a select group of people (militiamen), and sometimes only when they were on duty. *See* Comp. Exs. 20, 22, 30. The 1756 Maryland law California cites is wholly dissimilar because it is a restriction on the sale of liquor on certain days, not the carriage of firearms. *See* Comp. Ex. 23 (prohibiting "vend[ing] Sell[ing] or Disposing of any Strong Liquor at any Place of training…belonging to the Militia on any muster day" except for certain times). The 1859 Connecticut law is also best read as a restriction on selling alcohol, not carrying guns. It directs law enforcement to remove "any booth, shed, tent, or other temporary erection" used for selling liquor within a mile of military parade grounds. Comp. Ex. 62. These laws are not remotely, let alone relevantly, similar to California's ban on carry in all places selling alcohol for consumption on the premises.

California's 19th century laws, like those it cites to support its public gathering restriction, Br. 22, come too late to inform the meaning of the Second Amendment. And most are from the western territories or localities, which are not probative for the reasons explained *supra* in Part I.C.2. Indeed, some only prohibited carry by intoxicated individuals, *see* Comp. Exs. 69, 100, 103, 119, and 144, a different "how" than SB2's broader restriction. These laws are even more inapt comparators considering that Plaintiffs here seek only to carry a firearm where *others* may be drinking alcohol; they do not drink while carrying. *See, e.g.*, Carralero Decl. ¶ 12; Ham Decl. ¶ 9; Schwartz Decl. ¶ 14.

Faced with the long history of alcohol-selling establishments and no relevantly similar laws banning carry in them, California retreats to familiar territory: interest

balancing. The State argues that mixing guns and alcohol poses unique dangers, and thus its restriction should be upheld for this reason. *See* Br. 23; *see generally* Mancall Decl. These entities were highly regulated at the Founding, but that regulation did not include restrictions on carrying firearms. Without any such examples, California's restriction must be enjoined.

### 4. Public Transportation.

California and its historians emphasize that modern "systems" of public transportation did not exist at the Founding. Br. 23–24; Rivas Decl. ¶ 68; Salzmann Decl. ¶ 84, Doc. 20-10. While the Founding generation may not have imagined particular modes of public transportation like subways or buses, public transportation in some forms did exist at the Founding. As explained, passengers used to share stagecoaches on journeys throughout the colonies before the Revolution and in the states after it. *See* MPI 20. Stagecoach services offering to carry goods and passengers were advertised in various states during the Founding era.[9] And arms, such as blunderbusses, were carried on stagecoaches. *See* Nicholas J. Johnson et al., SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 2195 (3d ed. 2021).

Additionally, individuals could use "public" ferries and riverboats at the Founding. 1 STATUTES AT LARGE OF VIRGINIA 152 (Shepherd ed., 1835), https://bit.ly/46aZdBo (establishing numerous ferries to be kept "constantly" and fixing rates); 9 STATUTES AT LARGE OF SOUTH CAROLINA 61 (1841), https://bit.ly/3QPuoxL (establishing a public ferry as early as 1725). While California attempts to limit the South Carolina law to its historical context, Br. 24 n.12; Rivas Decl. ¶ 64, it cannot deny that the plain text of this law allowed firearms on ferries.

---

[9] *Thursday Paper* at 4, THE PA. GAZETTE (Apr. 30, 1761), https://bit.ly/40sLdSo; *Tuesday Paper* at 3, SOUTH-CAROLINA GAZETTE; AND COUNTRY JOURNAL (Nov. 22, 1768), https://bit.ly/465hnV6; *Saturday Paper* at 4, INDEPENDENT GAZETTEER, (Aug. 31, 1782), https://bit.ly/3QQD6M8; *Wednesday Paper* at 4, POUGHKEEPSIE JOURNAL (Apr. 18, 1787), https://bit.ly/3QO5rTq.

Because California argues that public transportation in its modern form did not exist at the Founding, it posits that this restriction receives more "nuanced" treatment. Br. 23–24. But as explained *supra* Part I.A.3, nuanced does not mean different in kind. California must still present relevantly similar analogues. It may not hide behind the rationales that public transportation is "crowded," "confined," and serves vulnerable people, Br. 24, because a place does not become sensitive simply because it is crowded; as explained, the Founding-era tradition was to allow arms in public gatherings, including around the vulnerable. *See supra* Parts I.A.4, I.C.2. As before, the State comes up short. Its historians point only to late 19th century restrictions imposed by rail companies, not by States. *See* Rivas Decl. ¶¶ 66–67; Salzmann Decl. ¶¶ 69–77 (conceding that many rule books by train companies "do not mention firearms at all").

California then pivots to say that "many" public transportation facilities are government buildings, which *Bruen* supposedly identified as a "category of sensitive places." Br. 25. But *Bruen* identified only three specific government buildings where guns could be prohibited: legislative assemblies, polling places, and courthouses. 142 S.Ct. 2133. California cannot extrapolate from that, without any supporting analogues, to say that *all* public transportation facilities are government buildings and therefore sensitive places. In any event, it strains logic and language to suggest that a subway car or a public bus is a government building, and these facilities wholly lack the comprehensive government-provided security distinguishing that subset of government buildings at the Founding. *See supra* at Part I.B.4.

### 5. Gambling establishments, stadiums, and amusement parks.

California offers no relevantly similar analogues to support its restrictions in gambling establishments, stadiums, and amusement parks. California's experts confirm that gambling existed at the Founding. *See* Mancall Decl. ¶ 16 (discussing early bans on certain types of "'excessive gaming,'" and noting that "[s]mall-wage betting was still permissible, under certain rules"); Rivas Decl. ¶ 23 (noting that

activities such as "cockfighting, horse racing, and all manner of gambling" were "likely to take place" in Philadelphia at the Founding). And analogous locations to stadiums and amusement parks existed during the colonial and Founding-era. *See* MPI 14; *see also* Janet Davis, *America's Big Circus Spectacular Has a Long and Cherished History*, SMITHSONIAN MAG. (Mar. 22, 2017), https://bit.ly/47b9P4M (noting that the first circus was held in 1793 in Philadelphia and that George Washington attended). But even though gambling (in places like taverns) was highly regulated at the Founding, *see, e.g.*, Mancall Decl. ¶ 16, California offers no relevantly similar analogues supporting its restrictions on carry.

Instead, California again returns to the "tradition" "prohibiting the carry of firearms where people gather for social and entertainment purposes." Br. 26. For all the reasons described *supra* in Part I.C.2., this flies in the face of extensive colonial and Founding-era evidence supporting carry by law-abiding citizens for self-defense in places where people gathered. And the same reasons recited above for rejecting the 1786 Virginia law that derives from the Statute of Northampton, *see id.*, apply equally here. What makes a place sensitive is neither the nature of the property nor the types of people who frequent it, *see id.* at Part I.A.4, but rather that the government treats it as sensitive by providing comprehensive security.

In terms of new analogues, California offers only a few. Br. 26. Restrictions applicable only in New Orleans in 1816 and 1882 are "localized" and therefore not afforded weight under *Bruen* as part of a historical tradition. 142 S.Ct. at 2154. So too the 1853 New Mexico law, which is from a territory. *See id.* Even if they did, three laws are not enough to support a historical tradition. *See id.* at 2142.

California's policy considerations, Br. 26 n.15, are afforded no consideration under *Bruen*. *See* 142 S.Ct. at 2127. And if it is true that casinos are "more likely to have a connection to organized crime than other establishments," Br. 26 n.15, that heightens the need for law-abiding carriage there. *See, e.g.*, *Bruen*, 142 S.Ct. at 2158

(Alito, J., concurring) (noting that rising criminal violence "cause[s] law-abiding citizens to feel the need to carry a gun for self-defense").

This Court must enjoin these provisions because California presents no relevantly similar analogues.

### 6. Parks and zoos.

California's main argument about the remaining categories of places is that vulnerable people gather there. For the reasons discussed *supra* in Part I.A.4, whether vulnerable people gather in a place has no bearing on whether it is sensitive. And because California's few analogues banning firearms in parks originate long after the Founding era, *see* Br. 33–34, they are afforded little weight under *Bruen*. *See* 142 S.Ct. at 2154.

California attempts to draw distinctions between parks at the Founding and parks today. *See, e.g.*, Br. 32–34; Glaser Decl. ¶ 18; Young Decl. ¶¶ 15–16, Doc. 20-13.[10] But the State does not seriously dispute that open spaces where people gathered for recreation existed at the Founding as they do today. *See, e.g.*, Glaser Decl. at 7 (conceding that town greens served as public gathering spaces). As Plaintiffs explained, Boston Common is considered "America's oldest park" and was established in 1634. *Koons*, 2023 WL 3478604, at *83. And a National Park Service report states that "the Common was a place for recreation as early as the 1660s." *Boston Common*, NAT'L PARK SERV., https://bit.ly/3SGumtc (last visited Nov. 19, 2023); *see also* MPI 16–18 (collecting sources). And because militia could drill in such parks, *see, e.g.*, Young Decl. ¶¶ 15–16, guns were permitted. Government-controlled state parks resemble those early parks, but at even greater scale. Even

---

[10] California claims that parks in their modern form originated in the mid-nineteenth century. But the State's ordinances countenance other unconstitutional restrictions, so they are not probative of the Second Amendment's meaning. For example, the Boston ordinance banned solicitation and playing music, Comp. Ex. 125, and the Rochester ordinance banned uttering "loud or indecent language," Comp. Ex. 185. These restrictions in these ordinances suggest that mid-nineteenth century parks were refined, aristocratic spaces, *dissimilar* from modern parks and parks at the Founding, where anyone could gather for any purpose.

before *Bruen*, courts had rejected such locations as "sensitive places." *See* MPI 17–18 (collecting cases). Simply because more people will be carrying after *Bruen* does not suddenly make them sensitive.

Finally, zoos. While there do not appear to have been zoos in 1791 or a few decades thereafter, traveling showmen visited towns with menageries displaying exotic species for public viewing. *See* Vernon N. Kisling, Rick Barongi, Zoo and Aquarium History 141–44 (2d ed. 2022) (calling such menageries "popular" toward the end of the 18th century and listing the types of animals publicly displayed). California supplies no relevantly similar analogues banning carry around such menageries. This Court should join others in finding that zoos are not sensitive places. *See Koons*, 2023 WL 3478604, at *81; *Antonyuk*, 639 F. Supp. 3d at 326–27.

In sum, despite the existence of parks dating to the Founding, there is no relevantly similar historical tradition of banning firearms by ordinary, law-abiding citizens while in them.

### 7.  Health care facilities, museums, and libraries.

California again argues that its restrictions in these locations are justified because the nation has a tradition of regulating firearms in places of gathering for "literary," "educational," or "scientific purposes." Br. 34. Plaintiffs have already dismantled those laws as probative analogues. *See supra* Part I.C.2.

California again falls back on the factual argument that carbon copies of today's health care facilities, museums and libraries did not exist at the Founding. But that is not the inquiry *Bruen* demands. *See Wolford*, 2023 WL 5043805, at *21 ("The test in *Bruen* does not direct courts to look at when a historical place became akin to the modern place being regulated. Rather, the focus is on determining whether a historical regulation is a proper analogue." (cleaned up)). Rather, this Court must ask whether there were analogous places to these locations at the Founding, and if so, whether

California has produced relevantly similar analogues banning carry there. The State has not.

As Plaintiffs explain, locations providing medical care and places where individuals assembled for cultural or literary purposes existed at the Founding. *See* MPI 15–16. Another court recently agreed. *See Koons*, 2023 WL 3478604, at *93 ("[H]ospitals and medical care facilities existed before and after this Nation's founding."). That these facilities served mostly the poor at the Founding, *see, e.g.*, Kisacky Decl. ¶ 31, Doc. 20-6, does not change the fact that California points to no tradition of banning carry in them.[11]

So too museums and libraries. Such locations date back to the colonial era in the United States. *See* MPI 14–15 (collecting sources). And some opened to the public in the antebellum area. *See, e.g.*, *Charleston Museum*, VISIT HISTORIC CHARLESTON, https://bit.ly/3QPrrxe (opened to the public in 1824). While California states that their form and accessibility differ, again, that distracts from the key issue. Other courts have found that variations of libraries and museums existed at the Founding, and that no laws banned carry within them. *See Koons*, 2023 WL 3478604, at *86. This Court should do the same.

### 8. Parking lots of the challenged locations.

Because all the places just discussed are not "sensitive," their parking lots are not either. California offers 1776 Delaware and 1870 Louisiana laws prohibiting carry near polling places on election day, but these restrictions differ in "how" they burden Second Amendment rights given their limited duration and geographical scope.

---

[11] California notes that the poor could not afford guns, so such restrictions would not have been needed. Br. 29. This assumption is unsupported by evidence. Even if it were, there is no indication that doctors or visitors to such facilities could not afford guns or carry them at medical facilities. Indeed, there is historical evidence that doctors on house calls carried firearms. *See* RICHARD FROTHINGHAM, LIFE AND TIMES OF JOSEPH WARREN 452 (1865), https://bit.ly/3QRwjlq (noting that Founding Father and doctor Joseph Warren carried guns while visiting patients for medical house calls).

California's precedent, Br. 36–37, does not engage in *Bruen*'s analogical reasoning and is thus unpersuasive. These cases also only involved parking lots around government buildings. *United States v. Class* reasoned that guns could be banned in a parking lot 1,000 feet from the U.S. Capitol's entrance, but expressly noted that this area could be easily avoided and thus did not affect carry elsewhere in the District. 930 F.3d 460, 466–67 (D.C. Cir. 2019). Two other decisions, *Bonidy* and *Dorosan*, held that guns could be restricted in U.S. Postal Service parking lots. Br. 36–37. These parking lot bans do not compare to the burden on the right of self-defense imposed by banning carry in virtually every place open to the public throughout the state, making them inept analogues. *See Bruen*, 142 S.Ct. at 2133.

## II.    The Other Factors Favor a Preliminary Injunction.

When a party "has established likelihood of success on the merits of a constitutional claim—particularly one involving a fundamental right—the remaining *Winter* factors favor enjoining the likely unconstitutional law." *Junior Sports Mags. v. Bonta*, 80 F.4th 1109, 1120 (9th Cir. 2023); *see also Baird*, 81 F.4th at 1042 (noting that when a plaintiff shows likelihood of success on the merits of a constitutional claim, that "tips the merged third and fourth factors decisively in his favor.").

Just so here. It is evident that SB2 causes Plaintiffs irreparable harm by depriving them of their fundamental right to carry in public spaces. And as the Ninth Circuit recently noted in the Second Amendment context, the "deprivation of constitutional rights unquestionably constitutes irreparable injury." *Baird,* 2023 WL 5763345, at *4 (cleaned up). As for the final two factors, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002); *see also Baird*, 2023 WL 5763345, at *4. Thus, the remaining factors favor injunctive relief.

## III.    The Court Should Waive Bond or Require Only Nominal Security.

California did not oppose, and therefore forfeits, any argument against this Court either waiving Rule 65(c)'s bond requirement or imposing only a nominal bond.

*See* MPI 24. Because "requiring nominal bonds is perfectly proper in public interest litigation," *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005), this Court should waive Rule 65(c)'s bond requirement.

## IV.    Enforcement of Any Injunction Should Not Be Stayed Pending Appeal.

California preemptively asks this Court to stay the enforcement of any injunction pending appeal. *See* Br. 50. Should this Court rule in favor of Plaintiffs, California must separately move for a stay of the judgment while any such appeal is pending. *See* FED. R. APP. P. 8(a)(1). California's stay request is premature and should be denied.

## CONCLUSION

For all these reasons, this Court should enjoin enforcement of the challenged provisions of SB2.[12]

Dated:  November 20, 2023          BENBROOK LAW GROUP, P.C.


                                   /s/ Bradley A. Benbrook
                                   BRADLEY A. BENBROOK
                                   Attorneys for Plaintiffs

---

[12] Plaintiffs respectfully request that the Court excuse their late filing of a proposed Order, which Plaintiffs promptly remedied upon learning of its omission.

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiffs, certifies that this Reply brief contains 9,994 words, which complies with the 10,000 word limit set by court order dated October 11, 2023.


Dated: November 20, 2023                         BENBROOK LAW GROUP, P.C.

                                                 /s/ Bradley A. Benbrook
                                                 BRADLEY A. BENBROOK
                                                 Attorneys for Plaintiffs