1   BENBROOK LAW GROUP, PC
    BRADLEY A. BENBROOK (SBN 177786)
2   STEPHEN M. DUVERNAY (SBN 250957)
    701 University Avenue, Suite 106
3   Sacramento, CA  95825
    Telephone: (916) 447-4900
4   Facsimile: (916) 447-4904
    brad@benbrooklawgroup.com
5   steve@benbrooklawgroup.com

6
    Attorneys for Plaintiffs
7

8                   UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10

11  MARCO ANTONIO CARRALERO;            Case No.:  8:23-cv-01798 (CJC)
    GARRISON HAM; MICHAEL
12  SCHWARTZ; ORANGE COUNTY             **APPENDIX OF HISTORICAL
    GUN OWNERS PAC; SAN DIEGO           SOURCES CITED IN REPLY IN
13  COUNTY GUN OWNERS PAC;              SUPPORT OF PLAINTIFFS'
    CALIFORNIA GUN RIGHTS               MOTION FOR A PRELIMINARY
14  FOUNDATION; and FIREARMS            INJUNCTION**
    POLICY COALITION, INC.,
15                                      Hon. Cormac J. Carney
                    Plaintiffs,
16
            v.
17                                      Date:  December 20, 2023
    ROB BONTA, in his official capacity as   Time: 1:30 p.m.
18  Attorney General of California,     Courtroom:  9B
                                        Judge: Hon. Cormac J. Carney
19
20                  Defendant.

21

22

23

24

25

26

27

28

## APPENDIX OF NEW HISTORICAL SOURCES

| Exhibit # | Citation | Page # in Brief |
|---|---|---|
| 1 | THE PUBLIC LAWS OF THE STATE OF SOUTH CAROLINA 271 (Grimke, ed. 1790) | 12 |
| 2 | VOTES AND PROCEEDINGS OF THE HOUSE OF DELEGATES OF THE STATE OF MARYLAND: NOVEMBER SESSION 1791, at *2 (Green ed., 1795) | 12 |
| 3 | PENNSYLVANIA STATUTES AT LARGE, VOLUME X: 1779-81, 378 (Stanley Ray ed., 1904) | 12 |
| 4 | 1 LAWS OF THE STATE OF NEW YORK 176 (2nd ed., Albany: Websters & Skinner 1807) | 12 |
| 5 | ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA 42 (Davis ed., 1796) | 12 |
| 6 | A DIGEST OF THE LAWS OF THE STATE OF GEORGIA, 1800 Ga. Laws 611 (Watkins ed., 1800) | 12 |
| 7 | 1 LAWS OF THE STATE OF NEW JERSEY 36 (Bloomfield ed., 1811) | 12 |
| 8 | 2 LAWS OF THE STATE OF DELAWARE 984 (Samuel & John Adams, eds., 1797) | 12 |
| 9 | 1 Blackstone, Commentaries on the Laws of England, 60–62 (1765) | 14 |
| 10 | *Gun*, WEBSTER'S AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) | 15 |
| 11 | Act of May 28, 1746, ch. XI, Acts & Laws of Massachusetts Bay 208 | 15 |
| 12 | John Adams, Argument for the Defense: 3-4 December 1770, NAT'L ARCHIVES FOUNDERS ONLINE, https://bit.ly/35FCuRh | 16 |
| 13 | 6 WILLIAM WALLER HENING, THE STATUTES AT LARGE, BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 534 (Richmond, Franklin Press 1819) | 16-17 |
| 14 | Connecticut, Hammond Trumbull, The Public Records of the Colony of Connecticut, Prior to the Union with New Haven Colony, p. 95 (Brown & Parsons 1850) | 17 |
| 15 | Massachusetts Bay Colony, 1 Nathaniel B. Shurtleff, Records of the Governor and Company of the Massachusetts Bay in New England, p. 190 (White 1853) (1639 order) | 17 |
| 16 | Maryland, 3 Archives of Maryland, p. 103 (Browne 1885) (1642 order) | 17 |
| 17 | 1 Records of the Colony of Rhode Island and Providence Plantations, In New England, p. 94 (Bartlett 1856) (1639 order) | 17 |
| 18 | 1 The Statutes At Large: Being A Collection Of All The Laws Of Virginia, From The First Session Of The Legislature, p. 174 (Hening 1808) | 17 |
| 19 | DONALD L. GRANT, THE WAY IT WAS IN THE SOUTH: THE BLACK EXPERIENCE IN GEORGIA 122 (2001) | 19 |
| 20 | The Pennsylvania Gazette, 30 Apr 1761, Thu Page 4, https://bit.ly/40sLdSo | 22 |

| 21 | South-Carolina Gazette; and Country Journal, 22 Nov 1768, Tue · Page 3, https://bit.ly/465hnV6 | 22 |
|----|---|----|
| 22 | Independent Gazetteer, 31 Aug 1782, Sat · Page 4, https://bit.ly/3QQD6M8 | 22 |
| 23 | Poughkeepsie Journal, 18 Apr. 1787, Wed Page 4, https://bit.ly/3QO5rTq | 22 |
| 24 | STATUTES AT LARGE OF VIRGINIA, Vol. I., at 152 (Shepherd 1835), https://bit.ly/46aZdBo | 23 |
| 25 | 9 STATUTES AT LARGE OF SOUTH CAROLINA 61 (1841), https://bit.ly/3QPuoxL | 23 |
| 26 | VERNON N. KISLING, RICK BARONGI, ZOO AND AQUARIUM HISTORY, at 141–44 (2d ed. 2022) | 26 |
| 27 | RICHARD FROTHINGHAM, LIFE AND TIMES OF JOSEPH WARREN, at 452 (1865), https://bit.ly/3QRwjlq | 27 |
| 28 | Albany Weekly Herald, 28 Sep 1893, Thu, Page 3, https://bit.ly/3MJc075 | 16 |
| 29 | The Eugene Guard, 15 May 1893, Mon, Page 2, https://bit.ly/3sCQt9A | 16 |

# EXHIBIT 1



_Edw.ᵈ Thomas Jr._
_1798_

THE

# P U B L I C   L A W S

OF THE STATE OF

# SOUTH-CAROLINA,

_FROM ITS FIRST ESTABLISHMENT AS A BRITISH PROVINCE DOWN TO THE YEAR 1790, INCLUSIVE,_

IN WHICH

IS COMPREHENDED SUCH OF THE STATUTES OF GREAT BRITAIN AS WERE MADE OF FORCE BY THE ACT OF ASSEMBLY OF 1712,

With an Appendix containing fuch other Statutes as have been enacted or declared to be of force in this State, either virtually or exprefsly,

TO WHICH IS ADDED

THE TITLES OF ALL THE LAWS (WITH THEIR RESPECTIVE DATES) WHICH HAVE BEEN PASSED IN SOUTH-CAROLINA DOWN TO THE PRESENT TIME,

ALSO

The Conftitution of the United States with the amendments thereto,

AND LIKEWISE

_THE NEWLY ADOPTED CONSTITUTION OF THE STATE OF SOUTH-CAROLINA._

TOGETHER WITH A COPIOUS INDEX TO THE WHOLE.

_By the Honorable JOHN FAUCHERAUD GRIMKÉ, Efq. A. B. & L. L. D. and one of the afsociate Judges of the Superior Courts in the State of South-Carolina._

LAW

P H I L A D E L P H I A:

PRINTED BY R. AITKEN & SON, IN MARKET STREET.

## of South-Carolina.

the fum of £2000 proclamation money, to the public-treafurer, in behalf of the public of this Province, for the due and faithful difcharge and execution of their faid offices: And the faid bonds fhall remain in his office, and may be fued for, by order of the faid court, for fatisfaction of the public, and all private perfons aggrieved by the mifconduct of the faid fheriffs. And, in cafe of the death, removal from this Province, or refufal to act, of any perfons fo appointed fheriffs, &c.‡

IX. The faid fheriffs fhall by themfelves, or their lawful deputies refpectively, attend all the courts hereby appointed, or directed to be held, within their refpective diftricts. ‖ And that the faid fheriffs, fhall have the like powers and authorities; and they, and their under fhe-riff, or gaoler, be fubject and liable to all actions, fuits, fines, forfeitures, penalties, and dif-abilities whatfoever, which any fheriff, under-fheriff, or gaoler, is liable or fubject to, or may in-cur by the laws and ftatutes of Great-Britain, for and in refpect of the efcapes of prifoners, or for, or in refpect of any other matter or thing whatfoever, relating to, or concerning their feveral and refpective offices.

X. *The firft part of this claufe is obfolete.* No fheriff, under fheriff, fheriff's clerk, or other fheriff's officer, fhall be an attorney, or act as fuch, in his own name, or in the name of any other perfon, or be allowed to plead or practice in any of the King's courts in this Province, during the time that he is in any fuch office.§

XI. ¶ And, for the eafe of fheriffs, with regard to the return of procefs: *Be it enacted by the authority aforefaid,* That the fheriffs of each diftrict or precinct, fhall, at the expiration of his office, turn over, to the fucceeding fheriff, by indenture and fchedule, all fuch writs and procefs, as fhall remain in his hands unexecuted, who fhall duly execute and return the fame. And in cafe any fuch fheriff, fhall refufe or neglect to turn over fuch procefs, in manner afore-faid, every fuch fheriff, fo neglecting or refufing, fhall be liable to make fuch fatisfaction, by damages and cofts, to the party aggrieved, as he, fhe, or they fhall fuftain by fuch neglect or refufal: And the faid fheriff fhall alfo deliver up to his fucceffor, the cuftody of the gaol, and the bodies of fuch perfons who fhall be confined therein, and the caufe of their detention.

XII. The fees to the judges, and feveral officers of the faid courts, for bufinefs done by them refpectively, fhall be the fame as thofe of the fame officers in the courts now holden in Charleftown for the like bufinefs, except where the proceedings fhall be fummary as above-mentioned; and the fheriffs fhall have the fame fees, for bufinefs done therein by them, as the provoft-marfhal is now entitled to, except in the cafes of fummary jurifdiction; and alfo except, that all mileage fhall be computed from the court-houfes in the feveral diftricts.

XIII. *Obfolete.*

XIV. This act fhall not extend to any action, which fhall be commenced before notice by pro-clamation, of the Governor or Commander in Chief, that the faid court-houfes and court-houfes are built and completed ; but all fuch actions and fuits, fhall and may be proceeded in, and determined in the fame manner, as if this act had never been made. And no perfon fhall be obliged to ferve as a juror, out of the diftrict or precinct wherein he fhall by this act be liable to ferve, after courts have been therein refpectively holden.

XV. *No clerk of any of the courts aforefaid, fhall act as an attorney or folicitor therein, or in any other court: And no perfon fhall practife in, or folicit in the caufe of any other in the faid courts, unlefs he has been or fhall be admitted a barrifter at law, or an attorney thereof, by the court of common pleas in Charleftown; or an attorney of that court, and an inhabitant of this province.

XVI. The faid courts fhall be courts of record, and all perfons neceffarily going to, attend-ing, or returning from the fame, fhall be free from arrefts in any civil action.

XVII. *And be it further enacted by the authority aforefaid,* That as foon as may be, after the ratification of this act, and after the court-houfes and goals herein mentioned are built, the judges of the faid court of common pleas in Charleftown, fhall caufe lifts of jurors in civil caufes, grand and petit juries, to be made for Charleftown, and alfo for each of the country diftricts and precincts, from the next antecedent tax lift of perfons within fuch refpective dif-tricts or precincts aforefaid, whofe names fhall be written on feparate pieces of paper: And the faid judges, fhall caufe jury-boxes to be made for the faid courts, and for the courts of ge-neral

*(marginal notes, right column:)*

A. D. 1769.
No. 1093.
In cafe of death, &c. how others fhall be appoint-ed.

The fheriffs, by themfelves, or lawful deputies, fhall attend all the courts in their refpective diftricts. And fhall have the fame powers, and be fubject to the like pe-nalties as the fheriffs in Great Britain.

Now fhall any fheriff, or officer under him, be allowed to plead or practife in faid courts.

How a fheriff fhall deliver up his office to his fucceffor.

Except on fum-mary proceed-ings, the fees of the judges and other officers, fhall be the fame as they now are.

All actions com-menced before this act fhall operate, to be proceeded on and determined, as if it had never been paffed. No clerks of faid courts al-lowed to act as attornies or fo-licitors; nor other perfons but fuch as are herein fpecified. Said courts de-clared of record, ing the fame, freed from at-refts.
Jurors how to be drawn, &c. after the courts houfes & gaols are built.

‡ See 31 §. of do.   All the reft of this claufe is altered or obfolete.
‖ See A. A. 19th February, 1758.
§ See A. A. 1789.   This claufe is copied nearly from 1 H. 5. c. 4.
¶ Copied nearly from 20 G. 2 c. 37.
* See A. A. 1789.

# EXHIBIT 2

# VOTES and PROCEEDINGS

OF THE

# HOUSE OF DELEGATES

OF THE

# STATE of MARYLAND.

## NOVEMBER SESSION, 1791.

Being the FIRST SESSION of this ASSEMBLY.

### TUESDAY, November 8, 1791.

MONDAY the feventh inftant being the day appointed by the conftitution and form of government for the meeting of the legiflature of this ftate, feveral of the members of this houfe accordingly met on that day, and a fufficient number of members to proceed on bufinefs not appearing, the houfe adjourned until this day, when the following members appeared, viz.

For SAINT-MARY's county,
Mr. Henry James Carroll,
Mr. William Thomas, jun.
Mr. James Hopewell,
Mr. Thomas Bond.
    KENT county,
Mr. James Ringgold,
Mr. Cornelius Comegys.
    ANNE-ARUNDEL county,
Mr. John G. Worthington,
Mr. John F. Mercer,
Mr. Nicholas Worthington.
    CALVERT county,
Mr. John Chefley.
    CHARLES county,
Mr. William H. M'Pherfon,
Mr. Henry Henley Chapman.
    BALTIMORE county,
Mr. Charles Ridgely, of Wm.
Mr. Charles Ridgely,
Mr. Harry D. Gough.
    TALBOT county.
Mr. Hugh Sherwood,
Mr. David Kerr,

Mr. James Tilghman,
Mr. Woolman Gibfon.
    SOMERSET county,
Mr. George Waggaman,
Mr. Levin Winder,
Mr. Tubman Lowes.
    DORCHESTER county,
Mr. William Goldfborough,
Mr. Mofes Lecompte,
Mr. Solomon Frazier,
Mr. John Ecclefton.
    CÆCIL county,
Mr. Samuel Miller,
Mr. Richard Bond,
Mr. Henry Hollingfworth.
    PRINCE-GEORGE's county,
Mr. Thomas Marfhall,
Mr. Thomas Clark.
    CITY of ANNAPOLIS,
Mr. Allen Quynn,
Mr. Gabriel Duvall.
    QUEEN-ANNE's county,
Mr. John Seney,

Mr. Robert Wright,
Mr. James O'Bryon,
Mr. Jacob Barnes.
    WORCESTER county,
Mr. Benjamin Dennis,
Mr. John Holland,
Mr. John Ratcliff,
Mr. John Purnell Marfhall.
    FREDERICK county,
Mr. John Rofs Key,
Mr. William Beatty,
Mr. Patrick S. Smith,
Mr. George Burkhart.
    HARFORD county,
Mr. Edward Prall,
Mr. John Love,
Mr. William Wilfon.
    CAROLINE county,
Mr. Jofeph Douglafs.
    WASHINGTON county,
Mr. Benoni Sweaingen.
    ALLEGANY county,
Mr. Daniel Crefap, jun.

A fufficient number of members being convened, they feverally qualified in the prefence of each other, by taking the feveral oaths required by the conftitution and form of government, fubfcribing a declaration of their belief in the chriftian religion, and by taking, repeating and fubfcribing, the oath to fupport the conftitution of the United States.

The houfe proceeded to ballot for a fpeaker, and the ballots being depofited in the ballot box, it appeared, upon examining the ballots, that the honourable Levin Winder, Efquire, was unanimoufly elected.

The houfe appointed Mr. William Harwood clerk. ORDERED, That he qualify as fuch, by taking the feveral oaths required, fubfcribing a declaration of his belief in the chriftian religion, and by taking the oath to fupport the conftitution of the United States, and an oath that he will honeftly, faithfully

Case 8:23-cv-01798-CJC-ADS   Document 29-1   Filed 11/20/23   Page 9 of 116   Page ID
#:1895

## 2  VOTES AND PROCEEDINGS, November, 1791.

faithfully and diligently, difcharge the office of clerk to the houfe of delegates of Maryland, and that he will not reveal or difclofe the fecrets thereof.

The houfe appointed Mr. Cornelius Mills fergeant at arms, and Mr. Charles Hogg door-keeper, ORDERED, That they be qualified.

On motion, ORDERED, That Mr. Tilghman and Mr. Mercer wait on his excellency the governor, and inform him that this houfe is met, and are ready to proceed on public bufinefs, and to receive any thing that he may have to lay before them.

On motion, ORDERED, That Mr. Wright, Mr. Quynn, Mr. Seney, Mr. N. Worthington, Mr. Lecompte, Mr. Duvall and Mr. Mercer, be a committee to examine and infpect the returns of elections, and report whether they have been made agreeably to the mode prefcribed by the conftitu- tion and form of government; and that they have power to fend for perfons, papers and records.

ORDERED, That Mr. Duvall, Mr.'John G. Worthington, Mr. James Tilghman, Mr. Ridgely, of Wm. and Mr. Chapman, be a committee of grievances and courts of juftice ; and that they have power to fend for perfons, papers and records.

ORDERED, That Mr. Quynn, Mr. Waggaman and Mr. N. Worthington, be a committee to inquire what laws have expired, or will expire during this feffion, or at the clofe thereof.

RESOLVED, That this houfe will fit, during this feffion, for the difpatch of public bufinefs, from nine o'clock in the morning until three in the afternoon.

RESOLVED, That the following rules be obferved during this feffion.

1. At the hour appointed for fitting the roll of the houfe fhall be called over, and the abfent mem- bers, if any, fent for.

2. Every member fhall take his feat when the fpeaker takes the chair, and remain uncovered until the houfe rifes.

3. Every member who fhall deliver his opinion, or fpeak in any debate, fhall ftand up in his place, and with refpect and decency addrefs himfelf to the fpeaker.

4. No member, at the time of his fpeaking in debate, fhall name any other by his proper name, but fhall ufe fome other diftinction.

5. If two or more members fhall rife to fpeak at the fame time, the fpeaker fhall declare which fhall fpeak firft.

6. No member fhall fpeak oftener than twice in any debate, except with leave, nor fhall any member be interrupted while he is fpeaking in order.

7. Any member called to order by the fpeaker, or any member, muft thereupon take his feat.

8. When the houfe is fitting, no member fhall fpeak to another fo as to interrupt any member who may be fpeaking in debate.

9. No motion fhall be debated until the fame be feconded, and (if defired by the fpeaker or any member) reduced to writing, delivered in at the table, and read by the clerk.

10. When a motion is made and feconded, the matter of the motion fhall receive a determination by the queftion, or be poftponed by general confent, or the previous queftion, before any other mo- tion fhall be received.

11. Every queftion fhall be entered on the journal, and the yeas and nays may be called for by any member on any queftion, and the name of the member requiring them fhall be entered on the journal.

12. The previous queftion, that is, Whether the queftion propounded be now put ? may be called for by any member on any queftion, except to an amendment, or other matter which cannot in its nature be poftponed.

13. If a queftion in debate contains more parts than one, any member may, (of right) have the fame divided into as many queftions as parts.

14. All queftions fhall be determined by the majority of the members prefent, and whenever the fpeaker (on a divifion if called for) fhall declare any queftion in the affirmative or negative, fuch declaration fhall decide the majority, unlefs the yeas and nays be called for, in which cafe the queftion fhall be determined as the majority fhall appear on the journal.

15. Every bill brought in by a member, or received from the fenate, fhall be read on two feveral days, with an intermiffion of one day at leaft, during which time it fha'l lie on the table for the perufal of the members, unlefs on very urgent occafions the houfe fhall, by efpecial order, difpenfe with this rule, which order fhall be entered on the journal.

16. Conferrees, and members appointed on draughts, if required by a member, fhall be elected by ballot, and the number fhall in no cafe exceed feven.

17. No bill or refolve fhall have a fecond reading until every member in the city be called upon to attend, except he be excufed by the houfe for indifpofition, or neceffary attendance on the public bufinefs.

18. No petition, memorial, or other application to the houfe, fhall be received, unlefs prefented by a member.

19. On an election to any office of truft or profit, no ballot fhall be counted, unlefs the perfon for whom the ballot fhall be given be named to the houfe before the balloting be gone into.

20. All queftions of order fhall be declared by the fpeaker.

21. No motion fhall be made after the hour of adjournment, without leave of the houfe.

22. All mifdemeanors which fhall happen in the houfe, fhall be cenfured or fined by the houfe.

23. No member fhall anfwer on the yeas and nays who did not divide on the queftion, and if any member divides on one fide, and on the yeas and nays anfwers on the other, it fhall be fo noted on the journal.

24. All

# EXHIBIT 3

# THE

# Statutes at Large

OF

# PENNSYLVANIA

FROM

# 1682 to 1801

COMPILED UNDER THE
AUTHORITY OF THE ACT OF MAY 19 1887 BY
JAMES T. MITCHELL AND HENRY FLANDERS
COMMISSIONERS

VOLUME X
1779 to 1781

WM. STANLEY RAY
STATE PRINTER OF PENNSYLVANIA
1904

The other members of the house of assembly, for every day's
attendance, each the sum of fifteen shillings.

The clerks of the house of assembly, for every day's at-
tendance, the sum of one pound.

The sergeant-at-arms, for every day's attendance, the sum
of ten shillings.

The door-keeper of the council and the door-keeper of the
house of assembly, each the sum of ten shillings for every
day's attendance.

[Section III.] (Section IV, P. L.) And be it further enacted
by the authority aforesaid, That every delegate in Congress
and member of council shall be further allowed, towards his
traveling charges, after the rate of six pence per mile, once
in every three months, in coming in and going from the places
where the Congress and council shall respectively sit, provided
he shall so often actually visit his family; and that every
member of assembly shall be further allowed, towards his
traveling charges, after the same rate, once in each sitting
of the house; which said wages and traveling expenses shall
be paid by the treasurer of this state to the delegates represent-
ing this state in Congress, and to the members of the council
and their door-keeper, on the drafts of the president or vice-
president in council; and to the speaker and other members of
assembly, to the clerk of the assembly, sergeant-at-arms and
door-keeper, on the drafts of the speaker of the house, signed in
assembly.

[Section IV.] (Section V, P. L.) And be it further enacted
by the authority aforesaid, That so much of any act of assem-
bly heretofore made as declares what salaries shall be paid to
the several officers of government and what wages shall be al-
lowed to the speaker and other members of assembly, to the
delegates representing this state in Congress, to the members
of council and others herein specially mentioned shall be and
is hereby repealed.

Passed December 27, 1781. Recorded L. B. No. 1, p. 264. See the
Acts of Assembly passed February 25, 1783, Chapter 1005. The Act
in the text was repealed by Acts of Assembly passed March 25, 1785,
Chapter 1142; September 17, 1785, Chapter 1185.

# EXHIBIT 4



*Wm. W. Van Wagenen*

# L A W S

OF THE

## State of New-York.

PUBLISHED BY AUTHORITY.

IN TWO VOLUMES.

*VOL. I.*

A L B A N Y:
PRINTED BY CHARLES R. AND GEORGE WEBSTER,
1802.

people of the state of New-York, and the bodies of the
same city and counties respectively, and to do and receive
all those things, which on the behalf of the people of the
state of New-York shall be then and there enjoined them ;
and also all the prisoners then being in the gaols thereof,
together with their attachments, indictments and all other
minuments, any ways concerning those prisoners ; and
*And petit* likewise so many good and lawful men of the same city
*jurors.* and counties respectively, duly qualified to serve as jurors
therein, as the said courts of oyer and terminer and gaol
delivery, or any justice thereof, shall from time to time
direct, by whom the truth of the matter may be the bet-
ter known, and enquired into, and who have no affinity to
those prisoners. And the said respective sheriffs shall
*And to pro-* cause to be publicly proclaimed throughout their respec-
*claim the* tive counties, that all those who will prosecute against
*court, and* those prisoners, be then and there to prosecute against
*notify prose-* 
*cutors, and* them as shall be just ; and shall also give notice to all jus-
*officers to at-* tices of the peace, coroners, bailiffs, and constables with-
*tend.* in their respective counties, that they be then and there
in their own persons, with their rolls, records, indictments,
and other remembrances, to do those things, which to
their offices in that behalf shall appertain to be done. And
*Sheriffs and* the said respective sheriffs and their officers shall then
*their officers* and there attend in their own proper persons, to do those
*to attend.* things which to their offices shall appertain. *And further,*
*District attor-* That the district attornies shall from time to time as soon
*nies to issue* as conveniently may be, after every circuit court shall be
*precepts.* appointed to be held, in the cities and counties of this
state, within their respective districts, and at least fifteen
days before the time of holding the same, issue precepts un-
der the seal of the supreme court, directed to the respective
sheriffs of the same cities and counties, for the purposes
aforesaid, mentioning the day and place, when and where,
the said courts are to be held, and commanding the said
sheriffs respectively, to do what is hereby required of
them, and that the said precepts shall always be in the
name of the people of the state of New-York, and be test-
*Teste of such* ed in the name of the chief justice of the said supreme
*precept.* court. *Provided,* That in case the office of chief justice shall
be vacant, the precepts shall be tested in the name of the
next senior justice of the said supreme court, and the said
precepts may be tested on any day of the term preceding
the vacation in which the court is to be held.

*Special com-*     XII. *And be it further enacted,* That it shall be lawful
*missions of* for the person administering the government of this state,
*oyer and ter-* by and with the advice and consent of the council of ap-
*miner and* 
*gaol delivery* pointment, to grant and issue commissions of oyer and
*may be issued.* terminer and gaol delivery, or either of them, in the
manner and form heretofore used, at any time hereafter,
when and as often as occasions require : But the justices

Case 8:23-cv-01798-CJC-ADS   Document 29-1   Filed 11/20/23   Page 15 of 116   Page ID #:1901

# EXHIBIT 5



# ABRIDGMENT

*nos*

OF THE

# PUBLIC PERMANENT LAWS

O F

# VIRGINIA.

THE REPEALING CLAUSES IN THE SEVERAL LAWS WHICH
HAVE THEM, ARE REDUCIBLE TO A FEW FORMS, AND
ARE ALIKE IN GENERAL. TO PREVENT THE SWEL-
LING OF THE BOOK UNNECESSARILY, AND YET
TO GIVE AT THE SAME TIME THE OPERA-
TIVE WORDS OF EVERY LAW, REFER-
ENCE IS MADE AT THE CLOSE OF EVE-
RY LAW TO THE FORM OF REPEAL
AS IT IS SET FORTH VERBATIM
IN THE APPENDIX.

EVERY ACT PASSED ON OR AFTER OCTOBER 19, 1792, IS TO BE
UNDERSTOOD TO CONTAIN THE FOLLOWING CLAUSE
OF COMMENCEMENT: " THIS ACT SHALL COMMENCE
" IN FORCE FROM AND AFTER THE PASSING
" THEREOF ;" UNLESS ITS COMMENCEMENT
SHALL BE PARTICULARLY EXPRESSED TO
BE ON A DIFFERENT DAY, OR IN A DIF-
FERENT FORM. THOSE ACTS WHICH
PASSED BEFORE THE 19th OF OC-
TOBER, 1792, AND COMMENCE
THEIR OPERATION ON A
DIFFERENT DAY FROM
THE DAY OF THEIR
PASSING, WILL
BE SPECIFIED.

THE DATE PREFIXED TO EACH LAW IS THE DAY ON
WHICH IT PASSED.

---

*R I C H M O N D :*

PRINTED BY AUGUSTINE DAVIS,
M,DCC,XCVI.

1796

UNIV. OF MICH. LAW LIBRARY.

Google

42                                     *Courts.*

X.  The said court shall have power to appoint a clerk, who shall hold his office during good behaviour, and be entitled to such fees or salary as the legislature may appoint, as also a serjeant at arms: And in case of a vacancy, in the recess of the said court, the said judge may make the like appointments under his hand and seal, during a vacation; and such succeeding clerk or serjeant, having, in any court of record, taken the oaths required by law, shall exercise the same power, perform the same duties, and be entitled to the same fees and profits, as if he had been appointed in term time. *(a)*

XI.  It shall be lawful for the high court of chancery to send any matter of law to the general court, for their opinion to be certified thereupon. *(b)*

XII.  Although any of the defendants, whether debtors or others, in any suit instituted in the said court, shall be absent from the commonwealth, the court may nevertheless proceed to a hearing and decree therein, as in the case of absent debtors having effects within the commonwealth. *(c)*

XIII.  The said court in its discretion, may direct an issue to be tried, whenever it shall be judged necessary, either in that court, or in any other court whatsoever, as justice or convenience to the parties may require, and in all other cases the mode of trial shall be the same as hath been heretofore used and practised in the courts of chancery in Virginia. *(d)*

XIV.  If a majority of the judges of the general court be interested in any suit, which in the case of any other person would have been proper for the jurisdiction of such court, it may be lawful to institute such suit in the high court of chancery, where proceedings shall be had conformably to the rules of the general court, and process shall be returnable as the high court of chancery shall direct; and thereafter an appeal may be entered to the court of appeals. *(e)*

XV.  It shall be lawful for the said court to arrange the business thereof, in the most convenient and equitable manner. *(f)*

XVI.  Any party thinking himself aggrieved by a decree of the court of a county, city, or borough, in chancery, and not having entered an appeal from the decree at the time it was pronounced, may appeal from such decree at any time within one month after the decree pronounced, lodging for that purpose with the clerk of the high court of chancery, a copy of the proceedings in the suit, and a petition suggesting error in the decree, signed by some counsel attending the high court of chancery, and also lodging with the [petition a bond executed by the appellant or his agent, and a surety or sureties with the like condition as is annexed to other appeal bonds, and affidavits, or solemn affirmations, verifying the sufficiency of the sureties; and the clerk shall thereupon issue a summons against the appellee, requiring him to appear and answer the said petition and appeal, and shall also issue a supersedeas, if necessary, to enjoin from proceeding in execution of the decree; and the court shall and may hear and determine the appeal in the same manner as if the appeal had been entered at the time the decree was pronounced. *(g)*

XVII.  *Provided always*, That whenever an appeal is prayed for from any inferior court to the said high court of chancery, or bond is given for the removal of any suit in chancery, in any manner whatsoever, it shall be sufficient in either case, if the said bond or bonds shall be executed by good and sufficient securities, although the appellant or party shall not execute the said bond or bonds. *(h)*

XVIII.  The said court, or the judge thereof in vacation, shall have power, for good cause shewn, to allow a petition of appeal, and if necessary, order a supersedeas to stop the execution of any decree pronounced by an inferior court, at any time within three years after pronouncing the same; the party praying such appeal and supersedeas, complying with the terms which the said court or judge shall annex to such order. *(h)*

XIX.  All original process to bring any person to answer any bill, petition or information in the said court, and all subsequent process thereupon, shall be issued and signed by

*(a)* Oct. 1777. c. 15. § 1.  *(b)* 1788. c. 69.  *(c)* 1787. c. 9.  *(d)* Oct. 1773. c. 3. §§.  *(e)* 1787. c. 67. § 131.  *(f)* 1788. c. 69.  *(g)* May 1788. c. 7. § 1.  *(h)* 1787. c. 9.

Google

# EXHIBIT 6

A

# DIGEST

OF THE

# *L A W S*

OF THE

# 𝔖tate of 𝔊eorgia.

*FROM ITS FIRST ESTABLISHMENT AS A BRITISH PROVINCE DOWN TO THE YEAR 1798, INCLUSIVE,*

AND THE

## PRINCIPAL ACTS OF 1799:

IN WHICH

Is comprehended the declaration of Independence; the State Conſtitutions of 1777 and 1789, with the alterations and amendments in 1794.

ALSO THE

## *Conſtitution of* 1798.

IT CONTAINS

As well all the Laws in force, as thoſe which are deemed uſeful and neceſſary, or which are explanatory of exiſting Laws; together, with the

## *TITLES OF ALL THE OBSOLETE AND OTHER ACTS.*

AND CONCLUDES

WITH AN APPENDIX containing the original Charters and other Documents, aſcertaining and defining the Limits and Boundary of the State; all the Treaties with the ſouthern tribes of Indians; the articles of Confederation and perpetual union; the Conſtitution of the United States, and a few Acts of Congreſs.

Together with a copious Index to the whole.

BY
## *ROBERT & GEORGE WATKINS.*

Philadelphia:

PRINTED BY *R. AITKEN*, Nᵒ. 22, MARKET STREET.

..........................

1800.

## LAWS OF GEORGIA.

611

Thompfon and Thomas M'Call, the fole and exclufive right of running a line of ftage
carriages between the city of Savannah and town of Augufta, not being carried into
effect on the part of the faid William Thompfon and Thomas M'Call, the fame fhall
be and is hereby repealed.

*In the margin:* A. D. 1796.
No. 571.

> THOMAS STEVENS, *Speaker of the Houfe of Reprefentatives.*
> BENJAMIN TALIAFERRO, *Prefident of the Senate.*

Concurred, *February* 22, 1796.

> JARED IRWIN, GOVERNOR.

---

### An Act for the better regulating and conducting elections in the feveral counties of this State.

*In the margin:* No. 572.

WHEREAS, the feveral acts heretofore paffed for the ordering and conducting
elections, have by experience been found defective and incomplete, and the
good citizens of this State will probably fuftain injuries and impofitions by a continu-
ance of them; to prevent which as much as poffible,

I. *Be it enacted by the fenate and houfe of reprefentatives of the State of Georgia in gene-
ral affembly met, and it is hereby enacted under and by virtue of the authority thereof,*
That all elections for members to reprefent this State in the general affembly thereof,
and for reprefentatives in congrefs, fheriffs, clerks of the fuperior and inferior
courts, regifters of probates, county furveyors and coroners, fhall be held at the
court houfe or place appointed for holding the fuperior courts in the refpective
counties.

*In the margin:* Elections to be held at the court houfe.

It fhall be the duty of any three or more of the magiftrates for each county, not
being candidates, to prefide at and make returns of all elections for fenators and
reprefentatives in the general affembly, reprefentatives in congrefs, and county offi-
cers; and the fheriff of each county or his deputy, is required to attend at fuch
elections, for the purpofe of enforcing the orders of the prefiding magiftrates in
preferving good order.

*In the margin:* Three or more magiftrates to prefide—the fheriff to pre-ferve order.

That at the general election which fhall be held on the firft Monday in November,
one thoufand feven hundred and ninety-feven, in the feveral counties of this State
for members of the general affembly, the electors in each county fhall elect a fheriff,
clerk of the fuperior and inferior courts, regifter of probates, county furveyor and
coroner, who fhall hold their offices for the term of two years if they fhall fo long
well behave themfelves; and at the expiration of the faid term of two years, the faid
electors fhall again elect the county officers aforefaid, and in like manner at every
fecond general election. *Provided,* That no perfon fhall be twice elected fheriff of
any county in any term of four years; in which provifion thofe now in office are
comprehended.

*In the margin:* County officers, when & in what manner to be e-lected—to hold their offices for two years.

*In the margin:* Provifo.

That the general election fhall be annually on the firft Monday in November; and
the time for taking in the votes fhall be from nine o'clock in the morning till fix o'clock
in the afternoon.

*In the margin:* The general e-lection to be an-nual. The time for taking votes.

When.

# EXHIBIT 7

# LAWS

## OF THE

# STATE OF NEW-JERSEY.—

COMPILED AND PUBLISHED,

## UNDER THE AUTHORITY OF THE

## LEGISLATURE.

*BY JOSEPH BLOOMFIELD.*

TRENTON :

PRINTED BY JAMES J. WILSON.

1811.

36                              DIGEST OF THE

Proviso.

*And provided alfo,* The legiflature may give its confent to the eftablifhment of one or
more governments weftward thereof; but monopolies of land by individuals, being
contrary to the fpirit of our free government, no fale of territory of this State, or
any part thereof, fhall take place to individuals or private companies, unlefs a coun-
ty or counties fhall have been firft laid off, including fuch territory, and the Indian
rights fhall have been extinguifhed thereto.

Certain con-
templated pur-
chafes ftated to
have become
conftitutionally
void by the fore-
going fection.

The contract
having failed,
the legiflature
to make provi-
fion for return-
ing the confi-
deration money

The money paid
for fuch pur-
chafes never to
be deemed a
part of the
funds of the
State.

Money is what
manner to be
drawn from the
treafury.

Donations or
gratuities how
to be granted.

Sect. 24. The foregoing fection of this article having declared the common rights
of the free citizens of this State, in and to all the territory without the prefent
temporary boundary line, and within the limits of this State, thereby defined, by
which the contemplated purchafes of certain companies of a confiderable portion
thereof, are become conftitutionally void; and juftice and good faith require, that
the State fhould not detain a confideration for a contract which has failed, the
legiflature, at their next feffion, fhall make provifion by law, for returning to any
perfon or perfons, who has or have *bona fide* depofited monies for fuch purchafes in
the treafury of this State: *Provided,* That the fame fhall not have been drawn
therefrom in terms of the act paffed the thirteenth day of February, one thoufand
feven hundred and ninety-fix, commonly called the refcinding act, or the appro-
priation laws of the years one thoufand feven hundred and ninety-fix and one thou-
fand feven hundred and ninety-feven: Nor fhall the monies, paid for fuch purchafes,
ever be deemed a part of the funds of this State, or be liable to appropriation as
fuch; but until fuch monies be drawn from the treafury, they fhall be confidered
altogether at the rifque of the perfons who have depofited the fame. No money
fhall be drawn out of the treafury, or from the public funds of this State, except
by appropriation made by law; and a regular ftatement and account of the receipts
and expenditures of all public monies, fhall be publifhed from time to time. No
vote, refolution, law, or order, fhall pafs the general affembly, granting a donation
or gratuity in favour of any perfon whatever, but by the concurrence of two-thirds
of the general affembly.

The cenfus in
what manner to
be taken.

Sect. 25. It fhall be the duty of the juftices of the inferior court, or any three of
them, in each county refpectively, within fixty days after the adjournment of this
convention, to appoint one one or more fit perfons in each county, not exceeding
one for each battalion diftrict, whofe duty it fhall be to take a full and accurate
cenfus or enumeration of all free white perfons, and people of colour, refiding
therein, diftinguifhing, in feparate columns, the free white perfons from perfons of
colour, and return the fame to the clerks of the fuperior courts of the feveral coun-
ties, certified under their hands, on or before the firft day of December next; the
perfons fo appointed, being firft feverally fworn before the faid juftices, or either
of them, duly and faithfully to perform the truft repofed in them; and it fhall be
the duty of the faid clerks, to tranfmit all fuch returns, under feal, directed to the
fpeaker of the houfe of reprefentatives, at the firft feffion of the legiflature there-
after: And it fhall be the duty of the general affembly, at their faid firft feffion, to
apportion the members of the houfe of reprefentatives among the feveral counties,
agreeably to the plan prefcribed by this conftitution, and to provide an adequate
                                                                        compenfation

EXHIBIT 8

# L A W S

## O F  T H E

# S T A T E

### O F

# D E L A W A R E,

FROM THE FOURTEENTH DAY OF OCTOBER, ONE THOUSAND SEVEN
HUNDRED, TO THE EIGHTEENTH DAY OF AUGUST, ONE
THOUSAND SEVEN HUNDRED AND NINETY-SEVEN.

IN TWO VOLUMES.

VOLUME II.

*Publifhed by Authority.*

N E W - C A S T L E:

PRINTED BY SAMUEL AND JOHN ADAMS,

M,DCC,XCVII.

984         LAWS OF THE STATE

C H A P.
CCXIII.
~~~~
1790.

them from and after the time for collection of the
said tax, shall have expired.

*Passed October* 26, 1790.

---

C H A P. CCXIV. b.

1790.

*An* ACT *directing the election of a Representative for this
state in the Congress of the United States.* (a).

Time and places
of holding the
election.

SECTION I. **B**E *it enacted by the General Assembly of
Delaware,* That an election of a
Representative for this state, to serve in the Congress
of the United States, for two years from the fourth
day of March next, shall be held by the citizens of
this state, qualified to vote for Members of the House
of Assembly, on the second Monday of November
next, at the following places, *to wit;* For the county
of New-Castle at the Court House in the town of
New-Castle; For the county of Kent at the Court
House in the town of Dover; For the county of Sus-
sex at the Court House in the town of Lewes; *(b)* in
like manner as by the election laws of this state is di-
rected for the election of Members of the General

Public notice
thereof to be
given.

Assembly of this state; of which election due and
public notice shall be given by the Sheriffs of the re-
spective counties, agreeably to the said election laws:
And the present Sheriffs, together with every other
officer and person whose duty it was to attend, con-
duct, and regulate the General Election held on the
first day of this present month of October, are hereby
authorised and required to attend, conduct, and re-
gulate the election herein directed to be held for the
purpose aforesaid, in like manner as in and by the said

Powers of the
officers for con-
ducting the elec-
tion.

election laws is directed; and the several powers and
authorities to the several officers given by the laws of
this state, relating to the election of Members of the
General

(a) See chap. 158. b. Ante.

(b) Place of election for Sussex county since established at George Town, see
chap. 257. b.

# EXHIBIT 9

1375/51

# COMMENTARIES

ON THE

# LAWS OF ENGLAND;

IN FOUR BOOKS.

By SIR WILLIAM BLACKSTONE, Knight,

ONE OF THE JUSTICES OF HIS MAJESTY'S COURT OF COMMON PLEAS

TOGETHER WITH

## A COPIOUS ANALYSIS OF THE CONTENTS.

And Notes with References to English and American Decisions and Statutes to date,
which Illustrate or Change the Law of the Text; also, a
Full Table of Abbreviations, and

SOME CONSIDERATIONS REGARDING THE STUDY OF THE LAW.

### By THOMAS M. COOLEY,

PROFESSOR OF LAW AND POLITICAL SCIENCE IN THE UNIVERSITY OF MICHIGAN, AND
AUTHOR OF "CONSTITUTIONAL LIMITATIONS," &c.

## VOL. 1. INCLUDING BOOKS I & II.

THIRD EDITION—REVISED.



CHICAGO.
CALLAGHAN AND COMPANY.
1884.

with the subject, or that expressly relate to the same point.(17)   Thus, when the law of England declares murder to be felony without benefit of clergy, we must resort to the same law of England to learn what the benefit of clergy is; and, when the common law censures simoniacal contracts, it affords great light to the subject to consider what the canon law has adjudged to be simony.(18)

3. As to the *subject matter*, words are always to be understood as having a regard thereto, for that is always supposed to be in the eye of the legislator, and all his expressions directed to that end.   Thus when a law of our Edward III. forbids all ecclesiastical persons to purchase *provisions at Rome*, it might seem to prohibit the buying of grain and other victuals; but, when we consider that the statute was made to repress the usurpations of the papal see, and that the nominations to benefices by the pope were called *provisions*, we shall see that the restraint is intended to be laid upon such provisions only.

4. As to the *effects* and *consequence*, the rule is, that where words bear either none, or a very absurd signification, if literally understood, we must a little deviate from the received sense of them.   Therefore the Bolognian law, mentioned by Puffendorf, (*p*) which enacted "that whoever drew blood in the streets should be punished with the utmost severity," was held after long debate not to extend to the surgeon, who opened the vein of a person that fell down in the street with a fit. (19)

*5. But, lastly, the most universal and effectual way of discovering [*61] the true meaning of a law, when the words are dubious, is by considering the *reason* and *spirit* of it; or the cause which moved the legislator to enact it. (20)   For when this reason ceases, the law itself ought likewise to cease with it.   An instance of this is given in a case put by Cicero, or whoever was the author of the treatise inscribed to Herennius. (*q*)   There was a law, that those who in a storm forsook the ship should forfeit all property therein; and that the ship and lading should belong entirely to those who staid in it.

<div align="center">(<em>p</em>) L. 5 c. 12, § 8.          (<em>q</em>) L. 1. c., 11.</div>

---

(17)  Where two or more statutes are *in pari materia*, or relate to the same subject, they are to be examined and construed together, not only because what is clear in one may aid what is doubtful or obscure in another, but also because those later in time may have the effect to modify and change those which preceded, and will do so, to the extent that they are found to be inconsistent.   For illustrations of the rule stated in the text, see Church v. Crocker, 3 Mass., 17; Mendon v. Worcester Co., 10 Pick., 245, Green v. Commonwealth, 13 Allen, 155; Frink v. King, 4 Ill., 144; Rogers v. Bradshaw, 20 Johns., 735; McCartee v. Orphan Society, 9 Cow., 507, Isham v. Bennington Iron Co., 19 Vt., 230 , Billingslea v. Baldwin, 23 Md., 85; Robbins v. Railroad Co., 32 Cal., 472; Hayes v. Hanson, 12 N. H., 284; Manuel v. Manuel, 13 Ohio St., 458; McLaughlin v. Hoover, 1 Ore., 31; The Abbotsford, 98 U. S., 440.

(18) See United States v. Palmer, 3 Wheat., 610.

(19)  The principle is, that we are not to suppose the legislature intended absurd consequences, and must therefore seek in their language for an intent which is reasonable: Langdon v. Potter, 3 Mass., 220; Ayres v. Knox, 7 Mass., 310; Putnam v. Longley, 11 Pick., 487, Henry v. Tilson, 17 Vt., 479; Perry Co. v. Jefferson Co., 94 Ill., 214; Bailey v. Commonwealth, 11 Bush, 688; United States v. Kirby, 7 Wall., 486; Oates v. National Bank, 100 U. S., 239.

The argument *ab inconvienti* is sometimes very strong when a statute has received a practical construction which has been followed for a considerable time; and courts in cases of doubt will sometimes allow long continued usage under a particular construction to have controlling force: Union Ins. Co. v. Hoge, 21 How., 35; Minor v. Happersett, 21 Wall., 162; Rogers v. Goodwin, 2 Mass., 476; Essex Co. v. Pacific Mills, 14 Allen, 389; State v. Mayhew, 2 Gill, 487; Edwards v. Pope, 3 Scam., 465; Chestnut v. Shane's Lessee, 16 Ohio, 599; Britton v. Ferry, 14 Mich., 66; Cameron v. Merchants' Bank, 37 Mich., 240; Plummer v. Plummer, 37 Miss., 185; Norris v Clymer, 2 Penn. St., 277; Hedgecock v. Davis, 64 N. C., 652; Scanlan v. Childs, 33 Wis., 663; Loeb v. Mathis, 37 Ind., 806; Collins v. Henderson, 11 Bush, 74; Railroad Co. v. Geiger, 34 Ind., 203.

(20)  For illustrations of the application of this principle, see People v. Insurance Co., 15 Johns., 381; Tonnele v. Hall, 4 N. Y., 140; Miller v. Dobson, 6 Ill., 572; Castner v. Walrod, 83 Ill., 171; Perry Co. v. Jefferson Co., 94 Ill., 214; Bailey v. Commonwealth, 11 Bush., 688; Durousseau v. United States, 6 Cranch, 307.

<div align="center">35</div>

Case 8:23-cv-01798-CJC-ADS   Document 29-1   Filed 11/20/23   Page 31 of 116   Page ID
#:1917

In a dangerous tempest all the mariners forsook the ship, except only one sick
passenger, who, by reason of his disease, was unable to get out and escape.  By
chance the ship came safe to port.  The sick man kept possession, and claimed
the benefit of the law.  Now here all the learned agree, that the sick man is
not within the reason of the law; for the reason of making it was, to give
encouragement to such as should venture their lives to save the vessel; but this
is a merit which he could never pretend to, who neither staid in the ship upon
that account, nor contributed anything to its preservation. (21)

From this method of interpreting laws, by the reason of them, arises what
we call *equity*, which is thus defined by Grotius: (r) "the correction of that
wherein the law, (by reason of its universality,) is deficient." For, since in laws
all cases cannot be foreseen or expressed, it is necessary that, when the general
decrees of the law come to be applied to particular cases, there should be some-
where a power vested of defining those circumstances, which (had they been
foreseen) the legislator himself would have expressed.  And these are the cases
which according to Grotius, " *lex non exacte definit, sed arbitrio boni viri
permittit.*" (22)

Equity thus depending, essentially, upon the particular circumstances of
each individual case, there can be no established *rules and fixed pre-
cepts of equity laid down, without destroying its very essence, and
reducing it to a positive law.  And, on the other hand, the liberty of consid-
ering all cases in an equitable light must not be indulged too far, lest thereby
we destroy all law, and leave the decision of every question entirely in the
breast of the judge.  And law, without equity, though hard and disagreeable,
is much more desirable for the public good than equity without law; which
would make every judge a legislator, and introduce most infinite confusion;
as there would then be almost as many different rules of action laid down
in our courts, as there are differences of capacity and sentiment in the human
mind.

[*62]

*(r) De Equitate, § 3.*

(21) It is always to be assumed that the legislature intended its enactment to be effectual,
not invalid; and therefore construction should aim to support, not to defeat it:  Shrews-
bury v. Boylston, 1 Pick., 105; Turnpike Co. v. McKean, 6 Hill, 616; Newland v. Marsh,
19 Ill., 384; Attorney-General v. Eau Claire, 37 Wis., 400; Marshall v. Grimes, 41 Miss.,
27; Dubuque v. Railroad Co., 39 Iowa, 56.  And it should seek to give effect to all its pro-
visions if practicable:  People v. Purdy, 2 Hill, 36; Parkinson v. State, 14 Md., 184; Rye-
gate v. Wardsboro, 30 Vt., 746; Brooks v. School Commissioners, 31 Ala., 227; Green v.
Weller, 32 Miss., 650; Wolcott v. Wigton, 7 Ind., 44; People v. Burns, 5 Mich., 114.  If a
statute is susceptible of two constructions, one of which would render it constitutional and
the other not, it is to receive the former construction as presumptively expressing the legis-
lative intent:  Dow v. Norris, 4 N. H. 17; People v. Supervisors, 17 N. Y., 241.

On interpretation generally, see Rutherford, Institutes of Natural Law; Dwarris on Stat-
utes, and especially Lieber's Hermeneutics.

(22)  The remark in the text may possibly lead some persons to suppose that there resides
in the courts the authority to give to statutes such a construction as shall prevent inequit-
able results, and to bring cases within their provisions and exempt other cases from them
according as equity may seem to require.  But this would be in effect for the courts to
take upon themselves the power of legislation, and by construction to mould the statutes to
suit their own views of what is just and right.  Such a power would be wholly inconsist-
ent with legislative independence, and it would also be inconsistent with certainty and
stability in the law.  When in a particular case a criminal statute is found to work unjust
consequences, the executive may interfere with the prerogative of pardon; but an equitable
judicial construction regards severe consequences only as they may tend to show that the
legislature did not probably contemplate that such a construction would be put upon their
acts as would bring about such consequences, and could not reasonably have intended it.

EXHIBIT 10



GUMM NESS  n  The state or qual ty of be ng gummy  v scousness                        6216
GUMMOS TY  n  The nature of gum  gumm ness  a v scous or adhes ve qual ty             6216
GUMMOUS  a  Of the nature of gum  v scous  adhes ve                                  6216
GUMMY  a  Cons st ng of gum  of the nature of gum  v scous  adhes ve                 6216
GUMP  n  A fool sh person  a dolt  [Vulgar ]                                         6216
GUMPT ON  n  Care  sk ll  understand ng  [Vulgar ]                                   6216
GUN  n  An nstrument cons st ng of a barrel or tube of  ron or other metal f xed  n a stock
from wh ch balls  shot or other deadly weapons are d scharged by the explos on of
gunpowder  The larger spec es of guns are called cannon  and the smaller spec es are
called muskets  carb nes  fowl ng p eces  etc  But one spec es of f re arms  the p stol  s
never called a gun                                                                  6216
  GUN  v i   o shoot                                                        6217
GUN BARREL  n  The barrel or tube of a gun                                           6217
GUNBOAT  n  A boat or small vessel f tted to carry a gun or two at the bow           6217
GUN CARR AGE  n  A wheel carr age for bear ng and mov ng cannon                      6217
GUNNEL  [See Gunwale ]                                                              6217
GUNNER  n  One sk lled  n the use of guns  a cannoneer  an off cer appo nted to manage
art llery  The gunner of a sh p of war has the charge of the ammun t on and art llery  and
h s duty  s to keep the latter  n good order  and to teach the men the exerc se of the guns
GUNNERY  n  The act of charg ng  d rect ng and f r ng guns  as cannon  mortars and 6217
the l ke  Gunnery  s founded on the sc ence of project les                          6217
GUNN NG  n  The act of hunt ng or shoot ng game w th a gun                          6217
GUNPOWDER  n  A compos t on of saltpeter  sulphur and charcoal  m xed and reduced to
a f ne powder  then granulated and dr ed   t s used  n art llery  n shoot ng game  n
blast ng rocks  etc                                                                 6217
GUNROOM  n  n sh ps  an apartment on the after end of the lower gun deck  occup ed
by the gunner  or by the l eutenants as a mess room                                 6217
GUNSHOT  n  The d stance of the po nt blank range of a cannon shot                   6217
  GUNSHO   a  Made by the shot o  a gun  as a gunshot wound                 6218
GUNSM TH  n  A maker of small arms  one whose occupat on  s to make or repa r small
f re arms                                                                           6218
GUNSM THERY  n  The bus ness of a gunsm th  the art of mak ng small f rearms         6218

## GUNSTICK — GYVE                                                                   6219

GUNST CK  n  A rammer  or ramrod  a st ck or rod to ram down the charge of a musket
etc                                                                                 6219
GUNSTOCK  n  The stock or wood  n wh ch the barrel of a gun  s f xed                 6219
GUNSTONE  n  A stone used for the shot of cannon  Before the nvent on of  ron balls
stones were used for shot                                                           6219
GUNTACKLE  n  The tackle used on board of sh ps to run the guns out of the ports  and
to secure them at sea  The tackles are pulleys aff xed to the s des of a gun carr age 6219
GUNWALE  GUNNEL  n  The upper edge of a sh p's s de  the uppermost wale of a sh p
or that p ece of t mber wh ch reaches on e ther s de from the quarter deck to the fore
castle  be ng the uppermost bend wh ch f n shes the upper works of the hull          6219
GURGE  n  [L  gurges ] A wh rlpool  [L ttle used ]                                   6219
  GURGE  v t   o swallow  [Not in use                                      6219
GURG ON  n  The coarser part of meal separated from the bran  [Not used ]           6219
GURGLE  v  [L  gurges  See Gargle  wh ch seems to be of the same fam ly  or the same
word d fferently appl ed ]                                                           6219
GURGL NG  ppr  Runn ng or flow ng w th a purl ng sound                              6219
GURHOF TE  n  A subvar ety of magnes an carbonate of l me  found near Gurhof  n
Lower Austr a   t s snow wh te  and has a dull  sl ghtly concho dal  or even fracture 6220
GURNARD  n  A f sh of several spec es of the genus Tr gla  The head  s lor cated w th
rough l nes or bony plates  and there are seven rays  n the membranes of the g lls   6220
GURRAH  n  A k nd of pla n  coarse  nd a musl n                                      6220

# EXHIBIT 11

THE

# ACTS AND RESOLVES,

PUBLIC AND PRIVATE,

OF THE

# PROVINCE OF THE MASSACHUSETTS BAY:

TO WHICH ARE PREFIXED

## THE CHARTERS OF THE PROVINCE.

WITH

HISTORICAL AND EXPLANATORY NOTES, AND AN APPENDIX.

PUBLISHED UNDER CHAPTER 87 OF THE RESOLVES OF THE GENERAL COURT
OF THE COMMONWEALTH FOR THE YEAR 1877.

## VOLUME III.

BOSTON:
PRINTED FOR THE COMMONWEALTH, BY ALBERT J. WRIGHT,
CORNER OF MILK AND FEDERAL STREETS.
1878.

# ACTS

PASSED AT THE SESSION BEGUN AND HELD AT BOSTON,
ON THE TWENTY–SEVENTH DAY OF AUGUST, A. D.
1746.

## CHAPTER 10.

### AN ACT IN FURTHER ADDITION TO AN ACT INTITLED "AN ACT FOR HIGHWAYS."

WHEREAS in and by an act made in the twelfth year of the reign of *Preamble.* her late majesty, Queen Ann, intitled "An Act in addition to the law *1713-14, chap. 8.* of this province, intitled 'An Act for highways,' made in the fifth year of the reign of the late King William and Queen Mary," provision is made for the laying out particular private ways between any inhabitants or proprietors within their respective towns to or for any original lot, but no power or liberty is therein given for the laying out any such way to any tract of land that is not an original lot, which is oftentimes equally necessary ; wherefore,—

*Be it enacted by the Governour, Council and House of Representatives,*

[SECT. 1.] That the selectmen of each town respectively, and in *Selectmen, and* case of their delay or refusal, his majesty's justices of the peace within *in case of their* the several counties of this province, at any of their general sessions, *refusal, the jus-* be and hereby are fully authorized and impowered, by themselves or *tices, em-* others, to lay out, or cause to be laid out, particular or private ways as *powered to lay* shall be thought necessary, to or for any tract of land not an original *out highways.* lot, as they are by said act of Queen Ann[e], for an original lot ; under the same regulations and restrictions, and observing the same rules as are therein specified, directed and provided.

[SECT. 2.] This act to continue in force for the space of three years *Limitation.* from the publication thereof, and from thence to the end of the next session of the general court, and no longer. [*Passed and published September* 13.*

## CHAPTER 11.

### AN ACT TO PREVENT THE FIRING OF GUNS CHARGED WITH SHOT[T] OR BALL IN THE TOWN OF BOSTON.

WHEREAS by the indiscreet firing of guns laden with shot[t] and ball *Preamble.* within the town and harbour of Boston, the lives and limbs of many *1713-14, chap. 6.* persons have been lost, and others have been in great danger, as well as other dammage has been sustained ; for the prevention thereof for the future,—

* The bill was passed to be enacted, by both branches, August 12, but was signed by the Governor as above, and was printed with the acts of this session.

*Be it enacted by the Governour, Council and House of Representatives,*

Penalty for firing off loaded cannon.

[SECT. 1.]   That no person or persons, from and after the publication of this act, shall presume to discharge or fire off any cannon laden with shot[t], from any wharf[ʃ]e or vessel in that part of the harbour of said town which is above the castle, on pain of forfeiting the sum of fifteen pounds for each gun so fired or discharged ; one moiety of said penalty to be to and for the use of the poor of said town of Boston, and the other moiety to him or them who shall inform, complain and sue for the same, to be recovered by action, bill, plaint or information, before any of his majesty's courts of record within the county of Suffolk ; and upon refusal thereof, such person shall suffer three months' imprisonm[en]t without bail or mainprize.

*And be it further enacted,*

Penalty for discharging guns or pistols loaded with shot or ball.

[SECT. 2.]   That no person shall, from and after the publication of this act, discharge any gun or pistol, charged with shot[t] or ball, in the town of Boston (the islands thereto belonging excepted), or in any part of the harbour between the castle and said town, on pain of forfeiting forty shillings [for] each gun or pistol so fired or discharged, to be recovered before one or more of his majesty's justices of the peace for the county of Suffolk, and disposed of in manner as aforesaid ; or shall suffer ten days' imprisonment.   And for the more effectual conviction of any person or persons so offending, it shall be lawful for any person to seize and take into custody any gun so fired off, and deliver the same to one of the next justices of the peace in said town of Boston, in order to its being produced at time of trial.

*Provided, nevertheless,—*

Proviso.

[SECT. 3.]   That this law shall not be so construed or understood as to prevent soldiers, in their common-training days, with the leave and by order of the commission officers of the company to which they belong, or other persons, at other times, with the leave of one or more of the field-officers of the regiment in Boston, from firing at a mark or target[t], for the exercise of their skill and judgment, provided it be done at the lower end of the common ; nor from firing at a mark, from the several batteries in the town of Boston, with the leave of the captain-general, and nowhere else.

Limitation.

[SECT. 4.]   This law to continue and be in force for the space of three years, and no longer.   [*Passed and published September* 13.

---

# CHAPTER 12.

## AN ACT IN ADDITION TO THE SEVERAL ACTS FOR THE BETTER REGULATING THE INDIANS.

Preamble.

WHEREAS the several laws already in force are insufficient for the well regulating of the Indian natives of this province in their several plantations,—

*Be it enacted by the Governour, Council, and House of Representatives,*

Three proper persons to be appointed as guardians to the Indians in their respective plantations.

[SECT. 1.]   That there be three proper persons appointed, for the future, by this court, near to every Indian plantation in this province, guardians to the said Indians in their respective plantations, who are hereby impowered to take into their hands the said Indians' lands, and allot to the several Indians of the several plantations such parts of the said lands and meadows as[ʃ]shall be sufficient for their particular improvement, from time to time, during the continuance of this act ; and the remainder, if any there be, shall be let out by the guardians of the

EXHIBIT 12

# Adams' Argument for the Defense: 3–4 December 1770

**F** founder_archive_gov/document_/Adam_/05_03_02_0001_0004_0016



## Adams' Argument for the Defense[1]

## 3–4 December 1770

May it please your Honours and you Gentlemen of the Jury,

I am for the prisoners at the bar, and shall apologize for it only in the words of the Marquis Beccaria: "If I can but be the instrument of preserving one life, his blessing and tears of transport, shall be a sufficient consolation to me, for the contempt of all mankind."[2] As the prisoners stand before you for their lives, it may be proper, to recollect with what temper the law requires we should proceed to this trial. The form of proceeding at their arraignment, has discovered that the spirit of the law upon such occasions, is conformable to humanity, to commonsense and feeling; that it is all benignity and candor. And the trial commences with the prayer of the Court, expressed by the Clerk, to the Supream JUDGE of Judges, empires and worlds "God send you a good deliverance "

We find, in the rules laid down by the greatest English Judges, who have been the brightest of mankind; We are to look upon it as more beneficial, that many guilty persons should escape unpunished, than one innocent person should suffer. The reason is, because it's of more importance to community, that innocence should be protected, than it is, that guilt should be punished; for guilt and crimes are so frequent in the world, that all of them cannot be punished; and many times they happen in such a manner, that it is not of much consequence to the public, whether they are punished or not. But when innocence itself, is brought to the bar and condemned, especially to die, the subject will exclaim, it is immaterial to me, whether I behave well or ill; for virtue itself, is no security. And if such a sentiment as this, should take place in the mind of the subject, there would be an end to all security what so ever. I will read the words of the law itself.

The rules I shall produce to you3 from Lord Chief Justice Hale, whose character as a lawyer, a man of learning and philosophy, and as a Christian, will be disputed by nobody living; one of the greatest and best characters, the English nation ever produced: his words are these. 2. H.H.P.C. Tutius semper est errare, in acquietando, quam in puniendo, ex-parte misericordiae, quam ex parte justitiae, it is always safer to err in acquitting, than punishing, on the part of mercy, than the part of justice. The next is from the same authority, 305 Tutius erratur ex parte mitiori, it is always safer to err on the milder side, the side of mercy, H H P C 509, the best rule in doubtful cases, is, rather to incline to acquital than conviction: and in page 300 Quod dubitas ne feceris, Where you are doubtful never act; that is, if you doubt of the prisoners guilt, never declare him guilty; this is always the rule, especially in cases of life Another rule from the same Author, 289, where he says, In some cases, presumptive evidence go far to prove a person guilty, though there is no express proof of the fact, to be committed by him; but then it must be very warily pressed, for it is better, five guilty persons should escape unpunished, than one innocent person should die.

The next authority shall be from another Judge, of equal character, considering the age wherein he lived; that is Chancellor Fortescue, in praise of the laws of England, page 59, this is a very ancient writer on the English law  his words are, "Indeed one would rather, much rather, that twenty guilty persons escape the punishment of death, than one innocent person be condemned, and suffer capitally." Lord Chief Justice Hale, says, It is better five guilty persons escape, than one innocent person suffer. Lord Chancellor Fortiscue, you see, carries the matter farther, and says, Indeed one had rather, much rather, that twenty guilty persons should escape, than one innocent person suffer capitally  Indeed this rule is not peculiar to the English law, there never was a system of laws in the world, in which this rule did not prevail; it prevailed in the ancient Roman law, and which is more remarkable, it prevails in the modern Roman law, even the judges in the Courts of Inquisition, who with racks, burnings and scourges, examine criminals, even there, they preserve it as a maxim, that it is better the guilty should escape punishment, than the innocent suffer  Satius esse nocentem absolvi quam insentem damnari,4 this is the temper we ought to set out with; and these the rules we are to be governed by. And I shall take it for granted, as a first principle, that the eight prisoners at the bar, had better be all acquitted, though we should admit them all to be guilty, than, that any one of them should by your verdict be found guilty, being innocent

I shall now consider the several divisions of law, under which the evidence will arrange it self.

The action now before you, is homicide; that is the killing of one man by another, the law calls it homicide, but it is not criminal in all cases, for one man to slay another. Had the prisoners been on the Plains of Abraham, and slain an hundred Frenchmen apiece, the English law would have considered it, as a commendable action, virtuous and prais[e]worthy so that every instance of killing a man, is not a crime in the eye of the law; there are many

other instances which I can not enumerate, an officer that executes a person under sentence of death, &c  So that Gentlemen, every instance of one man's killing another, is not a crime, much less a crime to be punished with death. But to descend to some more particulars.

The law divides homicide into three branches; the first, is justifiable, the second excusable, and the third felonious; felonious homicide, is subdivided into two branches; the first is murder, which is killing with malice aforethought, the second is manslaughter, which is killing a man on a sudden provocation  here Gentlemen, are four sorts of homicide, and you are to consider, whether all the evidence amounts to the first, second, third, or fourth of these heads. The fact, was the slaying five unhappy persons that night; you are to consider, whether it was justifiable, excusable, or felonious; and if felonious, whether it was murder or manslaughter. One of these four it must be, you need not divide your attention to any more particulars  I shall however, before I come to the evidence, show you several authorities, which will assist you and me in contemplating the evidence before us.

I shall begin with justifiable homicide; if an officer a sheriff execute a man on the gallows, draws and quarters him, as in case of high treason, and cuts off his head, this is justifiable homicide, it is his duty. So also, Gentlemen, the law has planted fences and barriers around every individual; it is a castle round every man's person, as well as his house  As the love of God and our neighbour, comprehends the whole duty of man, so self-love and social, comprehend all the duties we owe to mankind, and the first branch is self-love, which is not only our indisputable right, but our clearest duty, by the laws of nature, this is interwoven in the heart of every individual; God almighty, whose laws we cannot alter, has implanted it there, and we can annihilate ourselves, as easily as root out this affection for ourselves  It is the first, and strongest principle in our nature, Justice Blackstone calls it, "The primary cannon in the law of nature."5 That precept of our holy religion which commands us to love our neighbour as ourselves doth not command us to love our neighbour better than ourselves, or so well, no Christian Divine hath given this interpretation. The precept enjoins, that our benevolence to our fellow men, should be as real and sincere, as our affections to ourselves, not that it should be as great in degree. A man is authorised therefore by common sense, and the laws of England, as well as those of nature, to love himself better than his fellow subject: If two persons are cast away at sea, and get on a plank, (a case put by Sir Francis Bacon,) and the plank is insufficient to hold them both, the one hath a right to push the other off to save himself 6 The rules of the common law therefore, which authorize a man to preserve his own life at the expence of another's, are not contradicted by any divine or moral law. We talk of liberty and property, but, if we cut up the law of self-defence, we cut up the foundation of both, and if we give up this, the rest is of very little value, and therefore, this principle must be strictly attended to, for whatsoever the law pronounces in the case of these eight soldiers will be the law, to other persons and after ages, all the persons that have slain mankind in this country, from the beginning to this day, had better have been acquitted, than that a wrong rule and precedent should be established.

I shall now, read to you a few authorities on this subject of self-defence. Foster 273 in the
case of justifiable self defence, "The injured party may repell force with force in defence of
his person, habitation, or property, against one who manifestly intendeth and endeavoureth
with violence, or surprize, to commit a known felony upon either." In these cases he is not
obliged to retreat, but may pursue his adversary, till he findeth himself out of danger, and if in
a conflict between them he happeneth to kill, such killing is justifiable. Keiling, 128, 129.7 I
must in treat you, to consider the words of this authority, the injured person may repell force
by force against any who endeavours to commit any kind of felony on him or his, here the
rule is, I have a right to stand on my own defence, if you intend to commit felony; if any of the
persons made an attack on these soldiers, with an intention to rob them, if it was but to take
their hats feloniously, they had a right to kill them on the spot, and had no business to retreat;
if a robber meets me in the street, and commands me to surrender my purse, I have a right
to kill him without asking questions; if a person8 commits a bare assault on me, this will not
justify killing, but if he assaults me in such a manner, as to discover an intention, to kill me, I
have a right to destroy him, that I may put it out of his power to kill me. In the case you will
have to consider, I do not know there was any attempt to steal from these persons; however,
there were some persons concerned, who would probably enough have stolen, if there had
been any thing to steal; and many were there who had no such disposition, but this is not the
point we aim at, the question is, are you satisfied, the people made the attack in order to kill
the soldiers? If you are satisfied that the people, who ever they were, made that assault, with
a design to kill or maim the soldiers, this was such an assault, as will justify the soldiers
killing in their own defence  Further it seems to me, we may make another question, whether
you are satisfied that their real intention was to kill or maim or not? if any reasonable man, in
the situation of one of these soldiers, would have had reason to believe in the time of it, that
the people came with an intention to kill him, whether you have this satisfaction now, or not in
your own minds, they were justifiable, at least excusable in firing; you and I, may be
suspicious that the people who made this assault on the soldiers, did it to put them to the
flight, or purpose that they might go exulting about the town afterwards in triumph; but this
will not do, you must place yourselves in the situation of Wemms or Killroy— consider
yourselves, as knowing that the prejudices of the world about you, were against you; that the
people about you, thought you came to dragoon them into obedience to statutes,
instructions, mandates and edicts, which they thoroughly detested; that many of these
people were thoughtless and inconsiderate, old and young, sailors and land men, negroes
and molattos; that they, the soldiers had no friends about them, the rest were in opposition to
them; with all the bells ringing, to call the town together to assist the people in King-street; for
they knew by that time, that there was no fire; the people shouting, huzzaing, and making the
mob whistle as they call it, which when a boy makes it in the street, is no formidable thing,
but when made by a multitude, is a most hideous shriek, almost as terrible as an Indian yell;
the people crying Kill them! Kill them! Knock them over! heaving snow-balls, oyster shells,
clubs, white birch sticks three inches and an half diameter, consider yourselves, in this
situation, and then judge, whether a reasonable man in the soldiers situation, would not have
concluded they were going to kill him  I believe, if I was to reverse the scene, I should bring it

home to our own bosoms; suppose Colonel Marshall, when he came out of his own door, and saw these grenadiers coming down with swords, &c  had thought it proper to have appointed a military watch; suppose he had assembled Gray and Attucks that were killed, or any other persons in town, and had planted them in that station as a military watch, and there had come from Murray's barracks, thirty or forty soldiers, with no other arms than snow-balls, cakes of ice, oyster-shells, cinders and clubs, and attacked this military watch in this manner, what do you suppose would have been the feelings and reasonings of any of our householders; I confess I believe they would not have borne the one half of what the witnesses have sworn the soldiers bore, till they had shot down as many as were necessary to intimidate and disperse the rest; because, the law does not oblige us to bear insults to the danger of our lives, to stand still with such a number of people round us, throwing such things at us, and threatening our lives, until we are disabled to defend ourselves

"Where a known felony, is attempted upon the person, be it to rob, or murder, here the party assaulted may repel force with force, and even his own servant then attendant on him, or any other person present, may interpose for preventing mischief, and if death ensues, the party so interposing will be justified. In this case nature and social duty co-operate." Foster 274 9

Hawkins P.C. Chap. 28, §25. towards the end, "Yet it seems that a private person, a fortiori, an officer of justice, who happens unavoidably to kill another in endeavouring to defend himself from, or suppress dangerous rioters, may justify the fact, in as much as he only does his duty in aid of the public justice." 10 Section 24. "And I can see no reason why a person, who without provocation is assaulted by another in any place whatsoever, in such a manner as plainly shews an intent to murder him, as by discharging a pistol, or pushing at him with a drawn sword, &c. may not justify killing such an assailant, as much as if he had attempted to rob him: For is not he who attempts to murder me, more injurious than he who barely attempts to rob me? And can it be more justifiable to fight for my goods than for my life; and it is not only highly agreeable to reason that a man in such circumstances, may lawfully kill another, but it seems also to be confirmed by the general tenor of our law books, which speaking of homicide se defendendo, suppose it done in some quarrel or affray." 11

"And so perhaps the killing of dangerous rioters, may be justified by any private persons, who cannot otherwise suppress them, or defend themselves from them; in as much as every private person seems to be authorized by the law, to arm himself for the purposes aforesaid " Hawkins p. 71. §14 12—Here every private person is authorized to arm himself, and on the strength of this authority, I do not deny the inhabitants had a right to arm themselves at that time, for their defence, not for offence, that distinction is material and must be attended to.

Hawkins, page 75. §14. "And not only he who on an assault retreats to the wall or some such streight, beyond which he can go no further, before he kills the other, is judged by the law to act upon unavoidable necessity; but also he who being assaulted in such a manner, and in such a place, that he cannot go back without manifestly endangering his life, kills the other

without retreating at all."13—§16. "And an officer who kills one that insults him in the
execution of his office, and where a private person, that kills one who feloniously assaults
him in the high way, may justify the fact without ever giving back at all."14

There is no occasion for the Magistrate to read the Riot act. In the case before you, I
suppose you will be satisfied when you come to examine the witnesses, and compare it with
the rules of the common law, abstracted from all mutiny acts and articles of war, that these
soldiers were in such a situation, that they could not help themselves; people were coming
from Royal-exchange-lane, and other parts of the town, with clubs, and cord wood sticks; the
soldiers were planted by the wall of the Custom House; they could not retreat, they were
surrounded on all sides, for there were people behind them, as well as before them; there
were a number of people in Royal-exchange-lane; the soldiers were so near to the Custom
house, that they could not retreat, unless they had gone into the brick wall of it. I shall shew
you presently, that all the party concerned in this unlawful design, were guilty of what any
one of them did; if any body threw a snow-ball, it was the act of the whole party; if any struck
with a club, or threw a club, and the club had killed any body, the whole party would have
been guilty of murder in law.

Ld. C.J. HOLT, in Mawgridge's Case, Keyling 128, says, "Now it hath been held, that if A of
his malice prepensed assaults B, to kill him, and B draws his sword and attacks A and
pursues him, then A for his safety gives back, and retreats to a wall, and B still pursuing him
with his drawn sword, A in his defence kills B. This is murder in A. For A having malice
against B, and in pursuance thereof endeavouring to kill him, is answerable for all the
consequences, of which he was the original cause. It is not reasonable for any man that is
dangerously assaulted, and when he perceives his life in danger from his adversary, but to
have liberty for the security of his own life, to pursue him that maliciously assaulted him; for
he that hath manifested that he hath malice against another, is not fit to be trusted with a
dangerous weapon in his hand. And sore solved by all the Judges when they met at
Seargeant's inn, in preparation for my Lord Morley's trial."15

In the case here, we will take Montgomery, if you please, when he was attacked by the stout
man with the stick, who aimed it at his head, with a number of people round him, crying out,
Kill them! Kill them! had he not a right to kill the man. If all the party were guilty of the assault
made by the stout man, and all of them had discovered malice in their hearts, had not
Montgomery a right, according to Lord Chief Justice Holt, to put it out of their power to wreak
their malice upon him. I will not at present, look for any more authorities in the point of self-
defence; you will be able to judge from these, how far the law goes, in justifying or excusing
any person in defence of himself, or taking away the life of another who threatens him, in life
or limb; the next point is this, That in case of an unlawful assembly, all and every one of the
assembly is guilty of all and every unlawful act, committed by any one of that assembly, in
prosecution of the unlawful design they set out upon.

Rules of law should be universally known, what ever effect they may have on politics; they are rules of common law, the law of the land, and it is certainly true, that where ever there is an unlawful assembly, let it consist of many persons or a few, everyman in it is guilty of every unlawful act committed by any one of the whole party, be they more or be they less, in pursuance of their unlawful design  This is the policy of the law  to discourage and prevent riots, insurrections, turbulence and tumults.

In the continual vicissitudes of human things, amidst the shocks of fortune and the whirls of passion, that take place at certain critical seasons, even in the mildest government, the people are liable to run into riots and tumults. There are Church-quakes and state-quakes, in the moral and political world, as well as earthquakes, storms and tempests in the physical  Thus much however must be said in favour of the people and of human nature, that it is a general, if not universal truth, that the aptitude of the people to mutinies, seditions, tumults and insurrections, is in direct proportion to the despotism of the government. In governments completely despotic, i.e. where the will of one man, is the only law, this disposition is most prevalent.—In Aristocracies, next—in mixed Monarchies, less than either of the former—in compleat Republick's the least of all—and under the same form of government as in a limited monarchy, for example, the virtue and wisdom of the administration, may generally be measured by the peace and order, that are seen among the people. However this may be, such is the imperfection of all things in this world, that no form of government, and perhaps no wisdom or virtue in the administration, can at all times avoid riots and disorders among the people.

Now it is from this difficulty, that the policy of the law hath framed such strong discouragements, to secure the people against tumults; because when they once begin, there is danger of their running to such excesses, as will overturn the whole system of government. There is the rule from the reverend sage of the law, so often quoted before.

I. H.H.P.C. 437. "All present, aiding and assisting, are equally principal with him that gave the stroke, whereof the party died  For tho' one gave the stroke, yet in interpretation of law, it is the stroke of every person, that was present aiding and assisting."16

I. H.H.P.C. 440. "If divers come with one assent to do mischief, as to kill, rob, or beat, and one doth it, they are all principals in the felony. If many be present, and one only gives the stroke whereof the party dies, they are all principal, if they came for that purpose."17

Now if the party at Dock square, came with an intention only to beat the soldiers, and began the affray with them, and any of them had been accidentally killed, it would have been murder, because it was an unlawful design they came upon; if but one does it, they are all considered in the eye of the law to be guilty, if any one gives the mortal stroke, they are all principal here, therefore there is a reversal of the scene; if you are satisfied, that these soldiers were there on a lawful design and it should be proved any of them shot without provocation and killed any body, he only is answerable for it. First Hale's pleas of the crown.

1. H.H.P.C. 444. "Although if many come upon an unlawful design, and one of the company kill one of the adverse party, in pursuance of that design, all are principals; yet if many be together upon a lawful account, and one of the company, kill another of an adverse party, without any particular abetment of the rest to this fact of homicide they are not all guilty that are of the company, but only those that gave the stroke or actually abetted him to do it "[18]

1. H.H.P.C. 445. "In the case of a riotous assembly to rob or steal deer, or do any unlawful act of violence, there the offence of one, is the offence of all the company "[19]

In another place, 1. H.H.P.C. 439. "The Lord Dacre and divers others went to steal deer in the park of one Pelham—Raydon one of the company, killed the keeper in the park; the Lord Dacre and the rest of the company being in the other part of the park  Yet it was adjudged murder in them all, and they died for it."[20] And he quotes Crompton, 25. Dalton 93 p. 241.[21] So that in so strong a case as this, where this nobleman set out to hunt deer in the ground of another, he was in one part of the park, his company in another part, yet they were all guilty of murder.

The next is Hale's Pleas of the Crown, 1. H.H.P.C. 440, "The case of Drayton Bassit, diverse persons doing an unlawful act, all are guilty of what is done by one."[22]

Foster, 353, 354  "A general resolution against all opposers, whether such resolution appears upon evidence to have been actually and implicitly entered into by the confederates, or may reasonably be collected from their number, arms or behaviour, at, or before the scene of action, such resolutions, so proved, have always been considered as strong ingredients in cases of this kind. And in cases of homicide, committed inconsequence of them, every person present; in the sense of the law, when the homicide hath been committed, hath been involved in the guilt of him that gave the mortal blow."[23]

Foster. "The cases of Lord Dacre mentioned by Hale, and of Pudsey, reported by Crompton, and cited by Hale, turned upon this point. The offences they respectively stood charged with as principals, were committed far out of their sight and hearing; and yet both were held to be present  It was sufficient, that at the instant the facts were committed, they were of the same party and upon the same pursuit, and under the same engagements and expectations of mutual defence and support, with those that did the facts."[24]

Thus far I have proceeded, and I believe it will not be hereafter disputed by any body, that this law ought to be known to every one who has any disposition to be concerned in an unlawful assembly, whatever mischief happens in the prosecution of the design they set out upon, all are answerable for it. It is necessary we should consider the definitions of some other crimes, as well as murder; sometimes one crime gives occasion to another, an assault is sometimes the occasion of man-slaughter, sometimes of excusable homicide. It is

necessary to consider what is a riot. 1. Hawk. c. 65.§2. I shall give you the definition of it. "Where so ever more than three persons use force or violence, for the accomplishment of any design whatever, all concerned are rioters."25

Were there not more than three persons in Dock-square? Did they not agree to go to King-street, and attack the Main guard? Where then, is the reason for hesitation, at calling it a riot? If we cannot speak the law as it is, where is our liberty? And this is law, that wherever more than three persons, are gathered together, to accomplish any thing with force, it is a riot. 1. Hawk. c. 65, §2. "Wherever more than three, use force and violence, all who are concerned therein are rioters: But in some cases wherein the law authorizes force, it is lawful and commendable to use it  As for a sheriff, 2  And  67  Poph  121  or constable, 3 H  7  10 6. or perhaps even for a private person, Poph. 121. Moore, 656. to assemble a competent number of people, in order with force, to oppose rebels, or enemies, or rioters, and afterwards with such force, actually to suppress them."26

I do not mean to apply the word rebel on this occasion: I have no reason to suppose that ever there was one in Boston, at least among the natives of the country; but rioters are in the same situation, as far as my argument is concerned, and proper officers may suppress rioters, and so may even private persons

If we strip ourselves free from all military laws, mutiny acts, articles of war and soldiers oaths, and consider these prisoners as neighbours, if any of their neighbours were attacked in King-street, they had a right to collect together to suppress this riot and combination. If any number of persons meet together at a fair, or market, and happen to fall together by the ears, they are not guilty of a riot, but of a sudden affray  here is another paragraph which I must read to you, 1. Hawkins, c. 65, §3, "If a number of persons, being met together at a fair or market, or on any other lawful and innocent occasion, happen on a sudden quarrel, to fall together by the ears, they are not guilty of a riot, but of a sudden affray only, of which none are guilty, but those who actually engage in it," &c.27 End of the §. It would be endless, as well as superfluous, to examine, whether every particular person engaged in a riot, were in truth one of the first assembly, or actually had a previous knowledge of the design thereof.28

I have endeavoured to produce the best authorities, and to give you the rules of law in their words, for I desire not to advance any thing of my own. I chuse to lay down the rules of law, from authorities which cannot be disputed. Another point is this, whether, and how far, a private person may aid another in distress? Suppose a press gang should come on shore in this town, and assault any sailor, or householder in King street, in order to carry them on board one of his Majesty's ships and impress him without any warrant, as a seaman in his Majesty's service, how far do you suppose the inhabitants would think themselves warranted by law, to interpose against that lawless press gang? I agree that such a press gang would be as unlawful an assembly, as that was in King street  If they were to press an inhabitant, and carry him off for a sailor, would not the inhabitants think them-selves warranted by law to interpose in behalf of their fellow citizens? Now Gentlemen, if the soldiers had no right to

interpose in the relief of the Sentry, the inhabitants would have no right to interpose with regard to the citizen, for whatever is law for a soldier, is law for a sailor, and for a citizen, they all stand upon an equal footing, in this respect. I believe we shall not have it disputed, that it would be lawful to go into King-street, and help an honest man there, against the press master. We have many instances in the books which authorize it, which I shall produce to you presently.

Now suppose you should have a jealousy in your minds, that the people who made this attack on the Sentry, had nothing in their intention more than to take him off his post, and that was threatened by some; suppose they intended to go a little farther, and tar and feather him, or to ride him, (as the phrase is in Hudibras)[29] he would have a good right to have stood upon his defence, the defence of his liberty, and if he could not preserve that without hazard to his own life, he would be warranted, in depriving those of life, who were endeavouring to deprive him of his; that is a point I would not give up for my right hand, nay, for my life.

Well, I say, if the people did this, or if this was only their intention, surely the officer and soldiers had a right to go to his relief, and therefore they set out upon a lawful errand, they were therefore a lawful assembly, if we only consider them as private subjects and fellow citizens, without regard to Mutiny Acts, Articles of War, or Soldiers Oaths; a private person, or any number of private persons, have a right to go to the assistance of their fellow subject in distress and danger of his life, when assaulted and in danger from a few or a multitude. Keyl. 136. "If a man perceives another by force to be injuriously treated, pressed and restrained of his liberty, tho' the person abused doth not complain, or call for aid or assistance; and others out of compassion shall come to his rescue, and kill any of those that shall so restrain him, that is manslaughter. Keyl. A and others without any warrant, impress B to serve the King at sea, B quietly submitted and went off with the press master; Hugett and the others pursued them, and required a sight of their warrant; but they shewing a piece of paper that was not a sufficient warrant, thereupon Hugett with the others drew their swords, and the press masters theirs, and so there was a combat, and those who endeavoured to rescue the pressed man killed one of the pretended press masters. This was but manslaughter, for when the liberty of one subject is invaded, it affects all the rest: it is a provocation to all people, as being of ill example and pernicious consequences."[30]

2. Lord Raymond, 1301. The Queen versus Tooley et alios, Lord Chief Justice Holt says, 3d. "The prisoner (i.e. Tooley) in this case had sufficient provocation; for if one be imprisoned upon an unlawful authority, it is a sufficient provocation to all people out of compassion;—and where the liberty of the subject is invaded, it is a provocation to all the subjects of England, &c. and sure a man ought to be concerned for magna charta and the laws; and if any one against the law imprisons a man, he is an offender against magna charta."[31]

I am not insensible of Sir Michael Foster's observations on these cases,32 but apprehend
they do not invalidate the authority of them as far as I now apply them to the purpose of my
argument. If a stranger, a mere fellow subject may interpose to defend the liberty, he may to
defend the life of another individual. But according to the evidence, some imprudent people
before the Sentry, proposed to take him off his post, others threatened his life, and
intelligence of this was carried to the Main-guard, before any of the prisoners turned out:
They were then ordered out to relieve the Sentry, and any of our fellow citizens might lawfully
have gone upon the same errand; they were therefore a lawful assembly.

I have but one point more of law to consider, and that is this: In the case before you, I do not
pretend to prove that every one of the unhappy persons slain, were concerned in the riot; the
authorities read to you just now, say, it would be endless to prove, whether every person that
was present and in a riot, was concerned in planning the first enterprise or not: nay, I believe
it but justice, to say, some were perfectly innocent of the occasion, I have reason to suppose,
that one of them was, Mr. Maverick; he was a very worthy young man, as he has been
represented to me, and had no concern in the riotous proceedings of that night; and I believe
the same may be said, in favour of one more, at least, Mr. Caldwell who was slain; and
therefore many people may think, that as he, and perhaps another was innocent, therefore
innocent blood having been shed, that must be expiated by the death of somebody or other. I
take notice of this, because one gentleman nominated by the sheriff, for a Juryman upon this
trial, because he said, he believed Capt. Preston was innocent, but innocent blood had been
shed, and therefore somebody ought to be hanged for it, which he thought was indirectly
giving his opinion in this cause.33 I am afraid many other persons have formed such an
opinion; I do not take it to be a rule, that where innocent blood is shed, the person must die.
In the instance of the Frenchmen on the Plains of Abraham, they were innocent, fighting for
their King and country, their blood is as innocent as any, there may be multitudes killed, when
innocent blood is shed on all sides, so that it is not an invariable rule. I will put a case, in
which, I dare say, all will agree with me: Here are two persons, the father and the son, go out
a hunting, they take different roads, the father hears a rushing among the bushes, takes it to
be game, fires and kills his son through a mistake; here is innocent blood shed, but yet
nobody will say the father ought to die for it. So that the general rule of law, is, that whenever
one person hath a right to do an act, and that act by any accident, takes away the life of
another, it is excusable, it bears the same regard to the innocent as to the guilty. If two men
are together, and attack me, and I have a right to kill them, I strike at them, and by mistake,
strike a third and kill him, as I had a right to kill the first, my killing the other, will be
excusable, as it happened by accident. If I in the heat of passion, aim a blow at the person
who has assaulted me, aiming at him, I kill another person, it is but manslaughter. Foster,
261. §3. "If an action unlawful in itself be done deliberately and with intention of mischief or
great bodily harm to particulars, or of mischief indiscriminately, fall it where it may, and death
ensues against or beside the original intention of the party, it will be murder. But if such

mischievous intention doth not appear, which is matter of fact and to be collected from circumstances, and the act was done heedlessly and inconsiderately, it will be manslaughter not accidental death, because the act upon which death ensued, was unlawful."34

"Under this head, &c. [, Start insertion,See the remainder inserted in pages, End,] 145, 14635

Supposing in this case, the Molatto man was the person made the assault, suppose he was concerned in the unlawful assembly, and this party of soldiers endeavouring to defend themselves against him, happened to kill another person who was innocent, though the soldiers had no reason that we know of, to think any person there, at least of that number who were crouding about them innocent, they might naturally enough presume all to be guilty of the riot and assault, and to come with the same design; I say, if on firing on these who were guilty, they accidentally killed an innocent person, it was not their faults, they were obliged to defend themselves against those who were pressing upon them, they are not answerable for it with their lives, for upon supposition it was justifiable or excusable to kill Attucks or any other person, it will be equally justifiable or excusable if in firing at him, they killed another who was innocent, or if the provocation was such as to mitigate the guilt to manslaughter, it will equally mitigate the guilt, if they killed an innocent man un-designedly, in aiming at him who gave the provocation, according to Judge Foster,36 and as this point is of such consequence, I must produce some more authorities for it. 1. Hawkins, 84. "Also, if a third person accidentally happen to be killed, by one engaged in a combat with another upon a sudden quarrel, it seems that he who kills him is guilty of manslaughter only."37 H.H.P.C. 442.38 To the same point, and 1. H.H.P.C. 48439 and 4 Black. 27.40

I shall now consider one question more, and that is concerning provocation.*41 We have hitherto been considering self-defence, and how far persons may go in defending themselves against aggressors, even by taking away their lives, and now proceed to consider, such provocations as the law allows to mitigate or extenuate the guilt of killing, where it is not justifiable or excusable.

An assault and battery, committed upon a man, in such a manner as not to endanger his life, is such a provocation as the law allows to reduce killing, down to the crime of manslaughter. Now the law has been made on more consideration than we are capable of making at present; the law considers a man as capable of bearing any thing, and every thing, but blows. I may reproach a man as much as I please, I may call him a thief, robber, traitor, scoundrel, coward, lobster, bloody back, &c. and if he kills me it will be murder, if nothing else but words preceed; but if from giving him such kind of language, I proceed to take him by the nose, or fillip him on the forehead, that is an assault! that is a blow; the law will not oblige a man to stand still and bear it; there is the distinction; hands off, touch me not, as soon as you touch me, if I run you thro' the heart it is but Manslaughter; the utility of this distinction, the more you think of it, the more you will be satisfied with it; it is an assault when ever a blow is struck, let it be ever so slight, and sometimes even without a blow. The law

considers man as frail and passionate, when his passions are touched, he will be thrown off his guard, and therefore the law makes allowances for this frailty, considers him as in a fit of passion, not having the possession of his intellectual faculties, and therefore does not oblige him to measure out his blows with a yard stick, or weigh them in a scale; let him kill with a sword, gun or hedge stake, it is not murder, but only manslaughter  Keyling's Reports 135 Regina versus Mawgri[d]ge. "Rules supported by authority and general consent, shewing what are always allowed to be sufficient provocations  First, if one man, upon any words shall make an assault upon another, either by pulling him by the nose, or filliping upon the forehead, and he that is so assaulted, shall draw his sword, and immediately run the other through, that is but manslaughter; for the peace is broken by the person killed, and with an indignity to him that received the assault. Besides, he that was so affronted might reasonably apprehend, that he that treated him in that manner, might have some further design upon him."[42] So that here is the boundary, when a man is assaulted, and kills in consequence of that assault, it is but manslaughter; I will just read as I go along the definition of an assault, 1. Hawkins Chap. 62, §1. "An assault is an attempt or offer, with force or violence, to do a co[r]poral hurt to another; as by stricking at him, with or without a weapon, or presenting a gun at him, at such a distance to which the gun will carry, or pointing a pitchfork at him, or by any other such like act done in an angry, threatning manner, &c. But no words can amount to an assault."[43] Here is the definition of an assault, which is a sufficient provocation to soften killing down to manslaughter, 1. Hawkins, Chap. 31, §36. "Neither can he be thought guilty of a greater crime (than manslaughter) who finding a man in bed with his wife, or being actually struck by him, or pulled by the nose, or filliped upon the forehead, immediately kills him, or in the defence of his person from an unlawful arrest; or in the defence of his house, from those who claiming a title to it, attempt forcibly to enter it, and to that purpose shoot at it, &c."[44] Every snow-ball, oyster shell, cake of ice, or bit of cinder that was thrown that night, at the Sentinel, was an assault upon him; every one that was thrown at the party of soldiers, was an assault upon them, whether it hit any of them or not  I am guilty of an assault, if I present a gun at any person, whether I shoot at him or not, it is an assault, and if I insult him in that manner, and he shoots me, it is but manslaughter. Foster, 295, 6. "To what I have offered with regard to sudden rencounters, let me add, that the blood, already too much heated, kindleth afresh at every pass or blow. And in the tumult of the passions, in which mere instinct self preservation, hath no inconsiderable share, the voice of reason is not heard  And therefore, the law in condesension to the infirmities of flesh and blood doth extenuate the offence."[45] Insolent, scurrilous, or slanderous language, when it preceeds an assault, aggravates it. Foster 316. "We all knew [, Start insertion,know, End,] that words of reproach, how grating and offensive soever, are in the eye of the law, no provocation, in the case of voluntary homicide, and yet every man who hath considered the human frame, or but attended to the workings of his own heart, knoweth, that affronts of that kind, pierce deeper, and stimulate in the veins more effectually, than a slight injury done to a third person, tho' under colour of justice, possibly can."[46] I produce this to show the assault, in this case, was aggravated by the scurrilous language which preceeded it. Such words of reproach,

13/25

stimulate in the veins, and exasperate the mind, and no doubt if an assault and battery succeeds them, killing under such a provocation, is softened to manslaughter, but, killing without such provocation, makes it murder.

FIVE o'Clock, p.m. the Court adjourned till Tuesday morning [, Start insertion,4 December, End,], nine o'Clock

Tuesday, NINE o'Clock, the Court met according to adjournment, and Mr. Adams proceeded.

May it please your Honours, and you Gentlemen of the Jury,

I yesterday afternoon produced from the best authorities, those rules of law which must govern all cases of homicide, particularly that which is now before you; it now remains to consider the evidence, and see whether any thing has occurred, that may be compared to the rules read to you; and I will not trouble myself nor you with laboured endeavours to be methodical, I shall endeavour to make some few observations, on the testimonies of the witnesses, such as will place the facts in a true point of light, with as much brevity as possible; but I suppose it would take me four hours to read to you, (if I did nothing else but read) the minutes of evidence that I have taken in this trial. In the first place the Gentleman who opened this cause, has stated to you, with candour and precision, the evidence of the identity of the persons

The witnesses are confident that they know the prisoners at the barr, and that they were present that night, and of the party; however, it is apparent, that witnesses are liable to make mistakes, by a single example before you. Mr. Bass, who is a very honest man, and of good character, swears positively that the tall man, Warren, stood on the right that night, and was the first that fired; and I am sure you are satisfied by this time, by many circumstances, that he is totally mistaken in this matter; this you will consider at your leisure. The witnesses in general did not know the faces of these persons before; very few of them knew the names of them before, they only took notice of their faces that night. How much certainty there is in this evidence, I leave you to determine.

There does not seem to me to be any thing very material in the testimony of Mr Aston,47 except to the identity of McCauley, and he is the only witness to that. If you can be satisfied in your own minds, without a doubt, that he knew McCauley so well as to be sure, you will believe he was there.

The next witness is Bridgham, he says he saw the tall man Warren, but saw another man belonging to the same regiment soon after, so like him, as to make him doubt whether it was Warren or not; he thinks he saw the Corporal, but is not certain, he says he was at the corner of the Custom house, this you will take notice of, other witnesses swear, he was the remotest man of all from him who fired first, and there are other evidences who swear the left man did not fire at all; if Wemms did not discharge his gun at all, he could not kill any of the persons, therefore he must be acquitted on the fact of killing; for an intention to kill, is not murder nor

manslaughter, if not carried into execution: The witness saw numbers of things thrown, and he saw plainly sticks strike the guns, about a dozen persons with sticks, gave three cheers, and surrounded the party, and struck the guns with their sticks several blows: This is a witness for the crown, and his testimony is of great weight for the prisoners; he gives his testimony very sensibly and impartially  He swears positively, that he not only saw ice or snow thrown, but saw the guns struck several times; if you believe this witness, of whose credibility you are wholly the judges, as you are of every other; if you do not believe him, there are many others who swear to circumstances in favour of the prisoners; it should seem impossible you should disbelieve so great a number, and of crown witnesses too, who swear to such variety of circumstances that fall in with one another so naturally to form our defence; this witness swears positively, there were a dozen of persons with clubs, surrounded the party; twelve sailors with clubs, were by much an overmatch to eight soldiers, chained there by the order and command of their officer, to stand in defence of the Sentry, not only so, but under an oath to stand there, i.e. to obey the lawful command of their officer, as much, Gentlemen of the Jury, as you are under oath to determine this cause by law and evidence; clubs they had not, and they could not defend themselves with their bayonets against so many people; it was in the power of the sailors to kill one half or the whole of the party, if they had been so disposed; what had the soldiers to expect, when twelve persons armed with clubs, (sailors too, between whom and soldiers, there is such an antipathy, that they fight as naturally when they meet, as the elephant and Rhinoceros) were daring enough, even at the time when they were loading their guns, to come up with their clubs, and smite on their guns; what had eight soldiers to expect from such a set of people? Would it have been a prudent resolution in them, or in any body in their situation, to have stood still, to see if the sailors would knock their brains out, or not? Had they not all the reason in the world to think, that as they had done so much, they would proceed farther? Their clubs were as capable of killing as a ball, an hedge stake is known in the law books as a weapon of death, as much as a sword, bayonet, or musket  He says, the soldiers were loading their guns, when the twelve surrounded them, the people went up to them within the length of their guns, and before the firing; besides all this he swears, they were called cowardly rascals, and dared to fire; he says these people were all dressed like sailors; and I believe, that by and bye you will find evidence enough to satisfy you, these were some of the persons that came out of Dock-square, after making the attack on Murray's barracks, and who had been arming themselves with sticks from the butchers stalls and cord wood piles, and marched up round Corn-hill under the command of Attucks. All the bells in town were ringing, the ratling of the blows upon the guns he heard, and swears it was violent; this corroborates the testimony of James Bailey, which will be considered presently. Some witnesses swear a club struck a soldier's gun, Bailey swears a man struck a soldier and knocked him down  before he fired, "the last man that fired, levelled at a lad, and moved his gun as the lad ran:" You will consider, that an intention to kill is not murder; if a man lays poison in the way of another, and with an express intention that he should take it up and die of it, it  s not murder: Suppose that soldier had malice in his heart, and was determined to murder that boy if he could, yet the evidence clears him of killing the boy, I say admit he had malice in his heart, yet it is plain he did not kill

him or any body else, and if you believe one part of the evidence, you must believe the other, and if he had malice, that malice was ineffectual; I do not recollect any evidence that assertains who it was that stood the last man but one upon the left, admitting he discovered a temper ever so wicked, cruel and malicious, you are to consider his ill temper is not imputable to another, no other had any intention of this deliberate kind, the whole transaction was sudden, there was but a very short space of time between the first gun and the last, when the first gun was fired the people fell in upon the soldiers and laid on with their weapons with more violence, and this served to encrease the provocation, and raised such a violent spirit of revenge in the soldiers, as the law takes notice of, and makes some allowance for, and in that fit of fury and madness, I suppose he aimed at the boy

The next witness is Dodge, he says, there were fifty people near the soldiers pushing at them; now the witness before says, there were twelve sailors with clubs, but now here are fifty more aiding and abetting of them, ready to relieve them in case of need; now what could the people expect? It was their business to have taken themselves out of the way; some prudent people by the Town-house, told them not to meddle with the guard, but you hear nothing of this from these fifty people; no, instead of that, they were huzzaing and whistling, crying damn you, fire! why don't you fire? So that they were actually assisting these twelve sailors that made the attack; he says the soldiers were pushing at the people to keep them off, ice and snow-balls were thrown, and I heard ice rattle on their guns, there were some clubs thrown from a considerable distance across the street. This witness swears he saw snow-balls thrown close before the party, and he took them to be thrown on purpose, he saw oyster shells likewise thrown    Mr Langford the watchman, is more particular in his testimony, and deserves a very particular consideration, because it is intended by the council for the crown, that his testimony shall distinguish Killroy from the rest of the prisoners, and exempt him from those pleas of justification, excuse or extenuation, which we rely upon for the whole party, because he had previous malice, and they would from hence conclude, he aimed at a particular person; you will consider all the evidence with regard to that, by itself

Hemmingway, the sheriff's coachman, swears he knew Killroy, and that he heard him say, he would never miss an opportunity of firing upon the inhabitants: this is to prove that Killroy had preconceived malice in his heart, not indeed against the unhappy persons who were killed, but against the inhabitants in general, that he had the spirit not only of a Turk or an Arab, but of the devil; but admitting that this testimony is litterally true, and that he had all the malice they would wish to prove, yet, if he was assaulted that night, and his life in danger, he had a right to defend himself as well as another man; if he had malice before, it does not take away from him the right of defending himself against any unjust aggressor. But it is not at all improbable, that there was some misunderstanding about these loose expressions; perhaps the man had no thoughts of what his words might import; many a man in his cups, or in anger, which is a short fit of madness, hath uttered the rashest expressions, who had no such savage disposition in general: so that there is but little weight in expressions uttered at a kitching fire, before a maid and a coachman, where he might think himself at liberty to talk

as much like a bully, a fool, and a madman as he pleased, and that no evil would come of it. Strictly speaking, he might mean no more than this, that he would not miss an opportunity of firing on the inhabitants, if he was attacked by them in such a manner as to justify it: soldiers have sometimes avoided opportunities of firing, when they would have been justified, if they had fired  I would recommend to them, to be tender by all means, nay, let them be cautious at their peril; but still what he said, amounts in strictness, to no more than this, "If the inhabitants make an attack on me, I will not bear from them what I have done already;" or I will bear no more, than what I am obliged by law to bear. No doubt it was under the fret of his spirits, the indignation, mortification, grief and shame, that he had suffered a defeat at the Rope walks; it was just after an account of an affray was published here, betwixt the soldiers and inhabitants at New York.<u>48</u> There was a little before the 5th of March, much noise in this town, and a pompous account in the news papers, of a victory obtained by the inhabitants there over the soldiers; which doubtless excited the resentment of the soldiers here, as well as exultations among some sorts of the inhabitants: and the ringing of the bells here, was probably copied from New York, a wretched example in this, and in two other instances at least: the defeat of the soldiers at the Rope-walks, was about that time too, and if he did, after that, use such expressions, it ought not to weigh too much in this case  It can scarcely amount to proof that he harboured any settled malice against the people in general. Other witnesses are introduced to show that Killroy had besides his general ill will against every body, particular malice against Mr. Gray, whom he killed, as Langford swears.

Some of the witnesses, have sworn that Gray was active in the battle at the Rope walks, and that Killroy was once there, from whence the Council for the Crown would infer, that Killroy, in King-street, on the 5th of March in the night, knew Gray whom he had seen at the Rope-walks before, and took that opportunity to gratify his preconceived malice; but if this is all true, it will not take away from him his justification, excuse, or extenuation, if he had any. The rule of the law is, if there has been malice between two, and at a distant time afterwards they met, and one of them assaults the other's life, or only assaults him, and he kills in consequence of it, the law presumes the killing was in self defence, or upon the provocation, not on account of the antecedent malice. If therefore the assault upon Killroy was so violent as to endanger his life, he had as good a right to defend himself, as much as if he never had before conceived any malice against the people in general, or Mr. Gray in particular. If the assault upon him, was such as to amount only to a provocation, not to a justification, his crime will be manslaughter only. However, it does not appear, that he knew Mr. Gray; none of the witnesses pretend to say he knew him, or that he ever saw him. It is true they were both in the Rope-walks at one time, but there were so many combatants on each side, that it is not even probable that Killroy should know them all, and no witnesses says there was any rencounter there between them two  Indeed, to return to Mr  Langford's testimony, he says, he did not perceive Killroy to aim at Gray, more than at him, but he says expressly, he did not aim at Gray. Langford says, "Gray had no stick, was standing with his arms folded up." This

witness, is however most probably mistaken in this matter, and confounds one time with another, a mistake which has been made by many witnesses, in this case, and considering the confusion and terror of the scene, is not to be wondered at.

Witnesses have sworn to the condition of Killroy's bayonet, that it was bloody the morning after the 5th of March  The blood they saw, if any, might be occasioned by a wound given by some of the bayonets in the affray, possibly in Mr. Fosdick's arm, or it might happen, in the manner mentioned by my brother before  One bayonet at least was struck off and it might fall, where the blood of some person slain afterwards flowed. It would be doing violence to every rule of law and evidence, as well as to common sense and the feelings of humanity, to infer from the blood on the bayonet, that it had been stabbed into the brains of Mr  Gray after he was dead, and that by Killroy himself who had killed him.

Young Mr  Davis swears, that he saw Gray that evening, a little before the firing, that he had a stick under his arm, and said he would go to the riot, "I am glad of it, (that is that there was a rumpus) I will go and have a slap at them, if I lose my life." And when he was upon the spot, some witnesses swear, he did not act that peaceable in-offensive part, which Langford thinks he did. They swear, they thought him in liquor—that he run about clapping several people on the shoulders saying, "Dont run away"   "they dare not fire " Langford goes on "I saw twenty or five and twenty boys about the Sentinal—and I spoke to him, and bid him not be afraid."—How came the Watchman Langford to tell him not to be afraid. Does not this circumstance prove, that he thought there was danger, or at least that the Sentinel in fact, was terrified and did think himself in danger. Langford goes on "I saw about twenty or five and twenty boys that is young shavers "   We have been entertained with a great variety of phrases, to avoid calling this sort of people a mob.—Some call them shavers, some call them genius's.—The plain English is gentlemen, most probably a motley rabble of saucy boys, negroes and molattoes, Irish teagues49 and out landish jack tarrs.—And why we should scruple to call such a set of people a mob, I can't conceive, unless the name is too respectable for them    The sun is not about to stand still or go out, nor the rivers to dry up because there was a mob in Boston on the 5th of March that attacked a party of soldiers.— Such things are not new in the world, nor in the British dominions, though they are comparatively, rareties and novelties in this town. Carr a native of Ireland had often been concerned in such attacks, and indeed, from the nature of things, soldiers quartered in a populous town, will always occasion two mobs, where they prevent one    They are wretched conservators of the peace!

Langford "heard the rattling against the guns, but saw nothing thrown."—This rattling must have been very remarkable, as so many witnesses heard it, who were not in a situation to see what caused it. These things which hit the guns made a noise, those which hit the soldiers persons, did not    But when so many things were thrown and so many hit their guns, to suppose that none struck their persons is incredible. Langford goes on "Gray struck me on the shoulder and asked me what is to pay? I answered, I don't know but I believe something will come of it, by and bye."—Whence could this apprehension of mischief arise, if Langford

did not think the assault, the squabble, the affray was such as would provoke the soldiers to fire?—"a bayonet went through my great coat and jacket," yet the soldier did not step out of his place. This looks as if Langford was nearer to the party than became a watchman. Forty or fifty people round the soldiers, and more coming from Quaker-lane, as well as the other lanes. The soldiers heard all the bells ringing and saw people coming from every point of the compass to the assistance of those who were insulting, assaulting, beating and abusing of them—what had they to expect but destruction, if they had not thus early taken measures to defend themselves?

Brewer saw Killroy, &c. saw Dr. Young, &c. "he said the people had better go home." It was an excellent advice, happy for some of them had they followed it, but it seems all advice was lost on these persons, they would harken to none that was given them in Dock-square, Royal exchange-lane or King-street, they were bent on making this assault, and on their own destruction.

The next witness that knows any thing, was, James Bailey, he saw Carrol, Montgomery and White, he saw some round the Sentry, heaving pieces of ice, large and hard enough to hurt any man, as big as your fist: one question is whether the Sentinel was attacked or not.—If you want evidence of an attack upon him there is enough of it, here is a witness an inhabitant of the town, surely no friend to the soldiers, for he was engaged against them at the Rope-walks; he says he saw twenty or thirty round the Sentry, pelting with cakes of ice, as big as one's fist; certainly cakes of ice of this size may kill a man, if they happen to hit some part of the head. So that, here was an attack on the Sentinel, the consequence of which he had reason to dread, and it was prudent in him to call for the Main-Guard: he retreated as far as he could, he attempted to get into the Custom-house, but could not; then he called to the Guard, and he had a good right to call for their assistance; "he did not know, he told the witness, what was the matter," "but he was afraid there would be mischief by and bye;" and well he might, with so many shavers and genius's round him—capable of throwing such dangerous things. Bailey swears, Montgomery fired the first gun, and that he stood at the right, "the next man to me, I stood behind him, &c." This witness certainly is not prejudiced in favour of the soldiers, he swears, he saw a man come up to Montgomery with a club, and knock him down before he fired, and that he not only fell himself, but his gun flew out of his hand, and as soon as he rose he took it up and fired. If he was knocked down on his station, had he not reason to think his life in danger, or did it not raise his passions and put him off his guard; so that it cannot be more than manslaughter.

When the multitude was shouting and huzzaing, and threatning life, the bells all ringing, the mob whistle screaming and rending like an Indian yell, the people from all quarters throwing every species of rubbish they could pick up in the street, and some who were quite on the other side of the street throwing clubs at the whole party, Montgomery in particular, smote with a club and knocked down, and as soon as he could rise and take up his firelock, another club from a far struck his breast or shoulder, what could he do? Do you expect he should behave like a Stoick Philosopher lost in Apathy? Patient as Epictatus while his master was

breaking his leggs with a cudgel?50 It is impossible you should find him guilty of murder. You must suppose him divested of all human passions, if you don't think him at the least provoked, thrown off his guard, and into the furor brevis, by such treatment as this.

Bailey "Saw the Molatto seven or eight minutes before the firing, at the head of twenty or thirty sailors in Corn-hill, and he had a large cordwood stick." So that this Attucks, by this testimony of Bailey compared with that of Andrew, and some others, appears to have undertaken to be the hero of the night; and to lead this army with banners, to form them in the first place in Dock square, and march them up to King-street, with their clubs; they passed through the main-street up to the Main-guard, in order to make the attack. If this was not an unlawful assembly, there never was one in the world. Attucks with his myrmidons comes round Jockson's [, Start insertion,Jackson's, End,] corner, and down to the party by the Sentry-box; when the soldiers pushed the people off, this man with his party cried, do not be afraid of them, they dare not fire, kill them! kill them! knock them over! And he tried to knock their brains out. It is plain the soldiers did not leave their station, but cried to the people, stand off: now to have this reinforcement coming down under the command of a stout Molatto fellow, whose very looks, was enough to terrify any person, what had not the soldiers then to fear? He had hardiness enough to fall in upon them, and with one hand took hold of a bayonet, and with the other knocked the man down: This was the behaviour of Attucks;— to whose mad behaviour, in all probability, the dreadful carnage of that night, is chiefly to be ascribed. And it is in this manner, this town has been often treated; a Carr from Ireland, and an Attucks from Framingham, happening to be here, shall sally out upon their thoughtless enterprizes, at the head of such a rabble of Negroes, &c. as they can collect together, and then there are not wanting, persons to ascribe all their doings to the good people of the town.

Mr. Adams proceeded to a minute consideration of every witness produced on the crown side; and endeavoured to shew, from the evidence on that side, which could not be contested by the council for the crown, that the assault upon the party, was sufficiently dangerous to justify the prisoners; at least, that it was sufficiently provoking, to reduce to manslaughter the crime, even of the two who were supposed to be proved to have killed. But it would swell this publication too much, to insert his observations at large, and there is the less necessity for it, as they will probably occur to every man who reads the evidence with attention. He then proceeded to consider the testimonies of the witnesses for the prisoners, which must also be omitted: And conc[l]uded,

I will enlarge no more on the evidence, but submit it to you.—Facts are stubborn things; and whatever may be our wishes, our inclinations, or the dictates of our passions, they cannot alter the state of facts and evidence: nor is the law less stable than the fact; if an assault was made to endanger their lives, the law is clear, they had a right to kill in their own defence; if it was not so severe as to endanger their lives, yet if they were assaulted at all, struck and abused by blows of any sort, by snow-balls, oyster-shells, cinders, clubs, or sticks of any

kind; this was a provocation, for which the law reduces the offence of killing, down to manslaughter, in consideration of those passions in our nature, which cannot be eradicated. To your candour and justice I submit the prisoners and their cause.

The law, in all vicissitudes of government, fluctuations of the passions, or flights of enthusiasm, will preserve a steady undeviating course; it will not bend to the uncertain wishes, imaginations, and wanton tempers of men. To use the words of a great and worthy man, a patriot, and an hero, and enlightned friend of mankind, and a martyr to liberty; I mean Algernon Sidney, who from his earliest infancy sought a tranquil retirement under the shadow of the tree of liberty, with his tongue, his pen, and his sword, "The law, (says he,) no passion can disturb. Tis void of desire and fear, lust and anger. 'Tis menc sine affectu; written reason; retaining some measure of the divine perfection. It does not enjoin that which pleases a weak, frail man, but without any regard to persons, commands that which is good, and punishes evil in all, whether rich, or poor, high or low,—Tis deaf, inexorable, inflexible."51 On the one hand it is inexorable to the cries and lamentations of the prisoners; on the other it is deaf, deaf as an adder to the clamours of the populace.

1. Wemms Trial 148–178.

2. "[I]f, by supporting the rights of mankind and of invincible truth, I shall contribute to save from the agonies of death one unfortunate victim of tyranny, or of ignorance, equally fatal; his blessing and tears of transport, will be a sufficient consolation to me for the contempt of all mankind." Beccaria, An Essay on Crimes and Punishments 42–43. See note 11 above; 1 JA, Diary and Autobiography 352–353

3. All the following authorities had been cited in Preston's trial.

4. Roughly, "It is preferable that the guilty be acquitted than that the innocent be condemned."

5. The exact citation has not been established. 3 Blackstone, Commentaries * 4, refers to "self-defence . . . the primary law of nature." See Rex v. Preston, note 24.

6. 4 Blackstone, Commentaries *186, discusses this example, attributing it to Bacon (Francis Bacon, Elements of The Common Laws of England, c. 5) and referring to 1 Hawkins, Pleas of the Crown 73, which also discusses the example and attributes it to "Dal. Cap 98," which may be Michael Dalton, The Country Justice. In the edition JA used (London 1746) the point appears in chapter 150, at p. 339.

7. See notes 30 and 31 above.

8. Wemms Trial erroneously reads "persons."

9. See note 30 above.

10. 1 <u>Hawkins, Pleas of the Crown</u> 72. (The section reference should be 23.)

11. 1 <u>Hawkins, Pleas of the Crown</u> 72.

12. 1 <u>Hawkins, Pleas of the Crown</u> 71, with immaterial grammatical shifts.

13. 1 <u>Hawkins, Pleas of the Crown</u> 75.

14. 1 <u>Hawkins, Pleas of the Crown</u> 75.

15. See note <u>31</u> above.

16. 1 <u>Hale, Pleas of the Crown</u> 437.

17. 1 <u>Hale, Pleas of the Crown</u> 440.

18. 1 <u>Hale, Pleas of the Crown</u> 444.

19. 1 <u>Hale, Pleas of the Crown</u> 445.

20. 1 <u>Hale, Pleas of the Crown</u> 439.

21. The references are presumably to Crompton, L'Authoritie et Jurisdiction des Court de la Maieste de la Royaume 25a (1594), and to <u>Dalton, The Country Justice</u>. See note <u>6</u> above. In the edition of Dalton which JA used (London, 1746), the point appears in chapter 145, at p. 331.

22. 1 <u>Hale, Pleas of the Crown</u> 440. Despite the quotation marks, JA is here only summarizing.

23. <u>Foster, Crown Cases</u> 353–354. Foster says "explicitly entered."

24. <u>Foster, Crown Cases</u> 354.

25. 1 <u>Hawkins, Pleas of the Crown</u> 156: "[W]here-ever more than three Persons use Force and Violence, in the Execution of any Design whatever wherein the Law does not allow the Use of such Force, all who are concerned therein are Rioters."

26. 1 Hawkins, Pleas of the Crown 156.

27. 1 <u>Hawkins, Pleas of the Crown</u> 156. The passage continues:

"because the Design of their Meeting was innocent and lawful, and the subsequent Breach of the Peace, happened unexpectedly without any previous Intention concerning it; yet it is said, That if Persons, innocently assembled together, do afterwards upon a Dispute happening to arise among them, form themselves into Parties, with Promises of mutual Assistance, and then make an Affray, They are guilty of a Riot, because upon their

confederating together with an Intention to break the Peace, they may as properly be said to be assembled together for that Purpose from the Time of such Confederacy, as if their first coming together had been on such a Design."

<u>28</u>. 1 <u>Hawkins, Pleas of the Crown</u> 157.

<u>29</u>. The reference is apparently to Samuel Butler's Hudibras, Part II, Canto II, lines 605–658. The editors have used the London edition of 1739.

<u>30</u>. Reg. v. Mawgridge, <u>Kelyng</u> 119, 136, 137, 84 <u>Eng. Rep.</u> 1107, 1114, 1115 (Q.B. 1707).

<u>31</u>. Reg. v. Tooley et al., 2 <u>Ld. Raym.</u> 1296, 1301, 1302, 92 <u>Eng. Rep.</u> 349, 352, 353 (Q.B. 1709).

<u>32</u>. <u>Foster, Crown Cases</u> 312:

"The Doctrine advanced in the Case of The Queen against Tooly and Others hath, I conceive, carried the Law in favour of Private Persons Officiously interposing farther than sound Reason founded in the Principles of true Policy will warrant. I say Officiously Interposing, because the Interposition of Private Persons in the Cases I have mentioned, for preserving the Peace and preventing Bloodshed, standeth upon quite a different Foot."

Foster continues the discussion at p. 313–316.

<u>33</u>. The individual has not been identified.

<u>34</u>. <u>Foster, Crown Cases</u> 261.

<u>35</u>. The reference is to Josiah Quincy's argument, text following note <u>53</u> above, <u>Wemms Trial</u> 145–146. Quotation marks, brackets, punctuation, and italics follow the original; see <u>Wemms Trial</u> 163.

<u>36</u>. <u>Foster, Crown Cases</u> 261–262.

<u>37</u>. 1 <u>Hawkins, Pleas of the Crown</u> 84.

<u>38</u>. 1 <u>Hale, Pleas of the Crown</u> 442.

<u>39</u>. 1 <u>Hale, Pleas of the Crown</u> 484.

<u>40</u>. See note <u>47</u> above. "Killing the Woman who was hired to wash. This was innocent Blood." Paine Massacre Notes. No such instance appears at the cited page.

<u>41</u>. The paragraphs printed following the asterisk below appear as a footnote in the <u>Wemms Trial</u> 164–165. They were clearly based on JA's research in Rex v. Corbet, No. <u>56</u>; citations for all the authorities may be found in the documentary text of that case.

* The distinction between Murder and Manslaughter, is more easily confounded than many other distinctions of Law relative to Homicide  And many persons among us seem to think that the punishment of Death ought to be inflicted upon all voluntary killing one private man by another, whether done suddenly or deliberately, cooly or in anger. These received notions may have originated partly from a false construction of the general precept to Noah, whoso sheddeth man's blood, by man shall his blood be shed. But may not some of these mistaken notions have been derived from law books  We find the distinction between Murder and Manslaughter, sometimes attributed to the peculiar benignity of the English law, and it is sometimes represented that the particular fact which the law of England calls Manslaughter, and indulges with Clergy, is punished with death in all other laws

Vide Observations on the Statutes page 54. By the law of Scotland, there is no such thing as Manslaughter, nor by the civil law; and therefore a criminal indicted for Murder under the Statute of Henry the Eighth, where the Judges proceed by the rules of the civil law, must either be found guilty of the Murder or acquitted—and in another place, Observations on the Statutes 422. Note (z.) I have before observed that by the civil law, as well as the law of Scotland, there is no such offence, as what is, with us termed Manslaughter: Sir Michael Foster 288  If taking general verdicts of acquittal, in plain cases of death, Per Infortunium, &c. deserveth the name of a deviation, it is far short of what is constantly practiced at an Admiralty sessions, under 28. H. 8. with regard to offences not ousted of Clergy by particular statutes, which had they been committed at land would have been intituled to Clergy. In these cases the Jury is constantly directed to acquit the prisoner; because the marine law doth not allow of Clergy in any case, and therefore in an indictment for murder on the high seas, if the fact cometh out upon evidence to be no more than Manslaughter, supposing it to have been committed at land, the prisoner is constantly acquitted.

II. Lord Raymond 1496. His Lordship says, "From these cases it appears, that though the law of England, is so far peculiarly favourable (I use the word peculiarly because I know of no other law, that makes such a distinction between Murder and Manslaughter) as to permit the excess of anger and passion (which a man ought to keep under and govern) in some instances to extenuate the greatest of private injuries, as the taking away a man's life is; yet in these cases, it must be such a passion, as for the time deprives him of his reasoning faculties.["]

I shall not enter into any enquiry, how far the Admiralty sessions in England, or a Special Court of Admiralty in America ought to proceed by the rules of civil law, though it is a question of immense importance to Americans. But must beg leave to observe that though the distinction between Murder and Manslaughter is not found in words in the civil law, yet the distinction between homicide, with deliberation and without deliberation, and on a sudden provocation is well known in that law, and the former is punished with death, the lat[t] er, with some inferior corporal punishment at the discretion of the Judges.

Indeed the civil law is more favourable, and indulgent to sudden anger and resentment than the common law, and allows many things to be a provocation sufficient to exempt the person killing from the Poena ordinaria, which is death, which the common law considers as a slight provocation or none at all.

Cod  Lib  9  Tit  16, Note 46  Gail, page 503  Maranta, page 49  Par  4  Dist  1  77

It should seem from these authorities, that the lenity and indulgence of the laws of England, is not unnatural, extraordinary, or peculiar, and instead of being unknown in the civil law, that it is carried much further in many respects than in the common law. And indeed it seems that the like indulgence, was permitted in the Jewish law—though it has been so often represented as peculiar to the English law, that many persons seem to think it unwarrantable, and tending to leave the guilt of blood upon the land.

42  See note 45 above

43. 1 Hawkins, Pleas of the Crown 133–134.

44. 1 Hawkins, Pleas of the Crown 82–83.

45. Foster, Crown Cases 296.

46. Foster, Crown Cases 316.

47  The reporter's mistake for Austin  A similar error (Bass for Bliss) appears in the preceding paragraph; see p. 219 above.

48. The Boston Gazette, 19 Feb. 1770, Suppl., had contained a full account of the Liberty Pole riots in New York during Jan. 1770.

49. "Anglicized spelling of the Irish name Tadhg. . . . A nickname for an Irishman." OED.

50  "Epaphroditus, it is said, once gratified his cruelty by twisting his slave's Epictetus' leg in some instrument of torture. 'If you go on, you will break it,' said Epictetus. The wretch did go on, and did break it. 'I told you that you would break it,' said Epictetus quietly, not giving vent to his anguish by a single word or a single groan." F. W. Farrar, Seekers After God 192 (London, 1891).

51  See Rex v  Preston, text at note 6

EXHIBIT 13

UNIV. OF MICH. LAW LIBRARY.

THE

# Statutes at Large;

BEING

## A COLLECTION

OF ALL THE

# LAWS OF VIRGINIA,

FROM THE

### FIRST SESSION OF THE LEGISLATURE,

IN THE YEAR 1619.

PUBLISHED PURSUANT TO AN ACT OF THE GENERAL ASSEMBLY
OF VIRGINIA, PASSED ON THE FIFTH DAY OF FEBRUARY,
ONE THOUSAND EIGHT HUNDRED AND EIGHT.

———:◈:———

### VOLUME VI.

———:◈:◈:◈:———

## By WILLIAM WALLER HENING.

———:◈:◈:◈:———

" The *Laws* of a country are necessarily connected with every thing be-
longing to the people of it; so that a thorough knowledge of *them*, and
of their progress would inform us of every thing that was most use-
ful to be known about them; and one of the greatest imperfections
of historians in general, is owing to their ignorance of law."

PRIESTLEY'S LECT. ON HIST. pa. 149.

24695

### RICHMOND.

PRINTED FOR THE EDITOR.

AT THE FRANKLIN PRESS.—W. W. GRAY, PRINT

..........

1819.

Generated on 2023-11-15 18:18 GMT / https://hdl.handle.net/2027/mdp.35112104867793
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

is to say, each councillor not being an officer of the
militia, four complete sets of arms, as is herein before
directed for a foot soldier: The speaker of the house
of Burgesses not being an officer of the militia, four
compleat sets of arms as before: The receiver general,
auditor, and secretary, not being a councillor or offi-
cer of the militia, each four compleat setts as before:
The attorney general, not being an officer of the mili-
tia, two compleat sets as before: The clerk of the
council, and clerk of the secretary's office, not being
officers of the militia, each two compleat sets as before:
The mayor, recorder, and aldermen of the city of
Williamsburg, and borough of Norfolk, (not before
by this act obliged, and not being officers of the mili-
tia) each two compleat sets, as before. And if they
shall fail or refuse so to do, within twelve months af-
ter the passing this act, then it shall and may be law-
ful, for the several courts of the counties, wherein the
persons before mentioned shall reside, and they are
hereby impowered and required to levy the value of
the same on each of them respectively.

VII. *And be it further enacted by the authority afore-*
*said,* That all such free mulattoes, negroes and In-
dians, as are or shall be listed, as aforesaid, shall ap-
pear without arms, and may be employed as drummers,
trumpeters or pioneers, or in such other servile labor,
as they shall be directed to perform. And for the bet-
ter training and exercising the militia, and rendering
them more serviceable.

How mulat-
toes, ne-
groes, and
Indians, may
be employ-
ed.

VIII. *Be it further enacted, by the authority afore-*
*said,* That every captain shall once in three months,
and oftner if thereto required, by the lieutenant or
chief commanding officer in the county, muster, train
and exercise his troop or company, and the lieutenant
or other chief commanding officer in the county, shall
cause a general muster and exercise of all the troops
and companies within his county, to be made in the
months of March and September yearly: And if any
soldier, shall at any general or private muster, refuse
to perform the commands of his officer, or behave him-
self refractorily or mutinously, or misbehave himself
at the courts martial, to be held in pursuance of this
act, as is herein after directed, it shall and may be
lawful to, and for the chief commanding officer, then
present, to fine every such soldier, if an horseman,
any sum not exceeding ten shillings, and if a footman,

When gene-
ral musters
shall be call-
ed.

Where per-
sons misbe-
have them-
selves at any
private or
generrl mus-
ter, how to
be punished.



Generated on 2023-11-15 18:17 GMT  /  https://hdl.handle.net/2027/mdp.35112104867793
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

not exceeding seven shillings and six pence, which fine
shall be immediately paid down to such officer; but
in case any such offender shall not be able to pay
down such fine immediately, then he shall give good
security to such officer, for the payment of the same
in three months. And in case any soldier so fined,
as aforesaid, shall refuse or fail to pay down his fine,
or to give such security for paying the same as afore-
said, then it shall and may be lawful, for such officer,
and he is hereby impowered by warrant under his
hands, to commit every such soldier to the county goal,
there to remain without bail or mainprize, for any
time not exceeding three days, and the offender or of-
fenders so committed, shall not be thence discharged,
until the lawful fees for commitment, imprisonment,
and discharge, shall be fully paid and satisfied.  And
every captain, or in his absence the lieutenant, shall
duly make a list of all the persons upon his muster-
roll, who shall be summoned, and do not appear at any
of the said musters armed and accoutred, as by this
act is directed, and return the same with the names of
all officers, who shall be absent to the next court mar-
tial: And every captain shall have power to appoint
a clerk to his troop or company, who shall keep the
muster-rolls, and attend all musters with the same,
and such clerk shall be exempted from mustering but
shall appear with arms at all such musters. And fur-
ther, it shall and may be lawful, for the lieutenant, or
other chief officer of the militia in the county, to or-
der all soldiers listed therein, to go armed to their re-
spective parish churches.

The court
martial.

IX. *And be it further enacted, by the authority afore-
said,* That it shall and may be lawful for the field of-
ficers and captains of every county, or the major part
of them, whereof the county lieutenant, colonel, lieu-
tenant colonel, or major, shall be one, and they are
hereby required to meet at the court-house of their
counties, respectively, the day next following the gene-
ral muster in September, every year, if fair, if not, the
next fair day, then and there to hold a court martial,
which court shall have power to adjourn from day to
day, and to enquire of the age and abilities of all per-
sons listed, and to exempt such as they shall adjudge
incapable of service, and of all delinquents returned
by the captains, for absence from musters, or appear-
ing without arms and accoutrements. And where any

Generated on 2023-11-15 18:17 GMT  /  https://hdl.handle.net/2027/mdp.35112104867793
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

person is returned a delinquent to a court martial, and
shall not be able by reason of sickness, or other real
disability to attend such court, to give in his reasona-
ble excuse for such delinquency; it shall and may be
lawful, for the succeeding court martial, to be held for
such county, city or borough, wherein such person
shall be returned a delinquent, upon such reasonable
excuse then offered, to remit such fine or fines, levied
by the preceeding court martial on such person: And
such court shall and may, and they are hereby impow-
ered to administer an oath or oaths, to any person or
persons, for their better information in the premisses,
and to order the fines inflicted by this act, not other-
wise directed, to be levied upon all delinquents who
shall not make out some just excuse, for not perform-
ing their duty, and to order and dispose of all such
fines, for buying drums, trumpets and trophies for the
use of the militia of the county, and for supplying the
militia of the said county with arms. And the said
courts shall have full power, and are hereby required
to keep a register of all their proceedings, and for that
purpose to appoint a clerk, and to allow him such sa-
lary for his service, out of the said fines, as they in
their discretion shall think reasonable: And after the
holding of every such court, the clerk shall make out
copies of all their orders, and deliver the same within
one month next following the said court to the sheriff
of the county, who is hereby required to demand and
receive the money or tobacco therein charged, of the
persons made chargeable therewith, and in case of non-
payment, on or before the tenth day of April, then next
following, to levy the same by distress and sale of the
goods of the person refusing according to the direc-
tions of the laws now in force, enabling the sale of
goods distrained for rent; and where any delinquent
shall remove out of the county, before he hath paid
and satisfied all fines laid on him, in pursuance of this
act, and shall not leave sufficient effects in the county,
to satisfy the same, then the said clerk shall send co-
pies of the said court's orders against such delinquents
to the sheriff of the county, into which he or they shall
be removed, and such sheriff is hereby impowered and
required to collect, levy and account for the same, in
the manner herein before directed.

X. *And be it further enacted, by the authority afore-* Penalties.
*said,* That the several persons hereafter mentioned,

Digitized by Google    Original from UNIVERSITY OF MICHIGAN

# EXHIBIT 14

THE

# PUBLIC RECORDS

OF THE

# COLONY OF CONNECTICUT,

PRIOR TO THE UNION WITH NEW HAVEN COLONY,

MAY, 1665;

TRANSCRIBED AND PUBLISHED, (IN ACCORDANCE WITH A RESOLUTION
OF THE GENERAL ASSEMBLY,) UNDER THE SUPERVISION
OF THE SECRETARY OF STATE,

WITH OCCASIONAL NOTES, AND AN APPENDIX;



By J. HAMMOND TRUMBULL,

COR. SEC. CONN. HIST. SOCIETY; COR. MEMB. N. YORK HIST. SOCIETY, ETC.

HARTFORD:

BROWN & PARSONS.

1850.

DOES NOT CIRCULATE

It is Ordered that there shall be a rate of forty pownd leuied, to be paid to Mr. Fenwicke, to be laid out for the repaireing the Fort.

For the avoyding of many differences and quarrells that may arise by takeing vppe debts of Indeans, It is Ordered, that whosoeuer, after the publisheing this Order, shall sell for day, or trust any Indean or Indeans w^th goods or comodityes, shall forfeit to the Country the double some or value of what they do betrust them w^thall; and that no man shall trade w^th them at or about their wygwams, but in their vessells or Pynnaces or att their owne howses, vnder the penalty of 20s. ech tyme.

To p^ruent or w^thstand such sudden assaults as may be made by Indeans vppon the Sabboth or lecture dayes, It is Ordered, that one p^rson in euery seuerall howse wherein is any souldear or souldears, shall bring a muskett, pystoll or some peece, w^th powder and shott to ech meeting, excepte some on Magistrate dispense w^th any on, and appoynt some other to supply his roome.

Jacob Waterhowse doth acknowledge himselfe bownd in a recognizance of Fifty pownd, to attend the next Court to answer for his mysdemeanor towards the Indeans.

The Court is adioyrned vntill Thursday next.

———

[113]   A P^rticuler Court, held the ix^th of No: 1643.

John Heynes Esq^r, Gou^r.

Ed: Hopkins Esq^r, Dep.

Roger Ludlowe Esq^r, George Willis, Mr. Webster, Mr. Welles, Mr. Whiteing, Capten Mason, Mr. Woolcott, Mr. Swayne.

*The Jury.*   Mr. Tailcott, Tho: Osmore, Ed: Stebbing, John Barnard, Arther Williams, Mathewe Sension, Tho: Dewey, Tho: Orton, Tho: Vffoote, Samuel Hales, Richard Parke, John Demon.

In the action of Nathaniell Dickinson pl^t, ag^t John Robins defen^t, the Jury find for the def^t.   Costs of Court vij.s,

In the ac. of Nathaniell Eldredge pl^t, ag^t Tho: Marshfield, the Jury find for the pl^t, the debt and costs of Court, xl.

EXHIBIT 15

# RECORDS

OF

# MASSACHUSETTS.

## VOL. I.

1628—1641.

190                         THE RECORDS OF THE COLONY OF

1636-7.

9 March.
321–
Order for
watches, &c.,
to prevent
danger by In-
dians.

Whearas many complaints have bene made to this Court, both formerly & at p̃sent, of the great neglect of all sorts of people of vseing the lawfull & necessary meanes of their safety, especially in this time of so <sup>much</sup><sub>great</sub> danger frō the Indians, it is therefore ordered, that the millitary officers in every towne shall p̃vide that the watches bee dewely kept in places most fit for comōn safetie, & also a ward on the Lords dayes, the same to begin before the end of this first month, & to bee continued vntill the end of September; & that every pson above the age of 18 yeares (except magistrats & elders of the churches) shalbee compellable to this servise, either in pson or by some substitute, to bee alowed by him that hath the charge of the watch or warde for that time, vpon paine of 5ˢ for every default, to bee levyed by distresse by the surveyar of the armes, & to bee implyed for light & fyer, & such necessaries, by the discretion of the millitary officers./

Arme to be
brought to
public as-
sembly.
Rep. 3 : 2 :
1638.

And all such persons (except such as some Courte or the counsell shall see cause to dispence wᵗʰ, & except those of Boston who shall hearin bee ordered by the magistrates there) shall come to the publike assemblyes wᵗʰ their musketts, or other peeces fit for servise, furnished wᵗʰ match, powder, & bullets, vpon paine of 12ᵈ for every default, to bee levyed & imployed as aforesaid./

322–
Not to trauajle
wᵗʰout armes.

And no person shall travell above one mile from his dweling house, except in places wheare other houses are neare together, wᵗʰout some armes, vpon paine of 12ᵈ for every default, to bee levyed & imployed as aforesaid./

323–
Watch houses.

And every towne shall p̃vide a sufficient watch house before the last of the 5ᵗʰ month next, vpon paine of 5ˡ./

Provided, that all such as keepe families at their farmes, being remote from any towne, shall not bee compellable to send their servants from their farmes to watch or warde in the townes./

324–
Surveyʳ to give
accont of for-
feitures.

The surveyor of the armes shall give account to the townesmen of all the said forfectures, & the imployment thereof, & any of the Courts or the counsell shall have power to heare & determine all questions & differences wᶜʰ may arise about the execution of this order./

For Dorchester, Mʳ Israel Staughton chosen captaine; Mʳ Natha: Dunkan, leiftenant; John Homan, ensigne./

For Charlestowne, Mʳ Robert Sedgwick chosen captaine./

For Watertowne, Mʳ Williᵐ Jenison chosen captaine./

[*189.]
Georg: Cook,
capt.

* For Newetowne, Mʳ George Cooke chosen captain; Mʳ Willi: Spencer, leiftenant; Mʳ Sam: Shepard, ens[ign]./

For Saugust, Mʳ Da⌃    ⌃    ; Mʳ Daniel Howe, leiftenant; Richʳd Walker, ensign./

# EXHIBIT 16

# ARCHIVES OF MARYLAND

## PROCEEDINGS

OF THE

## Council of Maryland

1636–1667

PUBLISHED BY AUTHORITY OF THE STATE, UNDER THE DIRECTION
OF THE MARYLAND HISTORICAL SOCIETY

WILLIAM HAND BROWNE
*Editor*



BALTIMORE
MARYLAND HISTORICAL SOCIETY
1885

in executing the charge and Command aforesaid upon pain of Liber F.
Contempt as may be Justly Inflicted by the Law Martiall, Given
under our Great Seal at S^t Maries this 23^th June 1642
    This our Comission to endure untill further Order to the
Contrary. Given 23 June 1642.

Cecilius &c To our Trusty Councellor William Blount Esq p. 154
Greeting Whereas the Military band of our County of S^t Maries
is at this time destitute of a Captain to take care & Charge of
the Safety and defence thereof Especially in this present danger
and fear of the Incursions of Some Indians our enemies, We
relyeing much upon the Skill and Courage Doe hereby Con-
stitute and authorise you to be the Captain of the Souldiery
our Said County of S^t Maries to leavie Muster and train all or
any English able to bear arms within O^r S^d County according
to your disretion and to punish all Contemners and other
offenders against the Law of discipline of war, according to the
Said Law and discipline as near as you may, and to use all
force and means you may for the resistance of the Enemy and
Safety and defence of the Colony, and to doe all and every
other thing which unto the Charge and Office of a Captain of
an Army belongeth or have accustomed to belong, And We
doe hereby require all the Inhabitants of the Said County and
all other persons within the Same for the time being to be
obedient unto you in all things that Shall concern the Execution
of the power & Command hereby Comitted unto you upon
Such pain of Contempt as may be Justly Inflicted by the Law
Martiall, This our Comission to endure untill the return of our
Dear brother Leonard Calvert into this Province, or untill
furth^r Order to the Contrary Given 23 June 1642.

Orders proclaimed 23 June 1642 upon pain of death or other
penalties, as by Severity of Martiall Law may be inflicted:

That noe Inhabitant or housekeeper entertain any Indian
upon any colour of Licence, nor doe permitt to any Indian any
Gunn powder and Shott.

That all housekeepers provide fixed gunn and Sufficient
powder and Shott for each person able to bear arms.

Noe man to discharge 3 Gunns within the Space of ¼ hour p. 155
nor concurr to the dischargeing Soe many, except to give or
Answer alarm.

Upon the hearing of an Alarum every housekeeper to answer
and continue it Soe far as he may.

Noe man able to bear arms to goe to church or Chappell or
any considerable distance from home without fixed gunn and
1 Charge at least of powder and Shott.

EXHIBIT 17

# RECORDS

OF THE

# COLONY OF RHODE ISLAND

AND

## PROVIDENCE PLANTATIONS,

IN

## NEW ENGLAND.



PRINTED BY ORDER OF THE LEGISLATURE.

TRANSCRIBED AND EDITED BY

JOHN RUSSELL BARTLETT,

SECRETARY OF STATE.

VOL. I.

## 1636 TO 1663.

--------------

PROVIDENCE, R. I.

A. CRAWFORD GREENE AND BROTHER, STATE PRINTERS.

1856.

1639.    It is ordered, that Mr. Robert Jefferies shall traine the
Band for the present.

It is ordered, that noe man shall go two miles from the
Towne unarmed, eyther with Gunn or Sword ; and that
none shall come to any public Meeting without his weap-
on. Upon the default of eyther he shall forfeitt five
shillings.

It is further ordered, that those Commissioners for-
merly appointed to negotiate the Business with our
Brethren of Pocassett, shall give them our propositions
under their hands, and shall require their propositions
under their hands, with their answers, and shall give reply
unto it ; and so shall returne to the Body a Brieve of
what they therein have done.

By order, Mr. Easson and Mr. John Clarke are desired
to informe Mr. Vane by writing, of the state of things
here, and desire him to treate about the obtaining a Pat-
tent of the Island from his Majestie ; and likewise to
write to Mr. Thomas Burrwood, Brother to Mr. Easson,
concerning the same thing.

The Court is adjourned to this day three weeks.

At the particular Courte holden the 3d of y$^e$ 10th,
1639.

John Bartlett and John Hadson, being convicted and as
well by witnesses as their own confession, found guiltie of
the Breach of the Peace, by their excess in drinking, are
adjudged to pay five shillings a piece unto the hands of
the Constable according to the Law in that case pro-
vided.

EXHIBIT 18

# Statutes at Large;

### BEING

# A COLLECTION

#### OF ALL THE

# LAWS OF VIRGINIA,

#### FROM THE

## FIRST SESSION OF THE LEGISLATURE,

### IN THE YEAR 1619.

PUBLISHED PURSUANT TO AN ACT OF THE GENERAL ASSEMBLY OF
VIRGINIA, PASSED ON THE FIFTH DAY OF FEBRUARY,
ONE THOUSAND EIGHT HUNDRED AND EIGHT.

## VOLUME I.

## BY WILLIAM WALLER HENING.

"The *Laws* of a country are necessarily connected with every thing be-
longing to the people of it : so that a thorough knowledge of *them*, and
of their progress would inform us of every thing that was most use-
ful to be known about them ; and one of the greatest imperfections
of historians in general, is owing to their ignorance of law."

PRIESTLEY'S LECT. ON HIST. pa. 149.

## RICHMOND :

PRINTED BY AND FOR SAMUEL PLEASANTS, JUNIOR, PRIN
TO THE COMMONWEALTH.
1809.

Generated on 2023-11-15 18:05 GMT / https://hdl.handle.net/2027/mdp.35112104867868
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

174                              LAWS OF VIRGINIA,

## ACT LI.

To go armed to church.

ALL men that are fittinge to beare armes, shall bringe their peices to the church uppon payne of every effence, yf the mayster allow not thereof to pay 2 lb. of tobacco, to be disposed by the church-wardens, who shall levy it by distresse, and the servants to be punished.

## ACT LII.

Obedience to superiors.

NOE person within this colony uppon rumour of supposed change and alteration shall presume to be disobedient to the present government, nor servants to their private officers, maysters and overseers, at their uttermost perills.

## ACT LIII.*

Adjoining plantations to assist, up-on alarms.

THE ioyninge plantations, to assisst the fronteires or their neighbours, uppon alarmns, the default to be severelie censured, and false alarmns punished.

## ACT LIV.

No hides to be exported.

IT is ordered, That no cowe hides, oxe hides, bull hides, goate skynes, deer skynes, or other hides, or skynes whatsoever, be sent or carryed out of this colony uppon forfeiture of thrice the value, whereof the one halfe to the informer, and the other halfe to publique uses.

## ACT LV.

Terms of the quarterly courts at James City.

IT is established and appoynted, That the fowre quarter corts shall be held at James-Citty yearlie, as followeth, vizt. uppon the first day of September, the first day of December, the first of March, and the first day of June.

## ACT LVI.

Commanders to exercise their men at stated

IT is ordered and appoynted, That the comanders of all the severall plantations, doe upon holy days exercise the men under his comand, and that the coman-

* There is no act numbered LIII in the manuscript.

Generated on 2023-11-15 18:06 GMT / https://hdl.handle.net/2027/mdp.35112104867868
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

EXHIBIT 19

ATLANTA-FULTON PUBLIC LIBRARY

R00978 59791

# The Way it was in the



*South*

## The Black Experience in *Georgia*

DONALD L. GRANT

Edited and with an Introduction by Jonathan Grant

Published by the University of Georgia Press
Athens, Georgia 30602
© 1993 by Mildred Bricker Grant
All rights reserved

The paper in this book meets the guidelines for
permanence and durability of the Committee on
Production Guidelines for Book Longevity of the
Council on Library Resources.

Printed in Canada

05   04   03   02   01   P   5   4   3   2   1

Library of Congress Cataloging-in-Publication Data
Grant, Donald L. (Donald Lee), 1919–1988.
The way it was in the South :
the Black experience in Georgia / by Donald L. Grant ;
edited with a foreword by Jonathan Grant.
      p.      cm.
Originally published: Secaucus, N.J. : Carol Pub. Group, ©1993.
Includes bibliographical references and index.
ISBN: 0-8203-2329-2 (pbk.: alk. paper)
1. African Americans—Georgia—History.
2. Georgia—Race relations.
3. Georgia—History. I. Grant, Jonathan. II. Title.
E185.93.C4 G75 2001
975.8'00496073—dc21      2001021350

British Library Cataloging-in-Publication Data available

Violence occurred throughout the state, although most of the 1870 Klan activity came in three major areas: Northwest, East-Central, and Southwest Georgia. The greatest Klan activity was probably centered around Wilkes County. These tactics, known as the "Georgia Plan," were later copied in other states, especially Mississippi, where Gen. John B. Gordon went in 1875 to help the Klan terrorize Republicans and return that state to Democratic control.

The poll tax was used again to ensure a Democratic victory in 1870, and in some areas Republican poll watchers and election managers were jailed. After military rule was reimposed, the reconstituted legislature passed the Akerman Bill, which was signed into law on October 3, 1870. This provided that voters did not need to pay poll taxes to cast ballots in the December elections. Democrats in towns like Sparta refused to acknowledge the new state law and swore out arrest warrants for black voters who would not pay their poll taxes and election managers who encouraged "illegal" voting.

All over Georgia white supremacists armed themselves and gathered at the polls on election day to prevent Republicans from voting. In some counties blacks had Republican ballots taken away from them and were forced to vote Democratic. Sometimes they were paid. Many blacks concluded that if they were going to have to vote against their principles, they might as well take whatever money was offered.

Despite widespread fraud by Democrats, Henry McNeal Turner was reelected by twenty-eight votes—and then was threatened with death if he did not immediately leave town. That night, 150 armed blacks protected his home and told city fathers that if one black was killed they would torch the town. It was peaceful in Macon that night. Later, Turner and other black leaders were convicted on charges of inciting to riot, but the convictions were overturned on appeal. Turner was denied his seat in the legislature, however.

In 1870, Georgia Democrats won 86 percent of the Senate and 81 percent of the House. Despite the overwhelming election of white Democrats, five blacks were elected to the Senate, two more than in 1868, and eighteen to House, as compared to twenty-nine in 1868. One, Abram Turner of Putnam County, was soon murdered, and the Klan initiated a race riot at the special election that was called to replace him, ensuring a Democratic victory. Even before the Democrat-controlled legislature assembled a year later, in November 1871, eleven of the remaining black members came under fire. Their elections were disputed by Democrats, and the Klan sent them notes saying they would die if they did not resign. Governor Bullock did resign and fled the state to avoid prosecution on charges of corruption. In "An Address to the People

EXHIBIT 20

The Pennsylvania Gazette (Philadelphia, Pennsylvania)   Thu Apr 30 1761   Page 4

https://www.newspapers.com/image/39390647

Downloaded on Nov 15 2023



Copyright © 2023 Newspapers.com   All Rights Reserved

EXHIBIT 21

Case 8:23-cv-01798-CJC-ADS   Document 29-1   Filed 11/20/23   Page 92 of 116   Page ID #:1978

The South-Carolina Gazette; and Country Journal (Charleston, South Carolina)   Tue Nov 22 1768   Page 3

https://www.newspapers.com/image/605387416

Downloaded on Nov 15 2023



Copyright © 2023 Newspapers.com  All Rights Reserved

# EXHIBIT 22

The Independen  Gaze  eer (Philadelphia, Pennsylvania)    Sat  Aug 31  1782    Page 4

https://www newspapers com/ mage/39983270

Down oaded on Nov 15  2023



Copyr ght © 2023 Newspapers com  A  R ghts Reserved

# EXHIBIT 23

Poughkeepsie Journal (Poughkeepsie, New York)   Wed  Apr 18  1787   Page 4
https //www newspapers com/ mage/114453304
Down oaded on Nov 15  2023



Copyr ght © 2023 Newspapers com  A  R ghts Reserved

POWERED BY
Newspapers
.com

EXHIBIT 24

UNIV. OF MICH. LAW LIBRARY

# STATUTES AT LARGE

OF

# VIRGINIA,

FROM OCTOBER SESSION 1792, TO DECEMBER SESSION 1806, INCLUSIVE,

## IN THREE VOLUMES,

(NEW SERIES,)

BEING A CONTINUATION OF HENING.

## VOL. I.

## BY SAMUEL SHEPHERD.

RICHMOND:
PRINTED BY SAMUEL SHEPHERD.

1835.

Digitized by Google

152                    LAWS OF VIRGINIA, OCTOBER 1792.

brought for her lands.
render the wife's lands in any suit instituted against the husband and wife for lands which are her inheritance during the coverture, then the wife may come at any time before judgment, and defend her right.

When the reversioner may defend a suit brought against the tenant for life.
3. If tenant in dower, tenant by the curtesy, or otherwise for term of life, or by gift, where the reversion is reserved, do make default, or will give up, the heirs or they unto whom the reversion belongeth, shall be admitted to their answer if they come before judgment; and if upon such default or surrender, judgment happen to be given, then the heir, or they unto whom the reversion belongeth, after the death of such tenants, shall in no wise be injured by such default or surrender.

When the dying seized of a disseisor shall not take away the right of entry.
4. The dying seized hereafter of any disseisor having no right or title, shall not be such descent in law as to take away the right of entry from such as, at the time of the death of the disseisor, had lawful title of entry, except such disseisor hath had peaceable possession five years next after the disseisin committed without entry, or continual claim of such as have lawful title.

Husband's conveyance of his wife's lands not to prejudice her or her heirs.
5. No feoffment, or other conveyance, or other act or acts hereafter to be made, suffered or done by the husband only, of any lands, tenements or hereditaments, being the inheritance or freehold of his wife, during the coverture between them, shall in any wise be, or make any discontinuance thereof, or be prejudicial or hurtful to the said wife or her heirs, or to such as shall have right, title, or interest to the same, by the death of such wife; but the said wife or her heirs, and such other to whom such right shall appertain after her decease, shall and may then lawfully enter into all such lands, tenements and hereditaments, according to their rights and titles therein; any such feoffment, or other conveyance or act to the contrary notwithstanding.

Repealing clause.
6. All and every statute and act, or clause and clauses of any statute or act, coming within the purview of this act, shall be, and the same are hereby repealed: *Provided nevertheless,* That nothing

Proviso.
herein contained shall be construed to affect any right which may have accrued, or been vested before the commencement of this act.

Commencement.
7. This act shall commence in force from and after the passing thereof.

----

CHAP. 52.—An ACT reducing into one the several acts for the settlement and regulation of ferries.

(Passed December 26, 1792.)

Public ferries established.
1. *Be it enacted by the general assembly,* That ferries be constantly kept at the places hereafter mentioned, and at the rates annexed to each ferry, that is to say:

Over the bay of Chesapeake.
                    *Over the bay of Chesapeake.*

From York, Hampton and Norfolk towns, to the land of the heirs of John Bowdoin, deceased, on Hungar's river, for a man or horse passing singly, three dollars and thirty-three cents; for a man and horse, or if there be more, for each, two dollars and fifty cents.

|  | For a Man. Cents. | For a Horse. Cents. |
|---|---|---|
| Over Patowmac river and its branches. *Over Patowmac river and its branches.* |  |  |
| From Henry Ashton's to Cedar Point Maryland, | 42 | 42 |
| From Thomas Rowe's to Cedar Point, | 42 | 42 |
| From Hooe's to Cedar Point, | 33 | 33 |

# EXHIBIT 25

THE

# STATUTES AT LARGE

OF

## SOUTH CAROLINA;

EDITED, UNDER AUTHORITY OF THE LEGISLATURE

BY

DAVID J. McCORD.



VOLUME THE NINTH,

Containing the Acts relating to Roads, Bridges and Ferries,

with an appendix,

Containing the Militia Acts prior to 1794.

COLUMBIA, S. C.
PRINTED BY A. S. JOHNSTON.
1841.

Google — Original from NEW YORK PUBLIC LIBRARY

OF SOUTH CAROLINA.                                        61

*Acts relating to Roads, Bridges and Ferries.*          A. D. 1725.

I. *And be it enacted*, by his Excellency Francis Nicholson, Esq., Governor, by and with the advice and consent of his Majesty's Honorable Council and the Assembly of this Province, and by the authority of the same, That a public ferry be, and is hereby, established at the plantation of the said James Wrixam, deceased, in Colleton county, across Pon Pon river, which shall be, and is hereby, vested in Mr. Henry Jackson, Mr. John Bull, and Mr. Christopher Smith, commissioners, for the space of ten years next ensuing the ratification of this Act, who are hereby empowered to agree with any person or persons who shall undertake the looking after the said ferry ; and there shall be found and provided a good and sufficient ferry boat, for which there shall be paid fifty pounds by the public, and no more, which ferry boat shall be able to carry over four horses at the least ; and the person or persons so to be appointed by the said commissioners, shall find and provide two able servants or slaves, who shall constantly attend the said ferry, at all hours, as well by night as by day, to carry over passengers, their horses, servants and slaves.

*Ferry over Pon Pon, at Wrixam's.*

II. *And be it further enacted* by the authority aforesaid, That the person so to be appointed by the said commissioners, shall be allowed for ferriage the several rates and prices following, that is to say : for a white man, fifteen pence ; for a slave, fifteen pence ; for a horse, fifteen pence ; for cattle, six pence per head, that shall be swam over, and fifteen pence per head if carried in the ferry boat ; for sheep and hogs, per head, seven pence half penny.

*Rates of Ferriage.*

III. *And be it further enacted* by the authority aforesaid, That the person who shall have the charge of the said ferry, shall keep the said ferry boat in good and sufficient repair, from time to time and at all times, during the said term of ten years, and shall cause constant attendance to be given at the said ferry at all times of the day and night as aforesaid, under the several penalties and forfeitures following, that is to say :—for non-attendance the first half hour, ten shillings ; for an hour, twenty shillings ; for every hour after, forty shillings. And every justice of the peace in the said county, upon information made to him upon oath, in writing, of such neglect, by any person who shall be delayed thereby, shall be, and is hereby, empowered to levy such forfeitures by warrant of distress under his hand and seal, directed to any adjacent constable, and sale of the defaulter's goods ; and in case of no goods to be found, against the body of the defaulter ; the monies arising by such defaults to be to the use of the poor of the parish.

*Penalty for neglect.*

IV. *And be it further enacted* by the authority aforesaid, That Mr. Henry Jackson, Mr. John Bull, and Mr. Christopher Smith, be, and are hereby appointed, commissioners for inspecting into the said ferry, and to appoint persons, from time time, to look after the same ; and to remove such person or persons upon notorious neglects, and others in his and their stead again to constitute, as they shall see necessary.

*Commissioners*

V. *And be it further enacted* by the authority aforesaid, That all persons under arms in times of alarms and expresses, shall have their ferriage free, themselves, servants, and horses.

VI. *And be it further enacted* by the authority aforesaid, That there shall be, and is hereby established, a scout consisting of seven men and an official cer, to scout on the out settlements of Ponpon, for the better security of the inhabitants, and to prevent their being surprised by Indians, who shall be under the command of a field officer, to be nominated by his Excellency the Governor, or commander-in-chief for the time being, for that purpose ; and

*Scout established.*

Digitized by Google          Original from NEW YORK PUBLIC LIBRARY

EXHIBIT 26

# 5 Zoological Gardens of the United States

*Vernon N. Kisling, Jr. and Rick Barongi*

## CONTENTS

5.1 Introduction ............................................................................................................ 141
5.2 Eighteenth- and Nineteenth-Century Menageries ............................................. 141
5.3 Nineteenth-Century Zoos and Aquariums ......................................................... 144
5.4 Twentieth-Century Zoos and Aquariums ........................................................... 154
5.5 Charting a New Course for the Twenty-First Century ....................................... 164
    5.5.1 Focusing on Mission ................................................................................ 164
    5.5.2 Growing Great Leaders ............................................................................ 164
    5.5.3 Raising the Bar on Animal Care and Conservation ................................ 165
    5.5.4 Powering Up through Philanthropy and Partnerships ............................. 165
    5.5.5 The Future ................................................................................................ 165
References ...................................................................................................................... 166
Additional Sources ....................................................................................................... 169

## 5.1 INTRODUCTION

Prior to the European colonization of North America, there is no information on primitive animal collections, although the southwest native American tribes kept and bred tropical parrots obtained in trade from the Aztecs of Central America and Incas of South America.[1,2] Hard work, frugality, simple pleasures, and the need to establish a new society in an overwhelming and threatening wilderness characterized America's colonial period. Colonists did not look favorably upon frivolous pursuits and amusements, and this viewpoint applied to the itinerant animal acts that appeared early in the eighteenth century. Nevertheless, fascination with wild animals attracted onlookers to these early itinerant acts, which featured bears and other native animals. These animals were brought to a tavern or village square for show and then the owner would pass around the hat to collect enough money to take him and his animals to the next town.[3] The intellectual study of America's indigenous wildlife during the colonial period was the domain of visiting European naturalists.[4,5]

## 5.2 EIGHTEENTH- AND NINETEENTH-CENTURY MENAGERIES

Exhibiting native species in itinerant animal shows remained common during the eighteenth century, but occasionally the native animals were replaced with more fascinating exotic animals from distant lands. A lion had the distinction of being the first exotic species exhibited when it was brought to Boston, Massachusetts in 1716. This representative of the "dark continent" was housed at the home of Captain Arthur Savage before it was moved in 1720 to the home of Martha Adams. Adams advertised in the newspaper, welcoming all to visit her lion whenever they wanted. She also had a sign on her house that read, "The Lion King of Beasts is to be seen here." This lion was shipped to the West Indies in 1726, but returned in 1727 to be shown in Philadelphia, Pennsylvania. In 1728, it appeared in New York and New Jersey and finally in New London, Connecticut before vanishing from the historian's view. It would be 1791 before another lion made it to American shores.[3,6]

DOI: 10.1201/9781003282488-5

Another exotic species reached America soon after the lion arrived in Boston. This was a camel, which arrived from Africa and was on display for about four weeks in 1721. Other camels arrived in 1739 in Boston and in 1787 in New York. This last occurrence involved a pair of camels that were exhibited all over New England, New York and Pennsylvania for about ten years.[3,6] Camels had actually been imported into Virginia in 1701, but for the purpose of domestication rather than exhibition.[7] A "ferocious Greenland bear," the "great white [polar] bear" was brought to Boston in 1733 and kept on its owner's property among the hustle and bustle of the Boston wharves. Another polar bear made its way to Boston in 1798.[3] Several ostriches were shown at Woart's Tavern, Boston in 1794 before leaving for South Carolina, the first documented occurrence of this species.[3]

These exotic animal arrivals were few and far between. Most exotic animal shipments during the eighteenth century went to British and European menageries. However, American sea captains occasionally ventured to transport exotic animals to America, where they hoped to sell these animals for a high profit. It was then up to the itinerant showmen who purchased these animals to keep them alive long enough to recoup their huge investment. To do so, the animals had to travel to as many communities as possible, an arduous undertaking at the time. Exotic animals usually appeared at one of the major commercial ports in the northeast and then traveled to other major cities, such as Boston, New York, Philadelphia and Baltimore, Maryland. These cities provided the largest audiences, but on the way to these cities the animals were exhibited at smaller invervening towns. To attract customers, the traveling animal shows were advertised in local newspapers and printed flyers. However, these documents were ephemeral and few have survived.

Itinerant animal acts exhibiting several species began to appear in the larger cities during the late 1700s and carried over into the early 1800s when traveling menageries and circus menageries became popular. A menagerie containing reptiles and birds, in addition to the usual mammals, was exhibited in New York in 1781. Another menagerie, consisting of a tiger, orangutan, sloth, baboon, buffalo, crocodile, lizards, snakes and other creatures, was exhibited at New York in 1789. In 1796, a menagerie of birds, a seal and about 20 other animals appeared in New York, followed the next year by another, which consisted of wolves, monkeys, a mongoose, numerous small mammals and numerous birds. Although the exact identity of some of these animals is not known, some no doubt represented species that were probably making their first appearances in the United States.[3,8]

The tiger promoted in the 1789 menagerie was part of a collection from Africa and Brazil so it may, or may not, actually have been a tiger since tigers are not from these regions. Two tigers from India did appear at Crombie's Tavern in Salem, Massachusetts in 1806. These tigers appeared later in 1806 in New York, and another tiger arrived in Salem in 1816. Likewise, the orangutan is not from the regions advertised. This orangutan, however, was followed by others shown in New York in 1828, in Salem in 1831 and in Boston in 1836.

The first elephant to arrive in America was a two-year-old female Captain Jacob Crowninshield brought to New York in 1796 aboard his ship *America*. After exhibition at Beaver Street and Broadway in New York, the elephant was sold and taken on tour to Philadelphia (1796), Baltimore (1796), Charleston, South Carolina (1796), Philadelphia (1797), New York (1797), Providence, Rhode Island (1797), Cambridge, Massachusetts (1797), Salem (1797), Philadelphia (1798), Charleston (1798), Boston (1804), Philadelphia (1806), New York (1808), Baltimore (1811), Gettysburg, Pennsylvania (1812), New York (1818) and many points in between. While at Cambridge in July 1797, the elephant (*the* elephant because she was the only elephant in America and her owner felt no obligation to name her) supposedly attended commencement ceremonies at Harvard University[3,6] (Figure 5.1).

Captain Crowninshield bought the elephant for $450 and sold it for $10,000, a fortune in 1796. The price of admission to see the elephant was 50 cents, so many paying customers were needed to recover the investment and maintenance costs. At the time (1790s) there were only two cities with more than 25,000 residents and most towns had fewer than 2,500.[9] Fortunately for the owner, the elephant was immensely popular and stayed healthy for two decades. Many other exhibitors were not as fortunate.[3]



**FIGURE 5.1**   Poster dated 1797 advertising the Boston exhibition of the first elephant brought to the United States. Facsimile of the original poster. Courtesy of Vernon Kisling.

After the American Revolution, European naturalists returned home, but since their work had primarily supported European scientific endeavors, there was little effect because there was no American scientific infrastructure to collapse. During the early republic period, American naturalists, after initially relying on European resources, began developing their own education programs, research support, societies, communication networks and collections. However, financial resources and human efforts had to be devoted to endeavors that would allow the newly independent nation to survive, and therefore the natural sciences emerged only slowly. American knowledge about

natural science improved in the early to mid-1800s as colleges were established, state-sponsored survey expeditions increased, journals and publications became more numerous, and the number of naturalists grew.[10–13]

American attitudes during the first half of the 1800s were still a mixture of a practical need to survive, a fear of the unknown wilderness and a need to conquer and cultivate that wilderness.[14] Itinerant animal acts continued to make the rounds of the big cities, as well as the new frontier towns, traveling the back roads and along the rivers. A lion, elephant and camel made their way to the remote frontier town of Natchez, Mississippi in 1806 and 1808 and two trained bears appeared at the Mississippi Hotel, Natchez in 1835. These itinerant acts, along with circus acts and other public amusements, were on their way to or from New Orleans, Louisiana.[15]

Other new species were displayed in America for the first time during the antebellum years, including a zebra in 1805, a rhinoceros in 1826, a quagga in 1833, a giraffe in 1837 and a hippopotamus in 1850.[3,16] A one-horned rhinoceros walked onto the stage at Peale's Museum, New York in 1826 and was still being exhibited in New York in 1829. Another rhinoceros appeared at Washington Gardens, Boston in 1830 and was on the road from 1831 to 1835. The quagga, a species (*Equus quagga*) that soon became extinct, was an important part of one traveling menagerie in 1833. Rufus Welch, Zebedee Macomber and Eisenhart Purdy, the managers of this menagerie, were able to obtain this rare animal because they fielded their own expeditions during 1833/34. Three giraffes from Cape Town, South Africa were brought to America in 1837 and exhibited for several years. By 1842, only one survived and was still exhibited. Another was imported in 1839 and shown at Peale's Museum, New York. George Bailey imported a hippopotamus in 1850.

In 1835, a gathering of traveling menagerie owners representing most of the menageries then in existence met at the Elephant Hotel in Somers, New York to form the Zoological Institute. The institute was formed as a corporation that owned and managed its menageries jointly in a coordinated manner, monopolizing the traveling menagerie business to control expenses. The institute was short-lived, however, since it succumbed to the financial crisis of 1837. From the 1830s until the Civil War the circus was coming of age, and many exhibited their own menageries, often including trained animal acts.[17,18]

## 5.3 NINETEENTH-CENTURY ZOOS AND AQUARIUMS

Joel R. Poinsett expressed interest in establishing a zoological garden in the United States during his Washington, D.C. address to the National Institution for the Promotion of Science in 1841. Poinsett called for a national institution that would include, among other organizations, a zoological garden.[19] His concern was expressed as part of a broader debate on establishing the Smithsonian Institution. Poinsett thought the Smithsonian should be modeled after the Jardin des Plantes in Paris, which had "an observatory, a museum containing collections of all the productions of nature, a botanic and zoological garden, and the necessary apparatus for illustrating every branch of physical science."[19,20] This suggestion, however, was in the minority and there was little interest in the zoological garden idea. The Smithsonian was eventually established in 1846 with a museum of natural history rather than a zoological garden.[21] The zoological garden idea was not publicly debated again until 1859 in Philadelphia, 1870 in Washington and 1872/73 in Boston, but no zoological garden was established until 1874.

Until 1800, Philadelphia was the capital of the American republic, as well as its largest city and a leading cultural center. It was a city distinctive in its civic pride and its patronage of science. It was the location of America's first scientific society (the American Philosophical Society, 1743), the first botanical garden (the Bartram Botanical Garden, 1731) and the second natural history museum (the Peale Museum, 1784). The antebellum years found Philadelphia with a number of public parks, gardens, museums, circuses, menageries, concerts, theaters and other cultural entertainment.[22] And with the determined assistance of some dedicated naturalists and civic leaders, Philadelphia would eventually find itself with America's first zoological garden.

# EXHIBIT 27

# ·LIFE AND TIMES

OF

# JOSEPH WARREN.

BY

### RICHARD FROTHINGHAM.

BOSTON:

LITTLE, BROWN, & COMPANY.

1865.

Digitized by Google

Entered, according to Act of Congress, in the year 1865, by

RICHARD FROTHINGHAM,

In the Clerk's Office of the District Court of the District of Massachusetts.

UNIV. OF
CALIFORNIA

Cambridge : Stereotyped and Printed by John Wilson and Sons.

Digitized by Google

TO

THOMAS  AUSTIN  GODDARD,

This Volume is Inscribed,

WITH  RESPECT  AND  AFFECTION,

BY  THE  AUTHOR.

Digitized by Google

Case 8:23-cv-01798-CJC-ADS  Document 29-1  Filed 11/20/23  Page 112 of 116  Page ID
#:1998

dent frustrated.[1]  Warren's friends felt apprehensions
for his safety.  As one of his students, Dr. Eustis,
returned home one evening, he passed a party of
officers who appeared to be on the watch; and he
advised Warren not to visit his patients that evening.
But Warren, putting his pistols in his pocket, replied,
"I have a visit to make to Mrs. ——, in Cornhill, this
evening, and I will go at once: come with me."[2]
It was about this time, when he was moved by the
taunts which the officers were uttering, that he said
to Eustis, "These fellows say we won't fight: by
Heavens, I hope I shall die up to my knees in blood!"[3]
One day he was passing the place at the Neck where
the gallows stood, and met three officers, one of
whom insultingly said, "Go on, Warren: you will
soon come to the gallows."  Warren turned, walked
up to the officers, and calmly asked who it was that
uttered these words, but received no reply.[4]

Warren did not attend the meetings of the com-
mittee of safety in April.  They held their sessions

[1] Moore's Diary of the Revolution, i. 157.  When George Chalmers was
preparing his history of the revolt of the American colonies, he addressed to
General Gage a series of questions, some of which refer to this period.  One of
these related to an alleged design of "the malcontents" to surprise Boston, with
a view to "massacre the troops."  In one of the replies of Chalmers, he says : —

"On the arrival of two vessels at Marblehead, on the 8th of April, 1775, an
unusual hurry and commotion was perceived among the disaffected.  It being on
a Sunday morning, Dr. Cooper, a notorious rebel, was officiating in his meeting-
house, and, on notice given him, pretended sudden sickness, went home, and sent
to another clergyman to do his duty in the evening.  He, with every other chief
of the faction, left Boston before night, and never returned to it.  The cause, at
the time unknown, was discovered on the 14th of said month, when a vessel
arrived with Government despatches, which contained directions to seize the
persons of certain notorious rebels.  It was too late.  They had received timely
notice of their danger, and were fled." — *4th Series of Mass. Hist. Soc. Collections,*
vol. iv.

[2] Tudor's Life of Otis, 466.            [3] *Ib.* See p. 168.

[4] Loring's Hundred Boston Orators, 48.

Digitized by Google

EXHIBIT 28

Newspapers
by ancestry

Albany Weekly Herald (Albany, Oregon)   Thu  Sep 28  1893   Page 3

https://www.newspapers.com/image/565701266

Downloaded on Nov 17  2023

Copyright © 2023 Newspapers.com  All Rights Reserved

Newspapers
POWERED BY
.com

# EXHIBIT 29

Case 8:23-cv-01798-CJC-ADS   Document 29-1   Filed 11/20/23   Page 116 of 116   Page ID #:2002

The Eugene Guard (Eugene, Oregon)   Mon   May 15   1893   Page 2

https //www newspapers com/ mage/131045758

Down oaded on Nov 17   2023



Copyr ght © 2023 Newspapers com  A  R ghts Reserved