ROB BONTA
Attorney General of California
MARK R. BECKINGTON
R. MATTHEW WISE
Supervising Deputy Attorneys General
TODD GRABARSKY
JANE REILLEY
LISA PLANK
ROBERT L. MEYERHOFF
Deputy Attorneys General
State Bar No. 298196
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6177
  Fax:  (916) 731-2144
  E-mail:  Robert.Meyerhoff@doj.ca.gov
*Attorneys for Rob Bonta, in his Official Capacity as Attorney General of the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RENO MAY, an individual, et al.,**<br><br>                               Plaintiffs,<br><br>           v.<br><br>**ROBERT BONTA, in his official capacity as Attorney General of the State of California, and Does 1-10,**<br><br>                               Defendants. | Case Nos. 8:23-cv-01696 CJC (ADSx)<br>              8:23-cv-01798 CJC (ADSx)<br><br>**SUR-REBUTTAL DECLARATION OF HOLLY BREWER IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:            December 20, 2023<br>Time:           1:30 p.m.<br>Courtroom:   9B<br>Judge:          Hon. Cormac J. Carney |
| **MARCO ANTONIO CARRALERO, an individual, et al.,**<br><br>                               Plaintiffs,<br><br>           v.<br><br>**ROBERT BONTA, in his official capacity as Attorney General of California,**<br><br>                               Defendant. | |

**SUR-REBUTTAL DECLARATION OF PROFESSOR HOLLY BREWER**

I, Holly Brewer, declare under penalty of perjury that the following is true and correct:

1. This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters set forth in this declaration.

2. I previously provided a declaration in support of the State of California's opposition to the plaintiffs' motions for preliminary injunction filed in *May v. Bonta*, C.D. Cal. No. 8:23-cv-01696 CJC (ADSx) (Dkt. No. 21-1) and *Carralero v. Bonta*, C.D. Cal. No. 8:23-cv-01798 CJC (ADSx) (Dkt. No. 20-1). See Decl. of Professor Holly Brewer (herein referred to as the "Brewer Declaration" or "Declaration"). My professional background and qualifications, and my retention and compensation information, are set forth in Paragraphs 3-7 and Paragraph 8 of the Declaration, respectively.

3. The Declaration was prepared pursuant to a request from the Office of the Attorney General of the State of California to provide an expert opinion on several aspects of the history of early America, including to comment on assertions made by the *May* and *Carralero* Plaintiffs in their preliminary injunction motions about the existence in early America of certain entities and establishments that today are frequented by children, and on the history of certain aspects of firearms regulation in the Anglo-American legal tradition.

4. For this rebuttal declaration, I have been asked by the Office of the Attorney General to review and provide a response and/or an expert opinion regarding certain statements (discussed herein below) made in the *Carallero* Plaintiffs' reply brief (*Carralero* Dkt. No. 29) and in the Rebuttal Declaration of Clayton Cramer (*May* Dkt. Nos. 29-15) ("Cramer Rebuttal Decl.") filed in support of the *May* Plaintiffs' reply. I have reviewed those statements and prepared this sur-rebuttal declaration.

5.      The opinions I provide in this sur-rebuttal declaration are based on my review of the referenced statements and the citations in support thereof and of documents filed in this lawsuit, and on my education, expertise, and research.  The opinions contained herein are made pursuant to a reasonable degree of professional certainty

**I.   RESPONSE TO STATEMENTS MADE IN REBUTTAL DECLARATION OF CLAYTON CRAMER FILED IN SUPPORT OF *MAY* PLAINTIFFS' REPLY**

6.      The *May* Plaintiffs' declarant Clayton Cramer purports to critique my Declaration in various respects. To start with, Cramer asserts in his Declaration "Summary" that "[a]n astonishing number of [Brewer's] sources either do not support or sometimes contradict her claims" that "institutions similar to those declared "sensitive areas" by SB 2 did not exist in the Founding Era."  Cramer Rebuttal Decl. ¶¶ 1-2.  However, Cramer's Declaration fails to identify *any* source contradicting the referenced established facts—that no public libraries, museums, zoos, stadiums, arenas, amusement parks, or playgrounds existed before 1791—or my opinions about them.

7.      Indeed, and tellingly, Cramer himself repeatedly expresses concurrence with these opinions in his rebuttal declaration.  Cramer Rebuttal Decl. ¶¶ 4[1], 5-8, 17.  As one example, in paragraph 8, Cramer explicitly disagrees with the *Carrelero* Plaintiffs' contention that venues analogous to stadiums, arenas and amusement parks were "widespread" during the Founding era.  *Id.* ¶ 8.

8.      In addition to concurring with my key points that no public libraries, museums, zoos, stadiums, arenas, amusement parks, or playgrounds existed before 1791, Cramer expressly agrees that this necessarily means there could not have

---

[1] Cramer's statements in paragraph 4 mistakenly assume that my reference to "the *Carralero* Plaintiff[s']" erroneous arguments that public libraries and museums existed in the Founding Era were directed at his declaration in support rather than those Plaintiffs' brief.  See Brewer Decl. ¶¶ 13-15.

been any historical laws regulating these institutions. Cramer Rebuttal Decl. ¶¶ 4, 5-8, 17.

9. The purpose of Cramer's meandering discussion relating to recreational spectator activities of the 1740s to 1790s is unclear. *See* Cramer Rebuttal Decl. ¶¶ 8-17. While Cramer has an idiosyncratic perspective on certain aspects of 18th century horse races and cock-fights, he ultimately agrees that modern events in crowded stadiums "have no Founding Era analog."

10. My Declaration concluded that in the absence of public libraries, museums, playgrounds, zoos, amusement parks and major sporting events in the colonial era, the closest analogue to these sites and events in the era of the new republic would have been public schools that were first built in the wake of the Revolution, at a time when firearm regulations often did exist. Brewer Decl. ¶ 23. Cramer opines that my "knowledge of the history of American public education is deficient"; he argues that New England colonies created public schools starting in 1635. Cramer Rebuttal Decl. ¶¶ 18-20.

11. Cramer's assertion is confusing, but might be based on Massachusetts' earliest experiments with rudimentary public schools, which in this context were a classic example of an "outlier." These schools, of which there were very few in the seventeenth century, consisted of education that lasted at most for a few months, and that had as its purpose to encourage children to learn to read the Bible in order to keep the devil at bay. As stated in the Massachusetts' 1647 law, parents and masters should teach children to read the Bible because "[i]t being one chief project of that old deluder, Satan, to keep men from the knowledge of the Scriptures." *See American Education: the Colonial Experience* (New York: Harper Collins, 1970), "Old Deluder Laws" at 181). That 1647 law required that every town of above 50 families should hire a tutor, and every town with more than 100 families should set up a grammar school to prepare boys who were capable to prepare to study for the ministry (at Harvard College). Such was the limited nature of public education in

the colonial period, during which many colonies and colonial governors did more to hinder such efforts than to support them. The historical record manifestly supports my opinion that public schools as we would think of them today—that is, schools that taught a variety of subjects, that children would attend for years (as opposed to months), and that prepared all children to become future citizens—began to slowly expand only after the Revolution.[2]

12. Cramer also attempts to critique my related opinion that college students in the period just after the Revolution were subject to relatively systematic rules barring weapons, but he does not cite evidence that contradicts the opinion.

13. First, I cited four examples of such firearm regulations at prominent institutions of the time, with citations, in paragraph 22 of my Declaration. Brewer Decl. ¶ 22, n. 9-12. All of these regulations date to between 1795 and 1838. I have included more below, in paragraph 16.

14. Second, rather than providing evidence to the contrary, Cramer in fact identifies additional examples of such firearm bans at colleges in his rebuttal declaration, including prohibitions on carrying "deadly weapons" that were in place at Oakland College of Mississippi in 1831 and at Illinois College in 1850. Cramer Rebuttal Decl. ¶ 24.[3]

---

[2] The most comprehensive evaluations of the history of public education in the United States are by Lawrence Cremin, who wrote three massive volumes over the course of his career. The two that relate to this question are *American Education: the Colonial Experience* (New York: Harper Collins, 1970), "Old Deluder Laws" at 181, and *American Education, the National Experience* (New York: Harper Collins, 1980). During the colonial period, in particular, royal governors often explicitly opposed free education, which they thought bred dissent. So in 1671 the governor of Virginia, William Berkeley, responded to an official inquiry about whether free schools existed in the colony with "I thank God, there are no free schools, nor printing; and I hope we shall not have these hundred years; for learning has brought disobedience, and heresy, and sects into the world, and printing has divulged them, and libels against the best governments. God keep us from both." See Cremin, *Colonial Experience* at 178.

[3] Cramer notes that the two weapons bans he cites prohibit the "carrying" of deadly weapons but not "possession" of deadly weapons within one's residence or room, but these nuances notwithstanding, these examples too support my opinion that there was a post-Revolution historical tradition of firearm restrictions at colleges. See Cramer Rebuttal Decl. ¶ 24.

15.     Because such post-Revolution regulations were made locally, by the schools themselves, and many such regulations were not published, they have not all survived as historical artifacts, certainly not in an easily searchable and published form.  For example, the University of Pennsylvania's *Rules and Regulations*, when published in 1820, set up general procedures for punishment of students for misbehavior, without any details about what would be punishable.  The details were left up to the trustees to elaborate at future meetings.[4]  That all such records about rules and regulations were not published in full means that any search through published records would miss many manuscript copies of rules and regulations that would include details about firearm restrictions in place during this time frame.  Any such search is thus necessarily incomplete.  But just because they are not searchable in the printed record does not mean that they did not exist.

16.     In preparing this rebuttal declaration, I was able to fairly efficiently find several more examples that appeared in virtually every set of comprehensive rules that were published.  While most of the published rules, unsurprisingly, were from prominent institutions, they do show a comprehensive pattern that suggests such policies were routine at most institutions.  I immediately refound (and reread) Yale's *Rules and Regulations* for the college in 1808, which I mentioned in my first account; the relevant rule therein stated that "[i]f any students shall keep any kind of fire-arms or gun-powder, or shall fire any gunpowder . . . he shall be admonished, rusticated, or otherwise punished as the case may require."[5]  Note that "rusticated" meant suspended from the college (that is, sent to "rusticate" in the country).  Harvard College's rules, as published in 1820, stated that "no student shall keep a gun or pistol or any gunpowder within the college or town of

---

[4] *Rules and Regulations of the University of Pennsylvania* (Philadelphia, 1820), 14-15.
[5] *Laws of Yale College* (New Haven: Oliver Steele, 1808), 24.

Cambridge," upon penalty of monetary fines.[6] Dartmouth's rules, published in 1822, prohibited firing any weapon anywhere near college (upon a heavy fine).[7] William & Mary's *Laws and Regulations* as published in 1830 prohibited "carrying arms privately" (meaning when not in some kind of formal military review or in use in a class—"gunnery" was studied in geometry). In addition, William and Mary's rules prohibited "shooting or making noise in the night or day in the city" as well as dueling. All three gun-related offenses could lead to suspension.[8]

17.   Relatedly, Cramer disputes my claim that students attending college in the 1790s were explicitly excluded from having to participate in the militia by *most* state militia statutes. Cramer Rebuttal Decl. ¶ 21. It is a bit tedious to go through all of these exemptions, but I note here that I went through all related statutes for all thirteen original states before stating that opinion (and can provide the text for all of them as required). For purposes of brevity, I focus here on some of the states that Cramer highlighted as *not* having such rules, to show that they in fact did.

18.   Connecticut's statute of 1793, for example, which Cramer says was exceptional, is actually more the rule. Connecticut exempted from military service "the President, Professors, and Tutors of College, and Students till the time of taking their second degrees" as well as "schoolmasters."[9]

19.   Cramer then states that in Virginia there was no such exception. However, there was, at least when there was no active war. In 1777, in the midst of the revolutionary war itself, Virginia students and professors both were expected to be part of the militia (1777), which was an understandable necessity. But when peace arrived, in October of 1782, Virginia exempted all faculty and most students

---

[6] *Laws of Harvard College* (Cambridge, MA: University Press, 1820), 24.
[7] *Dartmouth College Laws for the Use of the Students* (Haverhill, NH: Goss, 1822), 18.
[8] *Laws and Regulations of the College of William and Mary in Virginia* (Richmond: Thomas White, 1830), 4. The reference to "gunnery" being taught as part of mathematics is at page 8.
[9] *Acts and Laws of the State of Connecticut in America* (1796), 302.

from militia service: "*And be it further enacted,* That the rector, professors, masters and tutors, duly elected for, and bona fide acting as such in the said academy, *and in all other seminaries and public schools, and also all students thereof, under the age of twenty-one years, shall be, and are hereby exempted from military duty.*"[10]

20. In Georgia, another state that Cramer singled out, the militia act of 1792 excluded, along with legislators, ferrymen, and madmen, "all tutors and students."[11]

21. While in Delaware students did have to serve in the militia, they did not have to provide weapons, so they could hardly be expected to, as Cramer asserts, access them on short notice for emergency service. See Cramer Rebuttal Decl. ¶ 21. Delaware explicitly exempted from militia duty "teachers in colleges, academies, Latin schools, and schoolmasters." But immediately afterward, language was added stating that not only students but all young men did not have to supply their own weapons: "all young men under the age of twenty-one years, and all servants . . . shall be exempted from furnishing the necessary arms, ammunition and accoutrements."[12] There were a few other states like Delaware (that did not exempt students but also did not expect them to have weapons), but most statutes resembled the ones in Connecticut, Virginia, and Georgia discussed above. In summary, as previously noted, students were generally not expected to serve in the militia.

22. Finally, Cramer notes that the college student firearm bans were "rules, not laws." Cramer Rebuttal Decl. ¶¶ 21, 26. This is true, and of course I described the college firearms restrictions that I cited as "rules" and not as "laws."

---

[10] William Waller Hening, *Statutes at Large of Virginia*, (Richmond: Cochrane,1821-3) 9:313, 11:166. Italics mine.
[11] *Laws of the State of Georgia from their First Establishment to 1799* (Philadelphia: R. Aiken, 1800), p. 467 (Paragraph 32).
[12] Delaware. *Laws of the State of Delaware from the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-Seven*. New-Castle, Samuel & John Adams.1797, p. 1135.

Such rules demonstrate that there was a historical tradition of relevant firearm restrictions that reflected community norms and practices. It would have been bizarre at the time, when legislatures met only part of every year and created many fewer laws, for them to so comprehensively regulate how students should behave. They left that up to the institutions themselves, as shown above.

## II. RESPONSE TO STATEMENTS MADE IN *CARRALERO* PLAINTIFFS' REPLY BRIEF

23. On page 13 of their Reply brief, the *Carralero* Plaintiffs assert that "California [] misunderstands why students could be disarmed at the Founding," and that I "conceded" in my Declaration that "early firearms regulations on college campus[sic] disarmed students not because they are vulnerable but because their schools exercised *in loco parentis* authority over them." *Carallero* Reply brief, p. 13, lines 4-9, referencing paragraph 22 of my Declaration. These assertions reflect a misunderstanding of the status of minors during this period as well as of the concept of *loco parentis*. Children under the age of 21 were considered legally incapable in most ways, requiring the supervision of others. They were considered vulnerable, and in need of help, advice, and supervision, even if they attended college (as demonstrated above). William Blackstone's widely-read digest of the Common Law, which was reprinted in many editions during the founding era, put the issue of minors' legal disabilities precisely:

> The legal power of a father (for a mother, as such, is entitled to no power, but only to reverence and respect) the power of a father, I say, over the persons of his children ceases at the age of twenty one, for they are then enfranchised by arriving at years of discretion, or that point which the law has established . . . when the empire of the father, or other guardian, gives place to the empire of reason.[13]

---

[13] William Blackstone, *Commentaries on the Laws of England* (1765–1769; rpt. Chicago, 1979), I, 441, 450.

That is, until a young man (or woman) reached the age of 21 and had full use of his reason and therefore full capacity to make judgments, he had no independent political and legal capacity. This position was echoed by many judges in other treatises that provided the foundation of legal education during this period. James Kent, in his influential *Commentaries on American Law*, wrote in 1826: "The necessity of guardians results from the inability of infants to take care of themselves; and this inability continues, in contemplation of law, until the infant has attained the age of twenty-one years."[14] Those under 21 were accordingly subject to greater state supervision than nearly any other legal entity during the early years of the republic. It is for that reason that the concept of "in loco parentis" even existed.[15]

24.  My statement in paragraph 22 of the declaration that students lived under the authority of colleges operating in *loco parentis* for those under the age of 21 is in no way a concession that firearms restrictions for students were enacted for a purpose other than public safety, and in fact the opposite is true. *Loco parentis* assumed then, as it does now, that minors need to be supervised by parents, masters, guardians, professors and others, for their own benefit as well as, correspondingly, for public safety.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 5, 2023, at University Park, Maryland.

_____
Holly Brewer

---

[14] James Kent, *Commentaries On American Law* [1826] 2:259 (3d ed., 1836).
[15] Holly Brewer, *By Birth or Consent: Children, Law, and the Anglo-American Revolution in Authority* (Chapel Hill, UNC Press, 2005), chapter 7.

# CERTIFICATE OF SERVICE

Case Names:   *Reno May, et al. v. Robert Bonta, et al.;*
*Carralero, Marco Antonio, et al. v. Rob Bonta*

Case Nos.   **8:23-cv-01696-CJC (ADSx); 8:23-cv-01798-CJC (ADSx)**

I hereby certify that on December 7, 2023, I electronically filed the following document with the Clerk of the Court by using the CM/ECF system:

**SUR-REBUTTAL DECLARATION OF HOLLY BREWER IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished electronically by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct.

Executed on December 7, 2023, at San Francisco, California.

| Vanessa Jordan | *Vanessa Jordan* |
|---|---|
| Declarant | Signature |