ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
TODD GRABARSKY
JANE REILLEY
LISA PLANK
ROBERT L. MEYERHOFF
Deputy Attorneys General
State Bar No. 298196
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6177
  Fax:  (916) 731-2144
  E-mail:  Robert.Meyerhoff@doj.ca.gov
*Attorneys for Rob Bonta, in his Official Capacity as Attorney General of the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RENO MAY, an individual, et al.,**<br><br>            Plaintiffs,<br><br>        v.<br><br>**ROBERT BONTA, in his official capacity as Attorney General of the State of California, and Does 1-10,**<br><br>            Defendants.<br><br>**MARCO ANTONIO CARRALERO, an individual, et al.,**<br><br>            Plaintiffs,<br><br>        v.<br><br>**ROBERT BONTA, in his official capacity as Attorney General of California,**<br><br>            Defendant. | Case Nos. 8:23-cv-01696 CJC (ADSx)<br>              8:23-cv-01798 CJC (ADSx)<br><br>**SUR-REBUTTAL DECLARATION OF PATRICK J. CHARLES IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**<br><br>Date:            December 20, 2023<br>Time:           1:30 p.m.<br>Courtroom:  9B<br>Judge:          Hon. Cormac J. Carney<br>Action Filed: September 15, 2023 |

# SUR-REBUTTAL DECLARATION OF PATRICK J. CHARLES

Pursuant to 28 U.S.C. § 1746, I, Patrick J. Charles, declare and state as follows:

1. I am over the age of eighteen (18) years, competent to testify to the matters contained in this declaration and testify based on my personal knowledge and information.

2. I have been retained by the Office of the Attorney General for California as a historical and constitutional expert on Second Amendment matters. I also have expertise in legal history and its multiple uses in adjudicating constitutional questions.

3. I previously provided a declaration in the above-captioned matters in support of the State of California's opposition to the plaintiffs' motions for preliminary injunction. *See* Decl. of Patrick J. Charles, *May v. Bonta*, C.D. Cal. No. 8:23-cv-01696 CJC (ADSx) (Dkt. No. 21-2); *Carralero v. Bonta*, C.D. Cal. No. 8:23-cv-01798 CJC (ADSx) (Dkt. No. 20-2).

4. I have been asked by the Office of the Attorney General to review and provide an expert opinion regarding some of the statements made in the plaintiffs' reply briefs and supporting documents in these matters. *May* Dkt. Nos. 29, 29-9, 29-14, 29-15; *Carralero* Dkt. No. 29. I have reviewed those briefs and documents, and have prepared this sur-rebuttal declaration in response.

5. This sur-rebuttal declaration was compiled and completed outside my official duties for the United States Air Force (USAF), Department of Air Force (DAF), and Air Force Historical Research Agency (AFHRA). Moreover, the contents and opinions expressed in this declaration are solely my own, and not those of the USAF, DAF, AFHRA, the Department of Defense, or the federal government.

## I. RESPONSE TO PLAINTIFFS' GENERAL STATEMENTS ON SENSITIVE PLACES

6. As the Supreme Court has acknowledged, the Statute of Northampton and its tenets "survived both *Sir John Knight's Case* and the English Bill of Rights," *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2142 (2022), and subsequently was adopted in the American Colonies, *id*. at 2142-43; *see also* JOEL PRENTISS BISHOP, COMMENTARIES ON THE LAWS OF STATUTORY CRIMES § 784 (1873) (noting that the "offence" codified by the Statute of Northampton was already part of the "earlier common law," which "bears a date long anterior to the settlement of this country" that is "adapted to the wants of every civilized community"). And one of the key tenets of the Statute of Northampton that was embraced in the American Colonies was its "fairs" and "markets" language. 2 Edw. 3, c. 3 (1328) (Eng.).

7. This is historically indisputable as several late eighteenth century American legal sources attest. *See* 2 THE PERPETUAL LAWS, OF THE COMMONWEALTH OF MASSACHUSETTS, FROM THE ESTABLISHMENT OF ITS CONSTITUTION TO THE SECOND SESSION OF THE GENERAL COURT, IN 1798, at 259 (1799) (confirming that no person "shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth"); FRANCOIS-XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH CAROLINA 60-61 (1792) (attached hereto as **Exhibit A**) (confirming the survival of the "fairs" and "markets" language by the late eighteenth century); A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, OF PUBLIC AND PERMANENT NATURE, AS ARE NOW IN FORCE 30 (1803), https://catalog.hathitrust.org/Record/009779357 (confirming the survival of the "fairs" and "markets" language at the turn of the nineteenth century).

8. Furthermore, the Statute of Northampton is not the only English statute that regulated armed carriage at specific, sensitive locations. *See* Charles Decl.

¶¶ 9-10. Plaintiffs' declarant, Clayton Cramer, claims that laws cited in my declaration would have only applied in instances where the carrying of arms would disrupt government functions. *See* Clayton Cramer Rebuttal Decl. ¶¶ 31-35, *May v. Bonta* Dkt. No. 29-15. That is mistaken. For instance, the 1351 Royal Proclamation prohibited going armed "within the City of London, or within the suburbs, or in any other places between said city and the Place of Westminster." *Royal Proclamation as to the Wearing of Arms in the City, and at Westminster; and as to Playing at Games in the Palace at Westminster*, MEMORIALS OF LONDON AND LIFE 268-69, 273 (H.T. Riley ed., 1868). And although the Royal Proclamation's preamble states that this rule of law was laid down because people with arms were attempting to disrupt the proceedings of Parliament, the legal language of the proclamation is clear in its prohibition of carrying arms in those locations for any reason. *Id*.

9. Cramer also errs in his search for 4 Hen. 4, c. 29 (1402), which stated that "no Man be armed nor bear defensible armor to Merchant Towns Churches nor Congregations in the same, nor in the Highways, in affray of the Peace or the King's Liege people." Cramer asserts there was "no such law." Cramer Rebuttal Decl. ¶ 35. But it is contained in volume two of the *Statutes of the Realm*. *See* 2 THE STATUTES OF THE REALM 141 (1816) (1963 reprint), https://catalog.hathitrust.org/Record/012297566 (included as Exhibit 6 to Defendant's Compendium of Historical Laws and Treatises, *May* Dkt. 22).

10. Thus, it remains true that "armed carriage restrictions and the English common law against 'going armed' in urban and densely populated locations indeed made their way into the American Colonies and subsequent United States." Charles Decl. ¶ 12. Similarly, laws prohibiting unlawful "armed assemblies…no matter whether said assemblies were deemed the militia or not" were also part of American law prior to, contemporaneous with, and after the ratification of the Second

Amendment.[1] Charles Decl. ¶ 12. William Rawle's treatise *A View of the Constitution of the United States* confirms this was indeed the law of the land by the early-to-mid nineteenth century.[2] WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES 126 (2d ed., 1829) (noting that the Second Amendment "ought not…in any government…be abused to the disturbance of the public peace," which included the assembling "of persons with arms, for an unlawful purpose").

11. While the Plaintiffs dispute this, *see* Pls.' Evidentiary Objections to Charles Decl. ¶ 2, *May v. Bonta* Dkt. No. 29-9; Cramer Rebuttal Decl. ¶¶ 30-38, the evidentiary record is rather clear and straightforward: location specific restrictions on armed carriage in densely populated locations, what are otherwise known as "sensitive places," were part of American law prior to, contemporaneous with, and after the ratification of the Second Amendment. In short, there is indeed evidence supporting Anglo-American history and tradition of prohibiting the carrying of dangerous weapons at so-called "sensitive places."

## II. RESPONSE TO PLAINTIFFS' STATEMENTS ON REGULATIONS OF LIQUOR AND ARMS BEARING

12. Although the Plaintiffs and Cramer object to conclusions on the regulatory history of liquor and arms bearing, they do not provide any substantive historical evidence that counters it. The combination of liquor and arms bearing was widely deemed dangerous by the mid-to-late nineteenth century, as numerous laws attest. *See* Charles Decl. ¶¶ 22-26.

---

[1] My declaration cites laws and historical research showing that "armed assemblies circa the late eighteenth century, no matter whether said assemblies were deemed the militia or not," were generally deemed unlawful. Charles Decl. ¶ 12. Yet Cramer inaccurately claims that my declaration cites these sources for the proposition that the carrying of arms "in urban and densely populated locations" was prohibited. Cramer Rebuttal Decl. ¶¶ 41-47.

[2] Here, too, Cramer inaccurately characterizes my declaration as having "grossly misquoted" Rawle. Cramer Rebuttal Decl. ¶¶ 48-50. In actuality, my declaration (Charles Decl. ¶ 12), quoted verbatim language from Rawle's treatise, which states that the Second Amendment does not protect any "assemblage of person with arms, for an unlawful purpose…" RAWLE, *supra*, at 129.

### III. RESPONSE TO PLAINTIFFS' STATEMENTS ON REGULATION OF ARMS BEARING IN PLACES OF WORSHIP

13. Although the Plaintiffs assert that many eighteenth-century era "bring your guns to church laws" were not racist, the historical record strongly suggests otherwise—and indeed, Cramer concedes as much. Cramer Decl. ¶ 55.

14. To be sure, in accordance with their compulsory militia power, the colonies of Massachusetts and Rhode Island, enacted several laws requiring parishioners to bring their firearms to church to either (a) conduct mandatory militia training or (b) have their arms available should the colony come under attack from indigenous tribes. However, in the southern American Colonies, particularly Virginia, Maryland, Georgia, and South Carolina, where the institution of slavery was rampant, "bring your guns to church" laws were enacted for the racist purpose of maintaining slavery. This is not only my assessment having personally examined these laws and their historical genesis, *see* Patrick J. Charles, *Racist History and the Second Amendment: A Critical Commentary*, 43 CARDOZO L. REV. 1343, 1351 (2022), but also is the view of others, including Dr. Salley Hadden, who specializes in this area, SALLY E. HADDEN, SLAVE PATROLS: LAW AND VIOLENCE IN VIRGINIA AND THE CAROLINAS 23-24, 140-41 (2001).

### IV. RESPONSE TO PLAINTIFFS' STATEMENTS ON THE RELEVANCE ON CARRY PROHIBITIONS IN COMMERCIAL OR CORPORATE LIMITS

15. Plaintiffs mischaracterize my declaration's discussion on ordinances prohibiting the carrying of firearms in the "commercial" or "corporate" limits as "prohibiting carry in entire cities…" Pls. Evidentiary Objections to Charles Decl. ¶ 6. From the mid-to-late nineteenth century, however, the "commercial" or "corporate" limits generally encompassed those areas where the people regularly congregated to conduct shopping, business, and government affairs.

1     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 2, 2023, at Auburn, Alabama.

_____
PATRICK J. CHARLES

# Exhibit A

24627
North Carolina. Laws, Statutes, etc., 1792.
A Collection of the Statutes of the Parliament of England in Force in ... North Carolina.
Newbern, 1792. xxvi, 424, [3] pp.
AAS copy.

# A COLLECTION

## OF THE

# STATUTES

### OF THE PARLIAMENT OF

# ENGLAND

### IN FORCE IN THE STATE OF

# NORTH-CAROLINA.



PUBLISHED ACCORDING TO A RESOLVE OF THE GENERAL ASSEMBLY.

BY FRANCOIS-XAVIER MARTIN, Esq.

COUNSELLOR AT LAW.

*NEWBERN:*

FROM THE EDITOR's PRESS.

1792.

( 60 )

## C H A P.   VIII.

### *Nothing shall be taken for Beaupleader.*

ITEM, Whereas some of the realm have grievously complained, that they be grieved by Sheriffs, naming themselves the King's approvers, which take money by extortion for Beaupleader, the King will, that the statute of Marlebridge shall be observed and kept in this point.

---

## C H A P.   XIV.

### *None shall commit Maintenance.*

ITEM, Because the King desireth that common right be administered to all persons, as well poor as rich, he commandeth and defendeth, that none of his Counsellors, nor of his house, nor none other of his Ministers, nor no great man of the realm by himself, nor by other, by sending of letters, nor otherwise, nor none other in this land, great nor small, shall take upon them to maintain quarrels nor parties in the country, to the let and disturbance of the common law.

---

# Statutes made at Northampton, tribus Septimanis Paschae, in the Second Year of the Reign of Edward the Third, and in the Year of our Lord 1328.

---

## C H A P.   I.

### *A Confirmation of the Great Charter and the Charter of the Forest.*

[*Unnecessary to be inserted.*]

---

## C H A P.   III.

### *No Man shall come before the Justices, or go or ride armed.*

ITEM, It is enacted, that no man great nor small, of what condition soever he be, except the King's servants in his presence, and his Ministers in executing of the King's precepts, or of their office, and such as be in their company assisting them, and also upon a cry made for arms to keep the peace, and the same in such places where such acts happen, be so hardy to come before the King's Justices, or other of the King's

Minifters doing their office with force and arms, nor bring no force in an affray of peace, nor to go nor ride armed by night nor by day, in fairs, markets, nor in the prefence of the King's Juftices, or other minifters, nor in no part elfewhere, upon pain to forfeit their armour to the King, and their bodies to prifon at the King's pleafure. And that the King's Juftices in their prefence, Sheriffs and other minifters, in their bailiwicks, Lords of Franchifes, and their bailiffs in the fame, and Mayors and Bailiffs of cities and boroughs, within the fame cities and boroughs, and borough-holders, conftables and wardens of the peace within their wards fhall have power to execute this act. And that the Juftices affigned, at their coming down into the country, fhall have power to enquire how fuch officers and lords have exercifed their offices in this cafe, and to punifh them whom they find that have not done that which pertain to their office.

## CHAP. V.

### The Manner how Writs fhall be delivered to the Sheriff to be executed.

ITEM where it was ordained by the ftatute of Weftminfter the fecond, that they which will deliver their writs to the Sheriff fhall deliver them in the full county, or in the rere county, and that the Sheriff or Under-Sheriff fhall thereupon make a bill : it is accorded and eftablifhed, that at what time or place in the county a man doth deliver any writ to the Sheriff or to the Under-Sheriff, that they fhall receive the fame writs, and make a bill after the form contained in the fame ftatute, without taking any thing therefore. And if they refufe to make a bill, others that be prefent fhall fet to their feals, and if the Sheriff or Under-Sheriff do not return the faid writs, they fhall be punifhed after the form contained in the faid ftatute. And alfo the Juftices of Affize fhall have power to enquire thereof at every man's complaint, and to award damages, as having refpect to the delay, and to the lofs and peril that might happen.

## CHAP. VI.

### Juftices fhall have Power to punifh Breakers of the Peace.

ITEM, as to the keeping of the peace in time to come, it is ordained and enacted that the ftatutes made in time paft, with the ftatute of Winchefter, fhall be obferved and kept in every point : and where it is contained in the end of faid ftatute of Winchefter, that the Juftices affigned fhall have power to enquire of defaults, and to report to the King in his next parliament, and the King to remedy it, which no man hath yet feen, the fame Juftices fhall have power to punifh the offenders and difobeyers.

## CERTIFICATE OF SERVICE

Case Names: ***Reno May, et al. v. Robert Bonta, et al.;***
***Carralero, Marco Antonio, et al. v. Rob Bonta***

Case Nos. **8:23-cv-01696-CJC (ADSx); 8:23-cv-01798-CJC (ADSx)**

I hereby certify that on December 7, 2023, I electronically filed the following document with the Clerk of the Court by using the CM/ECF system:

**SUR-REBUTTAL DECLARATION OF PATRICK J. CHARLES IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION (with Exhibit A)**

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished electronically by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct.

Executed on December 7, 2023, at San Francisco, California.

|  |  |
|---|---|
| Vanessa Jordan | *Vanessa Jordan* |
| Declarant | Signature |