Rob Bonta
Attorney General of California
Mark R. Beckington
R. Matthew Wise
Supervising Deputy Attorneys General
Todd Grabarsky
Jane Reilley
Lisa Plank
Robert L. Meyerhoff
Deputy Attorneys General
State Bar No. 298196
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6177
  Fax:  (916) 731-2144
  E-mail:  Robert.Meyerhoff@doj.ca.gov
*Attorneys for Rob Bonta, in his Official Capacity as Attorney General of the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Reno May, an individual, et al.;**<br><br>Plaintiffs,<br><br>v.<br><br>**Robert Bonta, in his official capacity as Attorney General of the State of California, and Does 1-10,**<br><br>―――――――――――――<br><br>**Marco Antonio Carralero, an individual, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**Robert Bonta, in his official capacity as Attorney General of California,**<br><br>Defendant. | Case No. 8:23-cv-01696 CJC (ADSx)<br>            8:23-cv-01798 CJC (ADSx)<br><br>**SUR-REBUTTAL DECLARATION OF JOSHUA SALZMANN IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**<br><br>Date:            December 20, 2023<br>Time:            1:30 p.m.<br>Courtroom:  9B<br>Judge:          Hon. Cormac J. Carney<br>Action Filed: September 15, 2023 |

# SUR-REBUTTAL DECLARATION OF PROFESSOR JOSHUA SALZMANN

I, Joshua Salzmann, declare under penalty of perjury that the following is true and correct:

1. This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

2. I have been retained by the Office of the Attorney General for California as an expert on the history of passenger transportation in the United States from the Colonial Period to the 21st century, with an emphasis on towns, cities, and settled, urban areas.

3. I previously provided a declaration in the above-captioned matters in support of the State of California's opposition to the *May* and *Carralero* Plaintiffs' motions for preliminary injunction. See Decl. of Joshua Salzmann, *May v. Bonta*, C.D. Cal. No. 8:23-cv-01696 CJC (ADSx) (Dkt. No. 21-10); *Carralero v. Bonta*, C.D. Cal. No. 8:23-cv-01798 CJC (ADSx) (Dkt. No. 20-10) (Salzmann Decl.). My professional background and qualifications, as well as my retention and compensation information, are set forth in Paragraphs 3 through 6 of my prior declaration.

4. I have been asked by the Office of the Attorney General to review and provide an expert opinion regarding some of the statements made in the Plaintiffs' reply briefs and supporting documents in these matters. *May* Dkt. Nos. 29, 29-9, 29-14, 29-15; *Carralero* Dkt. No. 29. I have reviewed those briefs and documents, and have prepared this sur-rebuttal declaration in response.

## I. RESPONSE TO PLAINTIFFS' STATEMENTS REGARDING FOUNDING-ERA TRANSPORTATION SYSTEMS

5. The *Carralero* Plaintiffs contest my opinion that "[t]he first public transit systems as we understand them today emerged in the United States during

the first half of the 20th century." Salzmann Decl. ¶ 80. In doing so, the *Carralero* Plaintiffs conflate Founding-era forms of private, long-distance travel with public, mass-transit used largely by daily commuters in the modern era.

6. The *Carralero* Plaintiffs claim: "While the Founding generation may not have imagined particular modes of public transportation like subways or buses, public transportation in some forms did exist at the Founding. As explained, passengers used to share stagecoaches on journeys throughout the colonies before the Revolution and in the states after it." *Carralero* Dkt. No. 29 at 23. This claim is problematic for two reasons. First, it suggests that what has changed about transportation since the founding are merely the "particular modes of public transportation." The changes in public transportation since the colonial era were not simply a matter of modes of getting around. Rather, as detailed in my declaration, the transportation systems we have today are of an entirely different scale from and have distinctive political, economic, and social functions than those that existed in the Founding period. *See* Salzmann Decl. ¶¶ 10-68.

7. For instance, the stagecoaches and ferries of America's Founding era, to which the *Carralero* Plaintiffs cite, did not mainly serve local, daily commuters. Rather, stagecoaches and ferries were often used by long-distance travelers and could take many hours and even days. To illustrate this point, my declaration cites examples of passengers waiting for days at the ferry crossing from Brooklyn to Manhattan and of a stagecoach journey from Philadelphia to northern New Jersey that started at 4:00 AM and continued to after nightfall. *See* Salzmann Decl. ¶¶ 31, 33. Moreover, stagecoaches were a form of transportation largely used by the well-to-do (*id.* ¶¶ 28, 31), and they functioned not just as a mode of human transit but also as a means of transporting mail, legal documents, and money (*id.* ¶¶ 28-30). Thus, with respect to its cargo, a Founding-era stagecoach is more analogous to an armored car than to a modern city bus. To suggest that embarking on a stagecoach journey or crossing a body of water on a ferry was tantamount to using a

contemporary public transit system is to disregard a key purpose of historical inquiry: to understand and describe change over time.

8. The second issue with the *Carralero* Plaintiffs' criticism of my opinion that "the first public transit systems as we understand them today emerged in the United States during the first half of the 20th century" is that the *Carralero* Plaintiffs are imprecise about the meaning of the word "public."

9. After the *Carralero* Plaintiffs claim that "public transportation in some forms did exist at the Founding," they follow with a reference to stagecoaches, stating that "passengers used to share stagecoaches on journeys throughout the colonies before the Revolution and in the states after it." *Carralero* Dkt. No. 29 at 23. But the fact that "passengers used to share stagecoaches" does not change the fact that the vast majority of these stagecoaches—as well as other forms of Founding-era transit—were owned and operated by private individuals and companies. Thus, they were distinct from the contemporary "public" transit systems that are owned and operated by government entities.

10. Accordingly, and notwithstanding the *Carralero* Plaintiffs' arguments, it remains true that "[t]he first public transit systems as we understand them today emerged in the United States during the first half of the 20th century." Salzmann Decl. ¶ 80.

## II. RESPONSE TO PLAINTIFFS' STATEMENTS REGARDING RAILROAD RULE BOOKS AND TIMETABLES

11. Given that public transit as we know it today did not begin to emerge until the 20th century, I examined rule books and timetables from privately owned railroad companies to determine what policies, if any, those private companies had with respect to transporting firearms. The section of my declaration that discusses these policies is the subject of several objections raised by the *May* Plaintiffs and their declarant, Clayton Cramer, which I am happy to address.

12. First, the *May* Plaintiffs claim that I did not provide citations to support my statements regarding railroad firearm policies set forth in Paragraphs 69 and 70 of my declaration. *See* Pls.' Evidentiary Objections to Salzmann Decl. ¶ 9, *May v. Bonta* Dkt. No. 29-9. These two paragraphs contain a transition to a new section of my declaration and a short overview of the types of sources I consulted as a basis for the section; source citations follow in the subsequent paragraphs. *See* Salzmann Decl. ¶¶ 71-76. In those introductory paragraphs (Paragraphs 69 and 70), I note that I consulted railroad rule books and timetables in online and brick and mortar archives, and that some sources did mention firearms while others did not.

13. The *May* Plaintiffs objected that I had not specified which archives I consulted. To clarify, I consulted sources from the Newberry Library in Chicago, IL, The Illinois Railroad Museum, Hathi Trust, Wx4 Historical Maps and Timetables, Internet Archive, and Google Books. The Plaintiffs also object that I did not specifically identify the sources which made no mention of firearms. I did not identify each historical document that made no mention of firearms (nor did the Plaintiffs) for purposes of clarity and brevity.

14. I did, however, cite numerous sources of railroad rules and regulations about transporting firearms in the section following Paragraphs 69 and 70. *See* Salzmann Decl. ¶¶ 71-76. I cited twelve specific rules to be exact, and I included a digital link to the rules in my citation if one existed. I also wrote the full text of several of the firearm policies of the railroads in the body of my declaration for the purposes of transparency and clarity.

15. Both sets of Plaintiffs attempt to use my acknowledgement of the scope and results of my research as a basis to impugn my work. The *May* Plaintiffs' declarant, Clayton Cramer, claims that "[Salzmann] admits that he 'was not able to perform an exhaustive search and analysis of all historic railroad rule books that are still in existence today.'" *See* Clayton Cramer Rebuttal Decl. ¶ 93, *May* Dkt. No. 29-15. The *Carralero* Plaintiffs state that I "concede" that many rule

1  books do not mention firearms at all.  *See Carralero* Dkt. No. 29 at 23.  However, I
2  do not regard these points as "admissions" or "concessions," but rather as instances
3  of my taking care to specify the nature and scope of the evidence I consulted, which
4  is my duty as a historian.

5      16.    I first address the claim that I did not perform an exhaustive search.
6  Performing an exhaustive search of every pre-20th century railroad rule and
7  regulation in the nation is an immense undertaking that would require extensive
8  time, travel, and effort searching for and analyzing all evidence that still remains in
9  existence, which was not possible to undertake given the timing constraints of the
10 Plaintiffs' motions for preliminary injunction.  I did, however, consult a substantial
11 sample size of over seventy railroad companies' rule books and timetables in
12 formulating my expert opinions.

13     17.    Second, in characterizing my statement that many railroad rule books
14 do not mention firearms as a "concession," the Plaintiffs suggest that the absence of
15 a discussion of firearms lends support to their position.  This logic does not follow.
16 As discussed below and in my declaration, state and local concealed carry laws also
17 applied to the transit systems that fell within each law's purview, and railroad rule
18 books did not often forbid passengers and employees from taking actions on
19 railroads that would violate an established law.  And yet, Cramer claims (without
20 citing to any historical evidence) that "unless there was a prohibition on carrying
21 guns on the train, there is no evidence that the practice was prohibited." Clayton
22 Cramer Rebuttal Decl. ¶ 97, *May* Dkt. No. 29-15.  I do not view this claim as
23 logical or credible.

24     18.    Moreover, my declaration offers evidence that certain railroads—
25 including the Union Pacific Railroad and the Central Pacific Railroad—did not
26 allow passengers to take loaded weapons on passenger cars, starting at least as early
27 as the 1880s.  *See* Salzmann Decl. ¶¶ 71-77.  The *May* Plaintiffs, in turn, attempt to
28 dismiss these rules as "outlier examples."  *See* Pls.' Evidentiary Objections to

1  Salzmann Decl. ¶ 9, *May* Dkt. No. 29-9.  However, this argument evidences a
2  misunderstanding of the magnitude and significance of these railroad systems.
3      19.  The Union Pacific Railroad and the Central Pacific Railroad—which
4  both had prohibitions on carrying loaded guns on passenger cars—were among the
5  largest and most important railroads in the United States of America.  Those two
6  railroads comprised, respectively, the eastern and western halves of America's first
7  transcontinental railroad, which was completed with much fanfare on May 10, 1869
8  at Promontory Point, Utah when California's Leland Stanford used a silver hammer
9  to tap the spike uniting the two lines.  The Union Pacific began in Omaha,
10 Nebraska and extended west for a total of 1,032 miles, and the Central Pacific
11 started in Sacramento, California and stretched east through the mountains for 881
12 miles.  The completion of the first transcontinental railroad triggered celebratory
13 cannon fire in New York and San Francisco, as the nation marked the monumental
14 achievement of connecting the Atlantic and Pacific coasts by land.  In sum, these
15 two railroads cannot be dismissed as peripheral to the story of U.S. transportation
16 history.  Rather, the Central Pacific and the Union Pacific—and their policies—
17 comprise a key chapter in our nation's transportation history.[1]
18     20.  Cramer also objects to my discussion of railroad rules on the basis that
19 "these were only institutional rules, not laws."  Clayton Cramer Rebuttal Decl. ¶ 97,
20 *May* Dkt. No. 29-15.  Given that most transportation was private in the 19th
21 century, institutional rules are important in helping us understand the history of the
22 regulation of firearms on transit systems.  But because private company rules are
23 not laws, I noted in my declaration that "it is also necessary to consider state and
24 municipal laws that would have applied to travelers to understand the rules about
25 carrying guns on mass transit."  Salzmann Decl. ¶ 78.  I also cited such laws in my
26 declaration, starting with a concealed carry statute from Chicago passed in 1871,

---

[1] RICHARD WHITE, RAILROADED: THE TRANSCONTINENTALS AND THE MAKING OF MODERN AMERICA 37 (2011).

7    Sur-Rebuttal Declaration of Joshua Salzmann
     (Case Nos. 8:23-cv-01696 and 8:23-cv-01798)

just three years after the ratification of the Fourteenth Amendment and squarely in the period of Reconstruction (1865-1877). *Id.* ¶¶ 78-79.

21. The *May* Plaintiffs object to my citing the Chicago statute, as follows: "There is no citation to authority that state or municipal laws on firearms carry would apply to interstate railroad travelers or were understood to apply to such travelers. There is also insufficient citation to such state and municipal laws supporting the opinion, with only one Post-Reconstruction era municipal law cited." *See* Pls.' Evidentiary Objections to Salzmann Decl. ¶ 12, *May* Dkt. No. 29-9.

22. There are several problems with the *May* Plaintiffs' claims. First, the Chicago statute is not a "Post-Reconstruction Era municipal law." Reconstruction ended in 1877, which is a well-established historical fact, and the Chicago statute dates to 1871.

23. Second, I did not cite to only a single law. I wrote about a single law in the body of the text of my declaration (the Chicago statute) and also cited to the numerous state and local concealed carry laws included in the compendium filed by the Office of the Attorney General. *See* Salzmann Decl. ¶ 79, n.88 ("*See, generally*, Defendants' compendium of historical analogues filed concurrently herewith."). I did not reiterate all of the state and local concealed carry laws included in the compendium in the body of the text of my declaration for purposes of brevity.

24. Third, the *May* Plaintiffs claim that there is "no citation to authority that state or municipal laws…were understood to apply to such travelers." *See* Pls.' Evidentiary Objections to Salzmann Decl. ¶ 12, *May* Dkt. No. 29-9. But by its plain terms, the Chicago concealed carry law applied within the city limits and did not include an exception for transit systems. *See* Salzmann Decl. ¶ 78 ("[The Chicago law] read: 'That all persons within the limits of the city of Chicago are hereby prohibited from carrying or wearing under their clothes, or concealed about their persons…any…dangerous or deadly weapon.'"). That would mean that

Chicago's concealed carry prohibition would apply to people who were commuting locally on the transportation systems that brought people to and from work and other destinations. The Chicago statute was, moreover, enforced by the police department, as my inclusion of data about arrests for violation of the city's concealed carry ordinance in the 1870s attests. *Id.* ¶ 79.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 1, 2023, at Chicago, Illinois.

*Joshua Salzmann*
_____
Joshua Salzmann

# CERTIFICATE OF SERVICE

Case Names: ***Reno May, et al. v. Robert Bonta, et al.;***
*Carralero, Marco Antonio, et al. v. Rob Bonta*

Case Nos.   **8:23-cv-01696-CJC (ADSx); 8:23-cv-01798-CJC (ADSx)**

I hereby certify that on December 7, 2023, I electronically filed the following document with the Clerk of the Court by using the CM/ECF system:

**SUR-REBUTTAL DECLARATION OF JOSHUA SALZMANN IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished electronically by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct.

Executed on December 7, 2023, at San Francisco, California.

| Vanessa Jordan | *Vanessa Jordan* |
|---|---|
| Declarant | Signature |